**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| 5000 TAKU INVESTORS LLC,<br>BUNNELL TAKU INVESTORS LLC,<br>and FUD NEARY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ZINNIA HEALTH LLC; ZH OPERATIONS LLC d/b/a LUNA HEALTH GROUP; URIS HALL LLC d/b/a ANCHORAGE RECOVERY CENTER; GOLDEN PEAK RECOVERY INC.; and CARDINAL RECOVERY LLC,<br><br>Defendants. | ) | Case No. 3:26-cv-______-___<br><br>INDEX OF EXHIBITS TO COMPLAINT |

## INDEX OF EXHIBITS TO COMPLAINT

| Exhibit | Description | Pages |
|---|---|---|
| A | Lease Agreement dated June 6, 2024, between 5000 Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, for 5000 Taku Drive, Anchorage, Alaska 99508 | 3–68 |
| B | Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, for 4950 Taku Drive, Anchorage, Alaska 99508 | 70–134 |
| C | Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, for 101 Bunnell Street, Anchorage, Alaska 99508 | 136–200 |
| D | Lease Agreement dated April 1, 2025, between FUD Neary LLC, as Landlord, and Zinnia Health LLC, as Tenant, for 102 Stewart Street, Anchorage, Alaska 99508 | 202–265 |
| E | Notice of Default dated May 15, 2026, from Timm & Garfinkel, LLC to Zinnia Health LLC and ZH Operations LLC, together with its Exhibit A | 267–271 |
| F | Notice of Default dated September 10, 2025, from Timm & Garfinkel, LLC to Zinnia Health LLC, together with its Exhibit A | 273–276 |

Page numbers are the continuous pagination of this compendium, which runs 276 pages and is stamped at the lower right of each page.

# EXHIBIT A

Lease Agreement dated June 6, 2024

5000 Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant

5000 Taku Drive, Anchorage, Alaska 99508

**LEASE AGREEMENT**

by and between

**5000 TAKU INVESTORS LLC**

as Landlord

and

**ZINNIA HEALTH LLC**

as Tenant

Made as of June 6, 2024

**5000 Taku Drive, Anchorage, AK 99508**



Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

## Table of Contents

**<u>Page</u>**

ARTICLE I DEFINED TERMS ....... 1
ARTICLE II Basic Lease Terms ....... 9
Section 2.01 Property ....... 9
Section 2.02 Initial Term Expiration Date ....... 9
Section 2.03 Extension Options ....... 9
Section 2.04 Expiration Date (if fully extended) ....... 9
Section 2.05 Initial Base Annual Rental ....... 9
Section 2.06 Rental Adjustment ....... 9
Section 2.07 Adjustment Date ....... 9
Section 2.08 Tenant Tax Identification No ....... 10
ARTICLE III Lease of Property ....... 10
Section 3.01 Lease ....... 10
Section 3.02 Quiet Enjoyment ....... 10
ARTICLE IV Lease Term; Extension ....... 10
Section 4.01 Initial Term ....... 10
Section 4.02 Extensions ....... 10
Section 4.03 Notice of Exercise ....... 10
Section 4.04 Removal of Personalty ....... 11
Section 4.05 Existing Personalty ....... 11
Section 4.06 UST Removal ....... 11
Section 4.07 Termination ....... 12
ARTICLE V Rental and Other Monetary Obligations ....... 12
Section 5.01 Base Monthly Rental ....... 12
Section 5.02 Adjustments ....... 12
Section 5.03 Monetary Obligations ....... 12
Section 5.04 Rentals To Be Net to Landlord ....... 13
Section 5.05 ACH Authorization ....... 13
Section 5.06 Late Charges; Default Interest ....... 13
Section 5.07 Holdover ....... 14
ARTICLE VI Representations and Warranties of Tenant ....... 14
Section 6.01 Organization, Authority and Status of Tenant ....... 14

| | | |
|---|---|---|
| Section 6.02 | Enforceability | 14 |
| Section 6.03 | Property Condition | 14 |
| Section 6.04 | Litigation | 14 |
| Section 6.05 | Absence of Breaches or Defaults | 15 |
| Section 6.06 | Licenses and Permits | 15 |
| Section 6.07 | Financial Condition; Information Provided to Landlord | 15 |
| Section 6.08 | Compliance With OFAC Laws | 15 |
| Section 6.09 | Solvency | 15 |
| Section 6.10 | Intentionally Omitted | 15 |
| Section 6.11 | Intentionally Omitted | 15 |
| Section 6.12 | Inentionally Omitted | 16 |
| Section 6.13 | Disclaimer of Warranties | 16 |
| Section 6.14 | Existing Leases and Subleases | 17 |
| ARTICLE VII | Taxes and Assessments; UTILITIES; INSURANCE | 17 |
| Section 7.01 | Taxes | 17 |
| Section 7.02 | Utilities | 19 |
| Section 7.03 | Insurance | 20 |
| Section 7.04 | UST State Funding | 24 |
| ARTICLE VIII | MAINTENANCE; ALTERATIONS | 25 |
| Section 8.01 | Condition of Property; Maintenance | 25 |
| Section 8.02 | Alterations and Improvements | 25 |
| Section 8.03 | Encumbrances | 26 |
| ARTICLE IX | Use of the Property; Compliance | 26 |
| Section 9.01 | Use | 26 |
| Section 9.02 | Alternative Use | 26 |
| Section 9.03 | Compliance | 27 |
| Section 9.04 | Environmental | 28 |
| Section 9.05 | Intentionally Omitted | 33 |
| ARTICLE X | Additional COVENANTS | 33 |
| Section 10.01 | Performance at Tenant's Expense | 33 |
| Section 10.02 | Inspection | 34 |
| Section 10.03 | Financial Information | 34 |
| Section 10.04 | OFAC Laws | 35 |
| Section 10.05 | Estoppel Certificate | 36 |

ARTICLE XI RELEASE AND Indemnification ......37
Section 11.01 Release and Indemnification ......37
Section 11.02 Non-Recourse to Landlord ......37
ARTICLE XII Condemnation and Casualty ......38
Section 12.01 Notification ......38
Section 12.02 Partial Condemnation or Casualty ......38
Section 12.03 Total Condemnation ......40
Section 12.04 Temporary Taking ......40
Section 12.05 Adjustment of Losses ......40
Section 12.06 Tenant Obligation in Event of Casualty ......41
Section 12.07 Tenant Awards and Payments ......41
Section 12.08 Uninsured Losses ......41
ARTICLE XIII Default, Conditional Limitations, Remedies and Measure of Damages ......41
Section 13.01 Event of Default ......41
Section 13.02 Remedies ......43
Section 13.03 Cumulative Remedies ......45
Section 13.04 Tenant Waiver ......45
ARTICLE XIV Mortgage, Subordination and Attornment ......46
Section 14.01 No Liens ......46
Section 14.02 Subordination ......46
Section 14.03 Election To Declare Lease Superior ......46
Section 14.04 Attornment ......46
Section 14.05 Execution of Additional Documents ......47
Section 14.06 Notice to Lender ......47
ARTICLE XV Assignment ......47
Section 15.01 Assignment by Landlord ......47
Section 15.02 No Assignment by Tenant ......47
Section 15.03 No Sale of Assets ......48
Section 15.04 Subletting ......49
Section 15.05 Intentioanlly Omitted ......51
ARTICLE XVI Notices ......51
Section 16.01 Notices ......51
ARTICLE XVII Landlord's Lien / Security Interest ......52
Section 17.01 Landlord's Lien and Security Interest ......52

ARTICLE XVIII MISCELLANEOUS .....52
Section 18.01 Force Majeure .....52
Section 18.02 No Merger .....53
Section 18.03 Interpretation .....53
Section 18.04 Characterization .....53
Section 18.05 Intentionally Omitted .....54
Section 18.06 Bankruptcy .....54
Section 18.07 Attorneys' Fees .....56
Section 18.08 Memoranda of Lease .....56
Section 18.09 No Brokerage .....56
Section 18.10 Waiver of Jury Trial and Certain Damages .....57
Section 18.11 Intentionally Omitted .....57
Section 18.12 State-Specific Provisions .....57
Section 18.13 Time Is of the Essence .....57
Section 18.14 Waiver and Amendment .....57
Section 18.15 Successors Bound .....58
Section 18.16 Captions .....58
Section 18.17 Other Documents .....58
Section 18.18 Entire Agreement .....58
Section 18.19 Forum Selection; Jurisdiction; Venue; Choice of Law .....58
Section 18.20 Counterparts .....58
Section 18.21 Landlord's Acquisition of the Property .....59

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of June 6th, 2024 (the "Effective Date"), by and between **5000 Taku Investors LLC**, a Delaware limited liability company ("Landlord"), whose address is 2211 N. Elston Avenue, Suite 400, Chicago, Illinois 60614 and **Zinnia Health LLC, a Delaware limited liability company** ("Tenant"), whose address is 520 Newport Center Drive, Suite 550, Newport Beach, California 92660. Capitalized terms not defined herein shall have the meanings set forth in Article I below.

In consideration of the mutual covenants and agreements herein contained, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*Adjustment Date*" means that date set forth in Section 2.07.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., as amended.

"*Base Annual Rental*" means the Initial Base Annual Rental amount set forth in Section 2.05 as adjusted as set forth in Sections 2.06, 2.07 and 5.02.

"*Base Monthly Rental*" means, for any month, an amount equal to 1/12 of the applicable Base Annual Rental for the period in which such month falls.

"*Business Day*" means a day on which banks located in New York, NY are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Commencement Date*" means the date on which Landlord acquires fee simple title to the Premises, which date shall be confirmed in writing by the parties.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees, recordation taxes and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Insurer*" means such environmental insurance company as Landlord shall select in its sole discretion.

"*Environmental Laws*" means federal, state and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, Underground Storage Tanks ("USTs"), and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Tenant and/or the Property.

"*Environmental Liens*" has the meaning set forth in Section 9.04(a)(ii).

"*Environmental Policy*" means (a) that certain environmental insurance policy issued at or prior to Closing by Environmental Insurer to Landlord with respect to the Property if a UST is located at the Property, and (b) any renewal or replacement environmental insurance policy with respect to the Property if a UST is located, which Environmental Policy shall be in form and substance satisfactory to Landlord in its sole discretion.

"*Event of Default*" has the meaning set forth in Section 13.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Existing Personalty*" has the meaning set forth in Section 4.05.

"*Expiration Date*" means the Initial Term Expiration Date and, if the Initial Term is extended in accordance with this Lease, the last day of any applicable Extension Term.

"*Extension Option*" has the meaning set forth in Section 4.02.

"*Extension Term*" has the meaning set forth in Section 4.02.

"*Force Majeure Event*" has the meaning set forth in Section 18.01.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) oil, petroleum products (including any and all constituents and additives), flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants which pose a hazard to the Property or to Persons on or about the Property, cause the Property to be in violation of any local, state or federal Law or regulation, (including without limitation, any Environmental Law), or are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", "regulated substances" or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; (iv) the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et seq.; and (v) regulations adopted and publications promulgated pursuant to the aforesaid laws; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million contained in transformers or other equipment; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the occupants of the Property or the owners and/or occupants of any property adjoining the Property.

"*Immediate Repairs*" has the meaning set forth in Section 8.01.

"*Indemnified Parties*" means Landlord, Lender, Environmental Insurer (if any), and their respective members, managers, officers, directors, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Landlord, Lender or Environmental Insurer, as applicable.

"*Initial Term*" has the meaning set forth in Section 4.01.

"*Initial Term Expiration Date*" has the meaning set forth in Section 2.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Landlord Entity*" or "*Landlord Entities*" means individually or collectively, as the context may require, Landlord and all Affiliates of Landlord

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*" shall have the meaning described in Section 4.01.

"*Legal Compliance Repairs*" has the meaning set forth in Section 8.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Property. Legal Requirements shall specifically include (i) The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Americans With Disabilities Act, and the accessibility code(s), if any, of the State in which the Property are located, and all regulations and guidelines promulgated under any and all of the foregoing, as the same may be amended from time to time, and (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), Federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"), any state or local act, law, or code, and any applicable common law), rules, and regulations (including 40 Code of Federal Regulations, Part 280 and state and local rules and regulations).

"*Lender*" means any lender in connection with any loan or extension of credit, now or hereafter existing, secured by Landlord's interest in the Property, and any servicer, collateral agent and/or trustee with respect to any such loan or extension of credit.


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including, without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Tenant Entity; (c) Tenant's ability to perform its obligations under this Lease; or (d) Landlord's interest in the Property, this Lease or the other Transaction Documents.

"*Minimum Net Worth*" has the meaning set forth in Section 10.03(a).

"*Monetary Obligations*" has the meaning set forth in Section 5.03.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings, now or hereafter in existence, executed by Landlord for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to the Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 7.03 payable with respect to the Property, as the case may be, and in either case, less any Costs incurred by Landlord in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by any of the Tenant Entities, with, or for the benefit of, any of the Landlord Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents.

"*Partial Condemnation*" means a Condemnation which is not a Total Condemnation.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Facility*" means using the Property as a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, and all related purposes such as ingress, egress and parking and uses incidental thereto.

"*Permitted Sublease*" shall mean a Sublease entered into by Tenant for 100% of the Property (a) for the purpose of permitting the Subtenant thereunder to operate a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, (b) pursuant to which the Subtenant makes the same representations to Tenant as are made by Tenant to Landlord as set forth in Section 6.08 of this Lease and such representations are true and correct at all times, and (c) which Sublease complies with all other requirements for a Sublease set forth in Section 15.04 of this Lease.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" has the meaning set forth in Section 17.01.

"*Property*" means those parcels of real estate legally described on Exhibit A attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate), including all signs and canopies, but shall exclude the Existing Personalty.

"*Property Termination Date*" has the meaning assigned to such term in Section 12.02(c).

"*Property Termination Date-Total Condemnation*" has the meaning assigned to such term in Section 12.03(a).

"*Regulated Substances*" means "<u>petroleum</u>" and "<u>petroleum-based substances</u>" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local laws applicable to or regulating USTs.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials, Regulated Substances or USTs from the Property, or on or onto the Property (even if the source thereof is an adjoining property).

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rent*" means the Rental, the Monetary Obligations, and all other amounts due and payable by Tenant to Landlord hereunder.

"*Rental*" means the Base Annual Rental and Base Monthly Rental.

"*Rental Adjustment*" has the meaning set forth in Section 2.06 as adjusted as set forth in Section 2.07.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning set forth in Section 7.01(b).

"*SNDA*" means subordination, nondisturbance and attornment agreement.

"*Sublease*" has the meaning assigned to such term in Section 15.04.

"*Subtenant*" means a subtenant pursuant to a Sublease.

"*Successor Landlord*" has the meaning set forth in Section 14.04.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Taxes*" has the meaning set forth in Section 7.01(a).

"*Temporary Taking*" has the meaning set forth in Section 12.04.

"*Tenant Entity*" or "*Tenant Entities*" means individually or collectively, as the context may require, Tenant, and all Affiliates thereof.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments,


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" means a Condemnation of all or substantially all of the Property, including a Condemnation (other than for a temporary use) of such a substantial part of the Property resulting in the portion of the Property remaining after such Condemnation being unsuitable for use as a Permitted Facility, as determined by Tenant in the exercise of good faith business judgment.

"*Transfer*" has the meaning assigned to such term in Section 15.02 of this Agreement.

"*Transaction*" has the meaning set forth in Section 15.01.

"*Transaction Documents*" means this Lease, the Purchase and Sale Agreement, any other leases between any Landlord entity and any Tenant entity with respect to any other properties purchased by any Landlord entity pursuant to the Purchase and Sale Agreement, and all documents related to any of the foregoing.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly owned subsidiary of such an entity.

## ARTICLE II

## BASIC LEASE TERMS

**Section 2.01** **Property**. The street address of the Property is set forth on Exhibit A attached hereto.

**Section 2.02** **Lease Commencement Date.** The Lease Commencement Date shall be June 7, 2024. The Initial Term Expiration Date shall be determined as follows:

(a) If the Commencement Date is the first day of a calendar month, then the Initial Term Expiration Date will be the day immediately preceding the **15th anniversary** of the Commencement Date.

(b) If the Commencement Date is not the first day of a calendar month, then the Initial Term Expiration Date will be the last day of the month in which the **15th anniversary** of the Commencement Date occurs.

**Section 2.03** **Extension Options**. Two (2) extensions of Five (5) years each, as described in Section 4.02.

**Section 2.04** **Expiration Date (if fully extended)** June 6, 2049.

**Section 2.05** **Initial Base Annual Rental**. $960,000.00

**Section 2.06** **Rental Adjustment**. Three percent (3.0%) of the Base Annual Rental then in effect, with such Rental Adjustment taking effect on an annual basis throughout the Initial Term, as described in Section 5.02. The rental adjustment during the extension terms will be capped at three percent (3.0%).

**Section 2.07** **Adjustment Date**. June 6th and every anniversary thereafter during the Lease Term (including any Extension Term).

**Section 2.08** **Tenant Tax Identification No**. 85-3793244

## ARTICLE III

## LEASE OF PROPERTY

**Section 3.01** **Lease**. In consideration of Tenant's payment of the Rent and Tenant's performance of all other obligations hereunder, Landlord hereby leases to Tenant, and Tenant hereby takes and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default, or any event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing.

**Section 3.02** **Quiet Enjoyment**. So long as Tenant shall pay the Rent provided in this Lease, and shall keep and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default shall have occurred and be continuing.

## ARTICLE IV

## LEASE TERM; EXTENSION

**Section 4.01** **Initial Term**. The initial term of this Lease ("Initial Term") shall commence as of the Commencement Date and shall expire at 11:59 p.m. on the Initial Term Expiration Date, unless terminated sooner as provided in this Lease or as may be extended as provided herein. The time period during which this Lease shall actually be in effect, is referred to as the "Lease Term." As of the Commencement Date, Tenant agrees to accept possession of the Property.

**Section 4.02** **Extensions**. Provided that this Lease has not expired or has not been sooner terminated, and that no Event of Default has occurred and is continuing at the time any Extension Option is exercised, and provided that all other agreements necessary to the continued operation of Tenant's business at the Property are extended for a period of not less than the applicable extension periods, Tenant shall have the right and option (each, an "Extension Option") to extend the Initial Term for the Property for two (2) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 4.03** **Notice of Exercise**. Tenant may only exercise an Extension Option by giving written notice thereof to Landlord of Tenant's election to do so (a) no later than six (6) months prior to the Expiration Date. If written notice of the exercise of any Extension Option is not received by Landlord by the applicable dates described above, then this Lease shall terminate on the Initial Term Expiration Date or, if applicable, the last day of the Extension Term then in effect. Upon the request of Landlord or Tenant, the parties hereto will, at the expense of the requesting party, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 4.03.

**Section 4.04** **Removal of Personalty**. Upon the expiration of the Lease Term, and if Tenant is not then in breach hereof, Tenant may remove from the Property all personal property belonging to Tenant. Tenant shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear. Any property of Tenant left on the Property on the tenth day following the expiration of the Lease Term shall, at Landlord's option, automatically and immediately become the property of Landlord. Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. All such property shall at Landlord's option be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord. If Landlord arranges for storage of any personal property, Landlord shall have a lien against such property for costs incurred in removing and storing the same.

**Section 4.05** **Existing Personalty**. To the extent that there is any furniture, trade fixtures, equipment or other personal property located upon the Property as of the Effective Date, such Existing Personalty is the property of Tenant, and

(a) Tenant shall maintain insurance on the Existing Personalty pursuant to and in accordance with the provisions of Section 7.03 below; and

(b) Tenant may utilize such Existing Personalty during the Lease Term; *provided, however*, that Tenant utilizes such Existing Personalty "AS IS" and "WHERE IS" without representation or warranty of any kind by Landlord, without any claim to ownership thereof, and Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's use of the Existing Personalty. Tenant shall maintain and repair such Existing Personalty and upon the expiration or sooner termination of this Lease, at Landlord's option, Tenant shall either leave the Existing Personalty on the Property in the same condition as of the Effective Date, normal wear and tear excepted, or remove the Existing Personalty in the same manner as set forth for Personalty in Section 4.04 above.

**Section 4.06** **Reserved**


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

**Section 4.07 Reserved**

## ARTICLE V

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 5.01 Base Monthly Rental**. Tenant's obligation to pay Base Monthly Rental begins on the Commencement Date, and subsequent monthly installments of Base Monthly Rental are due and payable on or before the first day of each succeeding calendar month during the Lease Term. If the Commencement Date is a date other than the first day of a calendar month, then Tenant must pay the Base Monthly Rental for the remainder of the month in which the Commencement Date occurs. The amount due for that partial month is a sum equal to the Base Monthly Rental specified for the first full calendar month of the Lease Term multiplied by a fraction, the numerator of which is the number of days from the Commencement Date to the end of the calendar month in which the Commencement Date falls and the denominator of which is the total number of days in that month. Notwithstanding the foregoing, beginning on the Commencement Date and ending on the date that is six (6) months following the Commencement Date, Tenant shall partially abated Base Monthly Rental in the amount of fifty percent (50%) of the Base Monthly Rental. Beginning on the first day of the seventh (7th) month following the Commencement Date, Tenant shall pay the entire Base Monthly Rental set forth in Section above.

**Section 5.02 Adjustments**. During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental then in effect shall increase by an amount equal to the Rental Adjustment.

**Section 5.03 Monetary Obligations**. In addition to Base Annual Rental and Base Monthly Rental, Tenant shall pay and discharge all sums of money required to be paid or reimbursed by Tenant under this Lease to Landlord, to any party on behalf of Landlord, to any third party or to any Indemnified Party (the obligations described in this sentence are referred to collectively as the "Monetary Obligations"). Tenant shall pay and discharge any Monetary Obligations when the same shall become due, provided that amounts which are billed to Landlord or any third party, but not to Tenant, shall be paid within thirty (30) days after Landlord's demand for payment thereof or, if later, when the same are due. In no event shall Tenant be required to pay to Landlord any Monetary Obligation that Tenant is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 5.04 Rentals To Be Net to Landlord**.

(a) The Base Annual Rental payable hereunder shall be net to Landlord, so that this Lease shall yield to Landlord the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property) shall be performed and paid by Tenant, including without limitation, common area maintenance charges, if any, related to the Property. Tenant shall perform all of its obligations under this Lease at its sole cost and expense. All Rent which Tenant is required to pay hereunder shall be the unconditional obligation of Tenant and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement,

deferment, deduction or counterclaim whatsoever. For the avoidance of doubt, Tenant shall pay all taxes, insurance and utility charges and shall be solely responsible for the maintenance of the Premises, including, without limitation utilities, building maintenance, repairs and replacements, including, but not limited to, the roof, structure, foundation, grease septic system, windows, and HVAC.

(b) Simultaneous with each payment to Landlord of Base Monthly Rental, Tenant shall pay to Landlord any applicable state sales tax and any applicable county or local sales tax. Tenant shall also pay to Landlord sales tax on any other payments which are subject to payment of any state or local sales tax, such sales tax payment to be made to Landlord at the same time as the payments subject to sales tax is paid by Tenant. In no event shall Tenant be responsible for paying Landlord's income taxes.

**Section 5.05 ACH Authorization**. Upon execution of this Lease, Tenant shall deliver to Landlord a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit B attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental, impound payments (if any), sales tax or real property tax (if any), and any other Monetary Obligations are transferred by Automated Clearing House Debit initiated by Landlord from an account established by Tenant at a United States bank or other financial institution to such account as Landlord may designate. Tenant shall continue to pay all Rental and other Monetary Obligations by Automated Clearing House Debit unless otherwise directed by Landlord.

**Section 5.06 Late Charges; Default Interest**. Any payment of Base Monthly Rental received more than five (5) days after its due date shall, in addition to any other remedy of Landlord, incur a late charge of five percent (5%) (which late charge is intended to compensate Landlord for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Tenant be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect. Any payment of a Monetary Obligation which is not paid to Landlord by Tenant on or prior to the date such payment is due to Landlord shall bear interest at a rate of interest per annum equal to the Default Rate.

**Section 5.07 Tenant Improvement Allowance.** Landlord will pay to Tenant the cash sum of One Million and 00/100 Dollars ($1,000,000.00) as "Tenant Improvement Allowance" (herein so called) for Tenant's improvements. The Tenant Improvement Allowance shall be paid in four (4) installments as follows: (1) the first payment of 50% of the Tenant Improvement Allowance is payable upon the Commencement Date, (2) the second payment of 25% of the Tenant Improvement Allowance is payable within thirty (30) days after Tenant has completed 75% of its work; (3) the third payment of 15% of the Tenant Improvement Allowance is payable within thirty (30) days after Tenant has completed 90% of its work and (4) the remaining balance of 10% of the Tenant Improvement within thirty (30) days after Tenant has substantially completed its work and certificate of occupancy has been issued. Each payment shall be conditioned upon Tenant's presentation to Landlord of a statement reflecting all costs, charges, fees and expenses incurred and work performed for the period immediately preceding such statement (each, a "Draw Statement") together with invoices evidencing the costs incurred by Tenant for the Tenant


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

Improvements and notarized or electronically executed lien waivers from each contractor, subcontractor and supplier of materials to whom such disbursement is payable (which may be conditioned on payment) rendering labor and materials in excess of $5,000.00. With respect to the final Draw Statement, Tenant shall additionally provide (i) final and unconditional notarized or electronically executed lien releases or lien waivers from all contractors, subcontractors and suppliers of materials performing work or delivering materials to the Premises in excess of $5,000.00 in connection with the Tenant Improvements, (ii) an affirmation that all of the Tenant improvements are complete and Tenant has opened for business in the Premises, and (iii) a final certificate of occupancy for the Premises.

**Section 5.08 Holdover**. If Tenant remains in possession of the Property after the expiration of the term hereof, Tenant, at Landlord's option and within Landlord's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Tenant shall comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rental by Landlord shall be deemed a consent to such holding over. Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee. In addition, if during any holdover period, Tenant fails to surrender the Premises within thirty (30) days following receipt of a written notice from Landlord that Landlord has entered into a lease with a new tenant and has demanded that Tenant vacate (a "**Disallowed Holdover**"), Landlord shall be entitled to seek damages, consequential as well as direct, incurred or actually sustained by Landlord by reason of such holding over, together with all costs incurred by Landlord (including but not limited to reasonable attorneys' fees) in connection with such holdover. The foregoing provision shall not affect Landlord's right of re-entry or any rights of Landlord hereunder or as otherwise provided by law.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF TENANT

The representations and warranties of Tenant contained in this Article VI are being made to induce Landlord to enter into this Lease, and Landlord has relied, and will continue to rely, upon such representations and warranties. Tenant represents and warrants to Landlord as follows:

**Section 6.01 Organization, Authority and Status of Tenant**. Tenant has been duly organized or formed, is validly existing and in good standing under the laws of its state of Delaware and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required. All necessary corporate action has been taken to authorize the execution, delivery and performance by Tenant of this Lease and of the other documents, instruments and agreements provided for herein, including without limitation, the Transaction Documents. Tenant is not, and if Tenant is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the

regulations promulgated thereunder. The Person who has executed this Lease on behalf of Tenant is duly authorized to do so.

**Section 6.02** **Enforceability**. This Lease constitutes the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

**Section 6.03** **Property Condition**. Tenant has physically inspected the Property and has examined title to the Property and has found all of the same satisfactory in all respects for all of Tenant's purposes.

**Section 6.04** **Litigation**. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Tenant Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 6.05** **Absence of Breaches or Defaults**. Tenant is not in default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound.

**Section 6.06** **Licenses and Permits**. Tenant has obtained all required licenses and permits, both governmental and private, to use and operate the Property as a Permitted Facility.

**Section 6.07** **Financial Condition: Information Provided to Landlord**. The financial statements, all financial data and all other documents and information heretofore delivered to Landlord by or with respect to the Tenant Entities and the Property in connection with this Lease or relating to the Tenant Entities or the Property are true, correct and complete in all material respects; there have been no amendments thereto since the date such items were prepared or delivered to Landlord; all financial statements provided were prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and fairly represent as of the date thereof the financial condition of each individual or entity to which they pertain; and no change has occurred to any such financial statements, financial data, documents and other information not disclosed in writing to Landlord, which has had, or could reasonably be expected to result in, a Material Adverse Effect.

**Section 6.08** **Compliance With OFAC Laws**. None of the Tenant Entities or Subtenants, and no individual or entity owning directly or indirectly any interest in any of the Tenant Entities or Subtenants, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

**Section 6.09** **Solvency**. There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Tenant, or to the best of Tenant's knowledge, its respective shareholders members, partners or Affiliates. Tenant does not have unreasonably small capital to conduct its business.

**Section 6.10** **Intentionally Omitted**.

**Section 6.11** **Intentionally Omitted.**

**Section 6.12** **RESERVED**

**Section 6.13** **Disclaimer of Warranties**. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) AND THE OTHER LANDLORD ENTITIES HAVE NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD OR ANY OF THE LANDLORD ENTITIES BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) LANDLORD'S TITLE THERETO, (v) VALUE, (vi) COMPLIANCE WITH SPECIFICATIONS, (vii) LOCATION, (viii) USE, (ix) CONDITION, (x) MERCHANTABILITY, (xi) QUALITY, (xii) DESCRIPTION, (xiii) DURABILITY, (xiv) OPERATION, INCOME, EXPENSES, ENTITLEMENTS OR ZONING, (xv) THE EXISTENCE OF ANY HAZARDOUS MATERIALS, RELEASE OR VIOLATION OF HAZARDOUS MATERIALS LAWS, OR (xvi) COMPLIANCE OF THE PROPERTY WITH ANY LAW OR LEGAL REQUIREMENT; AND ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE PROPERTY IS OF ITS SELECTION AND TO ITS SPECIFICATIONS AND THAT THE PROPERTY HAS BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN THE PROPERTY OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD AND ALL OTHER LANDLORD ENTITIES SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS SECTION 6.13 HAVE BEEN NEGOTIATED, AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES BY LANDLORD OR ANY LANDLORD ENTITY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING OTHERWISE.

**Section 6.14** **Intentionally Omitted.**


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

## ARTICLE VII

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 7.01 Taxes.**

(a) ***Payment***. Landlord shall cause all tax bills for the Premises to be issued in Tenant's name to the address designed by Tenant in Section 16.01 below. Subject to the provisions of this Article VII, Tenant shall pay directly to the applicable taxing authority, prior to the earlier of delinquency or the accrual of interest on the unpaid balance (except as otherwise set forth in Section 7.01(a)(iii)), all taxes and assessments of every type or nature assessed against or imposed upon the Property, Tenant, or Landlord during or prior to the Lease Term or arising out of this Lease and the activities of the parties hereunder (collectively, the "Taxes"), including, without limitation:

(i) All real estate taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures or improvements located on the Property, whether belonging to Landlord or Tenant, or any tax or charge levied in lieu of such taxes and assessments;

(ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Tenant;

(iii) all recordation taxes, realty transfer taxes and similar taxes due and payable by Landlord as a result of the transactions contemplated by the Transaction or any of the Transaction Documents; and

(iv) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rent hereunder (and which are not assessed against all gross income of the Landlord), the leasehold estate of either party or the activities of either party pursuant to this Lease, which such taxes shall be paid to Landlord simultaneously with any payment to Landlord of Base Monthly Rental or a Monetary Obligations, as the case may be.

Prior to the earlier of delinquency or the accrual of interest on the unpaid balance, Tenant shall provide Landlord with receipts showing that each tax and assessment payment required by this Section 7.01(a) (other than those described in Section 7.01(a)(iii)) was made in a timely fashion. Notwithstanding anything to the contrary herein, Tenant shall be responsible for all taxes and assessments upon the Property or any part thereof or improvements thereon for the tax year in which Landlord acquires the Property.

(b) ***Reserves***. Notwithstanding any other provision contained in this Lease, in the event that Tenant defaults in the payment of Taxes described in Section 7.01(a)(i) or (ii) or the payment of any premiums for the insurance required by Section 7.03, or upon the occurrence of any Event of Default, Landlord shall have the right, in addition to all other rights and remedies set forth in this Lease, upon written notice to Tenant and without waiving any default, to require Tenant to pay to Landlord on the first day of each month after such notice (or on the day of each month specified in the notice), one-twelfth (1/12) of the amount that Landlord reasonably estimates from time to time will be necessary in order to accumulate with Landlord, by the date that is at least thirty (30)

days prior to the date or dates any or all of such Taxes or insurance premiums are due, sufficient funds to pay any and all such Taxes and/or insurance premiums for the ensuing twelve (12) months (which shall not be deemed a trust fund) (the "Reserve"). Landlord may also require Tenant to pay one-sixth (1/6) of said estimated amount as reserve overage, which may be retained by Landlord from year to year. Tenant shall transmit bills for the Taxes and insurance premiums as soon as received. Landlord shall, upon prior written request of Tenant, provide Tenant with evidence reasonably satisfactory to Tenant that payment of such Taxes and insurance premiums, as applicable, was made in a timely fashion. In the event that the Reserve does not contain sufficient funds to timely pay any such Taxes or insurance premiums, upon Landlord's written notification thereof, Tenant shall, within five (5) Business Days of such notice, provide funds to Landlord in the amount of such deficiency. Landlord shall pay or cause to be paid directly to the applicable taxing authorities or insurance companies any such Taxes or insurance premiums, as applicable, then due and payable for which there are funds in the Reserve; *provided, however*, that in no event shall Landlord be obligated to pay any such Taxes or insurance premiums in excess of the funds held in the Reserve or after an Event of Default, and Tenant shall remain liable for any and all such Taxes and insurance premiums, including fines, penalties, interest or additional costs imposed by any insurance company or taxing authority (unless incurred as a result of Landlord's failure to timely pay the same if it had adequate funds in the Reserve). Tenant shall cooperate fully with Landlord in assuring that such Taxes and insurance premiums are timely paid. If the amount paid by Tenant into the Reserve in any year exceeds the aggregate required under this Lease, such excess shall be applied to the payments for the succeeding year. Landlord may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Landlord. Interest or other gains from such funds, if any, shall be the sole property of Landlord. Upon an Event of Default, in addition to any other remedies, Landlord may apply all Reserve funds against any sums due from Tenant to Landlord. Landlord shall give to Tenant an annual accounting showing all credits and debits to and from such Reserve funds received from Tenant.

(c) ***Right to Contest***. After written notice to Landlord and any Lender designated by Landlord, Tenant may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto (which shall exclude the right to contest Taxes described in Section 7.01(a)(iv)), including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that:

(i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings;

(ii) no Event of Default has occurred;

(iii) Tenant posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof;

(iv) Tenant shall promptly provide Landlord with copies of all notices received or delivered by Tenant and filings made by Tenant in connection with such proceeding; and

(v) prior to the date that any judgment becomes final or any writ or order is issued under which the Property could be sold pursuant to such final judgment, Tenant shall pay the amount of any such tax or assessment or part thereof as finally determined in such proceeding to be due, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.

Landlord will, at the request of Tenant, reasonably cooperate in such contest, provided that Landlord is not required to incur any third party out-of-pocket cost or expense in connection with any such contest.

(d) Taxes for the year in which the Commencement Date shall occur shall be prorated such that Landlord shall bear and be responsible the amount of Taxes coming due in the year in which the Commencement Date occurs multiplied by a fraction, the numerator of which is the number of days preceding the Commencement Date in such year and the denominator is the total number of days in such year.

**Section 7.02** **Utilities**. Tenant shall contract for, in its own name, and pay when due all charges for, the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Landlord be responsible for any interruption of any utility service except to the extent caused by the gross negligence or intentional misconduct of Landlord. Landlord shall have the same rights and remedies for nonpayment by Tenant of any utilities that Landlord has under this Lease for failure of Tenant to pay Rent. Landlord shall not be liable for any interruptions or curtailment in utility services and any such interruption or curtailment shall not constitute a termination of this Lease or eviction of Tenant except to the extent caused by the gross negligence or intentional misconduct of Landlord.

**Section 7.03** **Insurance**.

(a) ***Coverage***. Throughout the Lease Term, Tenant shall maintain, with respect to the Property, at Tenant's sole expense, the following types and amounts of insurance, in addition to such other insurance as Landlord and Lender may reasonably require from time to time:

(i) Insurance against loss or damage to the Property, including, without limitation, the Existing Personalty under a special cause of loss insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance if the Property is located within a 100-year floodplain (FEMA Zones A and V) and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 7.03(b)(x) below). Such policy shall also include coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost

of construction, or in an amount otherwise specified by Landlord. Such insurance shall be in amounts sufficient to prevent Landlord from becoming a co-insurer under the applicable policies, and in any event, after application of deductible, in amounts not less than 100% of the full insurable replacement cost values and sublimits satisfactory to Landlord, as determined from time to time at Landlord's request but not more frequently than once in any 12 month period.

(ii) Commercial general liability insurance, including products and completed operation liability, covering Landlord and Tenant against bodily injury liability, property damage liability and personal and advertising injury, garage liability coverage, garage keepers liability or bailee customers personal property coverage (with coverage not less than $1,000,000.00 per occurrence) in the event Tenant's activities require such coverage, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. The commercial general liability policy shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Tenant's obligations under Article XI hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Tenant or Landlord because of the negligence or other acts of the other, shall have a combined single limit of at least $2,000,000.00 for bodily injury and property damage, or such higher limits as Landlord or Lender may reasonably require from time to time, and shall be of form and substance satisfactory to Landlord and Lender. These limits may be satisfied through commercial general liability and umbrella liability policies. Tenant shall not be required to carry liquor liability policies.

(iii) Statutory workers' compensation insurance and Employers Liability insurance in the amount required by applicable law covering all persons employed by Tenant on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Property.

(iv) Rental value insurance, equal to 100% of the Base Annual Rental (as the same may adjusted hereunder) for a period of not less than twelve (12) months basic period plus a six (6) month extended period of indemnity, which insurance shall be carved out of Tenant's business interruption coverage for a separate rental value insurance payable to Landlord, or if rental value insurance is included in Tenant's business interruption coverage, the insurer shall provide priority payment to any rent obligations, and such obligations shall be paid directly to Landlord. Such insurance is to follow form of the special cause of loss coverage and is not to contain a co-insurance clause.

(v) Equipment Breakdown insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, located in or about the Property and in an amount equal to the lesser of (i) 25% of the 100% replacement cost of the Property or (ii) $5,000,000.00.

(vi) Automobile Liability Insurance not less than $1,000,000 per occurrence covering all owned and non-owned vehicles.

(vii) Builder's Risk Insurance, but only prior to the commencement of and during the construction of any permitted rehabilitation, replacement, reconstruction, restoration, renovation or alteration of the Property, and only to the extent that such coverage is not being maintained by Tenant's contractor(s) pursuant to a policy or polices reasonably acceptable to Landlord.

(viii) The foregoing insurance requirements shall also apply to any Subleases and subtenants shall provide the same proof of coverage to Landlord hereunder as Tenant.

(b) ***Insurance Provisions***. All insurance policies shall:

(i) provide

(A) via a waiver of subrogation endorsement, and a waiver of subrogation by the insurer as to claims against Landlord, any Lender designated by Landlord, and their respective employees and agents;

(B) that the insurer shall not deny a claim and that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Tenant, its officers, directors, employees or agents, or anyone acting for Tenant or any subtenant or other occupant of the Property; and

(C) that any losses otherwise payable thereunder shall be payable notwithstanding any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment;

(ii) be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Landlord and the insurance policy shall not be brought into contribution with insurance maintained by Landlord;

(iii) contain deductibles not to exceed $25,000.00 per occurrence, and all deductibles on insurance policies shall be borne by Tenant;

(iv) contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Landlord;

(v) provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Landlord and to any Lender covered by any standard mortgagee clause or endorsement;

(vi) provide that the insurer shall not have the option to restore the Property if Landlord elects to terminate this Lease in accordance with the terms hereof;

(vii) be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(viii) except for workers' compensation insurance referred to in Section 7.03(a)(iii) above, name Landlord and any Landlord Affiliate or Lender requested by Landlord, as an "additional insured" with respect to general liability insurance, as a "named insured" with respect to real property and the Existing Personalty, if applicable, and as a "loss payee" with respect to all real property, Existing Personalty and rental value insurance, as appropriate and as their interests may appear;

(ix) upon demand and at least thirty (30) days prior to the expiration date of any policy required hereunder, be evidenced by delivery to Landlord and any Lender designated by Landlord of an Acord Form 28 for property, rental value and boiler & machinery coverage (or any other form


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

requested by Landlord) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Landlord), which forms shall bear notations evidencing the prior payment of insurance premiums and be accompanied by other evidence satisfactory to Landlord and any Lender designated by Landlord that such payment has been made; provided that in the event that either such form is no longer available or any such Lender requires a different form, such evidence of insurance shall be in a form reasonably satisfactory to Landlord and any Lender designated by Landlord; and

(x) be issued by insurance companies licensed to do business in the states where the Property is located and which are rated A:VIII or better by Best's Insurance Guide or are otherwise approved by Landlord.

(c) ***Additional Obligations***. It is expressly understood and agreed that

(i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and any Lender designated by Landlord;

(ii) the minimum limits of insurance coverage set forth in this Section 7.03 shall not limit the liability or obligations of Tenant for its acts or omissions as provided in this Lease;

(iii) Tenant shall procure policies for all insurance for periods of not less than one year and shall provide to Landlord and any servicer or Lender of Landlord certificates of insurance or, upon Landlord's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times;

(iv) Tenant shall pay as they become due all premiums for the insurance required by this Section 7.03;

(v) in the event any insurance policy required to be maintained by Tenant hereunder contains any breach of warranty provisions, Tenant shall not cause any violations of the policy warranties, declarations or conditions in such policy;

(vi) Tenant shall, from time to time, upon request from Landlord, provide copies of all certificates of insurance required hereunder; and

(vii) in the event that Tenant fails to comply with any of the requirements set forth in this Section 7.03, within ten (10) days of the giving of written notice by Landlord to Tenant,

(A) Landlord shall be entitled to procure such insurance and/or require Tenant to deposit funds to cover the insurance premium payments into the Reserve pursuant to the terms of Section 7.01(b); and

(B) any sums expended by Landlord in procuring such insurance shall be a Monetary Obligation (and not Rental) and shall be repaid by Tenant, together with interest thereon at the

Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(d) ***Blanket Policies***. Notwithstanding anything to the contrary in this Section 7.03, any insurance which Tenant is required to obtain pursuant to this Section 7.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 7.03.

(e) ***Change in Operation***. Landlord reserves the right to require additional and/or other insurance if Tenant has a change in operation or use of the Property.

## ARTICLE VIII

## MAINTENANCE; ALTERATIONS

**Section 8.01 Condition of Property; Maintenance**. Tenant hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Landlord as to the condition thereof. Tenant shall, at its sole cost and expense, be responsible for:

(a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste, including without limitation, the roof and the HVAC and other electrical and mechanical systems;

(b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty;

(c) subject to Section 8.02, making all necessary structural, non-structural exterior and interior repairs and replacements to any building, structures or improvements erected on the Property,

(d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facility; and

(e) paying all operating costs of the Property in the ordinary course of business. Tenant waives any right to require Landlord to maintain or repair all or any part of the Property or make repairs at the expense of Landlord pursuant to any Legal Requirements at any time in effect.

In elaboration of the foregoing, Tenant shall (a) keep the outside of all glass in the doors and windows of the Premises clean; (b) keep exterior surfaces of the entrances and exits to the Premises clean; (c) replace promptly any cracked or broken glass on the Premises with glass of like grade and quality; (d) keep any garbage, trash, rubbish or other refuse in appropriate containers; and (e) comply with all laws, ordinances, rules and regulations of governmental authorities.

Landlord and its mortgagee shall not be liable for, and Tenant waives, all claims for loss or damage to Tenant's business or loss, theft or damage to Tenant's personal property or the property of any person claiming by, through or under Tenant resulting from: (1) wind or weather; (2) the failure of any sprinkler, heating or air conditioning equipment, any electric wiring or any gas, water or steam pipes; (3) the backing up of any sewer pipe or downspout; (4) the bursting, leaking or running of any tank, water closet, drain or other pipe; (5) water, snow or ice upon or coming

through the roof, skylight, stairs, doorways, windows, walks or any other place upon or near the Premises; (6) any act or omission of any party other than Landlord or Landlord related parties; and (7) any other causes other than the gross negligence or intentional misconduct of Landlord and/or the Landlord related parties.

Tenant shall store all of Tenant's trash in dumpsters or other covered trash receptacles. Tenant may also maintain garbage cans customary to Tenant's business on the sidewalk located in front of the Premises, provided that (i) Tenant shall empty the garbage cans regularly and maintain the area in a neat and orderly fashion, including cleaning up any spills and (ii) the garbage cans shall not be located so as to block or materially impair access across the sidewalk.

Landlord shall have no obligation whatsoever to maintain or repair the Premises, the improvements, or equipment thereon, whether structural or non-structural, during the Term, all of which obligations are intended to be imposed on the Tenant.

**Section 8.02** **Alterations and Improvements**. After the completion of Tenant's initial improvements, , Tenant shall not alter the exterior, structural, plumbing or electrical elements of the Property or make any material alterations or improvements in any manner during the Lease Term, without the consent of Landlord, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Tenant may undertake nonstructural alterations to the Property, individually costing less than $150,000, without Landlord's prior written consent. No USTs may be installed at the Property without Landlord's written consent, which consent shall be at Landlord's sole and absolute discretion. If Landlord's consent is required hereunder and Landlord consents to the making of any such alterations, the same shall be made by Tenant at Tenant's sole expense by a licensed contractor and according to plans and specifications approved by Landlord and subject to such other conditions as Landlord shall reasonably require, including, but not limited to, Landlord's supervision of any such alterations. Any work at any time commenced by Tenant on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $10,000 or more, Tenant shall promptly provide Landlord with evidence of full payment to all laborers and materialmen contributing to the alterations, including, but not limited to, executed lien waivers.

**Section 8.03** Additionally, upon completion of any alterations, Tenant shall promptly provide Landlord with:

(a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect);

(b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and

(c) any other documents or information reasonably requested by Landlord. Tenant shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. Tenant shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Landlord is not responsible for the payment of any costs


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

or expenses relating to the additions or alterations. Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Landlord, and Tenant shall execute and deliver to Landlord such instruments as Landlord may require to evidence the ownership by Landlord of such addition or alteration. If Tenant fails to bond or have discharged any lien as required herein within thirty (30) days thereafter, then Landlord may (but shall have no obligation to or discharge the lien on Tenant's behalf and the cost thereof shall be a Monetary Obligation immediately due and payable to Landlord plus interest at the Default Rate.

(d) All alterations, additions, and improvements to the Premises shall comply at all times with all applicable laws, rules, regulations, and ordinances, and Tenant shall obtain all necessary permits for such alterations, additions, and improvements. Notwithstanding anything in this Lease to the contrary, if Tenant constructs, makes or installs or causes to be constructed, made or installed any improvement or alteration in or to the Premises (including, but not limited to, the initial construction of the Building and Improvements), Tenant shall be solely responsible for ensuring that such improvements and/or alterations do not violate any provision in any local, state or federal law or regulation relating to accessibility for handicapped persons or the removal of architectural or communication barriers to accessibility, ("**Disability Law**"), including, but not limited to, The Americans with Disabilities Act. If any claim is asserted against Landlord under any Disability Law which claim relates directly or indirectly to any alterations or improvements installed, made or constructed, directly or indirectly, by or for Tenant in or to the Premises or any trade fixture or personal property item used by Tenant in the Premises, Tenant shall defend, indemnify and hold the Landlord Parties harmless from and against the claim and any and all charges, liabilities, obligations, penalties, damages, judgments, costs and expenses (including costs of investigation and attorneys' fees) arising or incurred against or suffered, directly or indirectly, by Landlord relating thereto. If it should be determined that any improvement or alteration constructed, made or installed in or to the Premises, directly or indirectly, by or for Tenant or any trade fixture or personal property item used by Tenant in the Premises is an illegal architectural or communication barrier under any Disability Law, Tenant shall immediately, at its sole cost and expense, remove the barrier or, to the extent allowed by the Disability Law, provide alternatives to the barrier so as to make the Premises accessible to handicapped persons.

**Section 8.04** **Encumbrances**. During the Lease Term, Landlord shall have the right to grant easements on, over, under and above the Property without the prior consent of Tenant, provided that such easements will not materially and adversely interfere with Tenant's use of the Property. Without Landlord's prior written consent, which consent shall be at Landlord's sole and absolute discretion, Tenant shall not grant any easements on, over, under or above the Property.

## ARTICLE IX

## USE OF THE PROPERTY; COMPLIANCE

**Section 9.01** **Use**. During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility and for no other purpose whatsoever. Except during periods when the Property is untenantable due to Casualty or Condemnation (and provided that Tenant continues to strictly comply with the other terms and conditions of this Lease), Tenant shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.

**Section 9.02** **Alternative Use**. Tenant shall not, by itself or through any permitted assignment, sublease or other type of transfer, convert the Property to an alternative use during the Lease Term without Landlord's prior written consent, which consent shall not be unreasonably withheld; *provided, however*, that Landlord's consent shall not be deemed unreasonably withheld if Landlord's decision is based on any or all of the following:

(a) whether the rental paid to Landlord would be equal to or greater than the anticipated rental assuming continued existing use;

(b) whether the proposed rental to be paid to Landlord is reasonable considering the converted use of the Property and the customary rental prevailing in the community for such use;

(c) whether the converted use will be consistent with the highest and best use of the Property;

(d) whether the concerted use is permitted at the Property in accordance with all applicable Legal Requirements, restrictions, covenants, and encumbrances of record;

(e) whether the converted use will increase Landlord's risks or decrease the value of the Property; and

(f) whether Landlord is able to obtain approval of its Lender to any such change in use.

**Section 9.03** **Compliance**. The use and occupation of the Property (whether by Tenant or any permitted Subtenant), and the condition thereof, shall, at Tenant's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property), and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property. Without in any way limiting the foregoing provisions, any Sublease shall expressly prohibit any Subtenant, licensee or occupant thereunder from violating, or permitting the violation of, any Legal Requirements or the above-referenced restrictions, covenants or encumbrances. In addition and without in any way limiting the foregoing provisions, Tenant shall comply, and shall cause all Subtenants, licensees or other occupants to comply, with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such laws may be amended from time to time, and all regulations promulgated thereunder, as they affect the Property now or hereafter in effect. Upon Landlord's written request from time to time during the Lease Term, Tenant shall certify in writing to Landlord that Tenant's representations, warranties and obligations under Section 6.07 and this Section 9.03 remain true and correct and have not been breached. Tenant shall immediately notify Landlord in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Tenant shall (and shall cause each Subtenant, licensee or occupant to) comply with all Legal Requirements and directives of Governmental Authorities and, at Landlord's request, provide to Landlord copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Tenant shall also reimburse Landlord for all Costs incurred by Landlord in evaluating the effect of such an event on the


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Landlord to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Landlord as the result of the existence of such an event and for any penalties or fines imposed upon Landlord as a result thereof. Tenant will use its best efforts to prevent any act or condition to exist on or about the Property which will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Tenant shall pay for such increase. Tenant will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Tenant's failure to comply with its obligations under this Section. All matters related to compliance with Environmental Law or dealing with Hazardous Materials shall be governed by Section 9.04. This Section is subject and subordinate to Section 9.04, and in the event of any inconsistency between Section 9.04 and this Section 9.03, Section 9.04 shall control and prevail.

**Section 9.04 Environmental**.

(a) ***Representations and Warranties***. Tenant represents and warrants to Landlord and Environmental Insurer which representations and warranties shall survive the execution and delivery of this Lease, as follows:

(i) Tenant is not in violation of or subject to, any pending or, to Tenant's actual knowledge, threatened investigation or inquiry by any Governmental Authority or to any remedial obligations under any Environmental Laws that could have a Material Adverse Effect, nor has Tenant received any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) with respect to the Property relating to

(A) Hazardous Materials, Regulated Substances or USTs, or Remediation thereof;

(B) possible liability of any Person pursuant to any Environmental Law;

(C) other environmental conditions; or

(D) any actual or potential administrative or judicial proceedings in connection with any of the foregoing that could have a Material Adverse Effect. The foregoing representations and warranties would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Property.

(ii) All uses and operations on or of the Property, whether by Tenant or, to Tenant's knowledge, any other Person acting on Tenant's behalf, have been in compliance with all Environmental Laws and environmental permits issued pursuant thereto;

(A) Tenant has not allowed any other tenant or other user of the Property to do any act that materially increased the dangers to human health or the environment, posed an unreasonable risk of harm to any Person (whether on or off the Property), impaired the value of the Property in any material respect, is contrary to any requirement set forth in the insurance policies maintained by Landlord including, without limitation, the Environmental Policy, constituted a public or private nuisance, constituted waste, or violated any covenant, condition, agreement or easement applicable to the Property.

(b) ***Covenants***.

(i) Tenant covenants to Landlord and Environmental Insurer during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A) The Property, Tenant and any Subtenant shall not be in violation of any investigation or inquiry by any Governmental Authority.

(B) All uses and operations on or of the Property, whether by Tenant, Subtenant or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(C) There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(D) Tenant shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Tenant, Subtenant or any other Person.

(E) Tenant shall not do or allow any Subtenant or other user of any part of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), has a Material Adverse Effect, is contrary to any material requirement set forth in the insurance policies maintained by Tenant, constitutes a public or private nuisance or constitutes waste, violates any covenant, condition, agreement or easement applicable to the Property, or creates the threat of a Release.

(F) Tenant shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property as may be reasonably requested by Landlord (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Landlord and Environmental Insurer the reports and other results thereof, and Landlord, Environmental Insurer and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof.

(G) Tenant shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 9.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(H) Tenant will dispose of all biomedical waste generated through its operations in a manner consistent with all applicable laws and/or regulations.

(ii) Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Tenant to satisfy any one or more of the covenants set forth in subsections (A) through (F) above provided that Tenant shall be in compliance with the requirements of any Governmental Authority with respect to the discovery or Remediation of any Release at the Property.

(c) ***Notification Requirements***. Tenant shall immediately notify Landlord and Environmental Insurer in writing upon Tenant obtaining actual knowledge of:

(i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property;

(ii) any non-compliance with any Environmental Laws related in any way to the Property;

(iii) any actual or potential Environmental Lien;

(iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and

(v) any written or oral notice or other communication, including but not limited to, notices of violation ("NOV") issued by a Governmental Authority of which Tenant becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or USTs, a Release or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Tenant shall, upon Landlord's or Environmental Insurer's written request, deliver to Landlord or Environmental Insurer a certificate stating that Tenant is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(d) ***Remediation***. Solely to the extent that they are the direct and proximate result of Tenant's conduct (whether intentional or negligent), Tenant shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release, a Threatened Release or a suspected Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment. Should Tenant fail to undertake such Remediation in accordance with the preceding sentence, Landlord, after written notice to Tenant and Tenant's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs reasonable incurred in connection therewith shall be paid by Tenant. Any Cost so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord.

(e) ***Indemnification***. Solely to the extent that they are the direct and proximate result of Tenant's conduct, Tenant shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, USTs, or other environmental matters concerning the Property, including, but not limited to, all fines, penalties, claims or expenses imposed pursuant to any Environmental Law and all Costs of Remediation (whether or not performed voluntarily). It is expressly understood and agreed that Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(f) ***Right of Entry***. Landlord and any other Person designated by Landlord, including but not limited to Environmental Insurer, if any, any receiver, any representative of a Governmental


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (including, without limitation, in connection with the exercise of any remedies set forth in this Lease) to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Landlord's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Tenant shall cooperate with and provide access to Landlord, Environmental Insurer and any other Person designated by Landlord.

(g) ***Survival***. The obligations of Tenant and the rights and remedies of Landlord under this Section 9.04 shall survive the termination, expiration and/or release of this Lease.

(h) ***Intentionally Omitted.***

(i) ***Intentionally Omitted.***

(j) ***Conveyance***. Upon expiration or termination of this Lease, and upon (and to the extent set forth in) a written request of Landlord, Tenant shall convey any UST (if any) to Landlord or Landlord's designee, free and clear of all liens and security interests.

(k) The obligations of this Article IX shall survive the expiration or termination of the Lease.

**Section 9.05 Intentionally Omitted.**

## ARTICLE X

## ADDITIONAL COVENANTS

**Section 10.01 Inspection**. Landlord, any Lender designated by Landlord, and their authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (which may be given by telephone, text or email, and which need not be given in the event of an emergency), without delay, hindrance or restriction, to enter the Property or any part thereof and inspect the same. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 11.01, excluding damages arising as a result of the negligence or intentional misconduct of Landlord.

The foregoing notwithstanding, certain areas of the Property shall have present in it information and documents covered by Health Insurance Portability and Accountability Act of 1996, as amended ("HIPPA"). Landlord agrees that it shall not (and shall not permit others to) access, copy, distribute, disclose, review, read, or otherwise interact with in anyway information covered by HIPPA or any of Tenant's other patient records, whether or not covered by HIPPA. Landlord agrees that in exercising Landlord's right to re-enter the Property, it or its agents, employees, contractors shall be accompanied at all times by a representative to Tenant.

**Section 10.02 Financial Information**.

(a) ***Intentionally Omitted***.

(b) ***Financial Statements***. On or before each February 15, Tenant and any guarantor of this lease shall deliver to Landlord:

(i) complete financial statements of the Tenant Entities including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended;

(ii) income statements for the business at the Property reflecting the business operations at the Property; and

(iii) a statement identifying each Subtenant, setting forth the rentals payable by each Subtenant and the revenue received from each Subtenant, setting forth the length of the unexpired term of each Sublease, identifying each Subtenant who is in default, and providing such other information as Landlord or Lender may require.

All such financial statements shall be prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and shall be certified to be accurate and complete by an officer or director of each Tenant Entity and otherwise be in form and substance satisfactory to Landlord and Lender. Tenant understands that Landlord will rely upon such financial statements and Tenant represents that such reliance is reasonable. In the event that Tenant's property and business at the Property are ordinarily consolidated with other business for financial statements purposes, such financial statements shall be prepared on a consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Property with the basis for allocation of overhead of other charges being clearly set forth. The financial statements delivered to Landlord need not be audited, but Tenant shall deliver to Landlord copies of any audited financial statements of the Tenant Entities which may be prepared, as soon as they are available. Within thirty (30) days after the end of each fiscal year of Tenant, and upon prior written request by Landlord, Tenant shall deliver such compliance certificate to Landlord as Landlord may reasonably require in order to establish that Tenant is in compliance with all of its obligations, duties and covenants under this Lease.

(c) ***Other Information***. Notwithstanding any provision contained herein, upon request at any time, Tenant will provide to Landlord any and all financial information and/or financial statements (and in the form or forms):

(i) requested by Landlord in connection with Landlord's filings with or disclosures to any Governmental Authority; or

(ii) as reasonably requested by Landlord.

**Section 10.03 OFAC Laws**. Tenant shall not enter into a Sublease or any other agreement with any Person who may appear on the list of Specifically Designated Nationals and Blocked Persons that is maintained under OFAC Laws or whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has

been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws. Upon receipt of notice or upon actual knowledge thereof, Tenant shall immediately notify Landlord in writing if any Person owning (directly or indirectly) any interest in any of the Tenant Entities or a Subtenant, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; *provided, however*, that the covenant in this Section 10.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 10.04 Estoppel Certificate**. At any time, and from time to time, Tenant shall, promptly and in no event later than ten (10) days after a request from Landlord or any Lender or mortgagee of Landlord, execute, acknowledge and deliver to Landlord or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Landlord, certifying:

(a) that Tenant has accepted the Property;

(b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor;

(c) the commencement and expiration dates of the Lease Term;

(d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable;

(e) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof;

(f) that no notice has been received by Tenant of any default pursuant to this Lease which has not been cured, except as to defaults specified in the certificate;

(g) Intentionally Omitted;

(h) that Tenant has no option to purchase, right of first refusal or similar rights;

(i) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Tenant;

(j) that neither Landlord nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and

(k) any other information reasonably requested by Landlord or any Lender or mortgagee, as the case may be. If Tenant shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Any such certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises or leasehold.

## ARTICLE XI

## RELEASE AND INDEMNIFICATION

**Section 11.01 Release and Indemnification**. TENANT AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LANDLORD, LENDER, AND THEIR RESPECTIVE AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW. TENANT AGREES THAT NEITHER LANDLORD NOR LENDER SHALL BE RESPONSIBLE OR LIABLE TO TENANT OR TENANT'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON. TENANT AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF TENANT SHALL BE ACTING AS TENANT'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LANDLORD, LENDER NOR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF. TENANT SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY; *PROVIDED, HOWEVER*, THAT THE TERM "GROSS NEGLIGENCE" SHALL NOT INCLUDE GROSS NEGLIGENCE IMPUTED AS A MATTER OF LAW TO ANY OF THE INDEMNIFIED PARTIES SOLELY BY REASON OF LANDLORD'S INTEREST IN THE PROPERTY OR LANDLORD'S FAILURE TO ACT IN RESPECT OF MATTERS WHICH ARE OR WERE THE OBLIGATION OF TENANT UNDER THIS LEASE) RELATING IN ANY WAY TO THE PROPERTY OR CAUSED BY, INCURRED OR RESULTING FROM TENANT'S OPERATIONS OR BY TENANT'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY TENANT OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY TENANT, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

**Section 11.02 Non-Recourse to Landlord**. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Property and not against any other assets, properties or funds of (i) Landlord, (ii) Landlord's members, or any entity controlling, controlled by, or in common control of Landlord or Landlord's members, any director, officer, general partner, shareholder, limited partner, beneficiary, employee, attorney, consultant, contractor or agent of Landlord or any general partner of Landlord or any of its general partners (or any legal representative, heir, estate, successor or assign of any thereof), (iii) any predecessor or successor limited liability company, partnership or corporation (or other entity) of Landlord or any of its members, managers, general partners, shareholders, officers, directors, employees or agents, either directly or through Landlord or its general partners, shareholders, officers, directors, employees or agents or any predecessor or successor partnership or corporation (or other entity), (iv) any Lender, or any lender to a Person holding an interest in Landlord, (v) any Person affiliated with any of the foregoing, or any director, officer, employee or agent of any thereof; or (vi) the heirs, successors, personal representatives or assigns of any of the foregoing. Such exculpation of liability shall be absolute and without exception whatsoever. Furthermore, it is understood and agreed that in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent (unless Landlord is found to have acted in bad faith), and Tenant's sole remedy shall be an action for injunctive relief or specific performance. WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL THE LANDLORD, ANY MORTGAGEES, OR LANDLORD RELATED PARTIES, EVER BE LIABLE FOR ANY CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OR ANY LOST PROFITS OF TENANT.

## ARTICLE XII

## CONDEMNATION AND CASUALTY

**Section 12.01 Notification**. Tenant shall promptly give Landlord written notice of:

(a) any Condemnation of the Property;

(b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property; and

(c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Tenant shall promptly send Landlord copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 12.02 Partial Condemnation or Casualty**. Except as otherwise provided in Section 12.03, in the event of a Partial Condemnation or a Casualty:

(a) ***Net Awards***. All Net Awards shall be paid to Landlord.


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

(b) ***Landlord Election To Continue or Terminate Lease***. Landlord shall have the option,

(i) subject to the right of Tenant to elect otherwise as set forth in subsection (d) below, to terminate this Lease by notifying Tenant in writing within thirty (30) days after Tenant gives Landlord notice

(A) of such Partial Condemnation or Casualty, or

(B) that title has vested in the condemning authority; or

(ii) to continue this Lease in effect, which election shall be evidenced by either a notice from Landlord to Tenant, or Landlord's failure to notify Tenant in writing that Landlord has elected to terminate this Lease with respect to the Property within such thirty (30) day period. In the event the Partial Condemnation is material and adverse to Tenant's continued business operations to the extent that Tenant cannot substantially maintain the level of its operations, Tenant shall have a period of sixty (60) days after receipt of Landlord's notice to terminate referenced above during which to elect, despite such Landlord notice of termination, to continue this Lease with respect to the Property on the terms herein provided.

(c) ***No Continuance of Lease***. If Tenant does not elect to continue this Lease, then this Lease shall terminate with respect to the Property as of the date (the "Property Termination Date") that title has vested in the condemning authority. Tenant shall vacate and surrender the Property by the Property Termination Date, in accordance with the provisions of this Lease, and all obligations of either party hereunder shall cease as of the date of termination; *provided, however*, Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligations to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease with respect to the Property prior to the date of termination shall survive such termination. In such event, Landlord may retain all Net Awards related to the Partial Condemnation or Casualty, and Tenant shall immediately pay Landlord an amount equal to the insurance deductible applicable to any Casualty.

(d) ***Continuance of Lease***. If Landlord elects not to terminate this Lease, or if Landlord elects to terminate this Lease, but Tenant elects to continue this Lease, then, provided, Tenant has not exercised a termination its termination right in the event of a Partial Condemnation, this Lease shall continue in full force and effect upon the following terms:

(i) All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii) Tenant hereby assumes all risk of loss, damage or destruction, whether by Casualty, or the theft of all or any portion of the Property. Tenant shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Landlord. Subject to the terms and provisions of the Mortgages and upon the written request of Tenant (accompanied by evidence reasonably satisfactory to Landlord that such amount has been paid or is due and payable and is properly part of such costs, and that Tenant has complied with the terms of Section 8.02 in connection with the restoration), Landlord shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Landlord, an amount up to but not exceeding

the amount of any Net Award (after deducting all Costs incidental to the collection of the Net Award) received by Landlord with respect to such Partial Condemnation or Casualty. Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Tenant shall provide evidence reasonably satisfactory to Landlord of funds available to Tenant to pay restoration expenses (a) up to the amount of the insurance deductible applicable to such Casualty and (b) which are in excess of the amount of the Net Award. Landlord shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Tenant shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 12.03 Total Condemnation**. In the event of a Total Condemnation of the Property, other than a Temporary Taking, then, in such event:

(a) ***Termination of Lease***. All obligations of either party hereunder shall cease as of the date (the "Property Termination Date-Total Condemnation") that title vests in the condemning authority; *provided, however*, that Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligation to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease prior to the Property Termination Date-Total Condemnation shall survive such termination.

(b) ***Net Award***. Landlord shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Tenant by this Lease, and Tenant hereby expressly assigns to Landlord all of its right, title and interest in and to every such Net Award and agrees that Tenant shall not be entitled to any Net Award or other payment for the value of Tenant's leasehold interest in this Lease; but Tenant shall be entitled to any award to relocate its personal property from the Property, so long as such award does not reduce the Net Award to Landlord.

**Section 12.04 Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect, without any reduction of Base Annual Rental or any other Monetary Obligation payable hereunder. Except as provided below and subject to the terms and provisions of the Mortgages, Tenant shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Landlord and Tenant as of the date of such expiration.

**Section 12.05 Adjustment of Losses**. Any loss under any property damage insurance required to be maintained by Tenant shall be adjusted by Landlord and Tenant (except that if an Event of Default has occurred and is continuing, Landlord may adjust such claim without the written consent of Tenant). Subject to the terms and provisions of the Mortgages, any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Landlord or, at Landlord's election, Tenant. Notwithstanding the foregoing or any other provisions of this Section 12.05 to the contrary, but subject to the terms and provisions of the Mortgages, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Landlord is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Tenant and otherwise, to file and prosecute Tenant's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and

apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Tenant to Landlord under this Lease, in such order, priority and proportions as Landlord in its discretion shall deem proper.

**Section 12.06 Tenant Obligation in Event of Casualty**. During all periods of time following a Casualty, Tenant shall take reasonable steps to ensure that the related Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 12.07 Tenant Awards and Payments**. Notwithstanding any provision contained in this Article XII, Tenant shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the Taking of any Personalty owned by Tenant, any insurance proceeds with respect to any Personalty owned by Tenant, the interruption of its business and moving expenses (subject, however, to the provisions of Section 7.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Landlord's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Landlord for the Condemnation or Casualty, including payments or proceeds related to any Personalty then owned by Landlord.

**Section 12.08 Uninsured Losses**. Nothing contained herein shall relieve Tenant of its obligations under this Article XII if the destruction or damage is not covered, either in whole or in part, by insurance.

**Section 12.09 Regulatory Changes**. If any legally constituted authority prohibits Tenant from utilizing the Property for Tenant's purpose (i.e., substance use treatment facility), then this Lease shall cease when the public authority takes possession (due to condemnation), or when Tenant can reasonably vacate the Property (due to regulatory changes). Tenant will notify Landlord upon being made aware of condemnation or regulations that prohibits utilizing the Property for Tenant's stated purpose, and this Lease will terminate immediately upon Tenant's payment of one (1) year's rent.

## ARTICLE XIII

## DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES

**Section 13.01 Event of Default**. Each of the following shall be an event of default by Tenant under this Lease (each, an "Event of Default"):

(a) if any representation or warranty of Tenant set forth in this Lease is false in any material respect when made (it being understood that any false representation pursuant to Section 6.11 or 6.12 shall always be deemed to be material), or if Tenant renders any false statement or account when made;

(b) if any Rental or other Monetary Obligation due under this Lease is not paid within five (5) days of the date when due;



Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1 Case 3:26-cv-00322-SLG Document 1-1 Filed 09/09/26 Page 43 of 276 Page 43 of 276

(c) if Tenant fails to pay, prior to delinquency, any Taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, or Tenant fails to maintain any insurance required to be maintained by Tenant pursuant to this Lease;

(d) if there is an Insolvency Event affecting Tenant;

(e) if Tenant vacates or abandons the Property, or the Property ceases to be occupied and open for business by a Subtenant; *provided, however*, that no default shall occur if the Property is temporarily not open for business due to renovations or repairs, or if the Property is not open for business because Tenant had to terminate a Subtenant because of a default pursuant to a Sublease so long at Tenant is actively seeking a Subtenant for the Property.

(f) if Tenant fails to observe or perform any of the other covenants, conditions or obligations of Tenant in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Landlord in immediate jeopardy, and is within the reasonable power of Tenant to promptly cure, all as determined by Landlord in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Landlord shall have given Tenant notice thereof and a period of thirty (30) days shall have elapsed, during which period Tenant may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Landlord in its reasonable discretion, and Tenant is diligently pursuing a cure of such failure, then Tenant shall have a reasonable period to cure such failure beyond such thirty (30) day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Landlord. If Tenant shall fail to correct or cure such failure within such ninety (90) day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g) if a final, non-appealable judgment is rendered by a court against Tenant which has a Material Adverse Effect, or which does not have a Material Adverse Effect but which is in the amount of $25,000 or more (excluding claims covered by insurance), and in either event is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h) if Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i) if the estate or interest of Tenant in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j) if there is an "Event of Default" or other breach or default by Tenant pursuant to any of the other Transaction Documents or any Other Agreement, after the passage of all applicable notice and cure or grace periods; or


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

(k) a Transfer occurs without the written consent of Landlord (except to the extent that such consent is not required and Tenant otherwise complies with the provisions of Article XV of this Lease).

**Section 13.02 Remedies**. Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Tenant, Landlord shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following.

(a) to terminate this Lease, whereupon Tenant's right to possession of the Property shall cease and this Lease, but not Tenant's liability, shall be terminated;

(b) to the extent not prohibited by applicable law, and without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action, and without terminating (or being deemed to terminate) this Lease, to re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Tenant upon the Property and, to the extent permissible, all permits and other rights or privileges of Tenant pertaining to the use and operation of the Property;

(c) to expel Tenant and those claiming under or through Tenant, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. If Tenant shall, after default, voluntarily give up possession of the Property to Landlord, deliver to Landlord or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Landlord's rights and the acceptance thereof by Landlord or its agents shall not be deemed to constitute a termination of the Lease. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate;

(d) to bring an action against Tenant for any damages sustained by Landlord or any equitable relief available to Landlord and to the extent not prohibited by applicable Law, subject to Section 14.01, to seize all personal property or fixtures upon the Property which Tenant owns or in which it has an interest, in which Landlord shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Tenant's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action; provided, however, in no event shall Landlord take possession of, ownership of, or any interest in any documents or information covered by HIPPA or similar privacy laws or otherwise containing patient information.

(e) to re-let the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Landlord, in its sole discretion, may determine, with all proceeds received from such re-letting being applied

to the Rental and other Monetary Obligations due from Tenant in such order as Landlord may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such re-letting. Except to the extent required by applicable Law, Landlord shall have no obligation to re-let the Property or any part thereof and shall in no event be liable for refusal or failure to re-let the Property or any part thereof, or, in the event of any such re-letting, for refusal or failure to collect any rent due upon such re-letting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate as specified in said notice;

(f) RESERVED

(g) to accelerate and recover from Tenant all Rent due and owing and scheduled to become due and owing under this Lease, discounted to present value, both before and after the date of such breach for the entire original scheduled Lease Term, and Landlord may collect the same by distress or otherwise;

(h) to recover from Tenant all Costs paid or incurred by Landlord as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(i) to immediately or at any time thereafter, and with or without notice, at Landlord's sole option but without any obligation to do so, correct such breach or default and charge Tenant all Costs incurred by Landlord therein, plus an administrative fee of five percent (5%) of such Costs. Any sum or sums so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord. Any such acts by Landlord in correcting Tenant's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Landlord's right to exercise any or all remedies set forth herein;

(j) to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant held by Landlord under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Tenant hereunder;

(k) without limiting the generality of the foregoing or limiting in any way the rights of Landlord under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Landlord shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction in any action taken by Landlord to enforce its rights and remedies hereunder in order to protect and preserve Landlord's interest under this Lease or in the Property, the Existing Personalty and the Personalty, and in connection therewith, TENANT HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(l) to seek any equitable relief available to Landlord, including, without limitation, the right of specific performance.

Additionally, in the event of any default by Tenant, Landlord shall take commercially reasonable efforts to mitigate its damages, which obligation shall include listing the Property for lease at a commercially reasonable rental.

Any action taken by Landlord under this Section 13.02 shall not operate as a waiver of any right which Landlord would otherwise have against Tenant for rental hereby or otherwise, and Tenant shall remain responsible to Landlord for any loss and/or damage suffered by Landlord by reason of Tenant's default or breach. The words "reenter" and "reentry" as used in this Lease are not restricted to their technical legal meaning.

Nothing set forth in this Section affects the right of Landlord to indemnification for liability arising prior to the termination of this Lease for personal injuries or property damage as may be provided elsewhere in this Lease. In all events, Landlord shall have the right upon at least ten (10) days' notice to Tenant (or without notice in the event of a bona fide emergency effecting material damage to property or endangering life or health) to cure any breach by Tenant at Tenant's sole cost and expense, and Tenant shall reimburse Landlord for such expense immediately upon demand plus Default Interest, commencing on the date due through the date of payment.

**Section 13.03 Cumulative Remedies**. (a) All powers and remedies given by Section 13.02 to Landlord, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Landlord under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Tenant contained in this Lease, and no delay or omission of Landlord to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Landlord may be exercised from time to time, and as often as may be deemed expedient, by Landlord, subject at all times to Landlord's right in its sole judgment to discontinue any work commenced by Landlord or change any course of action undertaken by Landlord.

**Section 13.04 Landlord Default**. If Landlord is ever in default under the terms of this Lease, or if Landlord commits a breach of any one or more of the covenants, terms and conditions herein set forth, then Tenant shall deliver Landlord a written notice that states the alleged default or breach (the "**Landlord Default Notice**"). If Landlord does not cure the alleged default or breach within thirty (30) days after it receives the Landlord Default Notice (provided however, that if the breach or failure to perform cannot be reasonably cured within the 30-day period, then a Landlord default shall only be deemed to occur if Landlord does not in good faith commence the cure within the 30-day period and thereafter fails to diligently pursue the cure to completion within ninety (90) days after receiving the Landlord Default Notice), then, Tenant may cure such default or breach, and Landlord shall reimburse Tenant for all costs expended by Tenant in connection therewith within thirty (30) days after receiving an invoice from Tenant therefor, and if Landlord fails to reimburse Tenant within the 30-day period, then Tenant may deduct the amount of such costs from the next installment of Monthly Base Rent due hereunder until such costs have been repaid in full. Tenant agrees not to exercise any remedies available by virtue of a Landlord's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be

reasonably necessary to cure such default) unless Tenant has also given such parties a reasonable opportunity to cure such default (including but not limited to foreclosure proceedings if necessary to effect such cure).

## ARTICLE XIV

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 14.01 No Liens**. Landlord's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Tenant, and nothing herein contained shall be construed to require such subordination by Landlord. NOTICE IS HEREBY GIVEN THAT TENANT IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR TENANT'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID. Landlord shall have no interest in any personal property owned by Tenant and Tenant's lenders shall have the right to place security interests on such personal property. Landlord waives any right, title, or interest that Landlord may have in Tenant's personal property, anything in this Lease to the contrary notwithstanding and Landlord shall execute such documents or interest as shall be reasonably necessary to give effect to such waiver.

**Section 14.02 Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Landlord, and Tenant covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Landlord, or any present or proposed mortgagees under trust deeds, upon the condition that Tenant shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing. If requested by Landlord, Tenant shall execute an SNDA with a Lender holding a Mortgage, and Tenant agrees to promptly execute and return such SNDA to Landlord.

**Section 14.03 Election To Declare Lease Superior**. If any mortgagee, receiver or other secured party elects to have this Lease and the interest of Tenant hereunder, be superior to any Mortgage and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such Mortgage, whether this Lease was executed before or after such Mortgage and in that event such mortgagee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such Mortgage and had been assigned to such mortgagee, receiver or other secured party.

**Section 14.04 Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Landlord as landlord under this Lease, Tenant shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Landlord"), and recognize the Successor Landlord as lessor under this Lease, and, subject to the provisions of this

Article XIV, this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant, provided that the Successor Landlord shall only be liable for any obligations of Landlord under this Lease which accrue after the date that such Successor Landlord acquires title. The term "Landlord", as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of title to the Premises, and in the event of any transfer or transfers of title to the Premises or any part thereof, Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease to be performed after the effective date of such transfer. In the event of any transfer or transfers of Landlord's interest in the Premises, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, and Tenant agrees to attorn to such transferee. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 14.05 Execution of Additional Documents**. Although the provisions in this Article XIV shall be self-operative and no future instrument of subordination shall be required, upon request by Landlord Tenant shall execute and deliver whatever instruments may be reasonably required for such purposes.

**Section 14.06 Notice to Lender**. Tenant shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Tenant has been notified of any breach or default by Landlord of any of its obligations under this Lease and give such Lender at least thirty (30) days beyond any notice period to which Landlord might be entitled to cure such default before Tenant may exercise any remedy with respect thereto.

## ARTICLE XV

## ASSIGNMENT

**Section 15.01 Assignment by Landlord**. As a material inducement to Landlord's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Tenant hereby agrees that Landlord may, from time to time and at any time and without the consent of Tenant, engage in the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Landlord's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee (so long as Landlord and such purchaser or assignee notify Tenant in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Landlord hereunder from and after the date of such assignment). At the request of Landlord, Tenant will execute such documents confirming the sale, assignment or other transfer and such other agreements as Landlord may reasonably request, provided that the same do not increase the liabilities and obligations of Tenant hereunder.

Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 15.02 No Assignment by Tenant**. Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Property in entering into this Lease. Any assignment, sublease, transfer, conveyance, pledge or mortgage by Tenant, whether voluntary or involuntary, whether by operation of Law (for example, by merger) or otherwise, of any part or all of this Lease, or of any part or all of the leasehold estate created by this this Lease, or any interest herein is defined in this Agreement as a "Transfer". No Transfer shall occur without the prior written consent of Landlord, which consent shall not unreasonably be withheld. Notwithstanding the foregoing, Landlord's consent will not be required for a mortgage or pledge by Tenant of its assets so long as Tenant maintains the Minimum Net Worth requirement after such mortgage or pledge, after taking into account any distributions by Tenant of the proceeds from a financing secured by such mortgage or pledge. In no event, however, shall Tenant mortgage or pledge its leasehold interest hereunder without Landlord's prior written consent, which consent shall not unreasonably be withheld by Landlord. At the time of any assignment of this Lease which is approved in writing by Landlord, the assignee shall assume all of the obligations of Tenant under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Landlord. Such assignment of this Lease shall not relieve Tenant of its obligations respecting this Lease unless otherwise agreed to by Landlord. Any transfer, mortgage, assignment or pledge of this Lease by Tenant shall be voidable at the sole option of Landlord. Any consent to any Transfer shall not be deemed to be a consent to any subsequent Transfer.

In determining whether to grant consent to the Transfer, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in this Lease; whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, satisfactory to Landlord; use of the Premises by the proposed assignee, sublessee, or transferee must be identical to the use permitted by this Lease; use of the Premises by the proposed assignee, sublessee, or transferee will not violate or create any potential violation of any laws; a tangible net worth which is at least equal to the greater of Tenant's Tangible Net Worth at the Effective Date. For purposes of this Lease, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with GAAP, excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, and copyrights, franchises. If, pursuant to any provision of this Section 15.02, this Lease is assigned or transferred, or if all or any part of the Premises is sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, transferee, subtenant or occupant, and apply the net amount collected to the Rent and Additional Rent reserved in this Lease, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any covenant or condition of this Lease or a release of Tenant from the performance or further performance by Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Tenant may without the consent of Landlord and provided that Tenant remains liable for the performance of the terms of this Lease, assign this Lease in its entirety, or sublet the Property, with respect to all of the Property: (i) to an entity resulting from a


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

merger or consolidation with Tenant; or (ii) to any parent, affiliate or direct or indirect subsidiary of Tenant; (iii) to an entity which controls, is controlled by or is under common control with Tenant; (iv) in connection with the listing by Tenant or its parent or affiliates of its stock on a stock exchange; (v) or the sale by Tenant of any of its membership interests to a private equity firm or other buyer. In the event of any assignment or sublet pursuant to this paragraph, Tenant shall give Landlord a courtesy written notice at lease thirty (30) days in advance of the assignment or sublease, along with such other customary information as Landlord may reasonably request regarding the identity of the assignee or subtenant, together with updated insurance certifications.

**Section 15.03 Subletting**.

(a) Tenant shall not sublet the Property without the prior written consent of Landlord, which may be not be unreasonably withheld by Landlord, and any such purported subletting without Landlord's consent shall be void. Any Sublease shall be included in the definition of a "Transfer." Notwithstanding the foregoing, no Landlord consent shall be required with respect to entering into (or amending) a Sublease that is a Permitted Sublease (or with respect to an assignment by the Subtenant thereunder) so long as the Permitted Sublease also satisfies (or after the amendment or assignment continues to satisfy) all of the other requirements set forth in this Section 15.04 for a Sublease. Landlord agrees that Tenant's patients occupying rooms are not Subtenants.

(b) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now or hereafter in effect (the "Subleases") entered into for any part or all of the Property and any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom. Nothing in this Section 15.04 shall constitute an agreement by Landlord to permit Tenant to enter into Subleases without Landlord's written consent.

(c) Any Sublease of the Property shall be subject and subordinate to the provisions of this Lease (and all future amendments to this Lease). No assignment or Sublease shall affect or reduce any of the obligations of Tenant hereunder, including rental payments, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or Sublease had been made, notwithstanding the fact that a Subtenant, and not Tenant, may be in occupancy of the Property (it being understood that all of the representations, warranties, covenants and obligations of Tenant shall at all times remain in full force and effect with respect to the Property, even if Tenant may not at all times be in occupancy of the Property). No assignment or Sublease shall impose any additional obligations on Landlord under this Lease. Any Sublease shall require the Subtenant thereunder to maintain general liability insurance and statutory workers' compensation insurance in form and amounts set forth in this Lease.

(d) Tenant shall, within five (5) days after the execution and delivery of any assignment or Sublease (or amendment thereto) consented to by Landlord, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment, shall be in recordable form.

(e) Landlord shall have no obligation to recognize any or to agree to not disturb any Subtenant upon any Event of Default, unless Landlord shall agree to do so in writing by separate instrument, but Landlord shall have no obligation to do so. In the event of Tenant's surrender of this Lease or

the termination of this Lease for any reason or by any circumstance, Landlord may, at its option, either terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder (except to the extent that Landlord has entered into a nondisturbance agreement with a Subtenant).

(f) Tenant shall comply with all of the terms and conditions of this Lease relating to the Property, even though the Property may be subject to the terms of a Sublease, and the fact that Tenant may not have actual possession of the Property shall not relieve Tenant of any obligation to perform any covenant or satisfy any condition required to be performed or satisfied by Tenant under this Lease with respect to the Property.

(g) Tenant shall be responsible, at its sole cost and expense (with the right to obtain payment from or require payment by Subtenants subject to the License set forth in Section 15.04(h) below), for performing all covenants and satisfying all conditions required to be performed or satisfied by Tenant pursuant to any Sublease.

(h) Intentionally omitted.

(i) Subject to the License, Tenant shall be responsible for collecting from the Subtenants, and remitting to the appropriate Governmental Authorities, any sales, use or similar tax payable on rents received by Tenant pursuant to the Subleases.

(j) Tenant shall not accept any prepayment of rent from or on behalf of a Subtenant for more than thirty (30) days in advance of the accrual thereof. If there is any permitted prepayment of rent made pursuant to a Sublease, such prepayment shall be delivered to Landlord and applied by Landlord to the Rent obligations of Tenant next due and owing under this Lease.

(k) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all Subleases, and to any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom, subject to the License.

(l) If Tenant fails to timely perform its obligations, or exercise its rights and remedies, as the "landlord" under any Sublease, then Landlord may, but shall not be obligated to, enter upon the Property (or applicable portion thereof) and perform any such obligations or exercise any such rights and remedies, as the "landlord" under the applicable Sublease, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action. Tenant hereby agrees to reimburse Landlord on demand for any expense that Landlord incurs while exercising its rights under this Section 15.04(l), together with interest at the Default Rate, which interest shall accrue from the date of Landlord's payment of such expense until the date of reimbursement by Tenant. Furthermore, Tenant hereby agrees to defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from the exercise of Landlord's rights under this Section 15.04(l).

(m) No Sublease shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable to the same extent as though no Sublease had been made unless otherwise agreed to by Landlord.

**Section 15.04 Intentionally Omitted.**

## ARTICLE XVI

## NOTICES

**Section 16.01 Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease (collectively, "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) facsimile or E-Mail transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by facsimile or E-Mail transmission. Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Tenant: | Zinnia Health LLC<br>520 Newport Center, Suite 550<br>Newport Beach, CA 92660<br>Adam Bhaijee<br>Email: adam.bhaijee@zinniahealth.com |
| With a copy to | Paganelli Law Group<br>10401 N. Meridian Street, Suite 450<br>Indianapolis, IN 46290<br>Attn: Tony Paganelli |
| If to Landlord: | 5000 Taku Investors LLC<br>2211 N. Elston Avenue, Suite 400<br>Chicago, IL 60614<br>Attn: Shai Wolkowicki<br>Email: shai@shaitownrealty.com |
| With a copy to: | Northstone Law LLC<br>1016 W. Jackson Blvd, Suite 509<br>Chicago, IL 60607<br>Attn: Animesh K. Ravani, Esq.<br>Email: ani@northstone.law |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. If any mortgagee of Landlord shall notify Tenant that it is the holder of a mortgage affecting the Premises, Tenant shall provide a


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

copy of such Notice to such mortgagee, but failure to provide such a copy shall not affect the validity of such Mortgage.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01 Force Majeure**. If either party shall, without fault of such party, be delayed or prevented from the performance of any act required hereunder (other than the payment of money) by reason of acts of God, strikes, lockouts, labor troubles, war, terrorism, pandemic or epidemic, or inability to procure materials and such party gives the other party written notice of such event within ten (10) days after such event (a "Force Majeure Event"), the financial inability of the party excepted, performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended by a period equal to the period of such delay; *provided, however*, that nothing in this Section shall excuse Tenant from the prompt payment of any Rent or any other Monetary Obligations due hereunder. In the event of a Force Majeure Event in any event such party shall proceed with all diligence to complete the performance of the act upon the cessation of the Force Majeure Event.

**Section 17.02 No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly,

(a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and

(b) the fee estate or ownership of the Property or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03 Interpretation**. Landlord and Tenant acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant. Whenever Landlord or an Indemnified Party is entitled to indemnification, such indemnification shall include (but shall not be limited to) the obligation of the indemnifying party to pay the reasonable legal fees and expenses of counsel selected by Landlord or such Indemnified Party.

**Section 17.04 Characterization**. The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Landlord entering into this Lease:

(a) Landlord and Tenant intend that: (i) this Lease is a "true lease," this Lease is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (ii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Landlord and Tenant, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, nor to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

(b) Landlord and Tenant covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Accounting Standards Codification (ASC) 840, as amended, and as a true lease for state law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 18.04; (iii) the Lease Term (including any Extension Term) is less than eighty percent (80%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Landlord and Tenant on that basis, and the execution and delivery of, and the performance by Tenant of its obligations pursuant to, this Lease do not constitute a transfer of all or any part of the Property.

(c) Tenant stipulates and agrees not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 18.04.

(d) Tenant acknowledges that fee simple title (both legal and equitable) is in Landlord and that Tenant has only the leasehold right of possession and use of the Property as provided herein.

**Section 17.05 Intentionally Omitted**.

**Section 17.06 Bankruptcy**. As a material inducement to Landlord executing this Lease, Tenant acknowledges and agrees that Landlord is relying upon

(a) the financial condition and specific operating experience of Tenant and Tenant's obligation to use the Property as a Permitted Facility.

(b) Tenant's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Tenant; and

(c) all defaults under this Lease being cured promptly and this Lease being assumed as required in any order for relief entered under the Bankruptcy Code for Tenant, or this Lease being rejected within such deadline as may be established by the United States Bankruptcy Court and the Property surrendered to Landlord.

**Section 17.07 Attorneys' Fees.** In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled. Each party shall also be entitled to recover its reasonable attorneys' fees and other Costs incurred in any bankruptcy action filed by or against the other party, including, without limitation, those incurred in seeking relief from the automatic stay, in dealing with the assumption or rejection of this Lease, in any adversary proceeding, and in the preparation and filing of any proof of claim. The parties hereby expressly intend that such award of reasonable attorneys' fees and costs shall be mandatory and not discretionary.

**Section 17.08 Memoranda of Lease**. Upon the Commencement Date, Landlord and Tenant shall execute Landlord's standard form memorandum of lease in recordable form, indicating the names and addresses of Landlord and Tenant, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Landlord may not desire to disclose to the public. Further, upon Landlord's request, Tenant agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Landlord until the expiration or sooner termination of the Lease Term, which termination may be assigned by Landlord to any successor concurrently with this Lease; *provided, however*, if Tenant shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Tenant shall be responsible for payment of all taxes and recording fees in connection with the recording of the memoranda of lease contemplated by this Section 18.08. Landlord may, in its discretion, direct that neither this Lease nor a memorandum thereof be recorded.

**Section 17.09 No Brokerage**. Landlord and Tenant represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property. Each of Landlord and Tenant agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.10 Waiver of Jury Trial and Certain Damages**. LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LANDLORD AND ANY OF THE AFFILIATES, OFFICERS,

DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LANDLORD OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY TENANT OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.11 Intentionally Omitted**.

**Section 17.12 State-Specific Provisions**. The provisions and/or remedies which are set forth on the attached Exhibit C shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.13 Time Is of the Essence**. Time is of the essence with respect to each and every provision of this Lease. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included. If the time period by which any notices, acts or payments required hereunder must be delivered, performed or paid expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next business day. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. prevailing local time.

**Section 17.14 Waiver and Amendment**. No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. No acceptance by Landlord of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Landlord's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.15 Successors Bound**. Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.16 Captions**. Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.17 Other Documents**. Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.18 Entire Agreement**. This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided. All prior or contemporaneous agreements, letters of intent, representations, and understandings of

the parties are superseded by, and merged into, this Lease. No supplement, modification, or amendment of this Lease shall be binding unless executed in writing by Landlord and Tenant.

**Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law**. For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the exclusive jurisdiction of all federal and state courts located in the state where the Property is located. Tenant consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law. Furthermore, Tenant waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this Section shall limit or restrict the right of Landlord to commence any proceeding in the federal or state courts located in the states where the Property is located to the extent Landlord deems such proceeding necessary or advisable to exercise remedies available under this Lease. This Lease shall be governed by, and construed with, the laws of the state where the Property is located, without giving effect to any state's conflict of laws principles.

**Section 17.20 Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be deemed an original. This Lease may be accepted and signed in electronic form (e.g., by an electronic or digital signature or other means of demonstrating assent) and each party's electronic acceptance and signature will be deemed binding between the parties. Each party acknowledges and agrees it will not contest the validity or enforceability of this Lease, including under any applicable statute of frauds, because it was accepted and/or signed in electronic form. Electronic records of a party when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records. Notwithstanding the same, original signatures may be exchanged by the parties for record keeping purposes.

**Section 18.21 Landlord's Acquisition of the Property**. This Lease is contingent upon Landlord's acquisition of the Property. If the Landlord does not acquire the Property, any funds deposited by Tenant with Landlord under this Lease shall be returned and the parties shall have no further obligations hereunder except those which expressly survive the termination of this Lease. In no event shall Landlord be deemed in default of this Lease for not acquiring the Property.

**Section 18.22 Severability**. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, to any extent, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the maximum extent permitted by law.

**Section 18.23 Due Authorization**. Each person executing this Lease on behalf of Landlord and Tenant, respectively, warrants and represents that the Party for whom he or she is acting has been duly formed, is in good standing, and has duly authorized the transactions contemplated herein and the execution of this Lease by him or her and that, when so executed, this Lease shall constitute a valid and binding obligation of the Party on whose behalf it is so executed.


Document ID: 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1

**Section 18.24 Confidentiality**. All statements delivered to Landlord by Tenant and all information obtained by Landlord about Tenant, including, without limitation, financial information, in the exercise of Landlord's rights hereunder shall be held in strict confidence and shall not be disclosed to any party other than Landlord's personnel having the explicit need to know such information, for which Landlord agrees to get such personnel to similarly keep all such information confidential. Each party acknowledges that the terms and conditions of this Lease are to remain confidential for each parties' benefit, and may not be disclosed by either party to anyone except its professional advisors, prospective buyers, lenders, franchisor, or as required by order of the court, by any manner or means, directly or indirectly, without the other party's prior written consent which shall not be unreasonably withheld or delayed. The consent by either party to any disclosures shall not be deemed to be a waiver on the part of that party of any prohibition against any future disclosure.

**Section 18.25 No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

*Remainder of page intentionally left blank; signature page(s) to follow*

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease as of the date first above written.

**LANDLORD**:

**5000 Taku Investors LLC**

By: Shai Wolkowicki
Signer ID: HT4CDV4UN3...

Name: Shai Wolkowicki
Its: Manager

**[Signatures continued on next page]**



Document ID: 5c290727a32333bd869b17836ddc34354289cac4b9c50eea69cae589f083fda1

**TENANT:**

**Zinnia Health LLC,**
a Delaware limited liability company

By: ______________________________

Name: Taek-Geun Kwon
Its: Member

## EXHIBIT A

### LEGAL DESCRIPTION/STREET ADDRESS OF THE PROPERTY

**The land referred to herein below is situated in the Anchorage Recording District, Third Judicial District, State of Alaska and is described as follows:**

**Lots E1, E2, & E3, Tract E, WONDER PARK SUBDIVISION, according to the official plat thereof, filed under Plat Number P-217C, in the records of the Anchorage Recording District, Third Judicial District, State of Alaska.**

**APN: 006-293-17-000 - E1, 006-293-18-000 - E2, 006-293-19-000 - E3**

## EXHIBIT B

## FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS

| AUTHORIZATION AGREEMENT<br>PRE-ARRANGED PAYMENTS |
|---|
| Reference Number __________<br>I (We) (Tenant) authorize ______________________________ to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH. |
| Bank Name______________________________Branch______________________________ |
| City____________________________________State____________________Zip__________ |
| ***Transit - ABA Account Number Information |
| ACCOUNT TYPE*** Please specify checking or savings account (C/S) ________ |
| PLEASE FILL IN BANK INFORMATION CAREFULLY<br>ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION |

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non -sufficient funds or stop payment item is charged against the servicer's account.

| | |
|---|---|
| Tenant<br>Name(s) ______________________________________Number | Tax Identification |
| Date_____________________ | |
| Print Authorized Name | |
| Authorized Signature | |
| Print Authorized Name | |
| Authorized Signature | |
| Contact Phone Number ____________________ Fax Number | |
| Email Address: | |

Return Original to: __________________________

__________________________

__________________________

## EXHIBIT C

## STATE-SPECIFIC PROVISIONS

NONE.

## EXHIBIT D

INTENTIONALLY OMITTED

**EXHIBIT E**

NONE

## EXHIBIT G

**EXISTING SUBLEASES**

NONE.

# Signature Certificate

Envelope Ref:2ea010483de59e0213952df6ee56ef334fc23fc7

| Author: | Rebecca Somers | Creation Date: | 06 Jun 2024, 09:05:31, CDT | Completion Date: | 06 Jun 2024, 09:07:23, CDT |
|---|---|---|---|---|---|

## Document Details:



| | |
|---|---|
| Name: | Zinnia_Lease Template_Anchorage, AK_Final 6.6.2024 (2) |
| Type: | |
| Document Ref: | 5c290727a32333bd869b17836ddc34554289cac4b9c50eea69cae589f083fda1 |
| Document Total Pages: | 65 |

## Document Signed By:

| | |
|---|---|
| Name: | Shai Wolkowicki |
| Email: | shai@shaitownrealty.com |
| IP: | 76.109.64.58 |
| Location: | KINGS POINT, FL (US) |
| Date: | 06 Jun 2024, 09:07:23, CDT |
| Consent: | eSignature Consent Accepted |
| Security Level: | Email |

Shai Wolkowicki

Signer ID: HT4CDV4UN3...

## Document History:

| | |
|---|---|
| Envelope Created | Rebecca Somers created this envelope on 06 Jun 2024, 09:05:31, CDT |
| Invitation Sent | Invitation sent to Shai Wolkowicki on 06 Jun 2024, 09:06:35, CDT |
| Invitation Accepted | Invitation accepted by Shai Wolkowicki on 06 Jun 2024, 09:06:43, CDT |
| Signed by Shai Wolkowicki | Shai Wolkowicki signed this Envelope on 06 Jun 2024, 09:07:23, CDT |
| Executed | Document(s) successfully executed on 06 Jun 2024, 09:07:23, CDT |
| Signed Document(s) | Link emailed to shai@shaitownrealty.com |
| Signed Document(s) | Link emailed to rebecca@northstone.law |
| Signed Document(s) | Link emailed to ani@northstone.law |

# EXHIBIT B

Lease Agreement dated December 1, 2024

Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant

4950 Taku Drive, Anchorage, Alaska 99508


Page 69 of 276

**LEASE AGREEMENT**

by and between

**BUNNELL TAKU INVESTORS LLC**

as Landlord

and

**ZINNIA HEALTH LLC**

as Tenant

Made as of December 1, 2024

**4950 Taku Drive, Anchorage, Alaska, 99508**

**Table of Contents**

**Page**

ARTICLE I DEFINED TERMS ......1
ARTICLE II BASIC LEASE TERMS ......8
Section 2.01 Property ......8
Section 2.02 Lease Commencement Date ......8
Section 2.03 Extension Options ......8
Section 2.04 Expiration Date (if fully extended). ......9
Section 2.05 Initial Base Annual Rental ......9
Section 2.06 Rental Adjustment. ......9
Section 2.07 Adjustment Date ......9
Section 2.08 Tenant Tax Identification No. ......9
ARTICLE III LEASE OF PROPERTY ......9
Section 3.01 Lease ......9
Section 3.02 Quiet Enjoyment ......9
ARTICLE IV LEASE TERM; EXTENSION ......9
Section 4.01 Initial Term ......9
Section 4.02 Extensions ......10
Section 4.03 Notice of Exercise ......10
Section 4.04 Removal of Personalty ......10
Section 4.05 Existing Personalty ......10
Section 4.06 Reserved ......10
Section 4.07 Reserved ......11
ARTICLE V RENTAL AND OTHER MONETARY OBLIGATIONS ......11
Section 5.01 Base Monthly Rental ......11
Section 5.02 Adjustments ......11
Section 5.03 Monetary Obligations ......11
Section 5.04 Rentals To Be Net to Landlord. ......11
Section 5.05 ACH Authorization ......12
Section 5.06 Late Charges; Default Interest ......12
Section 5.07 Tenant Improvement Allowance ......12
Section 5.08 Holdover ......13

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF TENANT ..............................13
Section 6.01 Organization, Authority and Status of Tenant ..............................13
Section 6.02 Enforceability ..............................13
Section 6.03 Property Condition ..............................14
Section 6.04 Litigation ..............................14
Section 6.05 Absence of Breaches or Defaults ..............................14
Section 6.06 Licenses and Permits ..............................14
Section 6.07 Financial Condition: Information Provided to Landlord ..............................14
Section 6.08 Compliance With OFAC Laws ..............................14
Section 6.09 Solvency ..............................14
Section 6.10 Intentionally Omitted ..............................14
Section 6.11 Intentionally Omitted ..............................15
Section 6.12 Intentionally Omitted ..............................15
Section 6.13 Disclaimer of Warranties ..............................15
Section 6.14 Intentionally Omitted ..............................15
ARTICLE VII TAXES AND ASSESSMENTS; UTILITIES; INSURANCE ..............................15
Section 7.01 Taxes ..............................15
Section 7.02 Utilities ..............................18
Section 7.03 Insurance ..............................18
ARTICLE VIII MAINTENANCE; ALTERATIONS ..............................22
Section 8.01 Condition of Property; Maintenance ..............................22
Section 8.02 Alterations and Improvements ..............................23
Section 8.03 Encumbrances ..............................24
ARTICLE IX USE OF THE PROPERTY; COMPLIANCE ..............................24
Section 9.01 Use ..............................24
Section 9.02 Alternative Use ..............................24
Section 9.03 Compliance ..............................25
Section 9.04 Environmental ..............................26
Section 9.05 Intentionally Omitted ..............................29
ARTICLE X ADDITIONAL COVENANTS ..............................29
Section 10.01 Inspection ..............................29
Section 10.02 Financial Information ..............................29
Section 10.03 OFAC Laws ..............................30
Section 10.04 Estoppel Certificate ..............................31

ARTICLE XI RELEASE AND INDEMNIFICATION ....................................................32
Section 11.01 Release and Indemnification ....................................................32
Section 11.02 Non-Recourse to Landlord ....................................................32
ARTICLE XII CONDEMNATION AND CASUALTY ....................................................33
Section 12.01 Notification ....................................................33
Section 12.02 Partial Condemnation or Casualty ....................................................33
Section 12.03 Total Condemnation ....................................................35
Section 12.04 Temporary Taking ....................................................35
Section 12.05 Adjustment of Losses ....................................................35
Section 12.06 Tenant Obligation in Event of Casualty ....................................................36
Section 12.07 Tenant Awards and Payments ....................................................36
Section 12.08 Uninsured Losses ....................................................36
Section 12.09 Regulatory Changes ....................................................36
ARTICLE XIII DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES ....................................................36
Section 13.01 Event of Default ....................................................36
Section 13.02 Remedies ....................................................38
Section 13.03 Cumulative Remedies ....................................................40
Section 13.04 Landlord Default ....................................................40
ARTICLE XIV MORTGAGE, SUBORDINATION AND ATTORNMENT ....................................................41
Section 14.01 No Liens ....................................................41
Section 14.02 Subordination ....................................................41
Section 14.03 Election To Declare Lease Superior ....................................................41
Section 14.04 Attornment ....................................................41
Section 14.05 Execution of Additional Documents ....................................................42
Section 14.06 Notice to Lender ....................................................42
ARTICLE XV ASSIGNMENT ....................................................42
Section 15.01 Assignment by Landlord ....................................................42
Section 15.02 No Assignment by Tenant ....................................................43
Section 15.03 Subletting ....................................................44
Section 15.04 Intentionally Omitted ....................................................46
ARTICLE XVI NOTICES ....................................................46
Section 16.01 Notices ....................................................46
ARTICLE XVII MISCELLANEOUS ....................................................47
Section 17.01 Force Majeure ....................................................47

Section 17.02 No Merger....47
Section 17.03 Interpretation....47
Section 17.04 Characterization....47
Section 17.05 Intentionally Omitted....48
Section 17.06 Bankruptcy....48
Section 17.07 Attorneys' Fees....49
Section 17.08 Memoranda of Lease....49
Section 17.09 No Brokerage....49
Section 17.10 Waiver of Jury Trial and Certain Damages....49
Section 17.11 Intentionally Omitted....50
Section 17.12 State-Specific Provisions....50
Section 17.13 Time Is of the Essence....50
Section 17.14 Waiver and Amendment....50
Section 17.15 Successors Bound....50
Section 17.16 Captions....50
Section 17.17 Other Documents....50
Section 17.18 Entire Agreement....50
Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law....51
Section 17.20 Counterparts....51
Section 17.21 Landlord's Acquisition of the Property....51
Section 17.22 Severability....51
Section 17.23 Due Authorization....51
Section 17.24 Confidentiality....52
Section 17.25 No Offer....52

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of December 1, 2024 (the "Effective Date"), by and between **Bunnell Taku Investors LLC**, a Delaware limited liability company ("Landlord"), whose address is 2211 N. Elston Avenue, Suite 201, Chicago, Illinois 60614 and **Zinnia Health LLC, a Delaware limited liability company** ("Tenant"), whose address is 520 Newport Center Drive, Suite 550, Newport Beach, California 92660. Capitalized terms not defined herein shall have the meanings set forth in Article I below.

In consideration of the mutual covenants and agreements herein contained, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*Adjustment Date*" means that date set forth in Section 2.07.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., as amended.

"*Base Annual Rental*" means the Initial Base Annual Rental amount set forth in Section 2.05 as adjusted as set forth in Sections 2.06, 2.07 and 5.02.

"*Base Monthly Rental*" means, for any month, an amount equal to 1/12 of the applicable Base Annual Rental for the period in which such month falls.

"*Business Day*" means a day on which banks located in New York, NY are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Commencement Date*" means the  date on which Landlord acquires fee simple title to the Property, which date shall be confirmed in writing by the parties.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees, recordation taxes and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Insurer*" means such environmental insurance company as Landlord shall select in its sole discretion.

"*Environmental Laws*" means federal, state and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, Underground Storage Tanks ("USTs"), and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Tenant and/or the Property.

"*Environmental Liens*" has the meaning set forth in Section 9.04(a)(ii).

"*Environmental Policy*" means (a) that certain environmental insurance policy issued at or prior to Closing by Environmental Insurer to Landlord with respect to the Property if a UST is located at the Property, and (b) any renewal or replacement environmental insurance policy with respect to the Property if a UST is located, which Environmental Policy shall be in form and substance satisfactory to Landlord in its sole discretion.

"*Event of Default*" has the meaning set forth in Section 13.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Existing Personalty*" has the meaning set forth in Section 4.05.

"*Expiration Date*" means the Initial Term Expiration Date and, if the Initial Term is extended in accordance with this Lease, the last day of any applicable Extension Term.

"*Extension Option*" has the meaning set forth in Section 4.02.

"*Extension Term*" has the meaning set forth in Section 4.02.

"*Force Majeure Event*" has the meaning set forth in Section 18.01.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) oil, petroleum products (including any and all constituents and additives), flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants which pose a hazard to the Property or to Persons on or about the Property, cause the Property to be in violation of any local, state or federal Law or regulation, (including without limitation, any Environmental Law), or are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", "regulated substances" or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; (iv) the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et seq.; and (v) regulations adopted and publications promulgated pursuant to the aforesaid laws; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million contained in transformers or other equipment; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the occupants of the Property or the owners and/or occupants of any property adjoining the Property.

"*Immediate Repairs*" has the meaning set forth in Section 8.01.

"*Indemnified Parties*" means Landlord, Lender, Environmental Insurer (if any), and their respective members, managers, officers, directors, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Landlord, Lender or Environmental Insurer, as applicable.

"*Initial Term*" has the meaning set forth in Section 4.01.

"*Initial Term Expiration Date*" has the meaning set forth in Section 2.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Landlord Entity*" or "*Landlord Entities*" means individually or collectively, as the context may require, Landlord and all Affiliates of Landlord

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*" shall have the meaning described in Section 4.01.

"*Legal Compliance Repairs*" has the meaning set forth in Section 8.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Property. Legal Requirements shall specifically include (i) The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Americans With Disabilities Act, and the accessibility code(s), if any, of the State in which the Property are located, and all regulations and guidelines promulgated under any and all of the foregoing, as the same may be amended from time to time, and (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), Federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"), any state or local act, law, or code, and any applicable common law), rules, and regulations (including 40 Code of Federal Regulations, Part 280 and state and local rules and regulations).

"*Lender*" means any lender in connection with any loan or extension of credit, now or hereafter existing, secured by Landlord's interest in the Property, and any servicer, collateral agent and/or trustee with respect to any such loan or extension of credit.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including, without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Tenant Entity; (c) Tenant's ability to perform its obligations under this Lease; or (d) Landlord's interest in the Property, this Lease or the other Transaction Documents.

"*Minimum Net Worth*" means a net worth (computed in accordance with generally accepted accounting principles consistently applied) not less than $10,000,000.00 of EBITDA at the Property level.

"*Monetary Obligations*" has the meaning set forth in Section 5.03.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings, now or hereafter in existence, executed by Landlord for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to the Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 7.03 payable with respect to the Property, as the case may be, and in either case, less any Costs incurred by Landlord in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by any of the Tenant Entities, with, or for the benefit of, any of

the Landlord Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents.

"*Partial Condemnation*" means a Condemnation which is not a Total Condemnation.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Facility*" means using the Property as a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, and all related purposes such as ingress, egress and parking and uses incidental thereto.

"*Permitted Sublease*" shall mean a Sublease entered into by Tenant for 100% of the Property (a) for the purpose of permitting the Subtenant thereunder to operate a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, (b) pursuant to which the Subtenant makes the same representations to Tenant as are made by Tenant to Landlord as set forth in Section 6.08 of this Lease and such representations are true and correct at all times, and (c) which Sublease complies with all other requirements for a Sublease set forth in Section 15.04 of this Lease.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" has the meaning set forth in Section 17.01.

"*Property*" means those parcels of real estate legally described on Exhibit A attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate), including all signs and canopies, but shall exclude the Existing Personalty.

"*Property Termination Date*" has the meaning assigned to such term in Section 12.02(c).

"*Property Termination Date-Total Condemnation*" has the meaning assigned to such term in Section 12.03(a).

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local laws applicable to or regulating USTs.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other

movement of Hazardous Materials, Regulated Substances or USTs from the Property, or on or onto the Property (even if the source thereof is an adjoining property).

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rent*" means the Rental, the Monetary Obligations, and all other amounts due and payable by Tenant to Landlord hereunder.

"*Rental*" means the Base Annual Rental and Base Monthly Rental.

"*Rental Adjustment*" has the meaning set forth in Section 2.06 as adjusted as set forth in Section 2.07.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning set forth in Section 7.01(b).

"*SNDA*" means subordination, nondisturbance and attornment agreement.

"*Sublease*" has the meaning assigned to such term in Section 15.04.

"*Subtenant*" means a subtenant pursuant to a Sublease.

"*Successor Landlord*" has the meaning set forth in Section 14.04.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Taxes*" has the meaning set forth in Section 7.01(a).

"*Temporary Taking*" has the meaning set forth in Section 12.04.

"*Tenant Entity*" or "*Tenant Entities*" means individually or collectively, as the context may require, Tenant, and all Affiliates thereof.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" means a Condemnation of all or substantially all of the Property, including a Condemnation (other than for a temporary use) of such a substantial part of the Property resulting in the portion of the Property remaining after such Condemnation being unsuitable for use as a Permitted Facility, as determined by Tenant in the exercise of good faith business judgment.

"*Transfer*" has the meaning assigned to such term in Section 15.02 of this Agreement.

"*Transaction*" has the meaning set forth in Section 15.01.

"*Transaction Documents*" means this Lease, the Purchase and Sale Agreement, any other leases between any Landlord entity and any Tenant entity with respect to any other properties purchased by any Landlord entity pursuant to the Purchase and Sale Agreement, and all documents related to any of the foregoing.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly owned subsidiary of such an entity.

## ARTICLE II

## BASIC LEASE TERMS

**Section 2.01** **Property**. The street address of the Property is set forth on Exhibit A attached hereto.

**Section 2.02** **Lease Commencement Date.** The Lease Commencement Date shall be April 1, 2025. The Initial Term Expiration Date shall be determined as follows:

(a) If the Commencement Date is the first day of a calendar month, then the Initial Term Expiration Date will be the day immediately preceding the **15th anniversary** of the Commencement Date.

(b) If the Commencement Date is not the first day of a calendar month, then the Initial Term Expiration Date will be the last day of the month in which the **15th anniversary** of the Commencement Date occurs.

**Section 2.03** **Extension Options**. Two (2) extensions of Five (5) years each, as described in Section 4.02.

**Section 2.04** **Expiration Date (if fully extended)** March 31, 2050.

**Section 2.05** **Initial Base Annual Rental**. $102,000.00

**Section 2.06** **Rental Adjustment**. Three percent (3.0%) of the Base Annual Rental then in effect, with such Rental Adjustment taking effect on an annual basis throughout the Initial Term, as described in Section 5.02. The rental adjustment during the extension terms will be capped at three percent (3.0%).

**Section 2.07** **Adjustment Date**. April 1, 2026, and every anniversary thereafter during the Lease Term (including any Extension Term).

**Section 2.08** **Tenant Tax Identification No.** 85-3793244

## ARTICLE III

## LEASE OF PROPERTY

**Section 3.01** **Lease**. In consideration of Tenant's payment of the Rent and Tenant's performance of all other obligations hereunder, Landlord hereby leases to Tenant, and Tenant hereby takes and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default, or any event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing.

**Section 3.02** **Quiet Enjoyment**. So long as Tenant shall pay the Rent provided in this Lease, and shall keep and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default shall have occurred and be continuing.

## ARTICLE IV

## LEASE TERM; EXTENSION

**Section 4.01** **Initial Term**. The initial term of this Lease ("Initial Term") shall commence as of the Commencement Date and shall expire at 11:59 p.m. on the Initial Term Expiration Date, unless terminated sooner as provided in this Lease or as may be extended as provided herein. The time period during which this Lease shall actually be in effect, is referred to as the "Lease Term." As of the Commencement Date, Tenant agrees to accept possession of the Property.

**Section 4.02** **Extensions**. Provided that this Lease has not expired or has not been sooner terminated, and that no Event of Default has occurred and is continuing at the time any Extension Option is exercised, and provided that all other agreements necessary to the continued operation of Tenant's business at the Property are extended for a period of not less than the applicable extension periods, Tenant shall have the right and option (each, an "Extension Option") to extend the Initial Term for the Property for two (2) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 4.03** **Notice of Exercise**. Tenant may only exercise an Extension Option by giving written notice thereof to Landlord of Tenant's election to do so (a) no later than six (6) months prior to the Expiration Date. If written notice of the exercise of any Extension Option is not received by Landlord by the applicable dates described above, then this Lease shall terminate on the Initial Term Expiration Date or, if applicable, the last day of the Extension Term then in effect. Upon the request of Landlord or Tenant, the parties hereto will, at the expense of the requesting party, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 4.03.

**Section 4.04** **Removal of Personalty**. Upon the expiration of the Lease Term, and if Tenant is not then in breach hereof, Tenant may remove from the Property all personal property belonging to Tenant. Tenant shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear. Any property of Tenant left on the Property on the tenth day following the expiration of the Lease Term shall, at Landlord's option, automatically and immediately become the property of Landlord. Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. All such property shall at Landlord's option be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord. If Landlord arranges for storage of any personal property, Landlord shall have a lien against such property for costs incurred in removing and storing the same.

**Section 4.05** **Existing Personalty**. To the extent that there is any furniture, trade fixtures, equipment or other personal property located upon the Property as of the Effective Date, such Existing Personalty is the property of Tenant, and

(a) Tenant shall maintain insurance on the Existing Personalty pursuant to and in accordance with the provisions of Section 7.03 below; and

(b) Tenant may utilize such Existing Personalty during the Lease Term; *provided, however*, that Tenant utilizes such Existing Personalty "AS IS" and "WHERE IS" without representation or warranty of any kind by Landlord, without any claim to ownership thereof, and Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's use of the Existing Personalty. Tenant shall maintain and repair such Existing Personalty and upon the expiration or sooner termination of this Lease, at Landlord's option, Tenant shall either leave the Existing Personalty on the Property in the same condition as of the Effective Date, normal wear and tear excepted, or remove the Existing Personalty in the same manner as set forth for Personalty in Section 4.04 above.

**Section 4.06** **Reserved**

**Section 4.07 Reserved**

## ARTICLE V

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 5.01 Base Monthly Rental**. Tenant's obligation to pay Base Monthly Rental begins on the Commencement Date, and subsequent monthly installments of Base Monthly Rental are due and payable on or before the first day of each succeeding calendar month during the Lease Term. If the Commencement Date is a date other than the first day of a calendar month, then Tenant must pay the Base Monthly Rental for the remainder of the month in which the Commencement Date occurs. The amount due for that partial month is a sum equal to the Base Monthly Rental specified for the first full calendar month of the Lease Term multiplied by a fraction, the numerator of which is the number of days from the Commencement Date to the end of the calendar month in which the Commencement Date falls and the denominator of which is the total number of days in that month. Notwithstanding the foregoing, beginning on the Commencement Date and ending on the date that is six (6) months following the Commencement Date, Tenant shall partially abated Base Monthly Rental in the amount of fifty percent (50%) of the Base Monthly Rental. Beginning on the first day of the seventh (7th) month following the Commencement Date, Tenant shall pay the entire Base Monthly Rental set forth in Section above.

**Section 5.02 Adjustments**. During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental then in effect shall increase by an amount equal to the Rental Adjustment.

**Section 5.03 Monetary Obligations**. In addition to Base Annual Rental and Base Monthly Rental, Tenant shall pay and discharge all sums of money required to be paid or reimbursed by Tenant under this Lease to Landlord, to any party on behalf of Landlord, to any third party or to any Indemnified Party (the obligations described in this sentence are referred to collectively as the "Monetary Obligations"). Tenant shall pay and discharge any Monetary Obligations when the same shall become due, provided that amounts which are billed to Landlord or any third party, but not to Tenant, shall be paid within thirty (30) days after Landlord's demand for payment thereof or, if later, when the same are due. In no event shall Tenant be required to pay to Landlord any Monetary Obligation that Tenant is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 5.04 Rentals To Be Net to Landlord**.

(a) The Base Annual Rental payable hereunder shall be net to Landlord, so that this Lease shall yield to Landlord the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property) shall be performed and paid by Tenant, including without limitation, common area maintenance charges, if any, related to the Property. Tenant shall perform all of its obligations under this Lease at its sole cost and expense. All Rent which Tenant is required to pay hereunder shall be the unconditional obligation of Tenant and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement,

deferment, deduction or counterclaim whatsoever. For the avoidance of doubt, Tenant shall pay all taxes, insurance and utility charges and shall be solely responsible for the maintenance of the Property, including, without limitation utilities, building maintenance, repairs and replacements, including, but not limited to, the roof, structure, foundation, grease septic system, windows, and HVAC.

(b) Simultaneous with each payment to Landlord of Base Monthly Rental, Tenant shall pay to Landlord any applicable state sales tax and any applicable county or local sales tax. Tenant shall also pay to Landlord sales tax on any other payments which are subject to payment of any state or local sales tax, such sales tax payment to be made to Landlord at the same time as the payments subject to sales tax is paid by Tenant. In no event shall Tenant be responsible for paying Landlord's income taxes.

**Section 5.05** **ACH Authorization**. Upon execution of this Lease, Tenant shall deliver to Landlord a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit B attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental, impound payments (if any), sales tax or real property tax (if any), and any other Monetary Obligations are transferred by Automated Clearing House Debit initiated by Landlord from an account established by Tenant at a United States bank or other financial institution to such account as Landlord may designate. Tenant shall continue to pay all Rental and other Monetary Obligations by Automated Clearing House Debit unless otherwise directed by Landlord.

**Section 5.06** **Late Charges; Default Interest**. Any payment of Base Monthly Rental received more than five (5) days after its due date shall, in addition to any other remedy of Landlord, incur a late charge of five percent (5%) (which late charge is intended to compensate Landlord for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Tenant be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect. Any payment of a Monetary Obligation which is not paid to Landlord by Tenant on or prior to the date such payment is due to Landlord shall bear interest at a rate of interest per annum equal to the Default Rate.

**Section 5.07** **Tenant Improvement Allowance.** Landlord will pay to Tenant the cash sum of Four Hundred Thousand and 00/100 Dollars ($400,000.00) as "Tenant Improvement Allowance" (herein so called) for Tenant's improvements. The Tenant Improvement Allowance shall be paid within thirty (30) days following: Tenant's presentation to Landlord of a statement reflecting all costs, charges, fees and expenses incurred and work performed for the period immediately preceding such statement (each, a "Draw Statement") together with invoices evidencing the costs incurred by Tenant for the Tenant Improvements and notarized or electronically executed lien waivers from each contractor, subcontractor and supplier of materials to whom such disbursement is payable (which may be conditioned on payment) rendering labor and materials in excess of $5,000.00. With respect to the final Draw Statement, Tenant shall additionally provide (i) final and unconditional notarized or electronically executed lien releases or lien waivers from all contractors, subcontractors and suppliers of materials performing work or delivering materials to the Property in excess of $5,000.00 in connection with the Tenant

Improvements, (ii) an affirmation that all of the Tenant improvements are complete and Tenant has opened for business in the Property, and (iii) a final certificate of occupancy for the Property.

**Section 5.08 Holdover**. If Tenant remains in possession of the Property after the expiration of the term hereof, Tenant, at Landlord's option and within Landlord's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Tenant shall comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rental by Landlord shall be deemed a consent to such holding over. Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee. In addition, if during any holdover period, Tenant fails to surrender the Property within thirty (30) days following receipt of a written notice from Landlord that Landlord has entered into a lease with a new tenant and has demanded that Tenant vacate (a "**Disallowed Holdover**"), Landlord shall be entitled to seek damages, consequential as well as direct, incurred or actually sustained by Landlord by reason of such holding over, together with all costs incurred by Landlord (including but not limited to reasonable attorneys' fees) in connection with such holdover. The foregoing provision shall not affect Landlord's right of re-entry or any rights of Landlord hereunder or as otherwise provided by law.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF TENANT

The representations and warranties of Tenant contained in this Article VI are being made to induce Landlord to enter into this Lease, and Landlord has relied, and will continue to rely, upon such representations and warranties. Tenant represents and warrants to Landlord as follows:

**Section 6.01 Organization, Authority and Status of Tenant**. Tenant has been duly organized or formed, is validly existing and in good standing under the laws of its state of Delaware and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required. All necessary corporate action has been taken to authorize the execution, delivery and performance by Tenant of this Lease and of the other documents, instruments and agreements provided for herein, including without limitation, the Transaction Documents. Tenant is not, and if Tenant is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder. The Person who has executed this Lease on behalf of Tenant is duly authorized to do so.

**Section 6.02 Enforceability**. This Lease constitutes the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

**Section 6.03 Property Condition**. Tenant has physically inspected the Property and has examined title to the Property and has found all of the same satisfactory in all respects for all of Tenant's purposes.

**Section 6.04 Litigation**. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Tenant Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 6.05 Absence of Breaches or Defaults**. Tenant is not in default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound.

**Section 6.06 Licenses and Permits**. Tenant has obtained all required licenses and permits, both governmental and private, to use and operate the Property as a Permitted Facility.

**Section 6.07 Financial Condition: Information Provided to Landlord**. The financial statements, all financial data and all other documents and information heretofore delivered to Landlord by or with respect to the Tenant Entities and the Property in connection with this Lease or relating to the Tenant Entities or the Property are true, correct and complete in all material respects; there have been no amendments thereto since the date such items were prepared or delivered to Landlord; all financial statements provided were prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and fairly represent as of the date thereof the financial condition of each individual or entity to which they pertain; and no change has occurred to any such financial statements, financial data, documents and other information not disclosed in writing to Landlord, which has had, or could reasonably be expected to result in, a Material Adverse Effect.

**Section 6.08 Compliance With OFAC Laws**. None of the Tenant Entities or Subtenants, and no individual or entity owning directly or indirectly any interest in any of the Tenant Entities or Subtenants, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 6.09 Solvency**. There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Tenant, or to the best of Tenant's knowledge, its respective shareholders members, partners or Affiliates. Tenant does not have unreasonably small capital to conduct its business.

**Section 6.10 Intentionally Omitted**.

**Section 6.11 Intentionally Omitted.**

**Section 6.12 Intentionally Omitted.**

**Section 6.13 Disclaimer of Warranties**. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) AND THE OTHER LANDLORD ENTITIES HAVE NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD OR ANY OF THE LANDLORD ENTITIES BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) LANDLORD'S TITLE THERETO, (v) VALUE, (vi) COMPLIANCE WITH SPECIFICATIONS, (vii) LOCATION, (viii) USE, (ix) CONDITION, (x) MERCHANTABILITY, (xi) QUALITY, (xii) DESCRIPTION, (xiii) DURABILITY, (xiv) OPERATION, INCOME, EXPENSES, ENTITLEMENTS OR ZONING, (xv) THE EXISTENCE OF ANY HAZARDOUS MATERIALS, RELEASE OR VIOLATION OF HAZARDOUS MATERIALS LAWS, OR (xvi) COMPLIANCE OF THE PROPERTY WITH ANY LAW OR LEGAL REQUIREMENT; AND ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE PROPERTY IS OF ITS SELECTION AND TO ITS SPECIFICATIONS AND THAT THE PROPERTY HAS BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN THE PROPERTY OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD AND ALL OTHER LANDLORD ENTITIES SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS SECTION 6.13 HAVE BEEN NEGOTIATED, AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES BY LANDLORD OR ANY LANDLORD ENTITY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING OTHERWISE.

**Section 6.14 Intentionally Omitted.**

## ARTICLE VII

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 7.01 Taxes**.

(a) ***Payment***. Landlord shall cause all tax bills for the Property to be issued in Tenant's name to the address designed by Tenant in Section 16.01 below. Subject to the provisions of this Article VII, Tenant shall pay directly to the applicable taxing authority, prior to the earlier of delinquency or the accrual of interest on the unpaid balance (except as otherwise set forth in Section 7.01(a)(iii)), all taxes and assessments of every type or nature assessed against or imposed

upon the Property, Tenant, or Landlord during or prior to the Lease Term or arising out of this Lease and the activities of the parties hereunder (collectively, the "Taxes"), including, without limitation:

(i) All real estate taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures or improvements located on the Property, whether belonging to Landlord or Tenant, or any tax or charge levied in lieu of such taxes and assessments;

(ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Tenant;

(iii) all recordation taxes, realty transfer taxes and similar taxes due and payable by Landlord as a result of the transactions contemplated by the Transaction or any of the Transaction Documents; and

(iv) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rent hereunder (and which are not assessed against all gross income of the Landlord), the leasehold estate of either party or the activities of either party pursuant to this Lease, which such taxes shall be paid to Landlord simultaneously with any payment to Landlord of Base Monthly Rental or a Monetary Obligations, as the case may be.

Prior to the earlier of delinquency or the accrual of interest on the unpaid balance, Tenant shall provide Landlord with receipts showing that each tax and assessment payment required by this Section 7.01(a) (other than those described in Section 7.01(a)(iii)) was made in a timely fashion. Notwithstanding anything to the contrary herein, Tenant shall be responsible for all taxes and assessments upon the Property or any part thereof or improvements thereon for the tax year in which Landlord acquires the Property.

(b) ***Reserves***. Notwithstanding any other provision contained in this Lease, in the event that Tenant defaults in the payment of Taxes described in Section 7.01(a)(i) or (ii) or the payment of any premiums for the insurance required by Section 7.03, or upon the occurrence of any Event of Default, Landlord shall have the right, in addition to all other rights and remedies set forth in this Lease, upon written notice to Tenant and without waiving any default, to require Tenant to pay to Landlord on the first day of each month after such notice (or on the day of each month specified in the notice), one-twelfth (1/12) of the amount that Landlord reasonably estimates from time to time will be necessary in order to accumulate with Landlord, by the date that is at least thirty (30) days prior to the date or dates any or all of such Taxes or insurance premiums are due, sufficient funds to pay any and all such Taxes and/or insurance premiums for the ensuing twelve (12) months (which shall not be deemed a trust fund) (the "Reserve"). Landlord may also require Tenant to pay one-sixth (1/6) of said estimated amount as reserve overage, which may be retained by Landlord from year to year. Tenant shall transmit bills for the Taxes and insurance premiums as soon as received. Landlord shall, upon prior written request of Tenant, provide Tenant with evidence reasonably satisfactory to Tenant that payment of such Taxes and insurance premiums, as applicable, was made in a timely fashion. In the event that the Reserve does not contain sufficient funds to timely pay any such Taxes or insurance premiums, upon Landlord's written notification thereof, Tenant shall, within five (5) Business Days of such notice, provide funds to Landlord in the amount of such deficiency. Landlord shall pay or cause to be paid directly to the applicable

taxing authorities or insurance companies any such Taxes or insurance premiums, as applicable, then due and payable for which there are funds in the Reserve; *provided, however*, that in no event shall Landlord be obligated to pay any such Taxes or insurance premiums in excess of the funds held in the Reserve or after an Event of Default, and Tenant shall remain liable for any and all such Taxes and insurance premiums, including fines, penalties, interest or additional costs imposed by any insurance company or taxing authority (unless incurred as a result of Landlord's failure to timely pay the same if it had adequate funds in the Reserve). Tenant shall cooperate fully with Landlord in assuring that such Taxes and insurance premiums are timely paid. If the amount paid by Tenant into the Reserve in any year exceeds the aggregate required under this Lease, such excess shall be applied to the payments for the succeeding year. Landlord may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Landlord. Interest or other gains from such funds, if any, shall be the sole property of Landlord. Upon an Event of Default, in addition to any other remedies, Landlord may apply all Reserve funds against any sums due from Tenant to Landlord. Landlord shall give to Tenant an annual accounting showing all credits and debits to and from such Reserve funds received from Tenant.

(c) ***Right to Contest***. After written notice to Landlord and any Lender designated by Landlord, Tenant may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto (which shall exclude the right to contest Taxes described in Section 7.01(a)(iv)), including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that:

(i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings;

(ii) no Event of Default has occurred;

(iii) Tenant posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof;

(iv) Tenant shall promptly provide Landlord with copies of all notices received or delivered by Tenant and filings made by Tenant in connection with such proceeding; and

(v) prior to the date that any judgment becomes final or any writ or order is issued under which the Property could be sold pursuant to such final judgment, Tenant shall pay the amount of any such tax or assessment or part thereof as finally determined in such proceeding to be due, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.

Landlord will, at the request of Tenant, reasonably cooperate in such contest, provided that Landlord is not required to incur any third party out-of-pocket cost or expense in connection with any such contest.

(d) Taxes for the year in which the Commencement Date shall occur shall be prorated such that Landlord shall bear and be responsible the amount of Taxes coming due in the year in which

the Commencement Date occurs multiplied by a fraction, the numerator of which is the number of days preceding the Commencement Date in such year and the denominator is the total number of days in such year.

**Section 7.02** **Utilities**. Tenant shall contract for, in its own name, and pay when due all charges for, the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Landlord be responsible for any interruption of any utility service except to the extent caused by the gross negligence or intentional misconduct of Landlord. Landlord shall have the same rights and remedies for nonpayment by Tenant of any utilities that Landlord has under this Lease for failure of Tenant to pay Rent. Landlord shall not be liable for any interruptions or curtailment in utility services and any such interruption or curtailment shall not constitute a termination of this Lease or eviction of Tenant except to the extent caused by the gross negligence or intentional misconduct of Landlord.

**Section 7.03** **Insurance**.

(a) ***Coverage***. Throughout the Lease Term, Tenant shall maintain, with respect to the Property, at Tenant's sole expense, the following types and amounts of insurance, in addition to such other insurance as Landlord and Lender may reasonably require from time to time:

(i) Insurance against loss or damage to the Property, including, without limitation, the Existing Personalty under a special cause of loss insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance if the Property is located within a 100-year floodplain (FEMA Zones A and V) and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 7.03(b)(x) below). Such policy shall also include coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Landlord. Such insurance shall be in amounts sufficient to prevent Landlord from becoming a co-insurer under the applicable policies, and in any event, after application of deductible, in amounts not less than 100% of the full insurable replacement cost values and sublimits satisfactory to Landlord, as determined from time to time at Landlord's request but not more frequently than once in any 12 month period.

(ii) Commercial general liability insurance, including products and completed operation liability, covering Landlord and Tenant against bodily injury liability, property damage liability and personal and advertising injury, garage liability coverage, garage keepers liability or bailee customers personal property coverage (with coverage not less than $1,000,000.00 per occurrence) in the event Tenant's activities require such coverage, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. The commercial general liability policy shall

contain a broad form contractual liability endorsement under which the insurer agrees to insure Tenant's obligations under Article XI hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Tenant or Landlord because of the negligence or other acts of the other, shall have a combined single limit of at least $2,000,000.00 for bodily injury and property damage, or such higher limits as Landlord or Lender may reasonably require from time to time, and shall be of form and substance satisfactory to Landlord and Lender. These limits may be satisfied through commercial general liability and umbrella liability policies. Tenant shall not be required to carry liquor liability policies.

(iii) Statutory workers' compensation insurance and Employers Liability insurance in the amount required by applicable law covering all persons employed by Tenant on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Property.

(iv) Rental value insurance, equal to 100% of the Base Annual Rental (as the same may adjusted hereunder) for a period of not less than twelve (12) months basic period plus a six (6) month extended period of indemnity, which insurance shall be carved out of Tenant's business interruption coverage for a separate rental value insurance payable to Landlord, or if rental value insurance is included in Tenant's business interruption coverage, the insurer shall provide priority payment to any rent obligations, and such obligations shall be paid directly to Landlord. Such insurance is to follow form of the special cause of loss coverage and is not to contain a co-insurance clause.

(v) Equipment Breakdown insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, located in or about the Property and in an amount equal to the lesser of (i) 25% of the 100% replacement cost of the Property or (ii) $5,000,000.00.

(vi) Automobile Liability Insurance not less than $1,000,000 per occurrence covering all owned and non-owned vehicles.

(vii) Builder's Risk Insurance, but only prior to the commencement of and during the construction of any permitted rehabilitation, replacement, reconstruction, restoration, renovation or alteration of the Property, and only to the extent that such coverage is not being maintained by Tenant's contractor(s) pursuant to a policy or polices reasonably acceptable to Landlord.

(viii) The foregoing insurance requirements shall also apply to any Subleases and subtenants shall provide the same proof of coverage to Landlord hereunder as Tenant.

(b) ***Insurance Provisions***. All insurance policies shall:

(i) provide

(A) via a waiver of subrogation endorsement, and a waiver of subrogation by the insurer as to claims against Landlord, any Lender designated by Landlord, and their respective employees and agents;

(B) that the insurer shall not deny a claim and that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Tenant, its officers, directors,

employees or agents, or anyone acting for Tenant or any subtenant or other occupant of the Property; and

(C) that any losses otherwise payable thereunder shall be payable notwithstanding any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment;

(ii) be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Landlord and the insurance policy shall not be brought into contribution with insurance maintained by Landlord;

(iii) contain deductibles not to exceed $25,000.00 per occurrence, and all deductibles on insurance policies shall be borne by Tenant;

(iv) contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Landlord;

(v) provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Landlord and to any Lender covered by any standard mortgagee clause or endorsement;

(vi) provide that the insurer shall not have the option to restore the Property if Landlord elects to terminate this Lease in accordance with the terms hereof;

(vii) be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(viii) except for workers' compensation insurance referred to in Section 7.03(a)(iii) above, name Landlord and any Landlord Affiliate or Lender requested by Landlord, as an "additional insured" with respect to general liability insurance, as a "named insured" with respect to real property and the Existing Personalty, if applicable, and as a "loss payee" with respect to all real property, Existing Personalty and rental value insurance, as appropriate and as their interests may appear;

(ix) upon demand and at least thirty (30) days prior to the expiration date of any policy required hereunder, be evidenced by delivery to Landlord and any Lender designated by Landlord of an Acord Form 28 for property, rental value and boiler & machinery coverage (or any other form requested by Landlord) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Landlord), which forms shall bear notations evidencing the prior payment of insurance premiums and be accompanied by other evidence satisfactory to Landlord and any Lender designated by Landlord that such payment has been made; provided that in the event that either such form is no longer available or any such Lender requires a different form, such evidence of insurance shall be in a form reasonably satisfactory to Landlord and any Lender designated by Landlord; and

(x) be issued by insurance companies licensed to do business in the states where the Property is located and which are rated A:VIII or better by Best's Insurance Guide or are otherwise approved by Landlord.

(c) ***Additional Obligations***. It is expressly understood and agreed that

(i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and any Lender designated by Landlord;

(ii) the minimum limits of insurance coverage set forth in this Section 7.03 shall not limit the liability or obligations of Tenant for its acts or omissions as provided in this Lease;

(iii) Tenant shall procure policies for all insurance for periods of not less than one year and shall provide to Landlord and any servicer or Lender of Landlord certificates of insurance or, upon Landlord's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times;

(iv) Tenant shall pay as they become due all premiums for the insurance required by this Section 7.03;

(v) in the event any insurance policy required to be maintained by Tenant hereunder contains any breach of warranty provisions, Tenant shall not cause any violations of the policy warranties, declarations or conditions in such policy;

(vi) Tenant shall, from time to time, upon request from Landlord, provide copies of all certificates of insurance required hereunder; and

(vii) in the event that Tenant fails to comply with any of the requirements set forth in this Section 7.03, within ten (10) days of the giving of written notice by Landlord to Tenant,

(A) Landlord shall be entitled to procure such insurance and/or require Tenant to deposit funds to cover the insurance premium payments into the Reserve pursuant to the terms of Section 7.01(b); and

(B) any sums expended by Landlord in procuring such insurance shall be a Monetary Obligation (and not Rental) and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(d) ***Blanket Policies***. Notwithstanding anything to the contrary in this Section 7.03, any insurance which Tenant is required to obtain pursuant to this Section 7.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 7.03.

(e) ***Change in Operation***. Landlord reserves the right to require additional and/or other insurance if Tenant has a change in operation or use of the Property.

## ARTICLE VIII

## MAINTENANCE; ALTERATIONS

**Section 8.01 Condition of Property; Maintenance**. Tenant hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Landlord as to the condition thereof. Tenant shall, at its sole cost and expense, be responsible for:

(a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste, including without limitation, the roof and the HVAC and other electrical and mechanical systems;

(b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty;

(c) subject to Section 8.02, making all necessary structural, non-structural exterior and interior repairs and replacements to any building, structures or improvements erected on the Property,

(d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facility; and

(e) paying all operating costs of the Property in the ordinary course of business. Tenant waives any right to require Landlord to maintain or repair all or any part of the Property or make repairs at the expense of Landlord pursuant to any Legal Requirements at any time in effect.

In elaboration of the foregoing, Tenant shall (a) keep the outside of all glass in the doors and windows of the Property clean; (b) keep exterior surfaces of the entrances and exits to the Property clean; (c) replace promptly any cracked or broken glass on the Property with glass of like grade and quality; (d) keep any garbage, trash, rubbish or other refuse in appropriate containers; and (e) comply with all laws, ordinances, rules and regulations of governmental authorities.

Landlord and its mortgagee shall not be liable for, and Tenant waives, all claims for loss or damage to Tenant's business or loss, theft or damage to Tenant's personal property or the property of any person claiming by, through or under Tenant resulting from: (1) wind or weather; (2) the failure of any sprinkler, heating or air conditioning equipment, any electric wiring or any gas, water or steam pipes; (3) the backing up of any sewer pipe or downspout; (4) the bursting, leaking or running of any tank, water closet, drain or other pipe; (5) water, snow or ice upon or coming through the roof, skylight, stairs, doorways, windows, walks or any other place upon or near the Property; (6) any act or omission of any party other than Landlord or Landlord related parties; and (7) any other causes other than the gross negligence or intentional misconduct of Landlord and/or the Landlord related parties.

Tenant shall store all of Tenant's trash in dumpsters or other covered trash receptacles. Tenant may also maintain garbage cans customary to Tenant's business on the sidewalk located in front of the Property, provided that (i) Tenant shall empty the garbage cans regularly and maintain the area in a neat and orderly fashion, including cleaning up any spills and (ii) the garbage cans shall not be located so as to block or materially impair access across the sidewalk.

Landlord shall have no obligation whatsoever to maintain or repair the Property, the improvements, or equipment thereon, whether structural or non-structural, during the Term, all of which obligations are intended to be imposed on the Tenant.

**Section 8.02** **Alterations and Improvements**. After the completion of Tenant's initial improvements, , Tenant shall not alter the exterior, structural, plumbing or electrical elements of the Property or make any material alterations or improvements in any manner during the Lease Term, without the consent of Landlord, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Tenant may undertake nonstructural alterations to the Property, individually costing less than $150,000, without Landlord's prior written consent. No USTs may be installed at the Property without Landlord's written consent, which consent shall be at Landlord's sole and absolute discretion. If Landlord's consent is required hereunder and Landlord consents to the making of any such alterations, the same shall be made by Tenant at Tenant's sole expense by a licensed contractor and according to plans and specifications approved by Landlord and subject to such other conditions as Landlord shall reasonably require, including, but not limited to, Landlord's supervision of any such alterations. Any work at any time commenced by Tenant on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $10,000 or more, Tenant shall promptly provide Landlord with evidence of full payment to all laborers and materialmen contributing to the alterations, including, but not limited to, executed lien waivers.

Additionally, upon completion of any alterations, Tenant shall promptly provide Landlord with:

(a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect);

(b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and

(c) any other documents or information reasonably requested by Landlord. Tenant shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. Tenant shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Landlord is not responsible for the payment of any costs or expenses relating to the additions or alterations. Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Landlord, and Tenant shall execute and deliver to Landlord such instruments as Landlord may require to evidence the ownership by Landlord of such addition or alteration. If Tenant fails to bond or have discharged any lien as required herein within thirty (30) days thereafter, then Landlord may (but shall have no obligation to or discharge the lien on Tenant's behalf and the cost thereof shall be a Monetary Obligation immediately due and payable to Landlord plus interest at the Default Rate.

(d) All alterations, additions, and improvements to the Property shall comply at all times with all applicable laws, rules, regulations, and ordinances, and Tenant shall obtain all necessary

permits for such alterations, additions, and improvements. Notwithstanding anything in this Lease to the contrary, if Tenant constructs, makes or installs or causes to be constructed, made or installed any improvement or alteration in or to the Property (including, but not limited to, the initial construction of the Building and Improvements), Tenant shall be solely responsible for ensuring that such improvements and/or alterations do not violate any provision in any local, state or federal law or regulation relating to accessibility for handicapped persons or the removal of architectural or communication barriers to accessibility, ("**Disability Law**"), including, but not limited to, The Americans with Disabilities Act. If any claim is asserted against Landlord under any Disability Law which claim relates directly or indirectly to any alterations or improvements installed, made or constructed, directly or indirectly, by or for Tenant in or to the Property or any trade fixture or personal property item used by Tenant in the Property, Tenant shall defend, indemnify and hold the Landlord Parties harmless from and against the claim and any and all charges, liabilities, obligations, penalties, damages, judgments, costs and expenses (including costs of investigation and attorneys' fees) arising or incurred against or suffered, directly or indirectly, by Landlord relating thereto. If it should be determined that any improvement or alteration constructed, made or installed in or to the Property, directly or indirectly, by or for Tenant or any trade fixture or personal property item used by Tenant in the Property is an illegal architectural or communication barrier under any Disability Law, Tenant shall immediately, at its sole cost and expense, remove the barrier or, to the extent allowed by the Disability Law, provide alternatives to the barrier so as to make the Property accessible to handicapped persons.

**Section 8.03** **Encumbrances**. During the Lease Term, Landlord shall have the right to grant easements on, over, under and above the Property without the prior consent of Tenant, provided that such easements will not materially and adversely interfere with Tenant's use of the Property. Without Landlord's prior written consent, which consent shall be at Landlord's sole and absolute discretion, Tenant shall not grant any easements on, over, under or above the Property.

## ARTICLE IX

## USE OF THE PROPERTY; COMPLIANCE

**Section 9.01** **Use**. During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility and for no other purpose whatsoever. Except during periods when the Property is untenantable due to Casualty or Condemnation (and provided that Tenant continues to strictly comply with the other terms and conditions of this Lease), Tenant shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.

**Section 9.02** **Alternative Use**. Tenant shall not, by itself or through any permitted assignment, sublease or other type of transfer, convert the Property to an alternative use during the Lease Term without Landlord's prior written consent, which consent shall not be unreasonably withheld; *provided, however*, that Landlord's consent shall not be deemed unreasonably withheld if Landlord's decision is based on any or all of the following:

(a) whether the rental paid to Landlord would be equal to or greater than the anticipated rental assuming continued existing use;

(b) whether the proposed rental to be paid to Landlord is reasonable considering the converted use of the Property and the customary rental prevailing in the community for such use;

(c) whether the converted use will be consistent with the highest and best use of the Property;

(d) whether the concerted use is permitted at the Property in accordance with all applicable Legal Requirements, restrictions, covenants, and encumbrances of record;

(e) whether the converted use will increase Landlord's risks or decrease the value of the Property; and

(f) whether Landlord is able to obtain approval of its Lender to any such change in use.

**Section 9.03** **Compliance**. The use and occupation of the Property (whether by Tenant or any permitted Subtenant), and the condition thereof, shall, at Tenant's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property), and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property. Without in any way limiting the foregoing provisions, any Sublease shall expressly prohibit any Subtenant, licensee or occupant thereunder from violating, or permitting the violation of, any Legal Requirements or the above-referenced restrictions, covenants or encumbrances. In addition and without in any way limiting the foregoing provisions, Tenant shall comply, and shall cause all Subtenants, licensees or other occupants to comply, with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such laws may be amended from time to time, and all regulations promulgated thereunder, as they affect the Property now or hereafter in effect. Upon Landlord's written request from time to time during the Lease Term, Tenant shall certify in writing to Landlord that Tenant's representations, warranties and obligations under Section 6.07 and this Section 9.03 remain true and correct and have not been breached. Tenant shall immediately notify Landlord in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Tenant shall (and shall cause each Subtenant, licensee or occupant to) comply with all Legal Requirements and directives of Governmental Authorities and, at Landlord's request, provide to Landlord copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Tenant shall also reimburse Landlord for all Costs incurred by Landlord in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Landlord to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Landlord as the result of the existence of such an event and for any penalties or fines imposed upon Landlord as a result thereof. Tenant will use its best efforts to prevent any act or condition to exist on or about the Property which will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Tenant shall pay for such increase. Tenant will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Tenant's failure to comply with its obligations under this Section. All matters related to compliance

with Environmental Law or dealing with Hazardous Materials shall be governed by Section 9.04. This Section is subject and subordinate to Section 9.04, and in the event of any inconsistency between Section 9.04 and this Section 9.03, Section 9.04 shall control and prevail.

**Section 9.04 Environmental**.

(a) ***Representations and Warranties***. Tenant represents and warrants to Landlord and Environmental Insurer which representations and warranties shall survive the execution and delivery of this Lease, as follows:

(i) Tenant is not in violation of or subject to, any pending or, to Tenant's actual knowledge, threatened investigation or inquiry by any Governmental Authority or to any remedial obligations under any Environmental Laws that could have a Material Adverse Effect, nor has Tenant received any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) with respect to the Property relating to

(A) Hazardous Materials, Regulated Substances or USTs, or Remediation thereof;

(B) possible liability of any Person pursuant to any Environmental Law;

(C) other environmental conditions; or

(D) any actual or potential administrative or judicial proceedings in connection with any of the foregoing that could have a Material Adverse Effect. The foregoing representations and warranties would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Property.

(ii) All uses and operations on or of the Property, whether by Tenant or, to Tenant's knowledge, any other Person acting on Tenant's behalf, have been in compliance with all Environmental Laws and environmental permits issued pursuant thereto;

(A) Tenant has not allowed any other tenant or other user of the Property to do any act that materially increased the dangers to human health or the environment, posed an unreasonable risk of harm to any Person (whether on or off the Property), impaired the value of the Property in any material respect, is contrary to any requirement set forth in the insurance policies maintained by Landlord including, without limitation, the Environmental Policy, constituted a public or private nuisance, constituted waste, or violated any covenant, condition, agreement or easement applicable to the Property.

(b) ***Covenants***.

(i) Tenant covenants to Landlord and Environmental Insurer during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A) The Property, Tenant and any Subtenant shall not be in violation of any investigation or inquiry by any Governmental Authority.


Page 100 of 276

(B) All uses and operations on or of the Property, whether by Tenant, Subtenant or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(C) There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(D) Tenant shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Tenant, Subtenant or any other Person.

(E) Tenant shall not do or allow any Subtenant or other user of any part of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), has a Material Adverse Effect, is contrary to any material requirement set forth in the insurance policies maintained by Tenant, constitutes a public or private nuisance or constitutes waste, violates any covenant, condition, agreement or easement applicable to the Property, or creates the threat of a Release.

(F) Tenant shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property as may be reasonably requested by Landlord (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Landlord and Environmental Insurer the reports and other results thereof, and Landlord, Environmental Insurer and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof.

(G) Tenant shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 9.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(H) Tenant will dispose of all biomedical waste generated through its operations in a manner consistent with all applicable laws and/or regulations.

(ii) Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Tenant to satisfy any one or more of the covenants set forth in subsections (A) through (F) above provided that Tenant shall be in compliance with the requirements of any Governmental Authority with respect to the discovery or Remediation of any Release at the Property.

(c) ***Notification Requirements***. Tenant shall immediately notify Landlord and Environmental Insurer in writing upon Tenant obtaining actual knowledge of:

(i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property;

(ii) any non-compliance with any Environmental Laws related in any way to the Property;

(iii) any actual or potential Environmental Lien;

(iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and

(v) any written or oral notice or other communication, including but not limited to, notices of violation ("NOV") issued by a Governmental Authority of which Tenant becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or USTs, a Release or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Tenant shall, upon Landlord's or Environmental Insurer's written request, deliver to Landlord or Environmental Insurer a certificate stating that Tenant is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(d) ***Remediation***. Solely to the extent that they are the direct and proximate result of Tenant's conduct (whether intentional or negligent), Tenant shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release, a Threatened Release or a suspected Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment. Should Tenant fail to undertake such Remediation in accordance with the preceding sentence, Landlord, after written notice to Tenant and Tenant's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs reasonable incurred in connection therewith shall be paid by Tenant. Any Cost so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord.

(e) ***Indemnification***. Solely to the extent that they are the direct and proximate result of Tenant's conduct, Tenant shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, USTs, or other environmental matters concerning the Property, including, but not limited to, all fines, penalties, claims or expenses imposed pursuant to any Environmental Law and all Costs of Remediation (whether or not performed voluntarily). It is expressly understood and agreed that Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(f) ***Right of Entry***. Landlord and any other Person designated by Landlord, including but not limited to Environmental Insurer, if any, any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (including, without limitation, in connection with the exercise of any remedies set forth in this Lease) to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Landlord's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and




Page 102 of 276

conducting other invasive testing. Tenant shall cooperate with and provide access to Landlord, Environmental Insurer and any other Person designated by Landlord.

(g) ***Survival***. The obligations of Tenant and the rights and remedies of Landlord under this Section 9.04 shall survive the termination, expiration and/or release of this Lease.

(h) ***Intentionally Omitted.***

(i) ***Intentionally Omitted.***

(j) ***Conveyance***. Upon expiration or termination of this Lease, and upon (and to the extent set forth in) a written request of Landlord, Tenant shall convey any UST (if any) to Landlord or Landlord's designee, free and clear of all liens and security interests.

(k) The obligations of this Article IX shall survive the expiration or termination of the Lease.

**Section 9.05 Intentionally Omitted.**

## ARTICLE X

## ADDITIONAL COVENANTS

**Section 10.01 Inspection**. Landlord, any Lender designated by Landlord, and their authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (which may be given by telephone, text or email, and which need not be given in the event of an emergency), without delay, hindrance or restriction, to enter the Property or any part thereof and inspect the same. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 11.01, excluding damages arising as a result of the negligence or intentional misconduct of Landlord.

The foregoing notwithstanding, certain areas of the Property shall have present in it information and documents covered by Health Insurance Portability and Accountability Act of 1996, as amended ("HIPPA"). Landlord agrees that it shall not (and shall not permit others to) access, copy, distribute, disclose, review, read, or otherwise interact with in anyway information covered by HIPPA or any of Tenant's other patient records, whether or not covered by HIPPA. Landlord agrees that in exercising Landlord's right to re-enter the Property, it or its agents, employees, contractors shall be accompanied at all times by a representative to Tenant.

**Section 10.02 Financial Information**.

(a) ***Intentionally Omitted***.

(b) ***Financial Statements***. On or before each February 15, Tenant and any guarantor of this lease shall deliver to Landlord:

(i) complete financial statements of the Tenant Entities including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended;

(ii) income statements for the business at the Property reflecting the business operations at the Property; and

(iii) a statement identifying each Subtenant, setting forth the rentals payable by each Subtenant and the revenue received from each Subtenant, setting forth the length of the unexpired term of each Sublease, identifying each Subtenant who is in default, and providing such other information as Landlord or Lender may require.

All such financial statements shall be prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and shall be certified to be accurate and complete by an officer or director of each Tenant Entity and otherwise be in form and substance satisfactory to Landlord and Lender. Tenant understands that Landlord will rely upon such financial statements and Tenant represents that such reliance is reasonable. In the event that Tenant's property and business at the Property are ordinarily consolidated with other business for financial statements purposes, such financial statements shall be prepared on a consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Property with the basis for allocation of overhead of other charges being clearly set forth. The financial statements delivered to Landlord need not be audited, but Tenant shall deliver to Landlord copies of any audited financial statements of the Tenant Entities which may be prepared, as soon as they are available. Within thirty (30) days after the end of each fiscal year of Tenant, and upon prior written request by Landlord, Tenant shall deliver such compliance certificate to Landlord as Landlord may reasonably require in order to establish that Tenant is in compliance with all of its obligations, duties and covenants under this Lease.

(c) ***Other Information***. Notwithstanding any provision contained herein, upon request at any time, Tenant will provide to Landlord any and all financial information and/or financial statements (and in the form or forms):

(i) requested by Landlord in connection with Landlord's filings with or disclosures to any Governmental Authority; or

(ii) as reasonably requested by Landlord.

**Section 10.03 OFAC Laws**. Tenant shall not enter into a Sublease or any other agreement with any Person who may appear on the list of Specifically Designated Nationals and Blocked Persons that is maintained under OFAC Laws or whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws. Upon receipt of notice or upon actual knowledge thereof, Tenant shall immediately notify Landlord in writing if any Person owning (directly or indirectly) any

interest in any of the Tenant Entities or a Subtenant, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; *provided, however*, that the covenant in this Section 10.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 10.04 Estoppel Certificate**. At any time, and from time to time, Tenant shall, promptly and in no event later than ten (10) days after a request from Landlord or any Lender or mortgagee of Landlord, execute, acknowledge and deliver to Landlord or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Landlord, certifying:

(a) that Tenant has accepted the Property;

(b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor;

(c) the commencement and expiration dates of the Lease Term;

(d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable;

(e) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof;

(f) that no notice has been received by Tenant of any default pursuant to this Lease which has not been cured, except as to defaults specified in the certificate;

(g) Intentionally Omitted;

(h) that Tenant has no option to purchase, right of first refusal or similar rights;

(i) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Tenant;

(j) that neither Landlord nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and

(k) any other information reasonably requested by Landlord or any Lender or mortgagee, as the case may be. If Tenant shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes

and appoints Landlord as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Any such certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Property or leasehold.

## ARTICLE XI

## RELEASE AND INDEMNIFICATION

**Section 11.01 Release and Indemnification**. TENANT AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LANDLORD, LENDER, AND THEIR RESPECTIVE AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW. TENANT AGREES THAT NEITHER LANDLORD NOR LENDER SHALL BE RESPONSIBLE OR LIABLE TO TENANT OR TENANT'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON. TENANT AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF TENANT SHALL BE ACTING AS TENANT'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LANDLORD, LENDER NOR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF. TENANT SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY; *PROVIDED, HOWEVER*, THAT THE TERM "GROSS NEGLIGENCE" SHALL NOT INCLUDE GROSS NEGLIGENCE IMPUTED AS A MATTER OF LAW TO ANY OF THE INDEMNIFIED PARTIES SOLELY BY REASON OF LANDLORD'S INTEREST IN THE PROPERTY OR LANDLORD'S FAILURE TO ACT IN RESPECT OF MATTERS WHICH ARE OR WERE THE OBLIGATION OF TENANT UNDER THIS LEASE) RELATING IN ANY WAY TO THE PROPERTY OR CAUSED BY, INCURRED OR RESULTING FROM TENANT'S OPERATIONS OR BY TENANT'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY TENANT OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY TENANT, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

**Section 11.02 Non-Recourse to Landlord**. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Property and not against any other assets, properties or funds of (i) Landlord, (ii) Landlord's members, or any entity controlling,

controlled by, or in common control of Landlord or Landlord's members, any director, officer, general partner, shareholder, limited partner, beneficiary, employee, attorney, consultant, contractor or agent of Landlord or any general partner of Landlord or any of its general partners (or any legal representative, heir, estate, successor or assign of any thereof), (iii) any predecessor or successor limited liability company, partnership or corporation (or other entity) of Landlord or any of its members, managers, general partners, shareholders, officers, directors, employees or agents, either directly or through Landlord or its general partners, shareholders, officers, directors, employees or agents or any predecessor or successor partnership or corporation (or other entity), (iv) any Lender, or any lender to a Person holding an interest in Landlord, (v) any Person affiliated with any of the foregoing, or any director, officer, employee or agent of any thereof; or (vi) the heirs, successors, personal representatives or assigns of any of the foregoing. Such exculpation of liability shall be absolute and without exception whatsoever. Furthermore, it is understood and agreed that in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent (unless Landlord is found to have acted in bad faith), and Tenant's sole remedy shall be an action for injunctive relief or specific performance. WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL THE LANDLORD, ANY MORTGAGEES, OR LANDLORD RELATED PARTIES, EVER BE LIABLE FOR ANY CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OR ANY LOST PROFITS OF TENANT.

## ARTICLE XII

## CONDEMNATION AND CASUALTY

**Section 12.01 Notification**. Tenant shall promptly give Landlord written notice of:

(a) any Condemnation of the Property;

(b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property; and

(c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Tenant shall promptly send Landlord copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 12.02 Partial Condemnation or Casualty**. Except as otherwise provided in Section 12.03, in the event of a Partial Condemnation or a Casualty:

(a) ***Net Awards***. All Net Awards shall be paid to Landlord.

(b) ***Landlord Election To Continue or Terminate Lease***. Landlord shall have the option,

(i) subject to the right of Tenant to elect otherwise as set forth in subsection (d) below, to terminate this Lease by notifying Tenant in writing within thirty (30) days after Tenant gives Landlord notice

(A) of such Partial Condemnation or Casualty, or

(B) that title has vested in the condemning authority; or

(ii) to continue this Lease in effect, which election shall be evidenced by either a notice from Landlord to Tenant, or Landlord's failure to notify Tenant in writing that Landlord has elected to terminate this Lease with respect to the Property within such thirty (30) day period. In the event the Partial Condemnation is material and adverse to Tenant's continued business operations to the extent that Tenant cannot substantially maintain the level of its operations, Tenant shall have a period of sixty (60) days after receipt of Landlord's notice to continue the Lease, or, in the event Landlord has failed to notify Tenant in writing of its election to terminate this Lease as referenced above, the Lease shall be terminated on the terms herein provided.

(c) ***No Continuance of Lease***. If Tenant does not elect to continue this Lease, then this Lease shall terminate with respect to the Property as of the date (the "Property Termination Date") that title has vested in the condemning authority. Tenant shall vacate and surrender the Property by the Property Termination Date, in accordance with the provisions of this Lease, and all obligations of either party hereunder shall cease as of the date of termination; *provided, however*, Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligations to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease with respect to the Property prior to the date of termination shall survive such termination. In such event, Landlord may retain all Net Awards related to the Partial Condemnation or Casualty, and Tenant shall immediately pay Landlord an amount equal to the insurance deductible applicable to any Casualty.

(d) ***Continuance of Lease***. If Landlord elects not to terminate this Lease, or if Landlord elects to terminate this Lease, but Tenant elects to continue this Lease, then, provided, Tenant has not exercised a termination its termination right in the event of a Partial Condemnation, this Lease shall continue in full force and effect upon the following terms:

(i) All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii) Tenant hereby assumes all risk of loss, damage or destruction, whether by Casualty, or the theft of all or any portion of the Property. Tenant shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Landlord. Subject to the terms and provisions of the Mortgages and upon the written request of Tenant (accompanied by evidence reasonably satisfactory to Landlord that such amount has been paid or is due and payable and is properly part of such costs, and that Tenant has complied with the terms of Section 8.02 in connection with the restoration), Landlord shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Landlord, an amount up to but not exceeding

the amount of any Net Award (after deducting all Costs incidental to the collection of the Net Award) received by Landlord with respect to such Partial Condemnation or Casualty. Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Tenant shall provide evidence reasonably satisfactory to Landlord of funds available to Tenant to pay restoration expenses (a) up to the amount of the insurance deductible applicable to such Casualty and (b) which are in excess of the amount of the Net Award. Landlord shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Tenant shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 12.03 Total Condemnation**. In the event of a Total Condemnation of the Property, other than a Temporary Taking, then, in such event:

(a) ***Termination of Lease***. All obligations of either party hereunder shall cease as of the date (the "Property Termination Date-Total Condemnation") that title vests in the condemning authority; *provided, however*, that Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligation to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease prior to the Property Termination Date-Total Condemnation shall survive such termination.

(b) ***Net Award***. Landlord shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Tenant by this Lease, and Tenant hereby expressly assigns to Landlord all of its right, title and interest in and to every such Net Award and agrees that Tenant shall not be entitled to any Net Award or other payment for the value of Tenant's leasehold interest in this Lease; but Tenant shall be entitled to any award to relocate its personal property from the Property, so long as such award does not reduce the Net Award to Landlord.

**Section 12.04 Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect, without any reduction of Base Annual Rental or any other Monetary Obligation payable hereunder. Except as provided below and subject to the terms and provisions of the Mortgages, Tenant shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Landlord and Tenant as of the date of such expiration.

**Section 12.05 Adjustment of Losses**. Any loss under any property damage insurance required to be maintained by Tenant shall be adjusted by Landlord and Tenant (except that if an Event of Default has occurred and is continuing, Landlord may adjust such claim without the written consent of Tenant). Subject to the terms and provisions of the Mortgages, any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Landlord or, at Landlord's election, Tenant. Notwithstanding the foregoing or any other provisions of this Section 12.05 to the contrary, but subject to the terms and provisions of the Mortgages, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Landlord is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Tenant and otherwise, to file and prosecute Tenant's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and

apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Tenant to Landlord under this Lease, in such order, priority and proportions as Landlord in its discretion shall deem proper.

**Section 12.06 Tenant Obligation in Event of Casualty**. During all periods of time following a Casualty, Tenant shall take reasonable steps to ensure that the related Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 12.07 Tenant Awards and Payments**. Notwithstanding any provision contained in this Article XII, Tenant shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the Taking of any Personalty owned by Tenant, any insurance proceeds with respect to any Personalty owned by Tenant, the interruption of its business and moving expenses (subject, however, to the provisions of Section 7.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Landlord's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Landlord for the Condemnation or Casualty, including payments or proceeds related to any Personalty then owned by Landlord.

**Section 12.08 Uninsured Losses**. Nothing contained herein shall relieve Tenant of its obligations under this Article XII if the destruction or damage is not covered, either in whole or in part, by insurance.

**Section 12.09 Regulatory Changes**. If any legally constituted authority prohibits Tenant from utilizing the Property for Tenant's purpose (i.e., substance use treatment facility), then this Lease shall cease when the public authority takes possession (due to condemnation), or when Tenant can reasonably vacate the Property (due to regulatory changes). Tenant will notify Landlord upon being made aware of condemnation or regulations that prohibits utilizing the Property for Tenant's stated purpose, and this Lease will terminate immediately upon Tenant's payment of one (1) year's rent.

## ARTICLE XIII

## DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES

**Section 13.01 Event of Default**. Each of the following shall be an event of default by Tenant under this Lease (each, an "Event of Default"):

(a) if any representation or warranty of Tenant set forth in this Lease is false in any material respect when made (it being understood that any false representation pursuant to Section 6.11 or 6.12 shall always be deemed to be material), or if Tenant renders any false statement or account when made;

(b) if any Rental or other Monetary Obligation due under this Lease is not paid within five (5) days of the date when due;

(c) if Tenant fails to pay, prior to delinquency, any Taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, or Tenant fails to maintain any insurance required to be maintained by Tenant pursuant to this Lease;

(d) if there is an Insolvency Event affecting Tenant;

(e) if Tenant vacates or abandons the Property, or the Property ceases to be occupied and open for business by a Subtenant; *provided, however*, that no default shall occur if the Property is temporarily not open for business due to renovations or repairs, or if the Property is not open for business because Tenant had to terminate a Subtenant because of a default pursuant to a Sublease so long at Tenant is actively seeking a Subtenant for the Property.

(f) if Tenant fails to observe or perform any of the other covenants, conditions or obligations of Tenant in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Landlord in immediate jeopardy, and is within the reasonable power of Tenant to promptly cure, all as determined by Landlord in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Landlord shall have given Tenant notice thereof and a period of thirty (30) days shall have elapsed, during which period Tenant may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Landlord in its reasonable discretion, and Tenant is diligently pursuing a cure of such failure, then Tenant shall have a reasonable period to cure such failure beyond such thirty (30) day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Landlord. If Tenant shall fail to correct or cure such failure within such ninety (90) day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g) if a final, non-appealable judgment is rendered by a court against Tenant which has a Material Adverse Effect, or which does not have a Material Adverse Effect but which is in the amount of $25,000 or more (excluding claims covered by insurance), and in either event is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h) if Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i) if the estate or interest of Tenant in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j) if there is an "Event of Default" or other breach or default by Tenant pursuant to any of the other Transaction Documents or any Other Agreement, after the passage of all applicable notice and cure or grace periods; or


Page 111 of 276

(k) a Transfer occurs without the written consent of Landlord (except to the extent that such consent is not required and Tenant otherwise complies with the provisions of Article XV of this Lease).

**Section 13.02 Remedies**. Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Tenant, Landlord shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following.

(a) to terminate this Lease, whereupon Tenant's right to possession of the Property shall cease and this Lease, but not Tenant's liability, shall be terminated;

(b) to the extent not prohibited by applicable law, and without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action, and without terminating (or being deemed to terminate) this Lease, to re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Tenant upon the Property and, to the extent permissible, all permits and other rights or privileges of Tenant pertaining to the use and operation of the Property;

(c) to expel Tenant and those claiming under or through Tenant, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. If Tenant shall, after default, voluntarily give up possession of the Property to Landlord, deliver to Landlord or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Landlord's rights and the acceptance thereof by Landlord or its agents shall not be deemed to constitute a termination of the Lease. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate;

(d) to bring an action against Tenant for any damages sustained by Landlord or any equitable relief available to Landlord and to the extent not prohibited by applicable Law, subject to Section 14.01, to seize all personal property or fixtures upon the Property which Tenant owns or in which it has an interest, in which Landlord shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Tenant's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action; provided, however, in no event shall Landlord take possession of, ownership of, or any interest in any documents or information covered by HIPPA or similar privacy laws or otherwise containing patient information.

(e) to re-let the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Landlord, in its sole discretion, may determine, with all proceeds received from such re-letting being applied


Page 112 of 276

to the Rental and other Monetary Obligations due from Tenant in such order as Landlord may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such re-letting. Except to the extent required by applicable Law, Landlord shall have no obligation to re-let the Property or any part thereof and shall in no event be liable for refusal or failure to re-let the Property or any part thereof, or, in the event of any such re-letting, for refusal or failure to collect any rent due upon such re-letting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate as specified in said notice;

(f) RESERVED

(g) to accelerate and recover from Tenant all Rent due and owing and scheduled to become due and owing under this Lease, discounted to present value, both before and after the date of such breach for the entire original scheduled Lease Term, and Landlord may collect the same by distress or otherwise;

(h) to recover from Tenant all Costs paid or incurred by Landlord as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(i) to immediately or at any time thereafter, and with or without notice, at Landlord's sole option but without any obligation to do so, correct such breach or default and charge Tenant all Costs incurred by Landlord therein, plus an administrative fee of five percent (5%) of such Costs. Any sum or sums so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord. Any such acts by Landlord in correcting Tenant's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Landlord's right to exercise any or all remedies set forth herein;

(j) to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant held by Landlord under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Tenant hereunder;

(k) without limiting the generality of the foregoing or limiting in any way the rights of Landlord under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Landlord shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction in any action taken by Landlord to enforce its rights and remedies hereunder in order to protect and preserve Landlord's interest under this Lease or in the Property, the Existing Personalty and the Personalty, and in connection therewith, TENANT HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or


Page 113 of 276

(l) to seek any equitable relief available to Landlord, including, without limitation, the right of specific performance.

Additionally, in the event of any default by Tenant, Landlord shall take commercially reasonable efforts to mitigate its damages, which obligation shall include listing the Property for lease at a commercially reasonable rental.

Any action taken by Landlord under this Section 13.02 shall not operate as a waiver of any right which Landlord would otherwise have against Tenant for rental hereby or otherwise, and Tenant shall remain responsible to Landlord for any loss and/or damage suffered by Landlord by reason of Tenant's default or breach. The words "reenter" and "reentry" as used in this Lease are not restricted to their technical legal meaning.

Nothing set forth in this Section affects the right of Landlord to indemnification for liability arising prior to the termination of this Lease for personal injuries or property damage as may be provided elsewhere in this Lease. In all events, Landlord shall have the right upon at least ten (10) days' notice to Tenant (or without notice in the event of a bona fide emergency effecting material damage to property or endangering life or health) to cure any breach by Tenant at Tenant's sole cost and expense, and Tenant shall reimburse Landlord for such expense immediately upon demand plus Default Interest, commencing on the date due through the date of payment.

**Section 13.03 Cumulative Remedies**. (a) All powers and remedies given by Section 13.02 to Landlord, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Landlord under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Tenant contained in this Lease, and no delay or omission of Landlord to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Landlord may be exercised from time to time, and as often as may be deemed expedient, by Landlord, subject at all times to Landlord's right in its sole judgment to discontinue any work commenced by Landlord or change any course of action undertaken by Landlord.

**Section 13.04 Landlord Default**. If Landlord is ever in default under the terms of this Lease, or if Landlord commits a breach of any one or more of the covenants, terms and conditions herein set forth, then Tenant shall deliver Landlord a written notice that states the alleged default or breach (the "**Landlord Default Notice**"). If Landlord does not cure the alleged default or breach within thirty (30) days after it receives the Landlord Default Notice (provided however, that if the breach or failure to perform cannot be reasonably cured within the 30-day period, then a Landlord default shall only be deemed to occur if Landlord does not in good faith commence the cure within the 30-day period and thereafter fails to diligently pursue the cure to completion within ninety (90) days after receiving the Landlord Default Notice), then, Tenant may cure such default or breach, and Landlord shall reimburse Tenant for all costs expended by Tenant in connection therewith within thirty (30) days after receiving an invoice from Tenant therefor, and if Landlord fails to reimburse Tenant within the 30-day period, then Tenant may deduct the amount of such costs from the next installment of Monthly Base Rent due hereunder until such costs have been repaid in full. Tenant agrees not to exercise any remedies available by virtue of a Landlord's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be

reasonably necessary to cure such default) unless Tenant has also given such parties a reasonable opportunity to cure such default (including but not limited to foreclosure proceedings if necessary to effect such cure).

## ARTICLE XIV

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 14.01 No Liens**. Landlord's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Tenant, and nothing herein contained shall be construed to require such subordination by Landlord. NOTICE IS HEREBY GIVEN THAT TENANT IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR TENANT'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID. Landlord shall have no interest in any personal property owned by Tenant and Tenant's lenders shall have the right to place security interests on such personal property. Landlord waives any right, title, or interest that Landlord may have in Tenant's personal property, anything in this Lease to the contrary notwithstanding and Landlord shall execute such documents or interest as shall be reasonably necessary to give effect to such waiver.

**Section 14.02 Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Landlord, and Tenant covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Landlord, or any present or proposed mortgagees under trust deeds, upon the condition that Tenant shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing. If requested by Landlord, Tenant shall execute an SNDA with a Lender holding a Mortgage, and Tenant agrees to promptly execute and return such SNDA to Landlord.

**Section 14.03 Election To Declare Lease Superior**. If any mortgagee, receiver or other secured party elects to have this Lease and the interest of Tenant hereunder, be superior to any Mortgage and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such Mortgage, whether this Lease was executed before or after such Mortgage and in that event such mortgagee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such Mortgage and had been assigned to such mortgagee, receiver or other secured party.

**Section 14.04 Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Landlord as landlord under this Lease, Tenant shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Landlord"), and recognize the Successor Landlord as lessor under this Lease, and, subject to the provisions of this

Article XIV, this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant, provided that the Successor Landlord shall only be liable for any obligations of Landlord under this Lease which accrue after the date that such Successor Landlord acquires title. The term "Landlord", as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of title to the Property, and in the event of any transfer or transfers of title to the Property or any part thereof, Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease to be performed after the effective date of such transfer. In the event of any transfer or transfers of Landlord's interest in the Property, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, and Tenant agrees to attorn to such transferee. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 14.05 Execution of Additional Documents**. Although the provisions in this Article XIV shall be self-operative and no future instrument of subordination shall be required, upon request by Landlord Tenant shall execute and deliver whatever instruments may be reasonably required for such purposes.

**Section 14.06 Notice to Lender**. Tenant shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Tenant has been notified of any breach or default by Landlord of any of its obligations under this Lease and give such Lender at least thirty (30) days beyond any notice period to which Landlord might be entitled to cure such default before Tenant may exercise any remedy with respect thereto.

## ARTICLE XV

## ASSIGNMENT

**Section 15.01 Assignment by Landlord**. As a material inducement to Landlord's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Tenant hereby agrees that Landlord may, from time to time and at any time and without the consent of Tenant, engage in the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Landlord's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee (so long as Landlord and such purchaser or assignee notify Tenant in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Landlord hereunder from and after the date of such assignment). At the request of Landlord, Tenant will execute such documents confirming the sale, assignment or other transfer and such other agreements as Landlord may reasonably request, provided that the same do not increase the liabilities and obligations of Tenant hereunder.


Page 116 of 276

Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 15.02 No Assignment by Tenant**. Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Property in entering into this Lease. Any assignment, sublease, transfer, conveyance, pledge or mortgage by Tenant, whether voluntary or involuntary, whether by operation of Law (for example, by merger) or otherwise, of any part or all of this Lease, or of any part or all of the leasehold estate created by this this Lease, or any interest herein is defined in this Agreement as a "Transfer". No Transfer shall occur without the prior written consent of Landlord, which consent shall not unreasonably be withheld. Notwithstanding the foregoing, Landlord's consent will not be required for a mortgage or pledge by Tenant of its assets so long as Tenant maintains the Minimum Net Worth requirement after such mortgage or pledge, after taking into account any distributions by Tenant of the proceeds from a financing secured by such mortgage or pledge. In no event, however, shall Tenant mortgage or pledge its leasehold interest hereunder without Landlord's prior written consent, which consent shall not unreasonably be withheld by Landlord. At the time of any assignment of this Lease which is approved in writing by Landlord, the assignee shall assume all of the obligations of Tenant under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Landlord. Such assignment of this Lease shall not relieve Tenant of its obligations respecting this Lease unless otherwise agreed to by Landlord. Any transfer, mortgage, assignment or pledge of this Lease by Tenant shall be voidable at the sole option of Landlord. Any consent to any Transfer shall not be deemed to be a consent to any subsequent Transfer.

In determining whether to grant consent to the Transfer, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in this Lease; whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, satisfactory to Landlord; use of the Property by the proposed assignee, sublessee, or transferee must be identical to the use permitted by this Lease; use of the Property by the proposed assignee, sublessee, or transferee will not violate or create any potential violation of any laws; a tangible net worth which is at least equal to the greater of Tenant's Tangible Net Worth at the Effective Date. For purposes of this Lease, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with GAAP, excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, and copyrights, franchises. If, pursuant to any provision of this Section 15.02, this Lease is assigned or transferred, or if all or any part of the Property is sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, transferee, subtenant or occupant, and apply the net amount collected to the Rent and Additional Rent reserved in this Lease, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any covenant or condition of this Lease or a release of Tenant from the performance or further performance by Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Tenant may without the consent of Landlord and provided that Tenant remains liable for the performance of the terms of this Lease, assign this Lease in its entirety, or sublet the Property, with respect to all of the Property: (i) to an entity resulting from a

merger or consolidation with Tenant; or (ii) to any parent, affiliate or direct or indirect subsidiary of Tenant; (iii) to an entity which controls, is controlled by or is under common control with Tenant; (iv) in connection with the listing by Tenant or its parent or affiliates of its stock on a stock exchange; (v) or the sale by Tenant of any of its membership interests to a private equity firm or other buyer. In the event of any assignment or sublet pursuant to this paragraph, Tenant shall give Landlord a courtesy written notice at lease thirty (30) days in advance of the assignment or sublease, along with such other customary information as Landlord may reasonably request regarding the identity of the assignee or subtenant, together with updated insurance certifications.

**Section 15.03 Subletting**.

(a) Tenant shall not sublet the Property without the prior written consent of Landlord, which may be not be unreasonably withheld by Landlord, and any such purported subletting without Landlord's consent shall be void. Any Sublease shall be included in the definition of a "Transfer." Notwithstanding the foregoing, no Landlord consent shall be required with respect to entering into (or amending) a Sublease that is a Permitted Sublease (or with respect to an assignment by the Subtenant thereunder) so long as the Permitted Sublease also satisfies (or after the amendment or assignment continues to satisfy) all of the other requirements set forth in this Section 15.04 for a Sublease. Landlord agrees that Tenant's patients occupying rooms are not Subtenants.

(b) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now or hereafter in effect (the "Subleases") entered into for any part or all of the Property and any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom. Nothing in this Section 15.04 shall constitute an agreement by Landlord to permit Tenant to enter into Subleases without Landlord's written consent.

(c) Any Sublease of the Property shall be subject and subordinate to the provisions of this Lease (and all future amendments to this Lease). No assignment or Sublease shall affect or reduce any of the obligations of Tenant hereunder, including rental payments, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or Sublease had been made, notwithstanding the fact that a Subtenant, and not Tenant, may be in occupancy of the Property (it being understood that all of the representations, warranties, covenants and obligations of Tenant shall at all times remain in full force and effect with respect to the Property, even if Tenant may not at all times be in occupancy of the Property). No assignment or Sublease shall impose any additional obligations on Landlord under this Lease. Any Sublease shall require the Subtenant thereunder to maintain general liability insurance and statutory workers' compensation insurance in form and amounts set forth in this Lease.

(d) Tenant shall, within five (5) days after the execution and delivery of any assignment or Sublease (or amendment thereto) consented to by Landlord, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment, shall be in recordable form.

(e) Landlord shall have no obligation to recognize any or to agree to not disturb any Subtenant upon any Event of Default, unless Landlord shall agree to do so in writing by separate instrument, but Landlord shall have no obligation to do so. In the event of Tenant's surrender of this Lease or

the termination of this Lease for any reason or by any circumstance, Landlord may, at its option, either terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder (except to the extent that Landlord has entered into a nondisturbance agreement with a Subtenant).

(f) Tenant shall comply with all of the terms and conditions of this Lease relating to the Property, even though the Property may be subject to the terms of a Sublease, and the fact that Tenant may not have actual possession of the Property shall not relieve Tenant of any obligation to perform any covenant or satisfy any condition required to be performed or satisfied by Tenant under this Lease with respect to the Property.

(g) Tenant shall be responsible, at its sole cost and expense (with the right to obtain payment from or require payment by Subtenants subject to the License set forth in Section 15.04(h) below), for performing all covenants and satisfying all conditions required to be performed or satisfied by Tenant pursuant to any Sublease.

(h) Intentionally omitted.

(i) Subject to the License, Tenant shall be responsible for collecting from the Subtenants, and remitting to the appropriate Governmental Authorities, any sales, use or similar tax payable on rents received by Tenant pursuant to the Subleases.

(j) Tenant shall not accept any prepayment of rent from or on behalf of a Subtenant for more than thirty (30) days in advance of the accrual thereof. If there is any permitted prepayment of rent made pursuant to a Sublease, such prepayment shall be delivered to Landlord and applied by Landlord to the Rent obligations of Tenant next due and owing under this Lease.

(k) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all Subleases, and to any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom, subject to the License.

(l) If Tenant fails to timely perform its obligations, or exercise its rights and remedies, as the "landlord" under any Sublease, then Landlord may, but shall not be obligated to, enter upon the Property (or applicable portion thereof) and perform any such obligations or exercise any such rights and remedies, as the "landlord" under the applicable Sublease, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action. Tenant hereby agrees to reimburse Landlord on demand for any expense that Landlord incurs while exercising its rights under this Section 15.04(l), together with interest at the Default Rate, which interest shall accrue from the date of Landlord's payment of such expense until the date of reimbursement by Tenant. Furthermore, Tenant hereby agrees to defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from the exercise of Landlord's rights under this Section 15.04(l).


Page 119 of 276

(m) No Sublease shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable to the same extent as though no Sublease had been made unless otherwise agreed to by Landlord.

**Section 15.04 Intentionally Omitted.**

## ARTICLE XVI

## NOTICES

**Section 16.01 Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease (collectively, "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) facsimile or E-Mail transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by facsimile or E-Mail transmission. Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Tenant: | Zinnia Health LLC<br>520 Newport Center, Suite 550<br>Newport Beach, CA 92660<br>Adam Bhaijee<br>Email: adam.bhaijee@zinniahealth.com |
| With a copy to | Paganelli Law Group<br>10401 N. Meridian Street, Suite 450<br>Indianapolis, IN 46290<br>Attn: Tony Paganelli |
| If to Landlord: | Bunnell Taku Investors LLC<br>2211 N. Elston Avenue, Suite 201<br>Chicago, IL 60614<br>Attn: Shai Wolkowicki<br>Email: shai@shaitownrealty.com |
| With a copy to: | Northstone Law LLC<br>1016 W. Jackson Blvd, Suite 509<br>Chicago, IL 60607<br>Attn: Animesh K. Ravani, Esq.<br>Email: ani@northstone.law |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. If any mortgagee of Landlord shall notify Tenant that it is the holder of a mortgage affecting the Property, Tenant shall provide a

copy of such Notice to such mortgagee, but failure to provide such a copy shall not affect the validity of such Mortgage.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01 Force Majeure**. If either party shall, without fault of such party, be delayed or prevented from the performance of any act required hereunder (other than the payment of money) by reason of acts of God, strikes, lockouts, labor troubles, war, terrorism, pandemic or epidemic, or inability to procure materials and such party gives the other party written notice of such event within ten (10) days after such event (a "Force Majeure Event"), the financial inability of the party excepted, performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended by a period equal to the period of such delay; *provided, however*, that nothing in this Section shall excuse Tenant from the prompt payment of any Rent or any other Monetary Obligations due hereunder. In the event of a Force Majeure Event in any event such party shall proceed with all diligence to complete the performance of the act upon the cessation of the Force Majeure Event.

**Section 17.02 No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly,

(a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and

(b) the fee estate or ownership of the Property or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03 Interpretation**. Landlord and Tenant acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant. Whenever Landlord or an Indemnified Party is entitled to indemnification, such indemnification shall include (but shall not be limited to) the obligation of the indemnifying party to pay the reasonable legal fees and expenses of counsel selected by Landlord or such Indemnified Party.

**Section 17.04 Characterization**. The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Landlord entering into this Lease:

(a) Landlord and Tenant intend that: (i) this Lease is a "true lease," this Lease is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (ii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Landlord and Tenant, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, nor to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

(b) Landlord and Tenant covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Accounting Standards Codification (ASC) 840, as amended, and as a true lease for state law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 18.04; (iii) the Lease Term (including any Extension Term) is less than eighty percent (80%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Landlord and Tenant on that basis, and the execution and delivery of, and the performance by Tenant of its obligations pursuant to, this Lease do not constitute a transfer of all or any part of the Property.

(c) Tenant stipulates and agrees not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 18.04.

(d) Tenant acknowledges that fee simple title (both legal and equitable) is in Landlord and that Tenant has only the leasehold right of possession and use of the Property as provided herein.

**Section 17.05 Intentionally Omitted**.

**Section 17.06 Bankruptcy**. As a material inducement to Landlord executing this Lease, Tenant acknowledges and agrees that Landlord is relying upon

(a) the financial condition and specific operating experience of Tenant and Tenant's obligation to use the Property as a Permitted Facility.

(b) Tenant's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Tenant; and

(c) all defaults under this Lease being cured promptly and this Lease being assumed as required in any order for relief entered under the Bankruptcy Code for Tenant, or this Lease being rejected within such deadline as may be established by the United States Bankruptcy Court and the Property surrendered to Landlord.


Page 122 of 276

**Section 17.07 Attorneys' Fees.** In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled. Each party shall also be entitled to recover its reasonable attorneys' fees and other Costs incurred in any bankruptcy action filed by or against the other party, including, without limitation, those incurred in seeking relief from the automatic stay, in dealing with the assumption or rejection of this Lease, in any adversary proceeding, and in the preparation and filing of any proof of claim. The parties hereby expressly intend that such award of reasonable attorneys' fees and costs shall be mandatory and not discretionary.

**Section 17.08 Memoranda of Lease**. Upon the Commencement Date, Landlord and Tenant shall execute Landlord's standard form memorandum of lease in recordable form, indicating the names and addresses of Landlord and Tenant, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Landlord may not desire to disclose to the public. Further, upon Landlord's request, Tenant agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Landlord until the expiration or sooner termination of the Lease Term, which termination may be assigned by Landlord to any successor concurrently with this Lease; *provided, however*, if Tenant shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Tenant shall be responsible for payment of all taxes and recording fees in connection with the recording of the memoranda of lease contemplated by this Section 18.08. Landlord may, in its discretion, direct that neither this Lease nor a memorandum thereof be recorded.

**Section 17.09 No Brokerage**. Landlord and Tenant represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property. Each of Landlord and Tenant agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.10 Waiver of Jury Trial and Certain Damages**. LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LANDLORD AND ANY OF THE AFFILIATES, OFFICERS,

DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LANDLORD OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY TENANT OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.11 Intentionally Omitted**.

**Section 17.12 State-Specific Provisions**. The provisions and/or remedies which are set forth on the attached Exhibit C shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.13 Time Is of the Essence**. Time is of the essence with respect to each and every provision of this Lease. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included. If the time period by which any notices, acts or payments required hereunder must be delivered, performed or paid expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next business day. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. prevailing local time.

**Section 17.14 Waiver and Amendment**. No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. No acceptance by Landlord of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Landlord's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.15 Successors Bound**. Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.16 Captions**. Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.17 Other Documents**. Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.18 Entire Agreement**. This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided. All prior or contemporaneous agreements, letters of intent, representations, and understandings of

the parties are superseded by, and merged into, this Lease. No supplement, modification, or amendment of this Lease shall be binding unless executed in writing by Landlord and Tenant.

**Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law**. For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the exclusive jurisdiction of all federal and state courts located in the state where the Property is located. Tenant consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law. Furthermore, Tenant waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this Section shall limit or restrict the right of Landlord to commence any proceeding in the federal or state courts located in the states where the Property is located to the extent Landlord deems such proceeding necessary or advisable to exercise remedies available under this Lease. This Lease shall be governed by, and construed with, the laws of the state where the Property is located, without giving effect to any state's conflict of laws principles.

**Section 17.20 Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be deemed an original. This Lease may be accepted and signed in electronic form (e.g., by an electronic or digital signature or other means of demonstrating assent) and each party's electronic acceptance and signature will be deemed binding between the parties. Each party acknowledges and agrees it will not contest the validity or enforceability of this Lease, including under any applicable statute of frauds, because it was accepted and/or signed in electronic form. Electronic records of a party when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records. Notwithstanding the same, original signatures may be exchanged by the parties for record keeping purposes.

**Section 17.21 Landlord's Acquisition of the Property**. This Lease is contingent upon Landlord's acquisition of the Property. If the Landlord does not acquire the Property, any funds deposited by Tenant with Landlord under this Lease shall be returned and the parties shall have no further obligations hereunder except those which expressly survive the termination of this Lease. In no event shall Landlord be deemed in default of this Lease for not acquiring the Property.

**Section 17.22 Severability**. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, to any extent, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the maximum extent permitted by law.

**Section 17.23 Due Authorization**. Each person executing this Lease on behalf of Landlord and Tenant, respectively, warrants and represents that the Party for whom he or she is acting has been duly formed, is in good standing, and has duly authorized the transactions contemplated herein and the execution of this Lease by him or her and that, when so executed, this Lease shall constitute a valid and binding obligation of the Party on whose behalf it is so executed.


Page 125 of 276

**Section 17.24 Confidentiality**. All statements delivered to Landlord by Tenant and all information obtained by Landlord about Tenant, including, without limitation, financial information, in the exercise of Landlord's rights hereunder shall be held in strict confidence and shall not be disclosed to any party other than Landlord's personnel having the explicit need to know such information, for which Landlord agrees to get such personnel to similarly keep all such information confidential. Each party acknowledges that the terms and conditions of this Lease are to remain confidential for each parties' benefit, and may not be disclosed by either party to anyone except its professional advisors, prospective buyers, lenders, franchisor, or as required by order of the court, by any manner or means, directly or indirectly, without the other party's prior written consent which shall not be unreasonably withheld or delayed. The consent by either party to any disclosures shall not be deemed to be a waiver on the part of that party of any prohibition against any future disclosure.

**Section 17.25 No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

*Remainder of page intentionally left blank; signature page(s) to follow*

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease as of the date first above written.

**LANDLORD**:

**Bunnell Taku Investors LLC**

By: Shai Wolkowicki
Name: Shai Wolkowicki
Its: Manager

**[Signatures continued on next page]**




Page 127 of 276

**TENANT**:

**Zinnia Health LLC**

By: ________________________________

Name: Take-Geun Kwon

Its: CEO


Page 128 of 276

## EXHIBIT A

**LEGAL DESCRIPTION/STREET ADDRESS OF THE PROPERTY**

4950 Taku Drive, Anchorage, Alaska, 99508

## EXHIBIT B

## FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS

AUTHORIZATION AGREEMENT
PRE-ARRANGED PAYMENTS

Reference Number __________

I (We) (Tenant) authorize ______________________________ to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name______________________________Branch______________________________

City___________________________________State___________________Zip__________

— — — — — — — — — —     — — — — — — — — — — — — — — —

***Transit - ABA     Account Number Information

ACCOUNT TYPE*** Please specify checking or savings account (C/S) ________

PLEASE FILL IN BANK INFORMATION CAREFULLY
ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non -sufficient funds or stop payment item is charged against the servicer's account.

Tenant
Name(s) ______________________________________Number     Tax Identification
Date_____________________
Print Authorized Name
Authorized Signature
Print Authorized Name
Authorized Signature
Contact Phone Number ____________________ Fax Number
Email Address:

Return Original to: __________________________
__________________________
__________________________

**EXHIBIT C**

**STATE-SPECIFIC PROVISIONS**

NONE.

**EXHIBIT D**

INTENTIONALLY OMITTED

**EXHIBIT E**

NONE

# <u>EXHIBIT G</u>

## EXISTING SUBLEASES

NONE.

# EXHIBIT C

Lease Agreement dated December 1, 2024

Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant

101 Bunnell Street, Anchorage, Alaska 99508

**LEASE AGREEMENT**

by and between

**BUNNELL TAKU INVESTORS LLC**

as Landlord

and

**ZINNIA HEALTH LLC**

as Tenant

Made as of December 1, 2024

**101 Bunnell Street, Anchorage, Alaska 99508**

## Table of Contents

**Page**

ARTICLE I DEFINED TERMS ........ 1
ARTICLE II BASIC LEASE TERMS ........ 8
Section 2.01 Property ........ 8
Section 2.02 Lease Commencement Date ........ 8
Section 2.03 Extension Options ........ 8
Section 2.04 Expiration Date (if fully extended). ........ 9
Section 2.05 Initial Base Annual Rental ........ 9
Section 2.06 Rental Adjustment. ........ 9
Section 2.07 Adjustment Date. ........ 9
Section 2.08 Tenant Tax Identification No. ........ 9
ARTICLE III LEASE OF PROPERTY ........ 9
Section 3.01 Lease ........ 9
Section 3.02 Quiet Enjoyment. ........ 9
ARTICLE IV LEASE TERM; EXTENSION ........ 9
Section 4.01 Initial Term. ........ 9
Section 4.02 Extensions ........ 10
Section 4.03 Notice of Exercise. ........ 10
Section 4.04 Removal of Personalty ........ 10
Section 4.05 Existing Personalty ........ 10
Section 4.06 Reserved ........ 10
Section 4.07 Reserved ........ 11
ARTICLE V RENTAL AND OTHER MONETARY OBLIGATIONS ........ 11
Section 5.01 Base Monthly Rental ........ 11
Section 5.02 Adjustments ........ 11
Section 5.03 Monetary Obligations ........ 11
Section 5.04 Rentals To Be Net to Landlord. ........ 11
Section 5.05 ACH Authorization ........ 12
Section 5.06 Late Charges; Default Interest ........ 12
Section 5.07 Tenant Improvement Allowance ........ 12
Section 5.08 Holdover ........ 13

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF TENANT ....13
Section 6.01 Organization, Authority and Status of Tenant ....13
Section 6.02 Enforceability. ....13
Section 6.03 Property Condition ....14
Section 6.04 Litigation ....14
Section 6.05 Absence of Breaches or Defaults ....14
Section 6.06 Licenses and Permits. ....14
Section 6.07 Financial Condition: Information Provided to Landlord ....14
Section 6.08 Compliance With OFAC Laws ....14
Section 6.09 Solvency. ....14
Section 6.10 Intentionally Omitted ....14
Section 6.11 Intentionally Omitted ....15
Section 6.12 Intentionally Omitted ....15
Section 6.13 Disclaimer of Warranties. ....15
Section 6.14 Intentionally Omitted ....15
ARTICLE VII TAXES AND ASSESSMENTS; UTILITIES; INSURANCE ....15
Section 7.01 Taxes ....15
Section 7.02 Utilities ....18
Section 7.03 Insurance ....18
ARTICLE VIII MAINTENANCE; ALTERATIONS ....22
Section 8.01 Condition of Property; Maintenance ....22
Section 8.02 Alterations and Improvements ....23
Section 8.03 Encumbrances ....24
ARTICLE IX USE OF THE PROPERTY; COMPLIANCE ....24
Section 9.01 Use ....24
Section 9.02 Alternative Use ....24
Section 9.03 Compliance ....25
Section 9.04 Environmental ....26
Section 9.05 Intentionally Omitted ....29
ARTICLE X ADDITIONAL COVENANTS ....29
Section 10.01 Inspection ....29
Section 10.02 Financial Information ....29
Section 10.03 OFAC Laws ....30
Section 10.04 Estoppel Certificate ....31

ARTICLE XI RELEASE AND INDEMNIFICATION ....................32
Section 11.01 Release and Indemnification ....................32
Section 11.02 Non-Recourse to Landlord ....................32
ARTICLE XII CONDEMNATION AND CASUALTY ....................33
Section 12.01 Notification ....................33
Section 12.02 Partial Condemnation or Casualty ....................33
Section 12.03 Total Condemnation ....................35
Section 12.04 Temporary Taking ....................35
Section 12.05 Adjustment of Losses ....................35
Section 12.06 Tenant Obligation in Event of Casualty ....................36
Section 12.07 Tenant Awards and Payments. ....................36
Section 12.08 Uninsured Losses. ....................36
Section 12.09 Regulatory Changes ....................36
ARTICLE XIII DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES ....................36
Section 13.01 Event of Default ....................36
Section 13.02 Remedies. ....................38
Section 13.03 Cumulative Remedies ....................40
Section 13.04 Landlord Default ....................40
ARTICLE XIV MORTGAGE, SUBORDINATION AND ATTORNMENT ....................41
Section 14.01 No Liens ....................41
Section 14.02 Subordination ....................41
Section 14.03 Election To Declare Lease Superior ....................41
Section 14.04 Attornment ....................41
Section 14.05 Execution of Additional Documents ....................42
Section 14.06 Notice to Lender ....................42
ARTICLE XV ASSIGNMENT ....................42
Section 15.01 Assignment by Landlord ....................42
Section 15.02 No Assignment by Tenant ....................43
Section 15.03 Subletting. ....................44
Section 15.04 Intentionally Omitted ....................46
ARTICLE XVI NOTICES ....................46
Section 16.01 Notices ....................46
ARTICLE XVII MISCELLANEOUS ....................47
Section 17.01 Force Majeure ....................47

Section 17.02 No Merger....47
Section 17.03 Interpretation....47
Section 17.04 Characterization....47
Section 17.05 Intentionally Omitted....48
Section 17.06 Bankruptcy....48
Section 17.07 Attorneys' Fees....49
Section 17.08 Memoranda of Lease....49
Section 17.09 No Brokerage....49
Section 17.10 Waiver of Jury Trial and Certain Damages....49
Section 17.11 Intentionally Omitted....50
Section 17.12 State-Specific Provisions....50
Section 17.13 Time Is of the Essence....50
Section 17.14 Waiver and Amendment....50
Section 17.15 Successors Bound....50
Section 17.16 Captions....50
Section 17.17 Other Documents....50
Section 17.18 Entire Agreement....50
Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law....51
Section 17.20 Counterparts....51
Section 17.21 Landlord's Acquisition of the Property....51
Section 17.22 Severability....51
Section 17.23 Due Authorization....51
Section 17.24 Confidentiality....52
Section 17.25 No Offer....52


Page 140 of 276

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of December 1, 2024 (the "Effective Date"), by and between **Bunnell Taku Investors LLC**, a Delaware limited liability company ("Landlord"), whose address is 2211 N. Elston Avenue, Suite 201, Chicago, Illinois 60614 and **Zinnia Health LLC, a Delaware limited liability company** ("Tenant"), whose address is 520 Newport Center Drive, Suite 550, Newport Beach, California 92660. Capitalized terms not defined herein shall have the meanings set forth in Article I below.

In consideration of the mutual covenants and agreements herein contained, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*Adjustment Date*" means that date set forth in Section 2.07.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., as amended.

"*Base Annual Rental*" means the Initial Base Annual Rental amount set forth in Section 2.05 as adjusted as set forth in Sections 2.06, 2.07 and 5.02.

"*Base Monthly Rental*" means, for any month, an amount equal to 1/12 of the applicable Base Annual Rental for the period in which such month falls.

"*Business Day*" means a day on which banks located in New York, NY are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Commencement Date*" means the date on which Landlord acquires fee simple title to the Property, which date shall be confirmed in writing by the parties.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees, recordation taxes and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Insurer*" means such environmental insurance company as Landlord shall select in its sole discretion.

"*Environmental Laws*" means federal, state and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, Underground Storage Tanks ("USTs"), and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Tenant and/or the Property.

"*Environmental Liens*" has the meaning set forth in Section 9.04(a)(ii).

"*Environmental Policy*" means (a) that certain environmental insurance policy issued at or prior to Closing by Environmental Insurer to Landlord with respect to the Property if a UST is located at the Property, and (b) any renewal or replacement environmental insurance policy with respect to the Property if a UST is located, which Environmental Policy shall be in form and substance satisfactory to Landlord in its sole discretion.

"*Event of Default*" has the meaning set forth in Section 13.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Existing Personalty*" has the meaning set forth in Section 4.05.

"*Expiration Date*" means the Initial Term Expiration Date and, if the Initial Term is extended in accordance with this Lease, the last day of any applicable Extension Term.

"*Extension Option*" has the meaning set forth in Section 4.02.

"*Extension Term*" has the meaning set forth in Section 4.02.

"*Force Majeure Event*" has the meaning set forth in Section 18.01.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) oil, petroleum products (including any and all constituents and additives), flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants which pose a hazard to the Property or to Persons on or about the Property, cause the Property to be in violation of any local, state or federal Law or regulation, (including without limitation, any Environmental Law), or are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", "regulated substances" or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; (iv) the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et seq.; and (v) regulations adopted and publications promulgated pursuant to the aforesaid laws; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million contained in transformers or other equipment; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the occupants of the Property or the owners and/or occupants of any property adjoining the Property.

"*Immediate Repairs*" has the meaning set forth in Section 8.01.

"*Indemnified Parties*" means Landlord, Lender, Environmental Insurer (if any), and their respective members, managers, officers, directors, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Landlord, Lender or Environmental Insurer, as applicable.

"*Initial Term*" has the meaning set forth in Section 4.01.

"*Initial Term Expiration Date*" has the meaning set forth in Section 2.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Landlord Entity*" or "*Landlord Entities*" means individually or collectively, as the context may require, Landlord and all Affiliates of Landlord

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*" shall have the meaning described in Section 4.01.

"*Legal Compliance Repairs*" has the meaning set forth in Section 8.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Property. Legal Requirements shall specifically include (i) The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Americans With Disabilities Act, and the accessibility code(s), if any, of the State in which the Property are located, and all regulations and guidelines promulgated under any and all of the foregoing, as the same may be amended from time to time, and (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), Federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"), any state or local act, law, or code, and any applicable common law), rules, and regulations (including 40 Code of Federal Regulations, Part 280 and state and local rules and regulations).

"*Lender*" means any lender in connection with any loan or extension of credit, now or hereafter existing, secured by Landlord's interest in the Property, and any servicer, collateral agent and/or trustee with respect to any such loan or extension of credit.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including, without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Tenant Entity; (c) Tenant's ability to perform its obligations under this Lease; or (d) Landlord's interest in the Property, this Lease or the other Transaction Documents.

"*Minimum Net Worth*" means a net worth (computed in accordance with generally accepted accounting principles consistently applied) not less than $10,000,000.00 of EBITDA at the Property level.

"*Monetary Obligations*" has the meaning set forth in Section 5.03.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings, now or hereafter in existence, executed by Landlord for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to the Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 7.03 payable with respect to the Property, as the case may be, and in either case, less any Costs incurred by Landlord in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by any of the Tenant Entities, with, or for the benefit of, any of

the Landlord Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents.

"*Partial Condemnation*" means a Condemnation which is not a Total Condemnation.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Facility*" means using the Property as a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, and all related purposes such as ingress, egress and parking and uses incidental thereto.

"*Permitted Sublease*" shall mean a Sublease entered into by Tenant for 100% of the Property (a) for the purpose of permitting the Subtenant thereunder to operate a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, (b) pursuant to which the Subtenant makes the same representations to Tenant as are made by Tenant to Landlord as set forth in Section 6.08 of this Lease and such representations are true and correct at all times, and (c) which Sublease complies with all other requirements for a Sublease set forth in Section 15.04 of this Lease.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" has the meaning set forth in Section 17.01.

"*Property*" means those parcels of real estate legally described on Exhibit A attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate), including all signs and canopies, but shall exclude the Existing Personalty.

"*Property Termination Date*" has the meaning assigned to such term in Section 12.02(c).

"*Property Termination Date-Total Condemnation*" has the meaning assigned to such term in Section 12.03(a).

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local laws applicable to or regulating USTs.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other

movement of Hazardous Materials, Regulated Substances or USTs from the Property, or on or onto the Property (even if the source thereof is an adjoining property).

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rent*" means the Rental, the Monetary Obligations, and all other amounts due and payable by Tenant to Landlord hereunder.

"*Rental*" means the Base Annual Rental and Base Monthly Rental.

"*Rental Adjustment*" has the meaning set forth in Section 2.06 as adjusted as set forth in Section 2.07.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning set forth in Section 7.01(b).

"*SNDA*" means subordination, nondisturbance and attornment agreement.

"*Sublease*" has the meaning assigned to such term in Section 15.04.

"*Subtenant*" means a subtenant pursuant to a Sublease.

"*Successor Landlord*" has the meaning set forth in Section 14.04.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Taxes*" has the meaning set forth in Section 7.01(a).

"*Temporary Taking*" has the meaning set forth in Section 12.04.

"*Tenant Entity*" or "*Tenant Entities*" means individually or collectively, as the context may require, Tenant, and all Affiliates thereof.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" means a Condemnation of all or substantially all of the Property, including a Condemnation (other than for a temporary use) of such a substantial part of the Property resulting in the portion of the Property remaining after such Condemnation being unsuitable for use as a Permitted Facility, as determined by Tenant in the exercise of good faith business judgment.

"*Transfer*" has the meaning assigned to such term in Section 15.02 of this Agreement.

"*Transaction*" has the meaning set forth in Section 15.01.

"*Transaction Documents*" means this Lease, the Purchase and Sale Agreement, any other leases between any Landlord entity and any Tenant entity with respect to any other properties purchased by any Landlord entity pursuant to the Purchase and Sale Agreement, and all documents related to any of the foregoing.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly owned subsidiary of such an entity.

## ARTICLE II

## BASIC LEASE TERMS

**Section 2.01** **Property**. The street address of the Property is set forth on Exhibit A attached hereto.

**Section 2.02** **Lease Commencement Date.** The Lease Commencement Date shall be April 1, 2025. The Initial Term Expiration Date shall be determined as follows:

(a) If the Commencement Date is the first day of a calendar month, then the Initial Term Expiration Date will be the day immediately preceding the **15th anniversary** of the Commencement Date.

(b) If the Commencement Date is not the first day of a calendar month, then the Initial Term Expiration Date will be the last day of the month in which the **15th anniversary** of the Commencement Date occurs.

**Section 2.03** **Extension Options**. Two (2) extensions of Five (5) years each, as described in Section 4.02.

**Section 2.04** **Expiration Date (if fully extended)** March 31, 2050.

**Section 2.05** **Initial Base Annual Rental**. $660,000.00

**Section 2.06** **Rental Adjustment**. Three percent (3.0%) of the Base Annual Rental then in effect, with such Rental Adjustment taking effect on an annual basis throughout the Initial Term, as described in Section 5.02. The rental adjustment during the extension terms will be capped at three percent (3.0%).

**Section 2.07** **Adjustment Date**. April 1, 2026, and every anniversary thereafter during the Lease Term (including any Extension Term).

**Section 2.08** **Tenant Tax Identification No**. 85-3793244

## ARTICLE III

## LEASE OF PROPERTY

**Section 3.01** **Lease**. In consideration of Tenant's payment of the Rent and Tenant's performance of all other obligations hereunder, Landlord hereby leases to Tenant, and Tenant hereby takes and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default, or any event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing.

**Section 3.02** **Quiet Enjoyment**. So long as Tenant shall pay the Rent provided in this Lease, and shall keep and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default shall have occurred and be continuing.

## ARTICLE IV

## LEASE TERM; EXTENSION

**Section 4.01** **Initial Term**. The initial term of this Lease ("Initial Term") shall commence as of the Commencement Date and shall expire at 11:59 p.m. on the Initial Term Expiration Date, unless terminated sooner as provided in this Lease or as may be extended as provided herein. The time period during which this Lease shall actually be in effect, is referred to as the "Lease Term." As of the Commencement Date, Tenant agrees to accept possession of the Property.

**Section 4.02** **Extensions**. Provided that this Lease has not expired or has not been sooner terminated, and that no Event of Default has occurred and is continuing at the time any Extension Option is exercised, and provided that all other agreements necessary to the continued operation of Tenant's business at the Property are extended for a period of not less than the applicable extension periods, Tenant shall have the right and option (each, an "Extension Option") to extend the Initial Term for the Property for two (2) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 4.03** **Notice of Exercise**. Tenant may only exercise an Extension Option by giving written notice thereof to Landlord of Tenant's election to do so (a) no later than six (6) months prior to the Expiration Date. If written notice of the exercise of any Extension Option is not received by Landlord by the applicable dates described above, then this Lease shall terminate on the Initial Term Expiration Date or, if applicable, the last day of the Extension Term then in effect. Upon the request of Landlord or Tenant, the parties hereto will, at the expense of the requesting party, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 4.03.

**Section 4.04** **Removal of Personalty**. Upon the expiration of the Lease Term, and if Tenant is not then in breach hereof, Tenant may remove from the Property all personal property belonging to Tenant. Tenant shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear. Any property of Tenant left on the Property on the tenth day following the expiration of the Lease Term shall, at Landlord's option, automatically and immediately become the property of Landlord. Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. All such property shall at Landlord's option be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord. If Landlord arranges for storage of any personal property, Landlord shall have a lien against such property for costs incurred in removing and storing the same.

**Section 4.05** **Existing Personalty**. To the extent that there is any furniture, trade fixtures, equipment or other personal property located upon the Property as of the Effective Date, such Existing Personalty is the property of Tenant, and

(a) Tenant shall maintain insurance on the Existing Personalty pursuant to and in accordance with the provisions of Section 7.03 below; and

(b) Tenant may utilize such Existing Personalty during the Lease Term; *provided, however*, that Tenant utilizes such Existing Personalty "AS IS" and "WHERE IS" without representation or warranty of any kind by Landlord, without any claim to ownership thereof, and Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's use of the Existing Personalty. Tenant shall maintain and repair such Existing Personalty and upon the expiration or sooner termination of this Lease, at Landlord's option, Tenant shall either leave the Existing Personalty on the Property in the same condition as of the Effective Date, normal wear and tear excepted, or remove the Existing Personalty in the same manner as set forth for Personalty in Section 4.04 above.

**Section 4.06** **Reserved**

**Section 4.07** **Reserved**

## ARTICLE V

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 5.01** **Base Monthly Rental**. Tenant's obligation to pay Base Monthly Rental begins on the Commencement Date, and subsequent monthly installments of Base Monthly Rental are due and payable on or before the first day of each succeeding calendar month during the Lease Term. If the Commencement Date is a date other than the first day of a calendar month, then Tenant must pay the Base Monthly Rental for the remainder of the month in which the Commencement Date occurs. The amount due for that partial month is a sum equal to the Base Monthly Rental specified for the first full calendar month of the Lease Term multiplied by a fraction, the numerator of which is the number of days from the Commencement Date to the end of the calendar month in which the Commencement Date falls and the denominator of which is the total number of days in that month. Notwithstanding the foregoing, beginning on the Commencement Date and ending on the date that is six (6) months following the Commencement Date, Tenant shall partially abated Base Monthly Rental in the amount of fifty percent (50%) of the Base Monthly Rental. Beginning on the first day of the seventh (7th) month following the Commencement Date, Tenant shall pay the entire Base Monthly Rental set forth in Section above.

**Section 5.02** **Adjustments**. During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental then in effect shall increase by an amount equal to the Rental Adjustment.

**Section 5.03** **Monetary Obligations**. In addition to Base Annual Rental and Base Monthly Rental, Tenant shall pay and discharge all sums of money required to be paid or reimbursed by Tenant under this Lease to Landlord, to any party on behalf of Landlord, to any third party or to any Indemnified Party (the obligations described in this sentence are referred to collectively as the "Monetary Obligations"). Tenant shall pay and discharge any Monetary Obligations when the same shall become due, provided that amounts which are billed to Landlord or any third party, but not to Tenant, shall be paid within thirty (30) days after Landlord's demand for payment thereof or, if later, when the same are due. In no event shall Tenant be required to pay to Landlord any Monetary Obligation that Tenant is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 5.04** **Rentals To Be Net to Landlord**.

(a) The Base Annual Rental payable hereunder shall be net to Landlord, so that this Lease shall yield to Landlord the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property) shall be performed and paid by Tenant, including without limitation, common area maintenance charges, if any, related to the Property. Tenant shall perform all of its obligations under this Lease at its sole cost and expense. All Rent which Tenant is required to pay hereunder shall be the unconditional obligation of Tenant and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement,

deferment, deduction or counterclaim whatsoever. For the avoidance of doubt, Tenant shall pay all taxes, insurance and utility charges and shall be solely responsible for the maintenance of the Property, including, without limitation utilities, building maintenance, repairs and replacements, including, but not limited to, the roof, structure, foundation, grease septic system, windows, and HVAC.

(b) Simultaneous with each payment to Landlord of Base Monthly Rental, Tenant shall pay to Landlord any applicable state sales tax and any applicable county or local sales tax. Tenant shall also pay to Landlord sales tax on any other payments which are subject to payment of any state or local sales tax, such sales tax payment to be made to Landlord at the same time as the payments subject to sales tax is paid by Tenant. In no event shall Tenant be responsible for paying Landlord's income taxes.

**Section 5.05 ACH Authorization**. Upon execution of this Lease, Tenant shall deliver to Landlord a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit B attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental, impound payments (if any), sales tax or real property tax (if any), and any other Monetary Obligations are transferred by Automated Clearing House Debit initiated by Landlord from an account established by Tenant at a United States bank or other financial institution to such account as Landlord may designate. Tenant shall continue to pay all Rental and other Monetary Obligations by Automated Clearing House Debit unless otherwise directed by Landlord.

**Section 5.06 Late Charges; Default Interest**. Any payment of Base Monthly Rental received more than five (5) days after its due date shall, in addition to any other remedy of Landlord, incur a late charge of five percent (5%) (which late charge is intended to compensate Landlord for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Tenant be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect. Any payment of a Monetary Obligation which is not paid to Landlord by Tenant on or prior to the date such payment is due to Landlord shall bear interest at a rate of interest per annum equal to the Default Rate.

**Section 5.07 Tenant Improvement Allowance.** Landlord will pay to Tenant the cash sum of Two Million and 00/100 Dollars ($2,000,000.00) as "Tenant Improvement Allowance" (herein so called) for Tenant's improvements. The Tenant Improvement Allowance shall be paid within thirty (30) days following: Tenant's presentation to Landlord of a statement reflecting all costs, charges, fees and expenses incurred and work performed for the period immediately preceding such statement (each, a "Draw Statement") together with invoices evidencing the costs incurred by Tenant for the Tenant Improvements and notarized or electronically executed lien waivers from each contractor, subcontractor and supplier of materials to whom such disbursement is payable (which may be conditioned on payment) rendering labor and materials in excess of $5,000.00. With respect to the final Draw Statement, Tenant shall additionally provide (i) final and unconditional notarized or electronically executed lien releases or lien waivers from all contractors, subcontractors and suppliers of materials performing work or delivering materials to the Property in excess of $5,000.00 in connection with the Tenant Improvements, (ii) an

affirmation that all of the Tenant improvements are complete and Tenant has opened for business in the Property, and (iii) a final certificate of occupancy for the Property.

**Section 5.08 Holdover.** If Tenant remains in possession of the Property after the expiration of the term hereof, Tenant, at Landlord's option and within Landlord's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Tenant shall comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rental by Landlord shall be deemed a consent to such holding over. Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee. In addition, if during any holdover period, Tenant fails to surrender the Property within thirty (30) days following receipt of a written notice from Landlord that Landlord has entered into a lease with a new tenant and has demanded that Tenant vacate (a "**Disallowed Holdover**"), Landlord shall be entitled to seek damages, consequential as well as direct, incurred or actually sustained by Landlord by reason of such holding over, together with all costs incurred by Landlord (including but not limited to reasonable attorneys' fees) in connection with such holdover. The foregoing provision shall not affect Landlord's right of re-entry or any rights of Landlord hereunder or as otherwise provided by law.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF TENANT

The representations and warranties of Tenant contained in this Article VI are being made to induce Landlord to enter into this Lease, and Landlord has relied, and will continue to rely, upon such representations and warranties. Tenant represents and warrants to Landlord as follows:

**Section 6.01 Organization, Authority and Status of Tenant**. Tenant has been duly organized or formed, is validly existing and in good standing under the laws of its state of Delaware and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required. All necessary corporate action has been taken to authorize the execution, delivery and performance by Tenant of this Lease and of the other documents, instruments and agreements provided for herein, including without limitation, the Transaction Documents. Tenant is not, and if Tenant is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder. The Person who has executed this Lease on behalf of Tenant is duly authorized to do so.

**Section 6.02 Enforceability**. This Lease constitutes the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

**Section 6.03** **Property Condition**. Tenant has physically inspected the Property and has examined title to the Property and has found all of the same satisfactory in all respects for all of Tenant's purposes.

**Section 6.04** **Litigation**. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Tenant Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 6.05** **Absence of Breaches or Defaults**. Tenant is not in default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound.

**Section 6.06** **Licenses and Permits**. Tenant has obtained all required licenses and permits, both governmental and private, to use and operate the Property as a Permitted Facility.

**Section 6.07** **Financial Condition: Information Provided to Landlord**. The financial statements, all financial data and all other documents and information heretofore delivered to Landlord by or with respect to the Tenant Entities and the Property in connection with this Lease or relating to the Tenant Entities or the Property are true, correct and complete in all material respects; there have been no amendments thereto since the date such items were prepared or delivered to Landlord; all financial statements provided were prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and fairly represent as of the date thereof the financial condition of each individual or entity to which they pertain; and no change has occurred to any such financial statements, financial data, documents and other information not disclosed in writing to Landlord, which has had, or could reasonably be expected to result in, a Material Adverse Effect.

**Section 6.08** **Compliance With OFAC Laws**. None of the Tenant Entities or Subtenants, and no individual or entity owning directly or indirectly any interest in any of the Tenant Entities or Subtenants, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 6.09** **Solvency**. There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Tenant, or to the best of Tenant's knowledge, its respective shareholders members, partners or Affiliates. Tenant does not have unreasonably small capital to conduct its business.

**Section 6.10** **Intentionally Omitted.**

**Section 6.11 Intentionally Omitted.**

**Section 6.12 Intentionally Omitted.**

**Section 6.13 Disclaimer of Warranties**. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) AND THE OTHER LANDLORD ENTITIES HAVE NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD OR ANY OF THE LANDLORD ENTITIES BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) LANDLORD'S TITLE THERETO, (v) VALUE, (vi) COMPLIANCE WITH SPECIFICATIONS, (vii) LOCATION, (viii) USE, (ix) CONDITION, (x) MERCHANTABILITY, (xi) QUALITY, (xii) DESCRIPTION, (xiii) DURABILITY, (xiv) OPERATION, INCOME, EXPENSES, ENTITLEMENTS OR ZONING, (xv) THE EXISTENCE OF ANY HAZARDOUS MATERIALS, RELEASE OR VIOLATION OF HAZARDOUS MATERIALS LAWS, OR (xvi) COMPLIANCE OF THE PROPERTY WITH ANY LAW OR LEGAL REQUIREMENT; AND ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE PROPERTY IS OF ITS SELECTION AND TO ITS SPECIFICATIONS AND THAT THE PROPERTY HAS BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN THE PROPERTY OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD AND ALL OTHER LANDLORD ENTITIES SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS SECTION 6.13 HAVE BEEN NEGOTIATED, AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES BY LANDLORD OR ANY LANDLORD ENTITY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING OTHERWISE.

**Section 6.14 Intentionally Omitted.**

## ARTICLE VII

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 7.01 Taxes**.

(a) ***Payment***. Landlord shall cause all tax bills for the Property to be issued in Tenant's name to the address designed by Tenant in Section 16.01 below. Subject to the provisions of this Article VII, Tenant shall pay directly to the applicable taxing authority, prior to the earlier of delinquency or the accrual of interest on the unpaid balance (except as otherwise set forth in Section 7.01(a)(iii)), all taxes and assessments of every type or nature assessed against or imposed

upon the Property, Tenant, or Landlord during or prior to the Lease Term or arising out of this Lease and the activities of the parties hereunder (collectively, the "Taxes"), including, without limitation:

(i) All real estate taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures or improvements located on the Property, whether belonging to Landlord or Tenant, or any tax or charge levied in lieu of such taxes and assessments;

(ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Tenant;

(iii) all recordation taxes, realty transfer taxes and similar taxes due and payable by Landlord as a result of the transactions contemplated by the Transaction or any of the Transaction Documents; and

(iv) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rent hereunder (and which are not assessed against all gross income of the Landlord), the leasehold estate of either party or the activities of either party pursuant to this Lease, which such taxes shall be paid to Landlord simultaneously with any payment to Landlord of Base Monthly Rental or a Monetary Obligations, as the case may be.

Prior to the earlier of delinquency or the accrual of interest on the unpaid balance, Tenant shall provide Landlord with receipts showing that each tax and assessment payment required by this Section 7.01(a) (other than those described in Section 7.01(a)(iii)) was made in a timely fashion. Notwithstanding anything to the contrary herein, Tenant shall be responsible for all taxes and assessments upon the Property or any part thereof or improvements thereon for the tax year in which Landlord acquires the Property.

(b) ***Reserves***. Notwithstanding any other provision contained in this Lease, in the event that Tenant defaults in the payment of Taxes described in Section 7.01(a)(i) or (ii) or the payment of any premiums for the insurance required by Section 7.03, or upon the occurrence of any Event of Default, Landlord shall have the right, in addition to all other rights and remedies set forth in this Lease, upon written notice to Tenant and without waiving any default, to require Tenant to pay to Landlord on the first day of each month after such notice (or on the day of each month specified in the notice), one-twelfth (1/12) of the amount that Landlord reasonably estimates from time to time will be necessary in order to accumulate with Landlord, by the date that is at least thirty (30) days prior to the date or dates any or all of such Taxes or insurance premiums are due, sufficient funds to pay any and all such Taxes and/or insurance premiums for the ensuing twelve (12) months (which shall not be deemed a trust fund) (the "Reserve"). Landlord may also require Tenant to pay one-sixth (1/6) of said estimated amount as reserve overage, which may be retained by Landlord from year to year. Tenant shall transmit bills for the Taxes and insurance premiums as soon as received. Landlord shall, upon prior written request of Tenant, provide Tenant with evidence reasonably satisfactory to Tenant that payment of such Taxes and insurance premiums, as applicable, was made in a timely fashion. In the event that the Reserve does not contain sufficient funds to timely pay any such Taxes or insurance premiums, upon Landlord's written notification thereof, Tenant shall, within five (5) Business Days of such notice, provide funds to Landlord in the amount of such deficiency. Landlord shall pay or cause to be paid directly to the applicable

taxing authorities or insurance companies any such Taxes or insurance premiums, as applicable, then due and payable for which there are funds in the Reserve; *provided, however*, that in no event shall Landlord be obligated to pay any such Taxes or insurance premiums in excess of the funds held in the Reserve or after an Event of Default, and Tenant shall remain liable for any and all such Taxes and insurance premiums, including fines, penalties, interest or additional costs imposed by any insurance company or taxing authority (unless incurred as a result of Landlord's failure to timely pay the same if it had adequate funds in the Reserve). Tenant shall cooperate fully with Landlord in assuring that such Taxes and insurance premiums are timely paid. If the amount paid by Tenant into the Reserve in any year exceeds the aggregate required under this Lease, such excess shall be applied to the payments for the succeeding year. Landlord may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Landlord. Interest or other gains from such funds, if any, shall be the sole property of Landlord. Upon an Event of Default, in addition to any other remedies, Landlord may apply all Reserve funds against any sums due from Tenant to Landlord. Landlord shall give to Tenant an annual accounting showing all credits and debits to and from such Reserve funds received from Tenant.

(c) ***Right to Contest***. After written notice to Landlord and any Lender designated by Landlord, Tenant may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto (which shall exclude the right to contest Taxes described in Section 7.01(a)(iv)), including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that:

(i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings;

(ii) no Event of Default has occurred;

(iii) Tenant posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof;

(iv) Tenant shall promptly provide Landlord with copies of all notices received or delivered by Tenant and filings made by Tenant in connection with such proceeding; and

(v) prior to the date that any judgment becomes final or any writ or order is issued under which the Property could be sold pursuant to such final judgment, Tenant shall pay the amount of any such tax or assessment or part thereof as finally determined in such proceeding to be due, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.

Landlord will, at the request of Tenant, reasonably cooperate in such contest, provided that Landlord is not required to incur any third party out-of-pocket cost or expense in connection with any such contest.

(d) Taxes for the year in which the Commencement Date shall occur shall be prorated such that Landlord shall bear and be responsible the amount of Taxes coming due in the year in which

the Commencement Date occurs multiplied by a fraction, the numerator of which is the number of days preceding the Commencement Date in such year and the denominator is the total number of days in such year.

**Section 7.02** **Utilities**. Tenant shall contract for, in its own name, and pay when due all charges for, the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Landlord be responsible for any interruption of any utility service except to the extent caused by the gross negligence or intentional misconduct of Landlord. Landlord shall have the same rights and remedies for nonpayment by Tenant of any utilities that Landlord has under this Lease for failure of Tenant to pay Rent. Landlord shall not be liable for any interruptions or curtailment in utility services and any such interruption or curtailment shall not constitute a termination of this Lease or eviction of Tenant except to the extent caused by the gross negligence or intentional misconduct of Landlord.

**Section 7.03** **Insurance**.

(a) ***Coverage***. Throughout the Lease Term, Tenant shall maintain, with respect to the Property, at Tenant's sole expense, the following types and amounts of insurance, in addition to such other insurance as Landlord and Lender may reasonably require from time to time:

(i) Insurance against loss or damage to the Property, including, without limitation, the Existing Personalty under a special cause of loss insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance if the Property is located within a 100-year floodplain (FEMA Zones A and V) and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 7.03(b)(x) below). Such policy shall also include coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Landlord. Such insurance shall be in amounts sufficient to prevent Landlord from becoming a co-insurer under the applicable policies, and in any event, after application of deductible, in amounts not less than 100% of the full insurable replacement cost values and sublimits satisfactory to Landlord, as determined from time to time at Landlord's request but not more frequently than once in any 12 month period.

(ii) Commercial general liability insurance, including products and completed operation liability, covering Landlord and Tenant against bodily injury liability, property damage liability and personal and advertising injury, garage liability coverage, garage keepers liability or bailee customers personal property coverage (with coverage not less than $1,000,000.00 per occurrence) in the event Tenant's activities require such coverage, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. The commercial general liability policy shall

contain a broad form contractual liability endorsement under which the insurer agrees to insure Tenant's obligations under Article XI hereof to the extent insurable, and a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Tenant or Landlord because of the negligence or other acts of the other, shall have a combined single limit of at least $2,000,000.00 for bodily injury and property damage, or such higher limits as Landlord or Lender may reasonably require from time to time, and shall be of form and substance satisfactory to Landlord and Lender. These limits may be satisfied through commercial general liability and umbrella liability policies. Tenant shall not be required to carry liquor liability policies.

(iii) Statutory workers' compensation insurance and Employers Liability insurance in the amount required by applicable law covering all persons employed by Tenant on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Property.

(iv) Rental value insurance, equal to 100% of the Base Annual Rental (as the same may adjusted hereunder) for a period of not less than twelve (12) months basic period plus a six (6) month extended period of indemnity, which insurance shall be carved out of Tenant's business interruption coverage for a separate rental value insurance payable to Landlord, or if rental value insurance is included in Tenant's business interruption coverage, the insurer shall provide priority payment to any rent obligations, and such obligations shall be paid directly to Landlord. Such insurance is to follow form of the special cause of loss coverage and is not to contain a co-insurance clause.

(v) Equipment Breakdown insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, located in or about the Property and in an amount equal to the lesser of (i) 25% of the 100% replacement cost of the Property or (ii) $5,000,000.00.

(vi) Automobile Liability Insurance not less than $1,000,000 per occurrence covering all owned and non-owned vehicles.

(vii) Builder's Risk Insurance, but only prior to the commencement of and during the construction of any permitted rehabilitation, replacement, reconstruction, restoration, renovation or alteration of the Property, and only to the extent that such coverage is not being maintained by Tenant's contractor(s) pursuant to a policy or polices reasonably acceptable to Landlord.

(viii) The foregoing insurance requirements shall also apply to any Subleases and subtenants shall provide the same proof of coverage to Landlord hereunder as Tenant.

(b) ***Insurance Provisions***. All insurance policies shall:

(i) provide

(A) via a waiver of subrogation endorsement, and a waiver of subrogation by the insurer as to claims against Landlord, any Lender designated by Landlord, and their respective employees and agents;

(B) that the insurer shall not deny a claim and that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Tenant, its officers, directors,

employees or agents, or anyone acting for Tenant or any subtenant or other occupant of the Property; and

(C) that any losses otherwise payable thereunder shall be payable notwithstanding any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment;

(ii) be primary and provide that any "other insurance" clause in the insurance policy shall exclude any policies of insurance maintained by Landlord and the insurance policy shall not be brought into contribution with insurance maintained by Landlord;

(iii) contain deductibles not to exceed $25,000.00 per occurrence, and all deductibles on insurance policies shall be borne by Tenant;

(iv) contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Landlord;

(v) provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Landlord and to any Lender covered by any standard mortgagee clause or endorsement;

(vi) provide that the insurer shall not have the option to restore the Property if Landlord elects to terminate this Lease in accordance with the terms hereof;

(vii) be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(viii) except for workers' compensation insurance referred to in Section 7.03(a)(iii) above, name Landlord and any Landlord Affiliate or Lender requested by Landlord, as an "additional insured" with respect to general liability insurance, as a "named insured" with respect to real property and the Existing Personalty, if applicable, and as a "loss payee" with respect to all real property, Existing Personalty and rental value insurance, as appropriate and as their interests may appear;

(ix) upon demand and at least thirty (30) days prior to the expiration date of any policy required hereunder, be evidenced by delivery to Landlord and any Lender designated by Landlord of an Acord Form 28 for property, rental value and boiler & machinery coverage (or any other form requested by Landlord) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Landlord), which forms shall bear notations evidencing the prior payment of insurance premiums and be accompanied by other evidence satisfactory to Landlord and any Lender designated by Landlord that such payment has been made; provided that in the event that either such form is no longer available or any such Lender requires a different form, such evidence of insurance shall be in a form reasonably satisfactory to Landlord and any Lender designated by Landlord; and

(x) be issued by insurance companies licensed to do business in the states where the Property is located and which are rated A:VIII or better by Best's Insurance Guide or are otherwise approved by Landlord.

(c) ***Additional Obligations***. It is expressly understood and agreed that

(i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and any Lender designated by Landlord;

(ii) the minimum limits of insurance coverage set forth in this Section 7.03 shall not limit the liability or obligations of Tenant for its acts or omissions as provided in this Lease;

(iii) Tenant shall procure policies for all insurance for periods of not less than one year and shall provide to Landlord and any servicer or Lender of Landlord certificates of insurance or, upon Landlord's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times;

(iv) Tenant shall pay as they become due all premiums for the insurance required by this Section 7.03;

(v) in the event any insurance policy required to be maintained by Tenant hereunder contains any breach of warranty provisions, Tenant shall not cause any violations of the policy warranties, declarations or conditions in such policy;

(vi) Tenant shall, from time to time, upon request from Landlord, provide copies of all certificates of insurance required hereunder; and

(vii) in the event that Tenant fails to comply with any of the requirements set forth in this Section 7.03, within ten (10) days of the giving of written notice by Landlord to Tenant,

(A) Landlord shall be entitled to procure such insurance and/or require Tenant to deposit funds to cover the insurance premium payments into the Reserve pursuant to the terms of Section 7.01(b); and

(B) any sums expended by Landlord in procuring such insurance shall be a Monetary Obligation (and not Rental) and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(d) ***Blanket Policies***. Notwithstanding anything to the contrary in this Section 7.03, any insurance which Tenant is required to obtain pursuant to this Section 7.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 7.03.

(e) ***Change in Operation***. Landlord reserves the right to require additional and/or other insurance if Tenant has a change in operation or use of the Property.


Page 161 of 276

## ARTICLE VIII

## MAINTENANCE; ALTERATIONS

**Section 8.01 Condition of Property; Maintenance**. Tenant hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Landlord as to the condition thereof. Tenant shall, at its sole cost and expense, be responsible for:

(a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste, including without limitation, the roof and the HVAC and other electrical and mechanical systems;

(b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty;

(c) subject to Section 8.02, making all necessary structural, non-structural exterior and interior repairs and replacements to any building, structures or improvements erected on the Property,

(d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facility; and

(e) paying all operating costs of the Property in the ordinary course of business. Tenant waives any right to require Landlord to maintain or repair all or any part of the Property or make repairs at the expense of Landlord pursuant to any Legal Requirements at any time in effect.

In elaboration of the foregoing, Tenant shall (a) keep the outside of all glass in the doors and windows of the Property clean; (b) keep exterior surfaces of the entrances and exits to the Property clean; (c) replace promptly any cracked or broken glass on the Property with glass of like grade and quality; (d) keep any garbage, trash, rubbish or other refuse in appropriate containers; and (e) comply with all laws, ordinances, rules and regulations of governmental authorities.

Landlord and its mortgagee shall not be liable for, and Tenant waives, all claims for loss or damage to Tenant's business or loss, theft or damage to Tenant's personal property or the property of any person claiming by, through or under Tenant resulting from: (1) wind or weather; (2) the failure of any sprinkler, heating or air conditioning equipment, any electric wiring or any gas, water or steam pipes; (3) the backing up of any sewer pipe or downspout; (4) the bursting, leaking or running of any tank, water closet, drain or other pipe; (5) water, snow or ice upon or coming through the roof, skylight, stairs, doorways, windows, walks or any other place upon or near the Property; (6) any act or omission of any party other than Landlord or Landlord related parties; and (7) any other causes other than the gross negligence or intentional misconduct of Landlord and/or the Landlord related parties.

Tenant shall store all of Tenant's trash in dumpsters or other covered trash receptacles. Tenant may also maintain garbage cans customary to Tenant's business on the sidewalk located in front of the Property, provided that (i) Tenant shall empty the garbage cans regularly and maintain the area in a neat and orderly fashion, including cleaning up any spills and (ii) the garbage cans shall not be located so as to block or materially impair access across the sidewalk.

Landlord shall have no obligation whatsoever to maintain or repair the Property, the improvements, or equipment thereon, whether structural or non-structural, during the Term, all of which obligations are intended to be imposed on the Tenant.

**Section 8.02 Alterations and Improvements**. After the completion of Tenant's initial improvements, , Tenant shall not alter the exterior, structural, plumbing or electrical elements of the Property or make any material alterations or improvements in any manner during the Lease Term, without the consent of Landlord, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Tenant may undertake nonstructural alterations to the Property, individually costing less than $150,000, without Landlord's prior written consent. No USTs may be installed at the Property without Landlord's written consent, which consent shall be at Landlord's sole and absolute discretion. If Landlord's consent is required hereunder and Landlord consents to the making of any such alterations, the same shall be made by Tenant at Tenant's sole expense by a licensed contractor and according to plans and specifications approved by Landlord and subject to such other conditions as Landlord shall reasonably require, including, but not limited to, Landlord's supervision of any such alterations. Any work at any time commenced by Tenant on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $10,000 or more, Tenant shall promptly provide Landlord with evidence of full payment to all laborers and materialmen contributing to the alterations, including, but not limited to, executed lien waivers.

Additionally, upon completion of any alterations, Tenant shall promptly provide Landlord with:

(a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect);

(b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and

(c) any other documents or information reasonably requested by Landlord. Tenant shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. Tenant shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Landlord is not responsible for the payment of any costs or expenses relating to the additions or alterations. Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Landlord, and Tenant shall execute and deliver to Landlord such instruments as Landlord may require to evidence the ownership by Landlord of such addition or alteration. If Tenant fails to bond or have discharged any lien as required herein within thirty (30) days thereafter, then Landlord may (but shall have no obligation to or discharge the lien on Tenant's behalf and the cost thereof shall be a Monetary Obligation immediately due and payable to Landlord plus interest at the Default Rate.

(d) All alterations, additions, and improvements to the Property shall comply at all times with all applicable laws, rules, regulations, and ordinances, and Tenant shall obtain all necessary permits for such alterations, additions, and improvements. Notwithstanding anything in this Lease

to the contrary, if Tenant constructs, makes or installs or causes to be constructed, made or installed any improvement or alteration in or to the Property (including, but not limited to, the initial construction of the Building and Improvements), Tenant shall be solely responsible for ensuring that such improvements and/or alterations do not violate any provision in any local, state or federal law or regulation relating to accessibility for handicapped persons or the removal of architectural or communication barriers to accessibility, ("**Disability Law**"), including, but not limited to, The Americans with Disabilities Act. If any claim is asserted against Landlord under any Disability Law which claim relates directly or indirectly to any alterations or improvements installed, made or constructed, directly or indirectly, by or for Tenant in or to the Property or any trade fixture or personal property item used by Tenant in the Property, Tenant shall defend, indemnify and hold the Landlord Parties harmless from and against the claim and any and all charges, liabilities, obligations, penalties, damages, judgments, costs and expenses (including costs of investigation and attorneys' fees) arising or incurred against or suffered, directly or indirectly, by Landlord relating thereto. If it should be determined that any improvement or alteration constructed, made or installed in or to the Property, directly or indirectly, by or for Tenant or any trade fixture or personal property item used by Tenant in the Property is an illegal architectural or communication barrier under any Disability Law, Tenant shall immediately, at its sole cost and expense, remove the barrier or, to the extent allowed by the Disability Law, provide alternatives to the barrier so as to make the Property accessible to handicapped persons.

**Section 8.03** **Encumbrances**. During the Lease Term, Landlord shall have the right to grant easements on, over, under and above the Property without the prior consent of Tenant, provided that such easements will not materially and adversely interfere with Tenant's use of the Property. Without Landlord's prior written consent, which consent shall be at Landlord's sole and absolute discretion, Tenant shall not grant any easements on, over, under or above the Property.

## ARTICLE IX

## USE OF THE PROPERTY; COMPLIANCE

**Section 9.01** **Use**. During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility and for no other purpose whatsoever. Except during periods when the Property is untenantable due to Casualty or Condemnation (and provided that Tenant continues to strictly comply with the other terms and conditions of this Lease), Tenant shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.

**Section 9.02** **Alternative Use**. Tenant shall not, by itself or through any permitted assignment, sublease or other type of transfer, convert the Property to an alternative use during the Lease Term without Landlord's prior written consent, which consent shall not be unreasonably withheld; *provided, however*, that Landlord's consent shall not be deemed unreasonably withheld if Landlord's decision is based on any or all of the following:

(a) whether the rental paid to Landlord would be equal to or greater than the anticipated rental assuming continued existing use;

(b) whether the proposed rental to be paid to Landlord is reasonable considering the converted use of the Property and the customary rental prevailing in the community for such use;

(c) whether the converted use will be consistent with the highest and best use of the Property;

(d) whether the concerted use is permitted at the Property in accordance with all applicable Legal Requirements, restrictions, covenants, and encumbrances of record;

(e) whether the converted use will increase Landlord's risks or decrease the value of the Property; and

(f) whether Landlord is able to obtain approval of its Lender to any such change in use.

**Section 9.03** **Compliance**. The use and occupation of the Property (whether by Tenant or any permitted Subtenant), and the condition thereof, shall, at Tenant's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property), and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of record, with respect to the Property. Without in any way limiting the foregoing provisions, any Sublease shall expressly prohibit any Subtenant, licensee or occupant thereunder from violating, or permitting the violation of, any Legal Requirements or the above-referenced restrictions, covenants or encumbrances. In addition and without in any way limiting the foregoing provisions, Tenant shall comply, and shall cause all Subtenants, licensees or other occupants to comply, with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such laws may be amended from time to time, and all regulations promulgated thereunder, as they affect the Property now or hereafter in effect. Upon Landlord's written request from time to time during the Lease Term, Tenant shall certify in writing to Landlord that Tenant's representations, warranties and obligations under Section 6.07 and this Section 9.03 remain true and correct and have not been breached. Tenant shall immediately notify Landlord in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Tenant shall (and shall cause each Subtenant, licensee or occupant to) comply with all Legal Requirements and directives of Governmental Authorities and, at Landlord's request, provide to Landlord copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Tenant shall also reimburse Landlord for all Costs incurred by Landlord in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Landlord to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Landlord as the result of the existence of such an event and for any penalties or fines imposed upon Landlord as a result thereof. Tenant will use its best efforts to prevent any act or condition to exist on or about the Property which will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Tenant shall pay for such increase. Tenant will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Tenant's failure to comply with its obligations under this Section. All matters related to compliance

with Environmental Law or dealing with Hazardous Materials shall be governed by Section 9.04. This Section is subject and subordinate to Section 9.04, and in the event of any inconsistency between Section 9.04 and this Section 9.03, Section 9.04 shall control and prevail.

**Section 9.04 Environmental**.

(a) ***Representations and Warranties***. Tenant represents and warrants to Landlord and Environmental Insurer which representations and warranties shall survive the execution and delivery of this Lease, as follows:

(i) Tenant is not in violation of or subject to, any pending or, to Tenant's actual knowledge, threatened investigation or inquiry by any Governmental Authority or to any remedial obligations under any Environmental Laws that could have a Material Adverse Effect, nor has Tenant received any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) with respect to the Property relating to

(A) Hazardous Materials, Regulated Substances or USTs, or Remediation thereof;

(B) possible liability of any Person pursuant to any Environmental Law;

(C) other environmental conditions; or

(D) any actual or potential administrative or judicial proceedings in connection with any of the foregoing that could have a Material Adverse Effect. The foregoing representations and warranties would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Property.

(ii) All uses and operations on or of the Property, whether by Tenant or, to Tenant's knowledge, any other Person acting on Tenant's behalf, have been in compliance with all Environmental Laws and environmental permits issued pursuant thereto;

(A) Tenant has not allowed any other tenant or other user of the Property to do any act that materially increased the dangers to human health or the environment, posed an unreasonable risk of harm to any Person (whether on or off the Property), impaired the value of the Property in any material respect, is contrary to any requirement set forth in the insurance policies maintained by Landlord including, without limitation, the Environmental Policy, constituted a public or private nuisance, constituted waste, or violated any covenant, condition, agreement or easement applicable to the Property.

(b) ***Covenants***.

(i) Tenant covenants to Landlord and Environmental Insurer during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A) The Property, Tenant and any Subtenant shall not be in violation of any investigation or inquiry by any Governmental Authority.

(B) All uses and operations on or of the Property, whether by Tenant, Subtenant or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(C) There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(D) Tenant shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Tenant, Subtenant or any other Person.

(E) Tenant shall not do or allow any Subtenant or other user of any part of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), has a Material Adverse Effect, is contrary to any material requirement set forth in the insurance policies maintained by Tenant, constitutes a public or private nuisance or constitutes waste, violates any covenant, condition, agreement or easement applicable to the Property, or creates the threat of a Release.

(F) Tenant shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property as may be reasonably requested by Landlord (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Landlord and Environmental Insurer the reports and other results thereof, and Landlord, Environmental Insurer and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof.

(G) Tenant shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 9.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(H) Tenant will dispose of all biomedical waste generated through its operations in a manner consistent with all applicable laws and/or regulations.

(ii) Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Tenant to satisfy any one or more of the covenants set forth in subsections (A) through (F) above provided that Tenant shall be in compliance with the requirements of any Governmental Authority with respect to the discovery or Remediation of any Release at the Property.

(c) ***Notification Requirements***. Tenant shall immediately notify Landlord and Environmental Insurer in writing upon Tenant obtaining actual knowledge of:

(i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property;

(ii) any non-compliance with any Environmental Laws related in any way to the Property;

(iii) any actual or potential Environmental Lien;


Page 167 of 276

(iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and

(v) any written or oral notice or other communication, including but not limited to, notices of violation ("NOV") issued by a Governmental Authority of which Tenant becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or USTs, a Release or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Tenant shall, upon Landlord's or Environmental Insurer's written request, deliver to Landlord or Environmental Insurer a certificate stating that Tenant is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(d) ***Remediation***. Solely to the extent that they are the direct and proximate result of Tenant's conduct (whether intentional or negligent), Tenant shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release, a Threatened Release or a suspected Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the environment. Should Tenant fail to undertake such Remediation in accordance with the preceding sentence, Landlord, after written notice to Tenant and Tenant's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs reasonable incurred in connection therewith shall be paid by Tenant. Any Cost so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord.

(e) ***Indemnification***. Solely to the extent that they are the direct and proximate result of Tenant's conduct, Tenant shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, USTs, or other environmental matters concerning the Property, including, but not limited to, all fines, penalties, claims or expenses imposed pursuant to any Environmental Law and all Costs of Remediation (whether or not performed voluntarily). It is expressly understood and agreed that Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(f) ***Right of Entry***. Landlord and any other Person designated by Landlord, including but not limited to Environmental Insurer, if any, any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (including, without limitation, in connection with the exercise of any remedies set forth in this Lease) to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Landlord's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and

conducting other invasive testing. Tenant shall cooperate with and provide access to Landlord, Environmental Insurer and any other Person designated by Landlord.

(g) ***Survival***. The obligations of Tenant and the rights and remedies of Landlord under this Section 9.04 shall survive the termination, expiration and/or release of this Lease.

(h) ***Intentionally Omitted.***

(i) ***Intentionally Omitted.***

(j) ***Conveyance***. Upon expiration or termination of this Lease, and upon (and to the extent set forth in) a written request of Landlord, Tenant shall convey any UST (if any) to Landlord or Landlord's designee, free and clear of all liens and security interests.

(k) The obligations of this Article IX shall survive the expiration or termination of the Lease.

**Section 9.05 Intentionally Omitted.**

## ARTICLE X

## ADDITIONAL COVENANTS

**Section 10.01 Inspection**. Landlord, any Lender designated by Landlord, and their authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (which may be given by telephone, text or email, and which need not be given in the event of an emergency), without delay, hindrance or restriction, to enter the Property or any part thereof and inspect the same. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 11.01, excluding damages arising as a result of the negligence or intentional misconduct of Landlord.

The foregoing notwithstanding, certain areas of the Property shall have present in it information and documents covered by Health Insurance Portability and Accountability Act of 1996, as amended ("HIPPA"). Landlord agrees that it shall not (and shall not permit others to) access, copy, distribute, disclose, review, read, or otherwise interact with in anyway information covered by HIPPA or any of Tenant's other patient records, whether or not covered by HIPPA. Landlord agrees that in exercising Landlord's right to re-enter the Property, it or its agents, employees, contractors shall be accompanied at all times by a representative to Tenant.

**Section 10.02 Financial Information**.

(a) ***Intentionally Omitted***.

(b) ***Financial Statements***. On or before each February 15, Tenant and any guarantor of this lease shall deliver to Landlord:

(i) complete financial statements of the Tenant Entities including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended;

(ii) income statements for the business at the Property reflecting the business operations at the Property; and

(iii) a statement identifying each Subtenant, setting forth the rentals payable by each Subtenant and the revenue received from each Subtenant, setting forth the length of the unexpired term of each Sublease, identifying each Subtenant who is in default, and providing such other information as Landlord or Lender may require.

All such financial statements shall be prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and shall be certified to be accurate and complete by an officer or director of each Tenant Entity and otherwise be in form and substance satisfactory to Landlord and Lender. Tenant understands that Landlord will rely upon such financial statements and Tenant represents that such reliance is reasonable. In the event that Tenant's property and business at the Property are ordinarily consolidated with other business for financial statements purposes, such financial statements shall be prepared on a consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Property with the basis for allocation of overhead of other charges being clearly set forth. The financial statements delivered to Landlord need not be audited, but Tenant shall deliver to Landlord copies of any audited financial statements of the Tenant Entities which may be prepared, as soon as they are available. Within thirty (30) days after the end of each fiscal year of Tenant, and upon prior written request by Landlord, Tenant shall deliver such compliance certificate to Landlord as Landlord may reasonably require in order to establish that Tenant is in compliance with all of its obligations, duties and covenants under this Lease.

(c) ***Other Information***. Notwithstanding any provision contained herein, upon request at any time, Tenant will provide to Landlord any and all financial information and/or financial statements (and in the form or forms):

(i) requested by Landlord in connection with Landlord's filings with or disclosures to any Governmental Authority; or

(ii) as reasonably requested by Landlord.

**Section 10.03 OFAC Laws**. Tenant shall not enter into a Sublease or any other agreement with any Person who may appear on the list of Specifically Designated Nationals and Blocked Persons that is maintained under OFAC Laws or whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws. Upon receipt of notice or upon actual knowledge thereof, Tenant shall immediately notify Landlord in writing if any Person owning (directly or indirectly) any


Page 170 of 276

interest in any of the Tenant Entities or a Subtenant, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; *provided, however*, that the covenant in this Section 10.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 10.04 Estoppel Certificate**. At any time, and from time to time, Tenant shall, promptly and in no event later than ten (10) days after a request from Landlord or any Lender or mortgagee of Landlord, execute, acknowledge and deliver to Landlord or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Landlord, certifying:

(a) that Tenant has accepted the Property;

(b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor;

(c) the commencement and expiration dates of the Lease Term;

(d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable;

(e) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof;

(f) that no notice has been received by Tenant of any default pursuant to this Lease which has not been cured, except as to defaults specified in the certificate;

(g) Intentionally Omitted;

(h) that Tenant has no option to purchase, right of first refusal or similar rights;

(i) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Tenant;

(j) that neither Landlord nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and

(k) any other information reasonably requested by Landlord or any Lender or mortgagee, as the case may be. If Tenant shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes


Page 171 of 276

and appoints Landlord as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Any such certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Property or leasehold.

## ARTICLE XI

## RELEASE AND INDEMNIFICATION

**Section 11.01 Release and Indemnification**. TENANT AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LANDLORD, LENDER, AND THEIR RESPECTIVE AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW. TENANT AGREES THAT NEITHER LANDLORD NOR LENDER SHALL BE RESPONSIBLE OR LIABLE TO TENANT OR TENANT'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER PERSON. TENANT AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF TENANT SHALL BE ACTING AS TENANT'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LANDLORD, LENDER NOR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF. TENANT SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY; *PROVIDED, HOWEVER*, THAT THE TERM "GROSS NEGLIGENCE" SHALL NOT INCLUDE GROSS NEGLIGENCE IMPUTED AS A MATTER OF LAW TO ANY OF THE INDEMNIFIED PARTIES SOLELY BY REASON OF LANDLORD'S INTEREST IN THE PROPERTY OR LANDLORD'S FAILURE TO ACT IN RESPECT OF MATTERS WHICH ARE OR WERE THE OBLIGATION OF TENANT UNDER THIS LEASE) RELATING IN ANY WAY TO THE PROPERTY OR CAUSED BY, INCURRED OR RESULTING FROM TENANT'S OPERATIONS OR BY TENANT'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY TENANT OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY TENANT, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

**Section 11.02 Non-Recourse to Landlord**. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Property and not against any other assets, properties or funds of (i) Landlord, (ii) Landlord's members, or any entity controlling,

controlled by, or in common control of Landlord or Landlord's members, any director, officer, general partner, shareholder, limited partner, beneficiary, employee, attorney, consultant, contractor or agent of Landlord or any general partner of Landlord or any of its general partners (or any legal representative, heir, estate, successor or assign of any thereof), (iii) any predecessor or successor limited liability company, partnership or corporation (or other entity) of Landlord or any of its members, managers, general partners, shareholders, officers, directors, employees or agents, either directly or through Landlord or its general partners, shareholders, officers, directors, employees or agents or any predecessor or successor partnership or corporation (or other entity), (iv) any Lender, or any lender to a Person holding an interest in Landlord, (v) any Person affiliated with any of the foregoing, or any director, officer, employee or agent of any thereof; or (vi) the heirs, successors, personal representatives or assigns of any of the foregoing. Such exculpation of liability shall be absolute and without exception whatsoever. Furthermore, it is understood and agreed that in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent (unless Landlord is found to have acted in bad faith), and Tenant's sole remedy shall be an action for injunctive relief or specific performance. WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL THE LANDLORD, ANY MORTGAGEES, OR LANDLORD RELATED PARTIES, EVER BE LIABLE FOR ANY CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OR ANY LOST PROFITS OF TENANT.

## ARTICLE XII

## CONDEMNATION AND CASUALTY

**Section 12.01 Notification**. Tenant shall promptly give Landlord written notice of:

(a) any Condemnation of the Property;

(b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property; and

(c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Tenant shall promptly send Landlord copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 12.02 Partial Condemnation or Casualty**. Except as otherwise provided in Section 12.03, in the event of a Partial Condemnation or a Casualty:

(a) ***Net Awards***. All Net Awards shall be paid to Landlord.

(b) ***Landlord Election To Continue or Terminate Lease***. Landlord shall have the option,

(i) subject to the right of Tenant to elect otherwise as set forth in subsection (d) below, to terminate this Lease by notifying Tenant in writing within thirty (30) days after Tenant gives Landlord notice

(A) of such Partial Condemnation or Casualty, or

(B) that title has vested in the condemning authority; or

(ii) to continue this Lease in effect, which election shall be evidenced by either a notice from Landlord to Tenant, or Landlord's failure to notify Tenant in writing that Landlord has elected to terminate this Lease with respect to the Property within such thirty (30) day period. In the event the Partial Condemnation is material and adverse to Tenant's continued business operations to the extent that Tenant cannot substantially maintain the level of its operations, Tenant shall have a period of sixty (60) days after receipt of Landlord's notice to continue the Lease, or, in the event Landlord has failed to notify Tenant in writing of its election to terminate this Lease as referenced above, the Lease shall be terminated on the terms herein provided.

(c) ***No Continuance of Lease***. If Tenant does not elect to continue this Lease, then this Lease shall terminate with respect to the Property as of the date (the "Property Termination Date") that title has vested in the condemning authority. Tenant shall vacate and surrender the Property by the Property Termination Date, in accordance with the provisions of this Lease, and all obligations of either party hereunder shall cease as of the date of termination; *provided, however*, Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligations to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease with respect to the Property prior to the date of termination shall survive such termination. In such event, Landlord may retain all Net Awards related to the Partial Condemnation or Casualty, and Tenant shall immediately pay Landlord an amount equal to the insurance deductible applicable to any Casualty.

(d) ***Continuance of Lease***. If Landlord elects not to terminate this Lease, or if Landlord elects to terminate this Lease, but Tenant elects to continue this Lease, then, provided, Tenant has not exercised a termination its termination right in the event of a Partial Condemnation, this Lease shall continue in full force and effect upon the following terms:

(i) All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii) Tenant hereby assumes all risk of loss, damage or destruction, whether by Casualty, or the theft of all or any portion of the Property. Tenant shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Landlord. Subject to the terms and provisions of the Mortgages and upon the written request of Tenant (accompanied by evidence reasonably satisfactory to Landlord that such amount has been paid or is due and payable and is properly part of such costs, and that Tenant has complied with the terms of Section 8.02 in connection with the restoration), Landlord shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Landlord, an amount up to but not exceeding

the amount of any Net Award (after deducting all Costs incidental to the collection of the Net Award) received by Landlord with respect to such Partial Condemnation or Casualty. Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Tenant shall provide evidence reasonably satisfactory to Landlord of funds available to Tenant to pay restoration expenses (a) up to the amount of the insurance deductible applicable to such Casualty and (b) which are in excess of the amount of the Net Award. Landlord shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Tenant shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 12.03 Total Condemnation**. In the event of a Total Condemnation of the Property, other than a Temporary Taking, then, in such event:

(a) ***Termination of Lease***. All obligations of either party hereunder shall cease as of the date (the "Property Termination Date-Total Condemnation") that title vests in the condemning authority; *provided, however*, that Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligation to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease prior to the Property Termination Date-Total Condemnation shall survive such termination.

(b) ***Net Award***. Landlord shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Tenant by this Lease, and Tenant hereby expressly assigns to Landlord all of its right, title and interest in and to every such Net Award and agrees that Tenant shall not be entitled to any Net Award or other payment for the value of Tenant's leasehold interest in this Lease; but Tenant shall be entitled to any award to relocate its personal property from the Property, so long as such award does not reduce the Net Award to Landlord.

**Section 12.04 Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect, without any reduction of Base Annual Rental or any other Monetary Obligation payable hereunder. Except as provided below and subject to the terms and provisions of the Mortgages, Tenant shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Landlord and Tenant as of the date of such expiration.

**Section 12.05 Adjustment of Losses**. Any loss under any property damage insurance required to be maintained by Tenant shall be adjusted by Landlord and Tenant (except that if an Event of Default has occurred and is continuing, Landlord may adjust such claim without the written consent of Tenant). Subject to the terms and provisions of the Mortgages, any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Landlord or, at Landlord's election, Tenant. Notwithstanding the foregoing or any other provisions of this Section 12.05 to the contrary, but subject to the terms and provisions of the Mortgages, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Landlord is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Tenant and otherwise, to file and prosecute Tenant's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and

apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Tenant to Landlord under this Lease, in such order, priority and proportions as Landlord in its discretion shall deem proper.

**Section 12.06 Tenant Obligation in Event of Casualty**. During all periods of time following a Casualty, Tenant shall take reasonable steps to ensure that the related Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 12.07 Tenant Awards and Payments**. Notwithstanding any provision contained in this Article XII, Tenant shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the Taking of any Personalty owned by Tenant, any insurance proceeds with respect to any Personalty owned by Tenant, the interruption of its business and moving expenses (subject, however, to the provisions of Section 7.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Landlord's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Landlord for the Condemnation or Casualty, including payments or proceeds related to any Personalty then owned by Landlord.

**Section 12.08 Uninsured Losses**. Nothing contained herein shall relieve Tenant of its obligations under this Article XII if the destruction or damage is not covered, either in whole or in part, by insurance.

**Section 12.09 Regulatory Changes**. If any legally constituted authority prohibits Tenant from utilizing the Property for Tenant's purpose (i.e., substance use treatment facility), then this Lease shall cease when the public authority takes possession (due to condemnation), or when Tenant can reasonably vacate the Property (due to regulatory changes). Tenant will notify Landlord upon being made aware of condemnation or regulations that prohibits utilizing the Property for Tenant's stated purpose, and this Lease will terminate immediately upon Tenant's payment of one (1) year's rent.

## ARTICLE XIII

## DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES

**Section 13.01 Event of Default**. Each of the following shall be an event of default by Tenant under this Lease (each, an "Event of Default"):

(a) if any representation or warranty of Tenant set forth in this Lease is false in any material respect when made (it being understood that any false representation pursuant to Section 6.11 or 6.12 shall always be deemed to be material), or if Tenant renders any false statement or account when made;

(b) if any Rental or other Monetary Obligation due under this Lease is not paid within five (5) days of the date when due;

(c) if Tenant fails to pay, prior to delinquency, any Taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, or Tenant fails to maintain any insurance required to be maintained by Tenant pursuant to this Lease;

(d) if there is an Insolvency Event affecting Tenant;

(e) if Tenant vacates or abandons the Property, or the Property ceases to be occupied and open for business by a Subtenant; *provided, however*, that no default shall occur if the Property is temporarily not open for business due to renovations or repairs, or if the Property is not open for business because Tenant had to terminate a Subtenant because of a default pursuant to a Sublease so long at Tenant is actively seeking a Subtenant for the Property.

(f) if Tenant fails to observe or perform any of the other covenants, conditions or obligations of Tenant in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Landlord in immediate jeopardy, and is within the reasonable power of Tenant to promptly cure, all as determined by Landlord in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Landlord shall have given Tenant notice thereof and a period of thirty (30) days shall have elapsed, during which period Tenant may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Landlord in its reasonable discretion, and Tenant is diligently pursuing a cure of such failure, then Tenant shall have a reasonable period to cure such failure beyond such thirty (30) day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Landlord. If Tenant shall fail to correct or cure such failure within such ninety (90) day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g) if a final, non-appealable judgment is rendered by a court against Tenant which has a Material Adverse Effect, or which does not have a Material Adverse Effect but which is in the amount of $25,000 or more (excluding claims covered by insurance), and in either event is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h) if Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i) if the estate or interest of Tenant in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j) if there is an “Event of Default” or other breach or default by Tenant pursuant to any of the other Transaction Documents or any Other Agreement, after the passage of all applicable notice and cure or grace periods; or

(k) a Transfer occurs without the written consent of Landlord (except to the extent that such consent is not required and Tenant otherwise complies with the provisions of Article XV of this Lease).

**Section 13.02 Remedies**. Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Tenant, Landlord shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following.

(a) to terminate this Lease, whereupon Tenant's right to possession of the Property shall cease and this Lease, but not Tenant's liability, shall be terminated;

(b) to the extent not prohibited by applicable law, and without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action, and without terminating (or being deemed to terminate) this Lease, to re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Tenant upon the Property and, to the extent permissible, all permits and other rights or privileges of Tenant pertaining to the use and operation of the Property;

(c) to expel Tenant and those claiming under or through Tenant, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. If Tenant shall, after default, voluntarily give up possession of the Property to Landlord, deliver to Landlord or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Landlord's rights and the acceptance thereof by Landlord or its agents shall not be deemed to constitute a termination of the Lease. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate;

(d) to bring an action against Tenant for any damages sustained by Landlord or any equitable relief available to Landlord and to the extent not prohibited by applicable Law, subject to Section 14.01, to seize all personal property or fixtures upon the Property which Tenant owns or in which it has an interest, in which Landlord shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Tenant's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action; provided, however, in no event shall Landlord take possession of, ownership of, or any interest in any documents or information covered by HIPPA or similar privacy laws or otherwise containing patient information.

(e) to re-let the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Landlord, in its sole discretion, may determine, with all proceeds received from such re-letting being applied


Page 178 of 276

to the Rental and other Monetary Obligations due from Tenant in such order as Landlord may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such re-letting. Except to the extent required by applicable Law, Landlord shall have no obligation to re-let the Property or any part thereof and shall in no event be liable for refusal or failure to re-let the Property or any part thereof, or, in the event of any such re-letting, for refusal or failure to collect any rent due upon such re-letting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate as specified in said notice;

(f) RESERVED

(g) to accelerate and recover from Tenant all Rent due and owing and scheduled to become due and owing under this Lease, discounted to present value, both before and after the date of such breach for the entire original scheduled Lease Term, and Landlord may collect the same by distress or otherwise;

(h) to recover from Tenant all Costs paid or incurred by Landlord as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(i) to immediately or at any time thereafter, and with or without notice, at Landlord's sole option but without any obligation to do so, correct such breach or default and charge Tenant all Costs incurred by Landlord therein, plus an administrative fee of five percent (5%) of such Costs. Any sum or sums so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord. Any such acts by Landlord in correcting Tenant's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Landlord's right to exercise any or all remedies set forth herein;

(j) to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant held by Landlord under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Tenant hereunder;

(k) without limiting the generality of the foregoing or limiting in any way the rights of Landlord under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Landlord shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction in any action taken by Landlord to enforce its rights and remedies hereunder in order to protect and preserve Landlord's interest under this Lease or in the Property, the Existing Personalty and the Personalty, and in connection therewith, TENANT HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(l) to seek any equitable relief available to Landlord, including, without limitation, the right of specific performance.

Additionally, in the event of any default by Tenant, Landlord shall take commercially reasonable efforts to mitigate its damages, which obligation shall include listing the Property for lease at a commercially reasonable rental.

Any action taken by Landlord under this Section 13.02 shall not operate as a waiver of any right which Landlord would otherwise have against Tenant for rental hereby or otherwise, and Tenant shall remain responsible to Landlord for any loss and/or damage suffered by Landlord by reason of Tenant's default or breach. The words "reenter" and "reentry" as used in this Lease are not restricted to their technical legal meaning.

Nothing set forth in this Section affects the right of Landlord to indemnification for liability arising prior to the termination of this Lease for personal injuries or property damage as may be provided elsewhere in this Lease. In all events, Landlord shall have the right upon at least ten (10) days' notice to Tenant (or without notice in the event of a bona fide emergency effecting material damage to property or endangering life or health) to cure any breach by Tenant at Tenant's sole cost and expense, and Tenant shall reimburse Landlord for such expense immediately upon demand plus Default Interest, commencing on the date due through the date of payment.

**Section 13.03 Cumulative Remedies**. (a) All powers and remedies given by Section 13.02 to Landlord, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Landlord under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Tenant contained in this Lease, and no delay or omission of Landlord to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Landlord may be exercised from time to time, and as often as may be deemed expedient, by Landlord, subject at all times to Landlord's right in its sole judgment to discontinue any work commenced by Landlord or change any course of action undertaken by Landlord.

**Section 13.04 Landlord Default**. If Landlord is ever in default under the terms of this Lease, or if Landlord commits a breach of any one or more of the covenants, terms and conditions herein set forth, then Tenant shall deliver Landlord a written notice that states the alleged default or breach (the "**Landlord Default Notice**"). If Landlord does not cure the alleged default or breach within thirty (30) days after it receives the Landlord Default Notice (provided however, that if the breach or failure to perform cannot be reasonably cured within the 30-day period, then a Landlord default shall only be deemed to occur if Landlord does not in good faith commence the cure within the 30-day period and thereafter fails to diligently pursue the cure to completion within ninety (90) days after receiving the Landlord Default Notice), then, Tenant may cure such default or breach, and Landlord shall reimburse Tenant for all costs expended by Tenant in connection therewith within thirty (30) days after receiving an invoice from Tenant therefor, and if Landlord fails to reimburse Tenant within the 30-day period, then Tenant may deduct the amount of such costs from the next installment of Monthly Base Rent due hereunder until such costs have been repaid in full. Tenant agrees not to exercise any remedies available by virtue of a Landlord's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be

reasonably necessary to cure such default) unless Tenant has also given such parties a reasonable opportunity to cure such default (including but not limited to foreclosure proceedings if necessary to effect such cure).

## ARTICLE XIV

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 14.01 No Liens**. Landlord's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Tenant, and nothing herein contained shall be construed to require such subordination by Landlord. NOTICE IS HEREBY GIVEN THAT TENANT IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR TENANT'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID. Landlord shall have no interest in any personal property owned by Tenant and Tenant's lenders shall have the right to place security interests on such personal property. Landlord waives any right, title, or interest that Landlord may have in Tenant's personal property, anything in this Lease to the contrary notwithstanding and Landlord shall execute such documents or interest as shall be reasonably necessary to give effect to such waiver.

**Section 14.02 Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Landlord, and Tenant covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Landlord, or any present or proposed mortgagees under trust deeds, upon the condition that Tenant shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing. If requested by Landlord, Tenant shall execute an SNDA with a Lender holding a Mortgage, and Tenant agrees to promptly execute and return such SNDA to Landlord.

**Section 14.03 Election To Declare Lease Superior**. If any mortgagee, receiver or other secured party elects to have this Lease and the interest of Tenant hereunder, be superior to any Mortgage and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such Mortgage, whether this Lease was executed before or after such Mortgage and in that event such mortgagee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such Mortgage and had been assigned to such mortgagee, receiver or other secured party.

**Section 14.04 Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Landlord as landlord under this Lease, Tenant shall attorn to Lender or such purchaser or assignee, as the case may be (a "<u>Successor Landlord</u>"), and recognize the Successor Landlord as lessor under this Lease, and, subject to the provisions of this

Article XIV, this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant, provided that the Successor Landlord shall only be liable for any obligations of Landlord under this Lease which accrue after the date that such Successor Landlord acquires title. The term "Landlord", as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of title to the Property, and in the event of any transfer or transfers of title to the Property or any part thereof, Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease to be performed after the effective date of such transfer. In the event of any transfer or transfers of Landlord's interest in the Property, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, and Tenant agrees to attorn to such transferee. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 14.05 Execution of Additional Documents**. Although the provisions in this Article XIV shall be self-operative and no future instrument of subordination shall be required, upon request by Landlord Tenant shall execute and deliver whatever instruments may be reasonably required for such purposes.

**Section 14.06 Notice to Lender**. Tenant shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Tenant has been notified of any breach or default by Landlord of any of its obligations under this Lease and give such Lender at least thirty (30) days beyond any notice period to which Landlord might be entitled to cure such default before Tenant may exercise any remedy with respect thereto.

## ARTICLE XV

## ASSIGNMENT

**Section 15.01 Assignment by Landlord**. As a material inducement to Landlord's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Tenant hereby agrees that Landlord may, from time to time and at any time and without the consent of Tenant, engage in the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Landlord's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee (so long as Landlord and such purchaser or assignee notify Tenant in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Landlord hereunder from and after the date of such assignment). At the request of Landlord, Tenant will execute such documents confirming the sale, assignment or other transfer and such other agreements as Landlord may reasonably request, provided that the same do not increase the liabilities and obligations of Tenant hereunder.

Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 15.02 No Assignment by Tenant**. Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Property in entering into this Lease. Any assignment, sublease, transfer, conveyance, pledge or mortgage by Tenant, whether voluntary or involuntary, whether by operation of Law (for example, by merger) or otherwise, of any part or all of this Lease, or of any part or all of the leasehold estate created by this this Lease, or any interest herein is defined in this Agreement as a "Transfer". No Transfer shall occur without the prior written consent of Landlord, which consent shall not unreasonably be withheld. Notwithstanding the foregoing, Landlord's consent will not be required for a mortgage or pledge by Tenant of its assets so long as Tenant maintains the Minimum Net Worth requirement after such mortgage or pledge, after taking into account any distributions by Tenant of the proceeds from a financing secured by such mortgage or pledge. In no event, however, shall Tenant mortgage or pledge its leasehold interest hereunder without Landlord's prior written consent, which consent shall not unreasonably be withheld by Landlord. At the time of any assignment of this Lease which is approved in writing by Landlord, the assignee shall assume all of the obligations of Tenant under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Landlord. Such assignment of this Lease shall not relieve Tenant of its obligations respecting this Lease unless otherwise agreed to by Landlord. Any transfer, mortgage, assignment or pledge of this Lease by Tenant shall be voidable at the sole option of Landlord. Any consent to any Transfer shall not be deemed to be a consent to any subsequent Transfer.

In determining whether to grant consent to the Transfer, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in this Lease; whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, satisfactory to Landlord; use of the Property by the proposed assignee, sublessee, or transferee must be identical to the use permitted by this Lease; use of the Property by the proposed assignee, sublessee, or transferee will not violate or create any potential violation of any laws; a tangible net worth which is at least equal to the greater of Tenant's Tangible Net Worth at the Effective Date. For purposes of this Lease, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with GAAP, excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, and copyrights, franchises. If, pursuant to any provision of this Section 15.02, this Lease is assigned or transferred, or if all or any part of the Property is sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, transferee, subtenant or occupant, and apply the net amount collected to the Rent and Additional Rent reserved in this Lease, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any covenant or condition of this Lease or a release of Tenant from the performance or further performance by Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Tenant may without the consent of Landlord and provided that Tenant remains liable for the performance of the terms of this Lease, assign this Lease in its entirety, or sublet the Property, with respect to all of the Property: (i) to an entity resulting from a

merger or consolidation with Tenant; or (ii) to any parent, affiliate or direct or indirect subsidiary of Tenant; (iii) to an entity which controls, is controlled by or is under common control with Tenant; (iv) in connection with the listing by Tenant or its parent or affiliates of its stock on a stock exchange; (v) or the sale by Tenant of any of its membership interests to a private equity firm or other buyer. In the event of any assignment or sublet pursuant to this paragraph, Tenant shall give Landlord a courtesy written notice at lease thirty (30) days in advance of the assignment or sublease, along with such other customary information as Landlord may reasonably request regarding the identity of the assignee or subtenant, together with updated insurance certifications.

**Section 15.03 Subletting**.

(a) Tenant shall not sublet the Property without the prior written consent of Landlord, which may be not be unreasonably withheld by Landlord, and any such purported subletting without Landlord's consent shall be void. Any Sublease shall be included in the definition of a "Transfer." Notwithstanding the foregoing, no Landlord consent shall be required with respect to entering into (or amending) a Sublease that is a Permitted Sublease (or with respect to an assignment by the Subtenant thereunder) so long as the Permitted Sublease also satisfies (or after the amendment or assignment continues to satisfy) all of the other requirements set forth in this Section 15.04 for a Sublease. Landlord agrees that Tenant's patients occupying rooms are not Subtenants.

(b) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now or hereafter in effect (the "Subleases") entered into for any part or all of the Property and any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom. Nothing in this Section 15.04 shall constitute an agreement by Landlord to permit Tenant to enter into Subleases without Landlord's written consent.

(c) Any Sublease of the Property shall be subject and subordinate to the provisions of this Lease (and all future amendments to this Lease). No assignment or Sublease shall affect or reduce any of the obligations of Tenant hereunder, including rental payments, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or Sublease had been made, notwithstanding the fact that a Subtenant, and not Tenant, may be in occupancy of the Property (it being understood that all of the representations, warranties, covenants and obligations of Tenant shall at all times remain in full force and effect with respect to the Property, even if Tenant may not at all times be in occupancy of the Property). No assignment or Sublease shall impose any additional obligations on Landlord under this Lease. Any Sublease shall require the Subtenant thereunder to maintain general liability insurance and statutory workers' compensation insurance in form and amounts set forth in this Lease.

(d) Tenant shall, within five (5) days after the execution and delivery of any assignment or Sublease (or amendment thereto) consented to by Landlord, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment, shall be in recordable form.

(e) Landlord shall have no obligation to recognize any or to agree to not disturb any Subtenant upon any Event of Default, unless Landlord shall agree to do so in writing by separate instrument, but Landlord shall have no obligation to do so. In the event of Tenant's surrender of this Lease or

the termination of this Lease for any reason or by any circumstance, Landlord may, at its option, either terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder (except to the extent that Landlord has entered into a nondisturbance agreement with a Subtenant).

(f) Tenant shall comply with all of the terms and conditions of this Lease relating to the Property, even though the Property may be subject to the terms of a Sublease, and the fact that Tenant may not have actual possession of the Property shall not relieve Tenant of any obligation to perform any covenant or satisfy any condition required to be performed or satisfied by Tenant under this Lease with respect to the Property.

(g) Tenant shall be responsible, at its sole cost and expense (with the right to obtain payment from or require payment by Subtenants subject to the License set forth in Section 15.04(h) below), for performing all covenants and satisfying all conditions required to be performed or satisfied by Tenant pursuant to any Sublease.

(h) Intentionally omitted.

(i) Subject to the License, Tenant shall be responsible for collecting from the Subtenants, and remitting to the appropriate Governmental Authorities, any sales, use or similar tax payable on rents received by Tenant pursuant to the Subleases.

(j) Tenant shall not accept any prepayment of rent from or on behalf of a Subtenant for more than thirty (30) days in advance of the accrual thereof. If there is any permitted prepayment of rent made pursuant to a Sublease, such prepayment shall be delivered to Landlord and applied by Landlord to the Rent obligations of Tenant next due and owing under this Lease.

(k) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all Subleases, and to any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom, subject to the License.

(l) If Tenant fails to timely perform its obligations, or exercise its rights and remedies, as the "landlord" under any Sublease, then Landlord may, but shall not be obligated to, enter upon the Property (or applicable portion thereof) and perform any such obligations or exercise any such rights and remedies, as the "landlord" under the applicable Sublease, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action. Tenant hereby agrees to reimburse Landlord on demand for any expense that Landlord incurs while exercising its rights under this Section 15.04(l), together with interest at the Default Rate, which interest shall accrue from the date of Landlord's payment of such expense until the date of reimbursement by Tenant. Furthermore, Tenant hereby agrees to defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from the exercise of Landlord's rights under this Section 15.04(l).

(m) No Sublease shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable to the same extent as though no Sublease had been made unless otherwise agreed to by Landlord.

**Section 15.04 Intentionally Omitted.**

## ARTICLE XVI

## NOTICES

**Section 16.01 Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease (collectively, "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) facsimile or E-Mail transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by facsimile or E-Mail transmission. Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Tenant: | Zinnia Health LLC<br>520 Newport Center, Suite 550<br>Newport Beach, CA 92660<br>Adam Bhaijee<br>Email: adam.bhaijee@zinniahealth.com |
| With a copy to | Paganelli Law Group<br>10401 N. Meridian Street, Suite 450<br>Indianapolis, IN 46290<br>Attn: Tony Paganelli |
| If to Landlord: | Bunnell Taku Investors LLC<br>2211 N. Elston Avenue, Suite 201<br>Chicago, IL 60614<br>Attn: Shai Wolkowicki<br>Email: shai@shaitownrealty.com |
| With a copy to: | Northstone Law LLC<br>1016 W. Jackson Blvd, Suite 509<br>Chicago, IL 60607<br>Attn: Animesh K. Ravani, Esq.<br>Email: ani@northstone.law |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. If any mortgagee of Landlord shall notify Tenant that it is the holder of a mortgage affecting the Property, Tenant shall provide a

copy of such Notice to such mortgagee, but failure to provide such a copy shall not affect the validity of such Mortgage.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01 Force Majeure**. If either party shall, without fault of such party, be delayed or prevented from the performance of any act required hereunder (other than the payment of money) by reason of acts of God, strikes, lockouts, labor troubles, war, terrorism, pandemic or epidemic, or inability to procure materials and such party gives the other party written notice of such event within ten (10) days after such event (a "Force Majeure Event"), the financial inability of the party excepted, performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended by a period equal to the period of such delay; *provided, however*, that nothing in this Section shall excuse Tenant from the prompt payment of any Rent or any other Monetary Obligations due hereunder. In the event of a Force Majeure Event in any event such party shall proceed with all diligence to complete the performance of the act upon the cessation of the Force Majeure Event.

**Section 17.02 No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly,

(a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and

(b) the fee estate or ownership of the Property or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03 Interpretation**. Landlord and Tenant acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant. Whenever Landlord or an Indemnified Party is entitled to indemnification, such indemnification shall include (but shall not be limited to) the obligation of the indemnifying party to pay the reasonable legal fees and expenses of counsel selected by Landlord or such Indemnified Party.

**Section 17.04 Characterization**. The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Landlord entering into this Lease:

(a) Landlord and Tenant intend that: (i) this Lease is a "true lease," this Lease is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (ii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Landlord and Tenant, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, nor to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

(b) Landlord and Tenant covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Accounting Standards Codification (ASC) 840, as amended, and as a true lease for state law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 18.04; (iii) the Lease Term (including any Extension Term) is less than eighty percent (80%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Landlord and Tenant on that basis, and the execution and delivery of, and the performance by Tenant of its obligations pursuant to, this Lease do not constitute a transfer of all or any part of the Property.

(c) Tenant stipulates and agrees not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 18.04.

(d) Tenant acknowledges that fee simple title (both legal and equitable) is in Landlord and that Tenant has only the leasehold right of possession and use of the Property as provided herein.

**Section 17.05 Intentionally Omitted**.

**Section 17.06 Bankruptcy**. As a material inducement to Landlord executing this Lease, Tenant acknowledges and agrees that Landlord is relying upon

(a) the financial condition and specific operating experience of Tenant and Tenant's obligation to use the Property as a Permitted Facility.

(b) Tenant's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Tenant; and

(c) all defaults under this Lease being cured promptly and this Lease being assumed as required in any order for relief entered under the Bankruptcy Code for Tenant, or this Lease being rejected within such deadline as may be established by the United States Bankruptcy Court and the Property surrendered to Landlord.

**Section 17.07 Attorneys' Fees.** In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled. Each party shall also be entitled to recover its reasonable attorneys' fees and other Costs incurred in any bankruptcy action filed by or against the other party, including, without limitation, those incurred in seeking relief from the automatic stay, in dealing with the assumption or rejection of this Lease, in any adversary proceeding, and in the preparation and filing of any proof of claim. The parties hereby expressly intend that such award of reasonable attorneys' fees and costs shall be mandatory and not discretionary.

**Section 17.08 Memoranda of Lease**. Upon the Commencement Date, Landlord and Tenant shall execute Landlord's standard form memorandum of lease in recordable form, indicating the names and addresses of Landlord and Tenant, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Landlord may not desire to disclose to the public. Further, upon Landlord's request, Tenant agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Landlord until the expiration or sooner termination of the Lease Term, which termination may be assigned by Landlord to any successor concurrently with this Lease; *provided, however*, if Tenant shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Tenant shall be responsible for payment of all taxes and recording fees in connection with the recording of the memoranda of lease contemplated by this Section 18.08. Landlord may, in its discretion, direct that neither this Lease nor a memorandum thereof be recorded.

**Section 17.09 No Brokerage**. Landlord and Tenant represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property. Each of Landlord and Tenant agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.10 Waiver of Jury Trial and Certain Damages**. LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LANDLORD AND ANY OF THE AFFILIATES, OFFICERS,

DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LANDLORD OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY TENANT OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.11 Intentionally Omitted**.

**Section 17.12 State-Specific Provisions**. The provisions and/or remedies which are set forth on the attached Exhibit C shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.13 Time Is of the Essence**. Time is of the essence with respect to each and every provision of this Lease. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included. If the time period by which any notices, acts or payments required hereunder must be delivered, performed or paid expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next business day. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. prevailing local time.

**Section 17.14 Waiver and Amendment**. No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. No acceptance by Landlord of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Landlord's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.15 Successors Bound**. Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.16 Captions**. Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.17 Other Documents**. Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.18 Entire Agreement**. This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided. All prior or contemporaneous agreements, letters of intent, representations, and understandings of

the parties are superseded by, and merged into, this Lease. No supplement, modification, or amendment of this Lease shall be binding unless executed in writing by Landlord and Tenant.

**Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law**. For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the exclusive jurisdiction of all federal and state courts located in the state where the Property is located. Tenant consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law. Furthermore, Tenant waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this Section shall limit or restrict the right of Landlord to commence any proceeding in the federal or state courts located in the states where the Property is located to the extent Landlord deems such proceeding necessary or advisable to exercise remedies available under this Lease. This Lease shall be governed by, and construed with, the laws of the state where the Property is located, without giving effect to any state's conflict of laws principles.

**Section 17.20 Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be deemed an original. This Lease may be accepted and signed in electronic form (e.g., by an electronic or digital signature or other means of demonstrating assent) and each party's electronic acceptance and signature will be deemed binding between the parties. Each party acknowledges and agrees it will not contest the validity or enforceability of this Lease, including under any applicable statute of frauds, because it was accepted and/or signed in electronic form. Electronic records of a party when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records. Notwithstanding the same, original signatures may be exchanged by the parties for record keeping purposes.

**Section 17.21 Landlord's Acquisition of the Property**. This Lease is contingent upon Landlord's acquisition of the Property. If the Landlord does not acquire the Property, any funds deposited by Tenant with Landlord under this Lease shall be returned and the parties shall have no further obligations hereunder except those which expressly survive the termination of this Lease. In no event shall Landlord be deemed in default of this Lease for not acquiring the Property.

**Section 17.22 Severability**. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, to any extent, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the maximum extent permitted by law.

**Section 17.23 Due Authorization**. Each person executing this Lease on behalf of Landlord and Tenant, respectively, warrants and represents that the Party for whom he or she is acting has been duly formed, is in good standing, and has duly authorized the transactions contemplated herein and the execution of this Lease by him or her and that, when so executed, this Lease shall constitute a valid and binding obligation of the Party on whose behalf it is so executed.


Page 191 of 276

**Section 17.24 Confidentiality.** All statements delivered to Landlord by Tenant and all information obtained by Landlord about Tenant, including, without limitation, financial information, in the exercise of Landlord's rights hereunder shall be held in strict confidence and shall not be disclosed to any party other than Landlord's personnel having the explicit need to know such information, for which Landlord agrees to get such personnel to similarly keep all such information confidential. Each party acknowledges that the terms and conditions of this Lease are to remain confidential for each parties' benefit, and may not be disclosed by either party to anyone except its professional advisors, prospective buyers, lenders, franchisor, or as required by order of the court, by any manner or means, directly or indirectly, without the other party's prior written consent which shall not be unreasonably withheld or delayed. The consent by either party to any disclosures shall not be deemed to be a waiver on the part of that party of any prohibition against any future disclosure.

**Section 17.25 No Offer.** The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

*Remainder of page intentionally left blank; signature page(s) to follow*

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease as of the date first above written.

**LANDLORD**:

**Bunnell Taku Investors LLC**

By: Shai Wolkowicki
Name: Shai Wolkowicki
Its: Manager

**[Signatures continued on next page]**




Page 193 of 276

**TENANT**:

**Zinnia Health LLC**

By: ______________________________

Name: Take-Geun Kwon

Its: CEO


Page 194 of 276

# EXHIBIT A

## LEGAL DESCRIPTION/STREET ADDRESS OF THE PROPERTY

**101 Bunnell Street, Anchorage, Alaska 99508**


Page 195 of 276

## EXHIBIT B

## FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS

| AUTHORIZATION AGREEMENT<br>PRE-ARRANGED PAYMENTS |
|---|
| Reference Number __________<br>I (We) (Tenant) authorize ______________________________ to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH. |
| Bank Name______________________________Branch______________________________ |
| City___________________________________State___________________Zip__________ |
| __ __ __ __ __ __ __ __ __     __ __ __ __ __ __ __ __ __ __ __ __ __ __ __<br>***Transit - ABA     Account Number Information |
| ACCOUNT TYPE*** Please specify checking or savings account (C/S) ________ |
| PLEASE FILL IN BANK INFORMATION CAREFULLY<br>ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION |

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non -sufficient funds or stop payment item is charged against the servicer's account.

| | |
|---|---|
| Tenant<br>Name(s) ______________________________________ | Tax Identification<br>Number |
| Date_____________________ | |
| Print Authorized Name | |
| Authorized Signature | |
| Print Authorized Name | |
| Authorized Signature | |
| Contact Phone Number ____________________ | Fax Number |
| Email Address: | |

Return Original to: __________________________

__________________________

__________________________

# <u>EXHIBIT C</u>

## STATE-SPECIFIC PROVISIONS

NONE.

**EXHIBIT D**

INTENTIONALLY OMITTED

**EXHIBIT E**

NONE

## EXHIBIT G

**EXISTING SUBLEASES**

NONE.

# EXHIBIT D

Lease Agreement dated April 1, 2025

FUD Neary LLC, as Landlord, and Zinnia Health LLC, as Tenant

102 Stewart Street, Anchorage, Alaska 99508

**LEASE AGREEMENT**

by and between

**FUD NEARY LLC**

as Landlord

and

**ZINNIA HEALTH LLC**

as Tenant

Made as of April 1, 2025

**102 Stewart Street, Anchorage, Alaska 99508**

## Table of Contents


**Page**

ARTICLE I DEFINED TERMS ..... 1
ARTICLE II BASIC LEASE TERMS ..... 8
Section 2.01 Property ..... 8
Section 2.02 Lease Commencement Date ..... 8
Section 2.03 Extension Options ..... 8
Section 2.04 Expiration Date (if fully extended). ..... 9
Section 2.05 Initial Base Annual Rental ..... 9
Section 2.06 Rental Adjustment. ..... 9
Section 2.07 Adjustment Date ..... 9
Section 2.08 Tenant Tax Identification No. ..... 9
ARTICLE III LEASE OF PROPERTY ..... 9
Section 3.01 Lease ..... 9
Section 3.02 Quiet Enjoyment ..... 9
ARTICLE IV LEASE TERM; EXTENSION ..... 9
Section 4.01 Initial Term ..... 9
Section 4.02 Extensions ..... 10
Section 4.03 Notice of Exercise ..... 10
Section 4.04 Removal of Personalty ..... 10
Section 4.05 Existing Personalty ..... 10
Section 4.06 Reserved ..... 10
Section 4.07 Reserved ..... 11
ARTICLE V RENTAL AND OTHER MONETARY OBLIGATIONS ..... 11
Section 5.01 Base Monthly Rental ..... 11
Section 5.02 Adjustments ..... 11
Section 5.03 Monetary Obligations ..... 11
Section 5.04 Rentals To Be Net to Landlord. ..... 11
Section 5.05 ACH Authorization ..... 12
Section 5.06 Late Charges; Default Interest ..... 12
Section 5.07 Intentionally Omitted ..... 12
Section 5.08 Holdover ..... 12




Page 203 of 276

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF TENANT ..............................13
Section 6.01 Organization, Authority and Status of Tenant ..............................13
Section 6.02 Enforceability ..............................13
Section 6.03 Property Condition ..............................13
Section 6.04 Litigation ..............................13
Section 6.05 Absence of Breaches or Defaults ..............................13
Section 6.06 Licenses and Permits ..............................14
Section 6.07 Financial Condition: Information Provided to Landlord ..............................14
Section 6.08 Compliance With OFAC Laws ..............................14
Section 6.09 Solvency ..............................14
Section 6.10 Intentionally Omitted ..............................14
Section 6.11 Intentionally Omitted ..............................14
Section 6.12 Intentionally Omitted ..............................14
Section 6.13 Disclaimer of Warranties ..............................14
Section 6.14 Intentionally Omitted ..............................15
ARTICLE VII TAXES AND ASSESSMENTS; UTILITIES; INSURANCE ..............................15
Section 7.01 Taxes ..............................15
Section 7.02 Utilities ..............................17
Section 7.03 Insurance ..............................18
ARTICLE VIII MAINTENANCE; ALTERATIONS ..............................21
Section 8.01 Condition of Property; Maintenance ..............................21
Section 8.02 Alterations and Improvements ..............................22
Section 8.03 Encumbrances ..............................24
ARTICLE IX USE OF THE PROPERTY; COMPLIANCE ..............................24
Section 9.01 Use ..............................24
Section 9.02 Alternative Use ..............................24
Section 9.03 Compliance ..............................24
Section 9.04 Environmental ..............................25
Section 9.05 Intentionally Omitted ..............................28
ARTICLE X ADDITIONAL COVENANTS ..............................29
Section 10.01 Inspection ..............................29
Section 10.02 Financial Information ..............................29
Section 10.03 OFAC Laws ..............................30
Section 10.04 Estoppel Certificate ..............................30

ARTICLE XI RELEASE AND INDEMNIFICATION ....................31
Section 11.01 Release and Indemnification ....................31
Section 11.02 Non-Recourse to Landlord ....................32
ARTICLE XII CONDEMNATION AND CASUALTY ....................33
Section 12.01 Notification ....................33
Section 12.02 Partial Condemnation or Casualty ....................33
Section 12.03 Total Condemnation ....................34
Section 12.04 Temporary Taking ....................35
Section 12.05 Adjustment of Losses ....................35
Section 12.06 Tenant Obligation in Event of Casualty ....................35
Section 12.07 Tenant Awards and Payments ....................35
Section 12.08 Uninsured Losses ....................36
Section 12.09 Regulatory Changes ....................36
ARTICLE XIII DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES ....................36
Section 13.01 Event of Default ....................36
Section 13.02 Remedies ....................37
Section 13.03 Cumulative Remedies ....................40
Section 13.04 Landlord Default ....................40
ARTICLE XIV MORTGAGE, SUBORDINATION AND ATTORNMENT ....................40
Section 14.01 No Liens ....................40
Section 14.02 Subordination ....................41
Section 14.03 Election To Declare Lease Superior ....................41
Section 14.04 Attornment ....................41
Section 14.05 Execution of Additional Documents ....................41
Section 14.06 Notice to Lender ....................42
ARTICLE XV ASSIGNMENT ....................42
Section 15.01 Assignment by Landlord ....................42
Section 15.02 No Assignment by Tenant ....................42
Section 15.03 Subletting ....................43
Section 15.04 Intentionally Omitted ....................45
ARTICLE XVI NOTICES ....................45
Section 16.01 Notices ....................45
ARTICLE XVII MISCELLANEOUS ....................46
Section 17.01 Force Majeure ....................46

| | | |
|---|---|---|
| Section 17.02 | No Merger | 47 |
| Section 17.03 | Interpretation | 47 |
| Section 17.04 | Characterization | 47 |
| Section 17.05 | Intentionally Omitted | 48 |
| Section 17.06 | Bankruptcy | 48 |
| Section 17.07 | Attorneys' Fees | 48 |
| Section 17.08 | Memoranda of Lease | 48 |
| Section 17.09 | No Brokerage | 49 |
| Section 17.10 | Waiver of Jury Trial and Certain Damages | 49 |
| Section 17.11 | Intentionally Omitted | 49 |
| Section 17.12 | State-Specific Provisions | 49 |
| Section 17.13 | Time Is of the Essence | 49 |
| Section 17.14 | Waiver and Amendment | 50 |
| Section 17.15 | Successors Bound. | 50 |
| Section 17.16 | Captions | 50 |
| Section 17.17 | Other Documents | 50 |
| Section 17.18 | Entire Agreement | 50 |
| Section 17.19 | Forum Selection; Jurisdiction; Venue; Choice of Law | 50 |
| Section 17.20 | Counterparts | 50 |
| Section 17.21 | Landlord's Acquisition of the Property | 51 |
| Section 17.22 | Severability | 51 |
| Section 17.23 | Due Authorization | 51 |
| Section 17.24 | Confidentiality | 51 |
| Section 17.25 | No Offer | 51 |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of April 1, 2025 (the "Effective Date"), by and between **FUD Neary LLC**, a Delaware limited liability company ("Landlord"), whose address is 1133 W. Van Buren St., Chicago, IL 60607, and **Zinnia Health LLC**, a Delaware limited liability company ("Tenant"), whose address is 520 Newport Center Drive, Suite 550, Newport Beach, California 92660. Capitalized terms not defined herein shall have the meanings set forth in Article I below.

In consideration of the mutual covenants and agreements herein contained, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

## DEFINED TERMS

The following terms shall have the following meanings for all purposes of this Lease:

"*Adjustment Date*" means that date set forth in Section 2.07.

"*Affiliate*" means any Person which directly or indirectly controls, is under common control with or is controlled by any other Person. For purposes of this definition, "controls," "under common control with," and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 CFR Part 103.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Sec. 101 et seq., as amended.

"*Base Annual Rental*" means the Initial Base Annual Rental amount set forth in Section 2.05 as adjusted as set forth in Sections 2.06, 2.07 and 5.02.

"*Base Monthly Rental*" means, for any month, an amount equal to 1/12 of the applicable Base Annual Rental for the period in which such month falls.

"*Business Day*" means a day on which banks located in New York, NY are not required or authorized to remain closed.

"*Casualty*" means any loss of or damage to any property included within or related to the Property or arising from an adjoining property caused by an Act of God, fire, flood or other catastrophe.

"*Code*" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Commencement Date*" means the date on which Landlord acquires fee simple title to the Property, which date shall be confirmed in writing by the parties.

"*Condemnation*" means a Taking and/or a Requisition.

"*Costs*" means all reasonable costs and expenses incurred by a Person, including, without limitation, reasonable attorneys' fees and expenses, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, brokerage fees, escrow fees, title insurance premiums, appraisal fees, stamp taxes, recording fees, recordation taxes and transfer taxes or fees, as the circumstances require.

"*Default Rate*" means 18% per annum or the highest rate permitted by Law, whichever is less.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Lease.

"*Environmental Insurer*" means such environmental insurance company as Landlord shall select in its sole discretion.

"*Environmental Laws*" means federal, state and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees having the effect of law in effect now or in the future and including all amendments, that relate to Hazardous Materials, Regulated Substances, Underground Storage Tanks ("USTs"), and/or the protection of human health or the environment, or relating to liability for or Costs of Remediation or prevention of Releases, and apply to Tenant and/or the Property.

"*Environmental Liens*" has the meaning set forth in Section 9.04(a)(ii).

"*Environmental Policy*" means (a) that certain environmental insurance policy issued at or prior to Closing by Environmental Insurer to Landlord with respect to the Property if a UST is located at the Property, and (b) any renewal or replacement environmental insurance policy with respect to the Property if a UST is located, which Environmental Policy shall be in form and substance satisfactory to Landlord in its sole discretion.

"*Event of Default*" has the meaning set forth in Section 13.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Existing Personalty*" has the meaning set forth in Section 4.05.

"*Expiration Date*" means the Initial Term Expiration Date and, if the Initial Term is extended in accordance with this Lease, the last day of any applicable Extension Term.

"*Extension Option*" has the meaning set forth in Section 4.02.

"*Extension Term*" has the meaning set forth in Section 4.02.

"*Force Majeure Event*" has the meaning set forth in Section 18.01.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied from period to period.

"*Governmental Authority*" means any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority of the United States, any state or any political subdivision thereof with authority to adopt, modify, amend, interpret, give effect to or enforce any federal, state and local laws, statutes, ordinances, rules or regulations, including common law, or to issue court orders.

"*Hazardous Materials*" includes: (a) oil, petroleum products (including any and all constituents and additives), flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants which pose a hazard to the Property or to Persons on or about the Property, cause the Property to be in violation of any local, state or federal Law or regulation, (including without limitation, any Environmental Law), or are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", "regulated substances" or words of similar import under any applicable local, state or federal Law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; (iv) the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et seq.; and (v) regulations adopted and publications promulgated pursuant to the aforesaid laws; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million contained in transformers or other equipment; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the occupants of the Property or the owners and/or occupants of any property adjoining the Property.

"*Immediate Repairs*" has the meaning set forth in Section 8.01.

"*Indemnified Parties*" means Landlord, Lender, Environmental Insurer (if any), and their respective members, managers, officers, directors, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Landlord, Lender or Environmental Insurer, as applicable.

"*Initial Term*" has the meaning set forth in Section 4.01.

"*Initial Term Expiration Date*" has the meaning set forth in Section 2.02.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it bankrupt or insolvent; (ii) seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any Person, either such proceeding shall remain undismissed for a period of one hundred twenty (120) days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate action to authorize any of the actions set forth above in this definition.

"*Landlord Entity*" or "*Landlord Entities*" means individually or collectively, as the context may require, Landlord and all Affiliates of Landlord

"*Law(s)*" means any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted Governmental Authority, court or agency, now or hereafter enacted or in effect.

"*Lease Term*" shall have the meaning described in Section 4.01.

"*Legal Compliance Repairs*" has the meaning set forth in Section 8.01.

"*Legal Requirements*" means the requirements of all present and future Laws (including, without limitation, Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals), all judicial and administrative interpretations thereof, including any judicial order, consent, decree or judgment, and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Property, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Property. Legal Requirements shall specifically include (i) The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Americans With Disabilities Act, and the accessibility code(s), if any, of the State in which the Property are located, and all regulations and guidelines promulgated under any and all of the foregoing, as the same may be amended from time to time, and (ii) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), Federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"), any state or local act, law, or code, and any applicable common law), rules, and regulations (including 40 Code of Federal Regulations, Part 280 and state and local rules and regulations).

"*Lender*" means any lender in connection with any loan or extension of credit, now or hereafter existing, secured by Landlord's interest in the Property, and any servicer, collateral agent and/or trustee with respect to any such loan or extension of credit.

"*Losses*" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, Costs, diminutions in value, fines, penalties, interest, charges, fees, judgments, awards, amounts paid in settlement and damages of whatever kind or nature, inclusive of bodily injury and property damage to third parties (including, without limitation, attorneys' fees and other Costs of defense).

"*Material Adverse Effect*" means a material adverse effect on (a) the Property, including, without limitation, the operation of the Property as a Permitted Facility and/or the value of the Property; (b) the contemplated business, condition, worth or operations of any Tenant Entity; (c) Tenant's ability to perform its obligations under this Lease; or (d) Landlord's interest in the Property, this Lease or the other Transaction Documents.

"*Minimum Net Worth*" means a net worth (computed in accordance with generally accepted accounting principles consistently applied) not less than $10,000,000.00 of EBITDA at the Property level.

"*Monetary Obligations*" has the meaning set forth in Section 5.03.

"*Mortgages*" means, collectively, the mortgages, deeds of trust or deeds to secure debt, assignments of rents and leases, security agreements and fixture filings, now or hereafter in existence, executed by Landlord for the benefit of Lender with respect to the Property, as such instruments may be amended, modified, restated or supplemented from time to time and any and all replacements or substitutions.

"*Net Award*" means (a) the entire award payable with respect to the Property by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise; or (b) the entire proceeds of any insurance required under Section 7.03 payable with respect to the Property, as the case may be, and in either case, less any Costs incurred by Landlord in collecting such award or proceeds.

"*OFAC Laws*" means Executive Order 13224 issued by the President of the United States, and all regulations promulgated thereunder, including, without limitation, the Terrorism Sanctions Regulations (31 CFR Part 595), the Terrorism List Governments Sanctions Regulations (31 CFR Part 596), the Foreign Terrorist Organizations Sanctions Regulations (31 CFR Part 597), and the Cuban Assets Control Regulations (31 CFR Part 515), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including without limitation, the U.S. Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as supplemented, amended or modified from time to time after the Effective Date, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"*Other Agreements*" means, collectively, all agreements and instruments now or hereafter entered into between, among or by any of the Tenant Entities, with, or for the benefit of, any of

the Landlord Entities, including, without limitation, leases, promissory notes and guaranties, but excluding this Lease and all other Transaction Documents.

"*Partial Condemnation*" means a Condemnation which is not a Total Condemnation.

"*Permitted Amounts*" shall mean, with respect to any given level of Hazardous Materials or Regulated Substances, that level or quantity of Hazardous Materials or Regulated Substances in any form or combination of forms which does not constitute a violation of any Environmental Laws and is customarily employed in, or associated with, similar businesses located in the state where the Property is located.

"*Permitted Facility*" means using the Property as a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, and all related purposes such as ingress, egress and parking and uses incidental thereto.

"*Permitted Sublease*" shall mean a Sublease entered into by Tenant for 100% of the Property (a) for the purpose of permitting the Subtenant thereunder to operate a residential treatment center (also known as a rehabilitation center or "rehab center") for patients who have or may have substance abuse disorder, drug addition, alcohol addiction, or other mental health needs, whether or not related to addiction or substance abuse disorder, (b) pursuant to which the Subtenant makes the same representations to Tenant as are made by Tenant to Landlord as set forth in Section 6.08 of this Lease and such representations are true and correct at all times, and (c) which Sublease complies with all other requirements for a Sublease set forth in Section 15.04 of this Lease.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, Governmental Authority or any other form of entity.

"*Personalty*" has the meaning set forth in Section 17.01.

"*Property*" means those parcels of real estate legally described on Exhibit A attached hereto, all rights, privileges, and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate), including all signs and canopies, but shall exclude the Existing Personalty.

"*Property Termination Date*" has the meaning assigned to such term in Section 12.02(c).

"*Property Termination Date-Total Condemnation*" has the meaning assigned to such term in Section 12.03(a).

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any of the Environmental Laws and any applicable federal, state, county or local laws applicable to or regulating USTs.

"*Release*" means any presence, release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other

movement of Hazardous Materials, Regulated Substances or USTs from the Property, or on or onto the Property (even if the source thereof is an adjoining property).

"*Remediation*" means any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Materials, Regulated Substances or USTs, any actions to prevent, cure or mitigate any Release, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or any evaluation relating to any Hazardous Materials, Regulated Substances or USTs.

"*Rent*" means the Rental, the Monetary Obligations, and all other amounts due and payable by Tenant to Landlord hereunder.

"*Rental*" means the Base Annual Rental and Base Monthly Rental.

"*Rental Adjustment*" has the meaning set forth in Section 2.06 as adjusted as set forth in Section 2.07.

"*Requisition*" means any temporary requisition or confiscation of the use or occupancy of the Property by any Governmental Authority, civil or military, whether pursuant to an agreement with such Governmental Authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"*Reserve*" has the meaning set forth in Section 7.01(b).

"*SNDA*" means subordination, nondisturbance and attornment agreement.

"*Sublease*" has the meaning assigned to such term in Section 15.04.

"*Subtenant*" means a subtenant pursuant to a Sublease.

"*Successor Landlord*" has the meaning set forth in Section 14.04.

"*Taking*" means (a) any taking or damaging of all or a portion of the Property (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special; (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding; or (iii) by any other means; or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the Law applicable to the Property.

"*Taxes*" has the meaning set forth in Section 7.01(a).

"*Temporary Taking*" has the meaning set forth in Section 12.04.

"*Tenant Entity*" or "*Tenant Entities*" means individually or collectively, as the context may require, Tenant, and all Affiliates thereof.

"*Threatened Release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the soil, surface waters, groundwaters, land, stream sediments, surface or subsurface strata, ambient air or any other environmental medium comprising or surrounding the Property which may result from such Release.

"*Total Condemnation*" means a Condemnation of all or substantially all of the Property, including a Condemnation (other than for a temporary use) of such a substantial part of the Property resulting in the portion of the Property remaining after such Condemnation being unsuitable for use as a Permitted Facility, as determined by Tenant in the exercise of good faith business judgment.

"*Transfer*" has the meaning assigned to such term in Section 15.02 of this Agreement.

"*Transaction*" has the meaning set forth in Section 15.01.

"*Transaction Documents*" means this Lease, the Purchase and Sale Agreement, any other leases between any Landlord entity and any Tenant entity with respect to any other properties purchased by any Landlord entity pursuant to the Purchase and Sale Agreement, and all documents related to any of the foregoing.

"*U.S. Publicly Traded Entity*" means an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the United States or a wholly owned subsidiary of such an entity.

## ARTICLE II

## BASIC LEASE TERMS

**Section 2.01** **Property**. The street address of the Property is set forth on Exhibit A attached hereto.

**Section 2.02** **Lease Commencement Date.** The Lease Commencement Date shall be April 1, 2025. The Initial Term Expiration Date shall be determined as follows:

(a) If the Commencement Date is the first day of a calendar month, then the Initial Term Expiration Date will be the day immediately preceding the **15th anniversary** of the Commencement Date.

(b) If the Commencement Date is not the first day of a calendar month, then the Initial Term Expiration Date will be the last day of the month in which the **15th anniversary** of the Commencement Date occurs.

**Section 2.03** **Extension Options**. Two (2) extensions of Five (5) years each, as described in Section 4.02.


Page 214 of 276

**Section 2.04** **Expiration Date (if fully extended)** March 31, 2050.

**Section 2.05** **Initial Base Annual Rental**. $258,000.00

**Section 2.06** **Rental Adjustment**. Three percent (3.0%) of the Base Annual Rental then in effect, with such Rental Adjustment taking effect on an annual basis throughout the Initial Term, as described in Section 5.02. The rental adjustment during the extension terms will be capped at three percent (3.0%).

**Section 2.07** **Adjustment Date**. April 1, 2026 and every anniversary thereafter during the Lease Term (including any Extension Term).

**Section 2.08** **Tenant Tax Identification No.** 85-3793244

## ARTICLE III

## LEASE OF PROPERTY

**Section 3.01** **Lease**. In consideration of Tenant's payment of the Rent and Tenant's performance of all other obligations hereunder, Landlord hereby leases to Tenant, and Tenant hereby takes and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default, or any event or circumstance which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing.

**Section 3.02** **Quiet Enjoyment**. So long as Tenant shall pay the Rent provided in this Lease, and shall keep and perform all of the terms, covenants and conditions on its part contained herein, Tenant shall have, subject and to the terms and conditions set forth herein, the right to peacefully and quietly have, hold and occupy the Property free of any interference from Landlord or anyone claiming by, through or under Landlord; *provided, however*, in no event shall Tenant be entitled to bring any action against Landlord to enforce its rights hereunder if an Event of Default shall have occurred and be continuing.

## ARTICLE IV

## LEASE TERM; EXTENSION

**Section 4.01** **Initial Term**. The initial term of this Lease ("Initial Term") shall commence as of the Commencement Date and shall expire at 11:59 p.m. on the Initial Term Expiration Date, unless terminated sooner as provided in this Lease or as may be extended as provided herein. The time period during which this Lease shall actually be in effect, is referred to as the "Lease Term." As of the Commencement Date, Tenant agrees to accept possession of the Property.

**Section 4.02** **Extensions**. Provided that this Lease has not expired or has not been sooner terminated, and that no Event of Default has occurred and is continuing at the time any Extension Option is exercised, and provided that all other agreements necessary to the continued operation of Tenant's business at the Property are extended for a period of not less than the applicable extension periods, Tenant shall have the right and option (each, an "Extension Option") to extend the Initial Term for the Property for two (2) additional successive periods of five (5) years each (each, an "Extension Term"), pursuant to the terms and conditions of this Lease then in effect.

**Section 4.03** **Notice of Exercise**. Tenant may only exercise an Extension Option by giving written notice thereof to Landlord of Tenant's election to do so (a) no later than six (6) months prior to the Expiration Date. If written notice of the exercise of any Extension Option is not received by Landlord by the applicable dates described above, then this Lease shall terminate on the Initial Term Expiration Date or, if applicable, the last day of the Extension Term then in effect. Upon the request of Landlord or Tenant, the parties hereto will, at the expense of the requesting party, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 4.03.

**Section 4.04** **Removal of Personalty**. Upon the expiration of the Lease Term, and if Tenant is not then in breach hereof, Tenant may remove from the Property all personal property belonging to Tenant. Tenant shall repair any damage caused by such removal and shall leave the Property clean and in good and working condition and repair inside and out, subject to normal wear and tear. Any property of Tenant left on the Property on the tenth day following the expiration of the Lease Term shall, at Landlord's option, automatically and immediately become the property of Landlord. Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. All such property shall at Landlord's option be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord. If Landlord arranges for storage of any personal property, Landlord shall have a lien against such property for costs incurred in removing and storing the same.

**Section 4.05** **Existing Personalty**. To the extent that there is any furniture, trade fixtures, equipment or other personal property located upon the Property as of the Effective Date, such Existing Personalty is the property of Tenant, and

(a) Tenant shall maintain insurance on the Existing Personalty pursuant to and in accordance with the provisions of Section 7.03 below; and

(b) Tenant may utilize such Existing Personalty during the Lease Term; *provided, however*, that Tenant utilizes such Existing Personalty "AS IS" and "WHERE IS" without representation or warranty of any kind by Landlord, without any claim to ownership thereof, and Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's use of the Existing Personalty. Tenant shall maintain and repair such Existing Personalty and upon the expiration or sooner termination of this Lease, at Landlord's option, Tenant shall either leave the Existing Personalty on the Property in the same condition as of the Effective Date, normal wear and tear excepted, or remove the Existing Personalty in the same manner as set forth for Personalty in Section 4.04 above.

**Section 4.06** **Reserved**


Page 216 of 276

**Section 4.07** **Reserved**

## ARTICLE V

## RENTAL AND OTHER MONETARY OBLIGATIONS

**Section 5.01** **Base Monthly Rental**. Tenant's obligation to pay Base Monthly Rental begins on the Commencement Date, and subsequent monthly installments of Base Monthly Rental are due and payable on or before the first day of each succeeding calendar month during the Lease Term. If the Commencement Date is a date other than the first day of a calendar month, then Tenant must pay the Base Monthly Rental for the remainder of the month in which the Commencement Date occurs. The amount due for that partial month is a sum equal to the Base Monthly Rental specified for the first full calendar month of the Lease Term multiplied by a fraction, the numerator of which is the number of days from the Commencement Date to the end of the calendar month in which the Commencement Date falls and the denominator of which is the total number of days in that month. Notwithstanding the foregoing, beginning on the Commencement Date and ending on the date that is six (6) months following the Commencement Date, Tenant shall partially abated Base Monthly Rental in the amount of fifty percent (50%) of the Base Monthly Rental. Beginning on the first day of the seventh (7th) month following the Commencement Date, Tenant shall pay the entire Base Monthly Rental set forth in Section above.

**Section 5.02** **Adjustments**. During the Lease Term (including any Extension Term), on the first Adjustment Date and on each Adjustment Date thereafter, the Base Annual Rental then in effect shall increase by an amount equal to the Rental Adjustment.

**Section 5.03** **Monetary Obligations**. In addition to Base Annual Rental and Base Monthly Rental, Tenant shall pay and discharge all sums of money required to be paid or reimbursed by Tenant under this Lease to Landlord, to any party on behalf of Landlord, to any third party or to any Indemnified Party (the obligations described in this sentence are referred to collectively as the "Monetary Obligations"). Tenant shall pay and discharge any Monetary Obligations when the same shall become due, provided that amounts which are billed to Landlord or any third party, but not to Tenant, shall be paid within thirty (30) days after Landlord's demand for payment thereof or, if later, when the same are due. In no event shall Tenant be required to pay to Landlord any Monetary Obligation that Tenant is obligated to pay and has paid to any third party pursuant to any provision of this Lease.

**Section 5.04** **Rentals To Be Net to Landlord**.

(a) The Base Annual Rental payable hereunder shall be net to Landlord, so that this Lease shall yield to Landlord the Rentals specified during the Lease Term, and all Costs and obligations of every kind and nature whatsoever relating to the Property (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property) shall be performed and paid by Tenant, including without limitation, common area maintenance charges, if any, related to the Property. Tenant shall perform all of its obligations under this Lease at its sole cost and expense. All Rent which Tenant is required to pay hereunder shall be the unconditional obligation of Tenant and shall be payable in full when due and payable, without notice or demand, and without any setoff, abatement,

deferment, deduction or counterclaim whatsoever. For the avoidance of doubt, Tenant shall pay all taxes, insurance and utility charges and shall be solely responsible for the maintenance of the Property, including, without limitation utilities, building maintenance, repairs and replacements, including, but not limited to, the roof, structure, foundation, grease septic system, windows, and HVAC.

(b) Simultaneous with each payment to Landlord of Base Monthly Rental, Tenant shall pay to Landlord any applicable state sales tax and any applicable county or local sales tax. Tenant shall also pay to Landlord sales tax on any other payments which are subject to payment of any state or local sales tax, such sales tax payment to be made to Landlord at the same time as the payments subject to sales tax is paid by Tenant. In no event shall Tenant be responsible for paying Landlord's income taxes.

**Section 5.05 ACH Authorization**. Upon execution of this Lease, Tenant shall deliver to Landlord a complete Authorization Agreement – Pre-Arranged Payments in the form of Exhibit B attached hereto and incorporated herein by this reference, together with a voided check for account verification, establishing arrangements whereby payments of the Base Monthly Rental, impound payments (if any), sales tax or real property tax (if any), and any other Monetary Obligations are transferred by Automated Clearing House Debit initiated by Landlord from an account established by Tenant at a United States bank or other financial institution to such account as Landlord may designate. Tenant shall continue to pay all Rental and other Monetary Obligations by Automated Clearing House Debit unless otherwise directed by Landlord.

**Section 5.06 Late Charges; Default Interest**. Any payment of Base Monthly Rental received more than five (5) days after its due date shall, in addition to any other remedy of Landlord, incur a late charge of five percent (5%) (which late charge is intended to compensate Landlord for the cost of handling and processing such delinquent payment and should not be considered interest) and bear interest at the Default Rate, such interest to be computed from and including the date such payment was due through and including the date of the payment; *provided, however*, in no event shall Tenant be obligated to pay a sum of late charge and interest higher than the maximum legal rate then in effect. Any payment of a Monetary Obligation which is not paid to Landlord by Tenant on or prior to the date such payment is due to Landlord shall bear interest at a rate of interest per annum equal to the Default Rate.

**Section 5.07 Intentionally Omitted.**

**Section 5.08 Holdover**. If Tenant remains in possession of the Property after the expiration of the term hereof, Tenant, at Landlord's option and within Landlord's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay Rentals and Monetary Obligations in the amounts herein provided, except that the Base Monthly Rental shall be automatically increased to one hundred fifty percent (150%) of the last Base Monthly Rental payable under this Lease, and Tenant shall comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rental by Landlord shall be deemed a consent to such holding over. Tenant shall defend, indemnify, protect and hold the Indemnified Parties harmless from and against any and all Losses resulting from Tenant's failure to surrender possession upon the expiration of the Lease Term, including, without limitation, any claims made by any succeeding lessee. In addition, if during any holdover period, Tenant fails to surrender the Property within

thirty (30) days following receipt of a written notice from Landlord that Landlord has entered into a lease with a new tenant and has demanded that Tenant vacate (a "**Disallowed Holdover**"), Landlord shall be entitled to seek damages, consequential as well as direct, incurred or actually sustained by Landlord by reason of such holding over, together with all costs incurred by Landlord (including but not limited to reasonable attorneys' fees) in connection with such holdover. The foregoing provision shall not affect Landlord's right of re-entry or any rights of Landlord hereunder or as otherwise provided by law.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF TENANT

The representations and warranties of Tenant contained in this Article VI are being made to induce Landlord to enter into this Lease, and Landlord has relied, and will continue to rely, upon such representations and warranties. Tenant represents and warrants to Landlord as follows:

**Section 6.01** **Organization, Authority and Status of Tenant**. Tenant has been duly organized or formed, is validly existing and in good standing under the laws of its state of Delaware and is qualified as a foreign corporation to do business in any jurisdiction where such qualification is required. All necessary corporate action has been taken to authorize the execution, delivery and performance by Tenant of this Lease and of the other documents, instruments and agreements provided for herein, including without limitation, the Transaction Documents. Tenant is not, and if Tenant is a "disregarded entity," the owner of such disregarded entity is not, a "nonresident alien," "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or any other "person" that is not a "United States Person" as those terms are defined in the Code and the regulations promulgated thereunder. The Person who has executed this Lease on behalf of Tenant is duly authorized to do so.

**Section 6.02** **Enforceability**. This Lease constitutes the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

**Section 6.03** **Property Condition**. Tenant has physically inspected the Property and has examined title to the Property and has found all of the same satisfactory in all respects for all of Tenant's purposes.

**Section 6.04** **Litigation**. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving any Tenant Entity or the Property before any arbitrator or Governmental Authority which might reasonably result in any Material Adverse Effect.

**Section 6.05** **Absence of Breaches or Defaults**. Tenant is not in default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound, which has had, or could reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in any breach of or default under any document, instrument or agreement to which Tenant is a party or by which Tenant, the Property or any of Tenant's property is subject or bound.

**Section 6.06** **Licenses and Permits**. Tenant has obtained all required licenses and permits, both governmental and private, to use and operate the Property as a Permitted Facility.

**Section 6.07** **Financial Condition: Information Provided to Landlord**. The financial statements, all financial data and all other documents and information heretofore delivered to Landlord by or with respect to the Tenant Entities and the Property in connection with this Lease or relating to the Tenant Entities or the Property are true, correct and complete in all material respects; there have been no amendments thereto since the date such items were prepared or delivered to Landlord; all financial statements provided were prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and fairly represent as of the date thereof the financial condition of each individual or entity to which they pertain; and no change has occurred to any such financial statements, financial data, documents and other information not disclosed in writing to Landlord, which has had, or could reasonably be expected to result in, a Material Adverse Effect.

**Section 6.08** **Compliance With OFAC Laws**. None of the Tenant Entities or Subtenants, and no individual or entity owning directly or indirectly any interest in any of the Tenant Entities or Subtenants, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws or is otherwise in violation of any of the OFAC Laws; *provided, however*, that the representation contained in this sentence shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 6.09** **Solvency**. There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Tenant, or to the best of Tenant's knowledge, its respective shareholders members, partners or Affiliates. Tenant does not have unreasonably small capital to conduct its business.

**Section 6.10** **Intentionally Omitted**.

**Section 6.11** **Intentionally Omitted.**

**Section 6.12** **Intentionally Omitted.**

**Section 6.13** **Disclaimer of Warranties**. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) AND THE OTHER LANDLORD ENTITIES HAVE NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD OR ANY OF THE LANDLORD ENTITIES BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) LANDLORD'S TITLE THERETO, (v) VALUE, (vi) COMPLIANCE WITH SPECIFICATIONS, (vii) LOCATION, (viii) USE, (ix) CONDITION, (x) MERCHANTABILITY, (xi) QUALITY, (xii) DESCRIPTION, (xiii) DURABILITY, (xiv) OPERATION, INCOME, EXPENSES, ENTITLEMENTS OR ZONING, (xv) THE EXISTENCE

OF ANY HAZARDOUS MATERIALS, RELEASE OR VIOLATION OF HAZARDOUS MATERIALS LAWS, OR (xvi) COMPLIANCE OF THE PROPERTY WITH ANY LAW OR LEGAL REQUIREMENT; AND ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE PROPERTY IS OF ITS SELECTION AND TO ITS SPECIFICATIONS AND THAT THE PROPERTY HAS BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN THE PROPERTY OF ANY NATURE, WHETHER LATENT OR PATENT, LANDLORD AND ALL OTHER LANDLORD ENTITIES SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS SECTION 6.13 HAVE BEEN NEGOTIATED, AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES BY LANDLORD OR ANY LANDLORD ENTITY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING OTHERWISE.

**Section 6.14 Intentionally Omitted.**

## ARTICLE VII

## TAXES AND ASSESSMENTS; UTILITIES; INSURANCE

**Section 7.01 Taxes**.

(a) ***Payment***. Landlord shall cause all tax bills for the Property to be issued in Tenant's name to the address designed by Tenant in Section 16.01 below. Subject to the provisions of this Article VII, Tenant shall pay directly to the applicable taxing authority, prior to the earlier of delinquency or the accrual of interest on the unpaid balance (except as otherwise set forth in Section 7.01(a)(iii)), all taxes and assessments of every type or nature assessed against or imposed upon the Property, Tenant, or Landlord during or prior to the Lease Term or arising out of this Lease and the activities of the parties hereunder (collectively, the "Taxes"), including, without limitation:

(i) All real estate taxes or assessments upon the Property or any part thereof and upon any personal property, trade fixtures or improvements located on the Property, whether belonging to Landlord or Tenant, or any tax or charge levied in lieu of such taxes and assessments;

(ii) all taxes, charges, license fees and or similar fees imposed by reason of the use of the Property by Tenant;

(iii) all recordation taxes, realty transfer taxes and similar taxes due and payable by Landlord as a result of the transactions contemplated by the Transaction or any of the Transaction Documents; and

(iv) all excise, franchise, transaction, privilege, license, sales, use and other taxes upon the Rent hereunder (and which are not assessed against all gross income of the Landlord), the leasehold

estate of either party or the activities of either party pursuant to this Lease, which such taxes shall be paid to Landlord simultaneously with any payment to Landlord of Base Monthly Rental or a Monetary Obligations, as the case may be.

Prior to the earlier of delinquency or the accrual of interest on the unpaid balance, Tenant shall provide Landlord with receipts showing that each tax and assessment payment required by this Section 7.01(a) (other than those described in Section 7.01(a)(iii)) was made in a timely fashion. Notwithstanding anything to the contrary herein, Tenant shall be responsible for all taxes and assessments upon the Property or any part thereof or improvements thereon for the tax year in which Landlord acquires the Property.

(b) ***Reserves***. Notwithstanding any other provision contained in this Lease, in the event that Tenant defaults in the payment of Taxes described in Section 7.01(a)(i) or (ii) or the payment of any premiums for the insurance required by Section 7.03, or upon the occurrence of any Event of Default, Landlord shall have the right, in addition to all other rights and remedies set forth in this Lease, upon written notice to Tenant and without waiving any default, to require Tenant to pay to Landlord on the first day of each month after such notice (or on the day of each month specified in the notice), one-twelfth (1/12) of the amount that Landlord reasonably estimates from time to time will be necessary in order to accumulate with Landlord, by the date that is at least thirty (30) days prior to the date or dates any or all of such Taxes or insurance premiums are due, sufficient funds to pay any and all such Taxes and/or insurance premiums for the ensuing twelve (12) months (which shall not be deemed a trust fund) (the "Reserve"). Landlord may also require Tenant to pay one-sixth (1/6) of said estimated amount as reserve overage, which may be retained by Landlord from year to year. Tenant shall transmit bills for the Taxes and insurance premiums as soon as received. Landlord shall, upon prior written request of Tenant, provide Tenant with evidence reasonably satisfactory to Tenant that payment of such Taxes and insurance premiums, as applicable, was made in a timely fashion. In the event that the Reserve does not contain sufficient funds to timely pay any such Taxes or insurance premiums, upon Landlord's written notification thereof, Tenant shall, within five (5) Business Days of such notice, provide funds to Landlord in the amount of such deficiency. Landlord shall pay or cause to be paid directly to the applicable taxing authorities or insurance companies any such Taxes or insurance premiums, as applicable, then due and payable for which there are funds in the Reserve; *provided, however*, that in no event shall Landlord be obligated to pay any such Taxes or insurance premiums in excess of the funds held in the Reserve or after an Event of Default, and Tenant shall remain liable for any and all such Taxes and insurance premiums, including fines, penalties, interest or additional costs imposed by any insurance company or taxing authority (unless incurred as a result of Landlord's failure to timely pay the same if it had adequate funds in the Reserve). Tenant shall cooperate fully with Landlord in assuring that such Taxes and insurance premiums are timely paid. If the amount paid by Tenant into the Reserve in any year exceeds the aggregate required under this Lease, such excess shall be applied to the payments for the succeeding year. Landlord may deposit all Reserve funds in accounts insured by any federal or state agency and may commingle such funds with other funds and accounts of Landlord. Interest or other gains from such funds, if any, shall be the sole property of Landlord. Upon an Event of Default, in addition to any other remedies, Landlord may apply all Reserve funds against any sums due from Tenant to Landlord. Landlord shall give to Tenant an annual accounting showing all credits and debits to and from such Reserve funds received from Tenant.


Page 222 of 276

(c) ***Right to Contest***. After written notice to Landlord and any Lender designated by Landlord, Tenant may, at its own expense, contest or cause to be contested by appropriate legal proceedings conducted in good faith and with due diligence, any above-described item or lien with respect thereto (which shall exclude the right to contest Taxes described in Section 7.01(a)(iv)), including, without limitation, the amount or validity or application, in whole or in part, of any such item, provided that:

(i) neither the Property nor any interest therein would be in any danger of being sold, forfeited or lost by reason of such proceedings;

(ii) no Event of Default has occurred;

(iii) Tenant posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof;

(iv) Tenant shall promptly provide Landlord with copies of all notices received or delivered by Tenant and filings made by Tenant in connection with such proceeding; and

(v) prior to the date that any judgment becomes final or any writ or order is issued under which the Property could be sold pursuant to such final judgment, Tenant shall pay the amount of any such tax or assessment or part thereof as finally determined in such proceeding to be due, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including attorneys' fees and disbursements), interest, penalties or other liabilities in connection therewith.

Landlord will, at the request of Tenant, reasonably cooperate in such contest, provided that Landlord is not required to incur any third party out-of-pocket cost or expense in connection with any such contest.

(d) Taxes for the year in which the Commencement Date shall occur shall be prorated such that Landlord shall bear and be responsible the amount of Taxes coming due in the year in which the Commencement Date occurs multiplied by a fraction, the numerator of which is the number of days preceding the Commencement Date in such year and the denominator is the total number of days in such year.

**Section 7.02** **Utilities**. Tenant shall contract for, in its own name, and pay when due all charges for, the connection and use of water, gas, electricity, telephone, garbage collection, sewer use and other utility services supplied to the Property during the Lease Term. Under no circumstances shall Landlord be responsible for any interruption of any utility service except to the extent caused by the gross negligence or intentional misconduct of Landlord. Landlord shall have the same rights and remedies for nonpayment by Tenant of any utilities that Landlord has under this Lease for failure of Tenant to pay Rent. Landlord shall not be liable for any interruptions or curtailment in utility services and any such interruption or curtailment shall not constitute a termination of this Lease or eviction of Tenant except to the extent caused by the gross negligence or intentional misconduct of Landlord.

**Section 7.03 Insurance**.

(a) ***Coverage***. Throughout the Lease Term, Tenant shall maintain, with respect to the Property, at Tenant's sole expense, the following types and amounts of insurance, in addition to such other insurance as Landlord and Lender may reasonably require from time to time:

(i) Insurance against loss or damage to the Property, including, without limitation, the Existing Personalty under a special cause of loss insurance policy, which shall include coverage against all risks of direct physical loss, including but not limited to loss by fire, lightning, wind, terrorism, and other risks normally included in the standard ISO special form (and shall also include National Flood and Excess Flood insurance if the Property is located within a 100-year floodplain (FEMA Zones A and V) and earthquake insurance if the Property is located within a moderate to high earthquake hazard zone as determined by an approved insurance company set forth in Section 7.03(b)(x) below). Such policy shall also include coverage for ordinance or law covering the loss of value of the undamaged portion of the Property, costs to demolish and the increased costs of construction if any of the improvements located on, or the use of, the Property shall at any time constitute legal non-conforming structures or uses. Ordinance or law limits shall be in an amount equal to the full replacement cost for the loss of value of the undamaged portion of the Property and no less than 25% of the replacement cost for costs to demolish and the increased cost of construction, or in an amount otherwise specified by Landlord. Such insurance shall be in amounts sufficient to prevent Landlord from becoming a co-insurer under the applicable policies, and in any event, after application of deductible, in amounts not less than 100% of the full insurable replacement cost values and sublimits satisfactory to Landlord, as determined from time to time at Landlord's request but not more frequently than once in any 12 month period.

(ii) Commercial general liability insurance, including products and completed operation liability, covering Landlord and Tenant against bodily injury liability, property damage liability and personal and advertising injury, garage liability coverage, garage keepers liability or bailee customers personal property coverage (with coverage not less than $1,000,000.00 per occurrence) in the event Tenant's activities require such coverage, including without limitation any liability arising out of the ownership, maintenance, repair, condition or operation of every Property or adjoining ways, streets, parking lots or sidewalks. The commercial general liability policy shall contain a broad form contractual liability endorsement under which the insurer agrees to insure Tenant's obligations under Article XI hereof to the extent insurable, and a "<u>severability of interest</u>" clause or endorsement which precludes the insurer from denying the claim of Tenant or Landlord because of the negligence or other acts of the other, shall have a combined single limit of at least $2,000,000.00 for bodily injury and property damage, or such higher limits as Landlord or Lender may reasonably require from time to time, and shall be of form and substance satisfactory to Landlord and Lender. These limits may be satisfied through commercial general liability and umbrella liability policies. Tenant shall not be required to carry liquor liability policies.

(iii) Statutory workers' compensation insurance and Employers Liability insurance in the amount required by applicable law covering all persons employed by Tenant on the Property in connection with any work done on or about the Property for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Property.

(iv) Rental value insurance, equal to 100% of the Base Annual Rental (as the same may adjusted hereunder) for a period of not less than twelve (12) months basic period plus a six (6) month extended period of indemnity, which insurance shall be carved out of Tenant's business interruption coverage for a separate rental value insurance payable to Landlord, or if rental value insurance is included in Tenant's business interruption coverage, the insurer shall provide priority payment to any rent obligations, and such obligations shall be paid directly to Landlord. Such insurance is to follow form of the special cause of loss coverage and is not to contain a co-insurance clause.

(v) Equipment Breakdown insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus, if any, located in or about the Property and in an amount equal to the lesser of (i) 25% of the 100% replacement cost of the Property or (ii) $5,000,000.00.

(vi) Automobile Liability Insurance not less than $1,000,000 per occurrence covering all owned and non-owned vehicles.

(vii) Builder's Risk Insurance, but only prior to the commencement of and during the construction of any permitted rehabilitation, replacement, reconstruction, restoration, renovation or alteration of the Property, and only to the extent that such coverage is not being maintained by Tenant's contractor(s) pursuant to a policy or polices reasonably acceptable to Landlord.

(viii) The foregoing insurance requirements shall also apply to any Subleases and subtenants shall provide the same proof of coverage to Landlord hereunder as Tenant.

(b) ***Insurance Provisions***. All insurance policies shall:

(i) provide

(A) via a waiver of subrogation endorsement, and a waiver of subrogation by the insurer as to claims against Landlord, any Lender designated by Landlord, and their respective employees and agents;

(B) that the insurer shall not deny a claim and that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Tenant, its officers, directors, employees or agents, or anyone acting for Tenant or any subtenant or other occupant of the Property; and

(C) that any losses otherwise payable thereunder shall be payable notwithstanding any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment;

(ii) be primary and provide that any "<u>other insurance</u>" clause in the insurance policy shall exclude any policies of insurance maintained by Landlord and the insurance policy shall not be brought into contribution with insurance maintained by Landlord;

(iii) contain deductibles not to exceed $25,000.00 per occurrence, and all deductibles on insurance policies shall be borne by Tenant;


Page 225 of 276

(iv) contain a standard non-contributory mortgagee clause or endorsement in favor of any Lender designated by Landlord;

(v) provide that the policy of insurance shall not be terminated, cancelled or amended without at least thirty (30) days' prior written notice to Landlord and to any Lender covered by any standard mortgagee clause or endorsement;

(vi) provide that the insurer shall not have the option to restore the Property if Landlord elects to terminate this Lease in accordance with the terms hereof;

(vii) be in amounts sufficient at all times to satisfy any coinsurance requirements thereof;

(viii) except for workers' compensation insurance referred to in Section 7.03(a)(iii) above, name Landlord and any Landlord Affiliate or Lender requested by Landlord, as an "additional insured" with respect to general liability insurance, as a "named insured" with respect to real property and the Existing Personalty, if applicable, and as a "loss payee" with respect to all real property, Existing Personalty and rental value insurance, as appropriate and as their interests may appear;

(ix) upon demand and at least thirty (30) days prior to the expiration date of any policy required hereunder, be evidenced by delivery to Landlord and any Lender designated by Landlord of an Acord Form 28 for property, rental value and boiler & machinery coverage (or any other form requested by Landlord) and an Acord Form 25 for commercial general liability, workers' compensation and umbrella coverage (or any other form requested by Landlord), which forms shall bear notations evidencing the prior payment of insurance premiums and be accompanied by other evidence satisfactory to Landlord and any Lender designated by Landlord that such payment has been made; provided that in the event that either such form is no longer available or any such Lender requires a different form, such evidence of insurance shall be in a form reasonably satisfactory to Landlord and any Lender designated by Landlord; and

(x) be issued by insurance companies licensed to do business in the states where the Property is located and which are rated A:VIII or better by Best's Insurance Guide or are otherwise approved by Landlord.

(c) ***Additional Obligations***. It is expressly understood and agreed that

(i) if any insurance required hereunder, or any part thereof, shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or in jeopardy by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and any Lender designated by Landlord;

(ii) the minimum limits of insurance coverage set forth in this Section 7.03 shall not limit the liability or obligations of Tenant for its acts or omissions as provided in this Lease;

(iii) Tenant shall procure policies for all insurance for periods of not less than one year and shall provide to Landlord and any servicer or Lender of Landlord certificates of insurance or, upon Landlord's request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times;

(iv) Tenant shall pay as they become due all premiums for the insurance required by this Section 7.03;

(v) in the event any insurance policy required to be maintained by Tenant hereunder contains any breach of warranty provisions, Tenant shall not cause any violations of the policy warranties, declarations or conditions in such policy;

(vi) Tenant shall, from time to time, upon request from Landlord, provide copies of all certificates of insurance required hereunder; and

(vii) in the event that Tenant fails to comply with any of the requirements set forth in this Section 7.03, within ten (10) days of the giving of written notice by Landlord to Tenant,

(A) Landlord shall be entitled to procure such insurance and/or require Tenant to deposit funds to cover the insurance premium payments into the Reserve pursuant to the terms of Section 7.01(b); and

(B) any sums expended by Landlord in procuring such insurance shall be a Monetary Obligation (and not Rental) and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(d) ***Blanket Policies***. Notwithstanding anything to the contrary in this Section 7.03, any insurance which Tenant is required to obtain pursuant to this Section 7.03 may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 7.03.

(e) ***Change in Operation***. Landlord reserves the right to require additional and/or other insurance if Tenant has a change in operation or use of the Property.

## ARTICLE VIII

## MAINTENANCE; ALTERATIONS

**Section 8.01 Condition of Property; Maintenance**. Tenant hereby accepts the Property "AS IS" and "WHERE IS" with no representation or warranty of Landlord as to the condition thereof. Tenant shall, at its sole cost and expense, be responsible for:

(a) keeping all of the building, structures and improvements erected on the Property in good order and repair, free from actual or constructive waste, including without limitation, the roof and the HVAC and other electrical and mechanical systems;

(b) the repair or reconstruction of any building, structures or improvements erected on the Property damaged or destroyed by a Casualty;

(c) subject to Section 8.02, making all necessary structural, non-structural exterior and interior repairs and replacements to any building, structures or improvements erected on the Property,

(d) operating, remodeling, updating and modernizing the Property in accordance with those standards adopted from time to time on a system-wide basis for the Permitted Facility; and

(e) paying all operating costs of the Property in the ordinary course of business. Tenant waives any right to require Landlord to maintain or repair all or any part of the Property or make repairs at the expense of Landlord pursuant to any Legal Requirements at any time in effect.

In elaboration of the foregoing, Tenant shall (a) keep the outside of all glass in the doors and windows of the Property clean; (b) keep exterior surfaces of the entrances and exits to the Property clean; (c) replace promptly any cracked or broken glass on the Property with glass of like grade and quality; (d) keep any garbage, trash, rubbish or other refuse in appropriate containers; and (e) comply with all laws, ordinances, rules and regulations of governmental authorities.

Landlord and its mortgagee shall not be liable for, and Tenant waives, all claims for loss or damage to Tenant's business or loss, theft or damage to Tenant's personal property or the property of any person claiming by, through or under Tenant resulting from: (1) wind or weather; (2) the failure of any sprinkler, heating or air conditioning equipment, any electric wiring or any gas, water or steam pipes; (3) the backing up of any sewer pipe or downspout; (4) the bursting, leaking or running of any tank, water closet, drain or other pipe; (5) water, snow or ice upon or coming through the roof, skylight, stairs, doorways, windows, walks or any other place upon or near the Property; (6) any act or omission of any party other than Landlord or Landlord related parties; and (7) any other causes other than the gross negligence or intentional misconduct of Landlord and/or the Landlord related parties.

Tenant shall store all of Tenant's trash in dumpsters or other covered trash receptacles. Tenant may also maintain garbage cans customary to Tenant's business on the sidewalk located in front of the Property, provided that (i) Tenant shall empty the garbage cans regularly and maintain the area in a neat and orderly fashion, including cleaning up any spills and (ii) the garbage cans shall not be located so as to block or materially impair access across the sidewalk.

Landlord shall have no obligation whatsoever to maintain or repair the Property, the improvements, or equipment thereon, whether structural or non-structural, during the Term, all of which obligations are intended to be imposed on the Tenant.

**Section 8.02** **Alterations and Improvements**. After the completion of Tenant's initial improvements, Tenant shall not alter the exterior, structural, plumbing or electrical elements of the Property or make any material alterations or improvements in any manner during the Lease Term, without the consent of Landlord, which consent shall not be unreasonably withheld or conditioned; *provided, however*, Tenant may undertake nonstructural alterations to the Property, individually costing less than $150,000, without Landlord's prior written consent. No USTs may be installed at the Property without Landlord's written consent, which consent shall be at Landlord's sole and absolute discretion. If Landlord's consent is required hereunder and Landlord consents to the making of any such alterations, the same shall be made by Tenant at Tenant's sole expense by a licensed contractor and according to plans and specifications approved by Landlord and subject to such other conditions as Landlord shall reasonably require, including, but not limited to, Landlord's supervision of any such alterations. Any work at any time commenced by Tenant on the Property shall be prosecuted diligently to completion, shall be of good workmanship and materials and shall comply fully with all the terms of this Lease and all Legal Requirements. Upon completion of any alterations individually costing $10,000 or more, Tenant shall promptly provide

Landlord with evidence of full payment to all laborers and materialmen contributing to the alterations, including, but not limited to, executed lien waivers.

Additionally, upon completion of any alterations, Tenant shall promptly provide Landlord with:

(a) an architect's certificate certifying the alterations to have been completed in conformity with the plans and specifications (if the alterations are of such a nature as would require the issuance of such a certificate from the architect);

(b) a certificate of occupancy (if the alterations are of such a nature as would require the issuance of a certificate of occupancy); and

(c) any other documents or information reasonably requested by Landlord. Tenant shall keep the Property free from any liens arising out of any work performed on, or materials furnished to, the Property. Tenant shall execute and file or record, as appropriate, a "Notice of Non-Responsibility," or any equivalent notice permitted under applicable Law in the state where the Property is located which provides that Landlord is not responsible for the payment of any costs or expenses relating to the additions or alterations. Any addition to or alteration of the Property shall be deemed a part of the Property and belong to Landlord, and Tenant shall execute and deliver to Landlord such instruments as Landlord may require to evidence the ownership by Landlord of such addition or alteration. If Tenant fails to bond or have discharged any lien as required herein within thirty (30) days thereafter, then Landlord may (but shall have no obligation to or discharge the lien on Tenant's behalf and the cost thereof shall be a Monetary Obligation immediately due and payable to Landlord plus interest at the Default Rate.

(d) All alterations, additions, and improvements to the Property shall comply at all times with all applicable laws, rules, regulations, and ordinances, and Tenant shall obtain all necessary permits for such alterations, additions, and improvements. Notwithstanding anything in this Lease to the contrary, if Tenant constructs, makes or installs or causes to be constructed, made or installed any improvement or alteration in or to the Property (including, but not limited to, the initial construction of the Building and Improvements), Tenant shall be solely responsible for ensuring that such improvements and/or alterations do not violate any provision in any local, state or federal law or regulation relating to accessibility for handicapped persons or the removal of architectural or communication barriers to accessibility, ("**Disability Law**"), including, but not limited to, The Americans with Disabilities Act. If any claim is asserted against Landlord under any Disability Law which claim relates directly or indirectly to any alterations or improvements installed, made or constructed, directly or indirectly, by or for Tenant in or to the Property or any trade fixture or personal property item used by Tenant in the Property, Tenant shall defend, indemnify and hold the Landlord Parties harmless from and against the claim and any and all charges, liabilities, obligations, penalties, damages, judgments, costs and expenses (including costs of investigation and attorneys' fees) arising or incurred against or suffered, directly or indirectly, by Landlord relating thereto. If it should be determined that any improvement or alteration constructed, made or installed in or to the Property, directly or indirectly, by or for Tenant or any trade fixture or personal property item used by Tenant in the Property is an illegal architectural or communication barrier under any Disability Law, Tenant shall immediately, at its sole cost and expense, remove

the barrier or, to the extent allowed by the Disability Law, provide alternatives to the barrier so as to make the Property accessible to handicapped persons.

**Section 8.03** **Encumbrances**. During the Lease Term, Landlord shall have the right to grant easements on, over, under and above the Property without the prior consent of Tenant, provided that such easements will not materially and adversely interfere with Tenant's use of the Property. Without Landlord's prior written consent, which consent shall be at Landlord's sole and absolute discretion, Tenant shall not grant any easements on, over, under or above the Property.

## ARTICLE IX

## USE OF THE PROPERTY; COMPLIANCE

**Section 9.01** **Use**. During the Lease Term, the Property shall be used solely for the operation of a Permitted Facility and for no other purpose whatsoever. Except during periods when the Property is untenantable due to Casualty or Condemnation (and provided that Tenant continues to strictly comply with the other terms and conditions of this Lease), Tenant shall at all times during the Lease Term occupy the Property and shall diligently operate its business on the Property.

**Section 9.02** **Alternative Use**. Tenant shall not, by itself or through any permitted assignment, sublease or other type of transfer, convert the Property to an alternative use during the Lease Term without Landlord's prior written consent, which consent shall not be unreasonably withheld; *provided, however*, that Landlord's consent shall not be deemed unreasonably withheld if Landlord's decision is based on any or all of the following:

(a) whether the rental paid to Landlord would be equal to or greater than the anticipated rental assuming continued existing use;

(b) whether the proposed rental to be paid to Landlord is reasonable considering the converted use of the Property and the customary rental prevailing in the community for such use;

(c) whether the converted use will be consistent with the highest and best use of the Property;

(d) whether the concerted use is permitted at the Property in accordance with all applicable Legal Requirements, restrictions, covenants, and encumbrances of record;

(e) whether the converted use will increase Landlord's risks or decrease the value of the Property; and

(f) whether Landlord is able to obtain approval of its Lender to any such change in use.

**Section 9.03** **Compliance**. The use and occupation of the Property (whether by Tenant or any permitted Subtenant), and the condition thereof, shall, at Tenant's sole cost and expense, comply fully with all Legal Requirements and all restrictions, covenants and encumbrances of record (even if an obligation relating to the Property is, pursuant to Legal Requirements or pursuant to a recorded agreement, the obligation of the fee owner of the Property), and any owner obligations under such Legal Requirements, or restrictions, covenants and encumbrances of

record, with respect to the Property. Without in any way limiting the foregoing provisions, any Sublease shall expressly prohibit any Subtenant, licensee or occupant thereunder from violating, or permitting the violation of, any Legal Requirements or the above-referenced restrictions, covenants or encumbrances. In addition and without in any way limiting the foregoing provisions, Tenant shall comply, and shall cause all Subtenants, licensees or other occupants to comply, with all Legal Requirements relating to anti-terrorism, trade embargos, economic sanctions, Anti-Money Laundering Laws, and the Americans with Disabilities Act of 1990, as such laws may be amended from time to time, and all regulations promulgated thereunder, as they affect the Property now or hereafter in effect. Upon Landlord's written request from time to time during the Lease Term, Tenant shall certify in writing to Landlord that Tenant's representations, warranties and obligations under Section 6.07 and this Section 9.03 remain true and correct and have not been breached. Tenant shall immediately notify Landlord in writing if any of such representations, warranties or covenants are no longer true or have been breached or if Tenant has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, Tenant shall (and shall cause each Subtenant, licensee or occupant to) comply with all Legal Requirements and directives of Governmental Authorities and, at Landlord's request, provide to Landlord copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. Tenant shall also reimburse Landlord for all Costs incurred by Landlord in evaluating the effect of such an event on the Property and this Lease, in obtaining any necessary license from Governmental Authorities as may be necessary for Landlord to enforce its rights under the Transaction Documents, and in complying with all Legal Requirements applicable to Landlord as the result of the existence of such an event and for any penalties or fines imposed upon Landlord as a result thereof. Tenant will use its best efforts to prevent any act or condition to exist on or about the Property which will materially increase any insurance rate thereon, except when such acts are required in the normal course of its business and Tenant shall pay for such increase. Tenant will defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from Tenant's failure to comply with its obligations under this Section. All matters related to compliance with Environmental Law or dealing with Hazardous Materials shall be governed by Section 9.04. This Section is subject and subordinate to Section 9.04, and in the event of any inconsistency between Section 9.04 and this Section 9.03, Section 9.04 shall control and prevail.

**Section 9.04** **Environmental**.

(a) ***Representations and Warranties***. Tenant represents and warrants to Landlord and Environmental Insurer which representations and warranties shall survive the execution and delivery of this Lease, as follows:

(i) Tenant is not in violation of or subject to, any pending or, to Tenant's actual knowledge, threatened investigation or inquiry by any Governmental Authority or to any remedial obligations under any Environmental Laws that could have a Material Adverse Effect, nor has Tenant received any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) with respect to the Property relating to

(A) Hazardous Materials, Regulated Substances or USTs, or Remediation thereof;

(B) possible liability of any Person pursuant to any Environmental Law;

(C) other environmental conditions; or

(D) any actual or potential administrative or judicial proceedings in connection with any of the foregoing that could have a Material Adverse Effect. The foregoing representations and warranties would continue to be true and correct following disclosure to the applicable Governmental Authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Property.

(ii) All uses and operations on or of the Property, whether by Tenant or, to Tenant's knowledge, any other Person acting on Tenant's behalf, have been in compliance with all Environmental Laws and environmental permits issued pursuant thereto;

(A) Tenant has not allowed any other tenant or other user of the Property to do any act that materially increased the dangers to human health or the environment, posed an unreasonable risk of harm to any Person (whether on or off the Property), impaired the value of the Property in any material respect, is contrary to any requirement set forth in the insurance policies maintained by Landlord including, without limitation, the Environmental Policy, constituted a public or private nuisance, constituted waste, or violated any covenant, condition, agreement or easement applicable to the Property.

(b) ***Covenants***.

(i) Tenant covenants to Landlord and Environmental Insurer during the Lease Term, subject to the limitations of subsection (ii) below, as follows:

(A) The Property, Tenant and any Subtenant shall not be in violation of any investigation or inquiry by any Governmental Authority.

(B) All uses and operations on or of the Property, whether by Tenant, Subtenant or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

(C) There shall be no Releases in, on, under or from the Property, except in Permitted Amounts.

(D) Tenant shall keep the Property or cause the Property to be kept free and clear of all Environmental Liens, whether due to any act or omission of Tenant, Subtenant or any other Person.

(E) Tenant shall not do or allow any Subtenant or other user of any part of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), has a Material Adverse Effect, is contrary to any material requirement set forth in the insurance policies maintained by Tenant, constitutes a public or private nuisance or constitutes waste, violates any covenant, condition, agreement or easement applicable to the Property, or creates the threat of a Release.

(F) Tenant shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property as may be reasonably requested by Landlord (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Landlord and Environmental Insurer the reports and other results thereof, and

Landlord, Environmental Insurer and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof.

(G) Tenant shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to this Section 9.04, including but not limited to providing all relevant information and making knowledgeable persons available for interviews.

(H) Tenant will dispose of all biomedical waste generated through its operations in a manner consistent with all applicable laws and/or regulations.

(ii) Notwithstanding any provision of this Lease to the contrary, an Event of Default shall not be deemed to have occurred as a result of the failure of Tenant to satisfy any one or more of the covenants set forth in subsections (A) through (F) above provided that Tenant shall be in compliance with the requirements of any Governmental Authority with respect to the discovery or Remediation of any Release at the Property.

(c) ***Notification Requirements***. Tenant shall immediately notify Landlord and Environmental Insurer in writing upon Tenant obtaining actual knowledge of:

(i) any Releases or Threatened Releases in, on, under or from the Property other than in Permitted Amounts, or migrating towards the Property;

(ii) any non-compliance with any Environmental Laws related in any way to the Property;

(iii) any actual or potential Environmental Lien;

(iv) any required or proposed Remediation of environmental conditions relating to the Property required by applicable Governmental Authorities; and

(v) any written or oral notice or other communication, including but not limited to, notices of violation ("NOV") issued by a Governmental Authority of which Tenant becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials, Regulated Substances or USTs, a Release or Remediation thereof at or on the Property, other than in Permitted Amounts, possible liability of any Person relating to the Property pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section. Tenant shall, upon Landlord's or Environmental Insurer's written request, deliver to Landlord or Environmental Insurer a certificate stating that Tenant is and has been in full compliance with all of the environmental representations, warranties and covenants in this Lease.

(d) ***Remediation***. Solely to the extent that they are the direct and proximate result of Tenant's conduct (whether intentional or negligent), Tenant shall, at its sole cost and expense, and without limiting any other provision of this Lease, effectuate any Remediation required by any Governmental Authority of any condition (including, but not limited to, a Release, a Threatened Release or a suspected Release) in, on, under or from the Property and take any other reasonable action deemed necessary by any Governmental Authority for protection of human health or the

environment. Should Tenant fail to undertake such Remediation in accordance with the preceding sentence, Landlord, after written notice to Tenant and Tenant's failure to immediately undertake such Remediation, shall be permitted to complete such Remediation, and all Costs reasonable incurred in connection therewith shall be paid by Tenant. Any Cost so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord.

(e) ***Indemnification***. Solely to the extent that they are the direct and proximate result of Tenant's conduct, Tenant shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties from and against any and all Losses arising out of or in any way relating to any Environmental Laws, Hazardous Materials, Regulated Substances, USTs, or other environmental matters concerning the Property, including, but not limited to, all fines, penalties, claims or expenses imposed pursuant to any Environmental Law and all Costs of Remediation (whether or not performed voluntarily). It is expressly understood and agreed that Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease for any reason.

(f) ***Right of Entry***. Landlord and any other Person designated by Landlord, including but not limited to Environmental Insurer, if any, any receiver, any representative of a Governmental Authority, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times (including, without limitation, in connection with the exercise of any remedies set forth in this Lease) to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Landlord's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Tenant shall cooperate with and provide access to Landlord, Environmental Insurer and any other Person designated by Landlord.

(g) ***Survival***. The obligations of Tenant and the rights and remedies of Landlord under this Section 9.04 shall survive the termination, expiration and/or release of this Lease.

(h) ***Intentionally Omitted.***

(i) ***Intentionally Omitted.***

(j) ***Conveyance***. Upon expiration or termination of this Lease, and upon (and to the extent set forth in) a written request of Landlord, Tenant shall convey any UST (if any) to Landlord or Landlord's designee, free and clear of all liens and security interests.

(k) The obligations of this Article IX shall survive the expiration or termination of the Lease.

**Section 9.05 Intentionally Omitted.**


Page 234 of 276

## ARTICLE X

## ADDITIONAL COVENANTS

**Section 10.01 Inspection**. Landlord, any Lender designated by Landlord, and their authorized representatives shall have the right, at all reasonable times and upon giving reasonable prior notice (which may be given by telephone, text or email, and which need not be given in the event of an emergency), without delay, hindrance or restriction, to enter the Property or any part thereof and inspect the same. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Property and any other loss occasioned by such entry, but, subject to Section 11.01, excluding damages arising as a result of the negligence or intentional misconduct of Landlord.

The foregoing notwithstanding, certain areas of the Property shall have present in it information and documents covered by Health Insurance Portability and Accountability Act of 1996, as amended ("HIPPA"). Landlord agrees that it shall not (and shall not permit others to) access, copy, distribute, disclose, review, read, or otherwise interact with in anyway information covered by HIPPA or any of Tenant's other patient records, whether or not covered by HIPPA. Landlord agrees that in exercising Landlord's right to re-enter the Property, it or its agents, employees, contractors shall be accompanied at all times by a representative to Tenant.

**Section 10.02 Financial Information**.

(a) ***Intentionally Omitted***.

(b) ***Financial Statements***. On or before each February 15, Tenant and any guarantor of this lease shall deliver to Landlord:

(i) complete financial statements of the Tenant Entities including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended;

(ii) income statements for the business at the Property reflecting the business operations at the Property; and

(iii) a statement identifying each Subtenant, setting forth the rentals payable by each Subtenant and the revenue received from each Subtenant, setting forth the length of the unexpired term of each Sublease, identifying each Subtenant who is in default, and providing such other information as Landlord or Lender may require.

All such financial statements shall be prepared in accordance with GAAP (or in the same manner as the consolidated balance sheet dated December 31, 2022, provided by Tenant to Landlord before the Effective Date), and shall be certified to be accurate and complete by an officer or director of each Tenant Entity and otherwise be in form and substance satisfactory to Landlord and Lender. Tenant understands that Landlord will rely upon such financial statements and Tenant represents that such reliance is reasonable. In the event that Tenant's property and business at the Property are ordinarily consolidated with other business for financial statements purposes, such financial

statements shall be prepared on a consolidated basis showing separately the sales, profits and losses, assets and liabilities pertaining to the Property with the basis for allocation of overhead of other charges being clearly set forth. The financial statements delivered to Landlord need not be audited, but Tenant shall deliver to Landlord copies of any audited financial statements of the Tenant Entities which may be prepared, as soon as they are available. Within thirty (30) days after the end of each fiscal year of Tenant, and upon prior written request by Landlord, Tenant shall deliver such compliance certificate to Landlord as Landlord may reasonably require in order to establish that Tenant is in compliance with all of its obligations, duties and covenants under this Lease.

(c) ***Other Information***. Notwithstanding any provision contained herein, upon request at any time, Tenant will provide to Landlord any and all financial information and/or financial statements (and in the form or forms):

(i) requested by Landlord in connection with Landlord's filings with or disclosures to any Governmental Authority; or

(ii) as reasonably requested by Landlord.

**Section 10.03 OFAC Laws**. Tenant shall not enter into a Sublease or any other agreement with any Person who may appear on the list of Specifically Designated Nationals and Blocked Persons that is maintained under OFAC Laws or whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws. Upon receipt of notice or upon actual knowledge thereof, Tenant shall immediately notify Landlord in writing if any Person owning (directly or indirectly) any interest in any of the Tenant Entities or a Subtenant, or any director, officer, shareholder, member, manager or partner of any of such holders is a Person whose property or interests are subject to being blocked under any of the OFAC Laws, or is otherwise in violation of any of the OFAC Laws, or is under investigation by any Governmental Authority for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of the Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; *provided, however*, that the covenant in this Section 10.04 shall not apply to any Person to the extent such Person's interest is in or through a U.S. Publicly Traded Entity.

**Section 10.04 Estoppel Certificate**. At any time, and from time to time, Tenant shall, promptly and in no event later than ten (10) days after a request from Landlord or any Lender or mortgagee of Landlord, execute, acknowledge and deliver to Landlord or such Lender or mortgagee, as the case may be, a certificate in the form supplied by Landlord, certifying:

(a) that Tenant has accepted the Property;

(b) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications), or, if this Lease is not in full force and effect, the certificate shall so specify the reasons therefor;

(c) the commencement and expiration dates of the Lease Term;

(d) the date to which the Rentals have been paid under this Lease and the amount thereof then payable;

(e) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof;

(f) that no notice has been received by Tenant of any default pursuant to this Lease which has not been cured, except as to defaults specified in the certificate;

(g) Intentionally Omitted;

(h) that Tenant has no option to purchase, right of first refusal or similar rights;

(i) the capacity of the Person executing such certificate, and that such Person is duly authorized to execute the same on behalf of Tenant;

(j) that neither Landlord nor any Lender or mortgagee has actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operation of the Property, including any handling or disposal of Hazardous Materials or Regulated Substances; and

(k) any other information reasonably requested by Landlord or any Lender or mortgagee, as the case may be. If Tenant shall fail or refuse to sign a certificate in accordance with the provisions of this Section within ten (10) days following a request by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and deliver the certificate to any such third party, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Any such certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Property or leasehold.

## ARTICLE XI

## RELEASE AND INDEMNIFICATION

**Section 11.01 Release and Indemnification**. TENANT AGREES TO USE AND OCCUPY THE PROPERTY AT ITS OWN RISK AND HEREBY RELEASES LANDLORD, LENDER, AND THEIR RESPECTIVE AGENTS AND EMPLOYEES FROM ALL CLAIMS FOR ANY DAMAGE OR INJURY TO THE FULL EXTENT PERMITTED BY LAW. TENANT AGREES THAT NEITHER LANDLORD NOR LENDER SHALL BE RESPONSIBLE OR LIABLE TO TENANT OR TENANT'S EMPLOYEES, AGENTS, CUSTOMERS, LICENSEES OR INVITEES FOR BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE OCCASIONED BY THE ACTS OR OMISSIONS OF ANY OTHER LESSEE OR ANY OTHER

PERSON. TENANT AGREES THAT ANY EMPLOYEE OR AGENT TO WHOM THE PROPERTY OR ANY PART THEREOF SHALL BE ENTRUSTED BY OR ON BEHALF OF TENANT SHALL BE ACTING AS TENANT'S AGENT WITH RESPECT TO THE PROPERTY OR ANY PART THEREOF, AND NEITHER LANDLORD, LENDER NOR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS SHALL BE LIABLE FOR ANY LOSS OF OR DAMAGE TO THE PROPERTY OR ANY PART THEREOF. TENANT SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD HARMLESS EACH OF THE INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES (EXCLUDING LOSSES SUFFERED BY AN INDEMNIFIED PARTY ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY; *PROVIDED, HOWEVER*, THAT THE TERM "GROSS NEGLIGENCE" SHALL NOT INCLUDE GROSS NEGLIGENCE IMPUTED AS A MATTER OF LAW TO ANY OF THE INDEMNIFIED PARTIES SOLELY BY REASON OF LANDLORD'S INTEREST IN THE PROPERTY OR LANDLORD'S FAILURE TO ACT IN RESPECT OF MATTERS WHICH ARE OR WERE THE OBLIGATION OF TENANT UNDER THIS LEASE) RELATING IN ANY WAY TO THE PROPERTY OR CAUSED BY, INCURRED OR RESULTING FROM TENANT'S OPERATIONS OR BY TENANT'S USE AND OCCUPANCY OF THE PROPERTY, WHETHER RELATING TO ITS ORIGINAL DESIGN OR CONSTRUCTION, LATENT DEFECTS, ALTERATION, MAINTENANCE, USE BY TENANT OR ANY PERSON THEREON, SUPERVISION OR OTHERWISE, OR FROM ANY BREACH OF, DEFAULT UNDER, OR FAILURE TO PERFORM, ANY TERM OR PROVISION OF THIS LEASE BY TENANT, ITS OFFICERS, EMPLOYEES, AGENTS OR OTHER PERSONS. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT TENANT'S OBLIGATIONS UNDER THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE FOR ANY REASON WHATSOEVER.

**Section 11.02 Non-Recourse to Landlord**. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Property and not against any other assets, properties or funds of (i) Landlord, (ii) Landlord's members, or any entity controlling, controlled by, or in common control of Landlord or Landlord's members, any director, officer, general partner, shareholder, limited partner, beneficiary, employee, attorney, consultant, contractor or agent of Landlord or any general partner of Landlord or any of its general partners (or any legal representative, heir, estate, successor or assign of any thereof), (iii) any predecessor or successor limited liability company, partnership or corporation (or other entity) of Landlord or any of its members, managers, general partners, shareholders, officers, directors, employees or agents, either directly or through Landlord or its general partners, shareholders, officers, directors, employees or agents or any predecessor or successor partnership or corporation (or other entity), (iv) any Lender, or any lender to a Person holding an interest in Landlord, (v) any Person affiliated with any of the foregoing, or any director, officer, employee or agent of any thereof; or (vi) the heirs, successors, personal representatives or assigns of any of the foregoing. Such exculpation of liability shall be absolute and without exception whatsoever. Furthermore, it is understood and agreed that in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent (unless Landlord is found to have acted in bad faith), and Tenant's sole remedy shall be an action for injunctive relief or specific

performance. WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL THE LANDLORD, ANY MORTGAGEES, OR LANDLORD RELATED PARTIES, EVER BE LIABLE FOR ANY CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OR ANY LOST PROFITS OF TENANT.

## ARTICLE XII

## CONDEMNATION AND CASUALTY

**Section 12.01 Notification**. Tenant shall promptly give Landlord written notice of:

(a) any Condemnation of the Property;

(b) the commencement of any proceedings or negotiations which might result in a Condemnation of the Property; and

(c) any Casualty to the Property or any part thereof. Such notice shall provide a general description of the nature and extent of such Condemnation, proceedings, negotiations or Casualty, and shall include copies of any documents or notices received in connection therewith. Thereafter, Tenant shall promptly send Landlord copies of all notices, correspondence and pleadings relating to any such Condemnation, proceedings, negotiations or Casualty.

**Section 12.02 Partial Condemnation or Casualty**. Except as otherwise provided in Section 12.03, in the event of a Partial Condemnation or a Casualty:

(a) ***Net Awards***. All Net Awards shall be paid to Landlord.

(b) ***Landlord Election To Continue or Terminate Lease***. Landlord shall have the option,

(i) subject to the right of Tenant to elect otherwise as set forth in subsection (d) below, to terminate this Lease by notifying Tenant in writing within thirty (30) days after Tenant gives Landlord notice

(A) of such Partial Condemnation or Casualty, or

(B) that title has vested in the condemning authority; or

(ii) to continue this Lease in effect, which election shall be evidenced by either a notice from Landlord to Tenant, or Landlord's failure to notify Tenant in writing that Landlord has elected to terminate this Lease with respect to the Property within such thirty (30) day period. In the event the Partial Condemnation is material and adverse to Tenant's continued business operations to the extent that Tenant cannot substantially maintain the level of its operations, Tenant shall have a period of sixty (60) days after receipt of Landlord's notice to continue this Lease, or Landlord's failure to notify Tenant in writing that Landlord has elected to terminate this Lease referenced above during which to elect, despite such Landlord notice of continuation, to terminate this Lease with respect to the Property on the terms herein provided.

(c) ***No Continuance of Lease***. If Tenant does not elect to continue this Lease, then this Lease shall terminate with respect to the Property as of the date (the "Property Termination Date") that title has vested in the condemning authority. Tenant shall vacate and surrender the Property by the Property Termination Date, in accordance with the provisions of this Lease, and all obligations of either party hereunder shall cease as of the date of termination; *provided, however*, Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligations to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease with respect to the Property prior to the date of termination shall survive such termination. In such event, Landlord may retain all Net Awards related to the Partial Condemnation or Casualty, and Tenant shall immediately pay Landlord an amount equal to the insurance deductible applicable to any Casualty.

(d) ***Continuance of Lease***. If Landlord elects not to terminate this Lease, or if Landlord elects to terminate this Lease, but Tenant elects to continue this Lease, then, provided, Tenant has not exercised a termination its termination right in the event of a Partial Condemnation, this Lease shall continue in full force and effect upon the following terms:

(i) All Rental and other Monetary Obligations due under this Lease shall continue unabated.

(ii) Tenant hereby assumes all risk of loss, damage or destruction, whether by Casualty, or the theft of all or any portion of the Property. Tenant shall promptly commence and diligently prosecute restoration of the Property to the same condition, as nearly as practicable, as prior to such Partial Condemnation or Casualty as approved by Landlord. Subject to the terms and provisions of the Mortgages and upon the written request of Tenant (accompanied by evidence reasonably satisfactory to Landlord that such amount has been paid or is due and payable and is properly part of such costs, and that Tenant has complied with the terms of Section 8.02 in connection with the restoration), Landlord shall promptly make available in installments, subject to reasonable conditions for disbursement imposed by Landlord, an amount up to but not exceeding the amount of any Net Award (after deducting all Costs incidental to the collection of the Net Award) received by Landlord with respect to such Partial Condemnation or Casualty. Prior to the disbursement of any portion of the Net Award with respect to a Casualty, Tenant shall provide evidence reasonably satisfactory to Landlord of funds available to Tenant to pay restoration expenses (a) up to the amount of the insurance deductible applicable to such Casualty and (b) which are in excess of the amount of the Net Award. Landlord shall be entitled to keep any portion of the Net Award which may be in excess of the cost of restoration, and Tenant shall bear all additional Costs of such restoration in excess of the Net Award.

**Section 12.03 Total Condemnation**. In the event of a Total Condemnation of the Property, other than a Temporary Taking, then, in such event:

(a) ***Termination of Lease***. All obligations of either party hereunder shall cease as of the date (the "Property Termination Date-Total Condemnation") that title vests in the condemning authority; *provided, however*, that Tenant's obligations to the Indemnified Parties under any indemnification provisions of this Lease and Tenant's obligation to pay Rental and all other Monetary Obligations (whether payable to Landlord or a third party) accruing under this Lease prior to the Property Termination Date-Total Condemnation shall survive such termination.

(b) ***Net Award***. Landlord shall be entitled to receive the entire Net Award in connection with a Total Condemnation without deduction for any estate vested in Tenant by this Lease, and Tenant hereby expressly assigns to Landlord all of its right, title and interest in and to every such Net Award and agrees that Tenant shall not be entitled to any Net Award or other payment for the value of Tenant's leasehold interest in this Lease; but Tenant shall be entitled to any award to relocate its personal property from the Property, so long as such award does not reduce the Net Award to Landlord.

**Section 12.04 Temporary Taking**. In the event of a Condemnation of all or any part of the Property for a temporary use (a "Temporary Taking"), this Lease shall remain in full force and effect, without any reduction of Base Annual Rental or any other Monetary Obligation payable hereunder. Except as provided below and subject to the terms and provisions of the Mortgages, Tenant shall be entitled to the entire Net Award for a Temporary Taking, unless the period of occupation and use by the condemning authorities shall extend beyond the date of expiration of this Lease, in which event the Net Award made for such Temporary Taking shall be apportioned between Landlord and Tenant as of the date of such expiration.

**Section 12.05 Adjustment of Losses**. Any loss under any property damage insurance required to be maintained by Tenant shall be adjusted by Landlord and Tenant (except that if an Event of Default has occurred and is continuing, Landlord may adjust such claim without the written consent of Tenant). Subject to the terms and provisions of the Mortgages, any Net Award relating to a Total Condemnation or a Partial Condemnation shall be adjusted by Landlord or, at Landlord's election, Tenant. Notwithstanding the foregoing or any other provisions of this Section 12.05 to the contrary, but subject to the terms and provisions of the Mortgages, if at the time of any Condemnation or any Casualty or at any time thereafter an Event of Default shall have occurred and be continuing, Landlord is hereby authorized and empowered but shall not be obligated, in the name and on behalf of Tenant and otherwise, to file and prosecute Tenant's claim, if any, for a Net Award on account of such Condemnation or such Casualty and to collect such Net Award and apply the same to the curing of such Event of Default and any other then existing Event of Default under this Lease and/or to the payment of any amounts owed by Tenant to Landlord under this Lease, in such order, priority and proportions as Landlord in its discretion shall deem proper.

**Section 12.06 Tenant Obligation in Event of Casualty**. During all periods of time following a Casualty, Tenant shall take reasonable steps to ensure that the related Property is secure and does not pose any risk of harm to any adjoining property and Persons (including owners or occupants of such adjoining property).

**Section 12.07 Tenant Awards and Payments**. Notwithstanding any provision contained in this Article XII, Tenant shall be entitled to claim and receive any award or payment from the condemning authority expressly granted for the Taking of any Personalty owned by Tenant, any insurance proceeds with respect to any Personalty owned by Tenant, the interruption of its business and moving expenses (subject, however, to the provisions of Section 7.03(a)(iv) above), but only if such claim or award does not adversely affect or interfere with the prosecution of Landlord's claim for the Condemnation or Casualty, or otherwise reduce the amount recoverable by Landlord for the Condemnation or Casualty, including payments or proceeds related to any Personalty then owned by Landlord.

**Section 12.08 Uninsured Losses**. Nothing contained herein shall relieve Tenant of its obligations under this Article XII if the destruction or damage is not covered, either in whole or in part, by insurance.

**Section 12.09 Regulatory Changes**. If any legally constituted authority prohibits Tenant from utilizing the Property for Tenant's purpose (i.e., substance use treatment facility), then this Lease shall cease when the public authority takes possession (due to condemnation), or when Tenant can reasonably vacate the Property (due to regulatory changes). Tenant will notify Landlord upon being made aware of condemnation or regulations that prohibits utilizing the Property for Tenant's stated purpose, and this Lease will terminate immediately upon Tenant's payment of one (1) year's rent.

## ARTICLE XIII

## DEFAULT, CONDITIONAL LIMITATIONS, REMEDIES AND MEASURE OF DAMAGES

**Section 13.01 Event of Default**. Each of the following shall be an event of default by Tenant under this Lease (each, an "Event of Default"):

(a) if any representation or warranty of Tenant set forth in this Lease is false in any material respect when made (it being understood that any false representation pursuant to Section 6.11 or 6.12 shall always be deemed to be material), or if Tenant renders any false statement or account when made;

(b) if any Rental or other Monetary Obligation due under this Lease is not paid within five (5) days of the date when due;

(c) if Tenant fails to pay, prior to delinquency, any Taxes, assessments or other charges the failure of which to pay will result in the imposition of a lien against the Property, or Tenant fails to maintain any insurance required to be maintained by Tenant pursuant to this Lease;

(d) if there is an Insolvency Event affecting Tenant;

(e) if Tenant vacates or abandons the Property, or the Property ceases to be occupied and open for business by a Subtenant; *provided, however*, that no default shall occur if the Property is temporarily not open for business due to renovations or repairs, or if the Property is not open for business because Tenant had to terminate a Subtenant because of a default pursuant to a Sublease so long at Tenant is actively seeking a Subtenant for the Property.

(f) if Tenant fails to observe or perform any of the other covenants, conditions or obligations of Tenant in this Lease; *provided, however*, if any such failure does not involve the payment of any Monetary Obligation, is not willful or intentional, does not place the Property or any rights or property of Landlord in immediate jeopardy, and is within the reasonable power of Tenant to promptly cure, all as determined by Landlord in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Landlord shall have given Tenant notice thereof and a period of thirty (30) days shall

have elapsed, during which period Tenant may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such thirty (30) day period, as determined by Landlord in its reasonable discretion, and Tenant is diligently pursuing a cure of such failure, then Tenant shall have a reasonable period to cure such failure beyond such thirty (30) day period, which shall in no event exceed ninety (90) days after receiving notice of such failure from Landlord. If Tenant shall fail to correct or cure such failure within such ninety (90) day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required;

(g) if a final, non-appealable judgment is rendered by a court against Tenant which has a Material Adverse Effect, or which does not have a Material Adverse Effect but which is in the amount of $25,000 or more (excluding claims covered by insurance), and in either event is not discharged or provision made for such discharge within ninety (90) days from the date of entry thereof;

(h) if Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(i) if the estate or interest of Tenant in the Property shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within ninety (90) days after it is made;

(j) if there is an "Event of Default" or other breach or default by Tenant pursuant to any of the other Transaction Documents or any Other Agreement, after the passage of all applicable notice and cure or grace periods; or

(k) a Transfer occurs without the written consent of Landlord (except to the extent that such consent is not required and Tenant otherwise complies with the provisions of Article XV of this Lease).

**Section 13.02 Remedies**. Upon the occurrence of an Event of Default, with or without notice or demand, except as otherwise expressly provided herein or such other notice as may be required by statute and cannot be waived by Tenant, Landlord shall be entitled to exercise, at its option, concurrently, successively, or in any combination, all remedies available at Law or in equity, including, without limitation, any one or more of the following.

(a) to terminate this Lease, whereupon Tenant's right to possession of the Property shall cease and this Lease, but not Tenant's liability, shall be terminated;

(b) to the extent not prohibited by applicable law, and without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action, and without terminating (or being deemed to terminate) this Lease, to re-enter and take possession of the Property (or any part thereof), any or all personal property or fixtures of Tenant upon the Property and, to the extent permissible, all permits and other rights or privileges of Tenant pertaining to the use and operation of the Property;

(c) to expel Tenant and those claiming under or through Tenant, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom, without resort to legal or judicial process, procedure or action. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar Law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. If Tenant shall, after default, voluntarily give up possession of the Property to Landlord, deliver to Landlord or its agents the keys to the Property, or both, such actions shall be deemed to be in compliance with Landlord's rights and the acceptance thereof by Landlord or its agents shall not be deemed to constitute a termination of the Lease. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate;

(d) to bring an action against Tenant for any damages sustained by Landlord or any equitable relief available to Landlord and to the extent not prohibited by applicable Law, subject to Section 14.01, to seize all personal property or fixtures upon the Property which Tenant owns or in which it has an interest, in which Landlord shall have a landlord's lien and/or security interest, and to dispose thereof in accordance with the laws prevailing at the time and place of such seizure or to remove all or any portion of such property and cause the same to be stored in a public warehouse or elsewhere at Tenant's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action; provided, however, in no event shall Landlord take possession of, ownership of, or any interest in any documents or information covered by HIPPA or similar privacy laws or otherwise containing patient information.

(e) to re-let the Property or any part thereof for such term or terms (including a term which extends beyond the original Lease Term), at such rentals and upon such other terms as Landlord, in its sole discretion, may determine, with all proceeds received from such re-letting being applied to the Rental and other Monetary Obligations due from Tenant in such order as Landlord may, in its sole discretion, determine, which other Monetary Obligations include, without limitation, all repossession costs, brokerage commissions, attorneys' fees and expenses, alteration, remodeling and repair costs and expenses of preparing for such re-letting. Except to the extent required by applicable Law, Landlord shall have no obligation to re-let the Property or any part thereof and shall in no event be liable for refusal or failure to re-let the Property or any part thereof, or, in the event of any such re-letting, for refusal or failure to collect any rent due upon such re-letting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. Landlord reserves the right following any re-entry and/or re-letting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate as specified in said notice;

(f) RESERVED

(g) to accelerate and recover from Tenant all Rent due and owing and scheduled to become due and owing under this Lease, discounted to present value, both before and after the date of such breach for the entire original scheduled Lease Term, and Landlord may collect the same by distress or otherwise;

(h) to recover from Tenant all Costs paid or incurred by Landlord as a result of such breach, regardless of whether or not legal proceedings are actually commenced;

(i) to immediately or at any time thereafter, and with or without notice, at Landlord's sole option but without any obligation to do so, correct such breach or default and charge Tenant all Costs incurred by Landlord therein, plus an administrative fee of five percent (5%) of such Costs. Any sum or sums so paid by Landlord, together with interest at the Default Rate, shall be deemed to be a Monetary Obligation hereunder (and not Rental) and shall be immediately due from Tenant to Landlord. Any such acts by Landlord in correcting Tenant's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Landlord's right to exercise any or all remedies set forth herein;

(j) to immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant held by Landlord under this Lease or any other Transaction Document or any Other Agreement against any sum owing by Tenant hereunder;

(k) without limiting the generality of the foregoing or limiting in any way the rights of Landlord under this Lease or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Landlord shall be entitled to apply for and have a receiver appointed under applicable Law by a court of competent jurisdiction in any action taken by Landlord to enforce its rights and remedies hereunder in order to protect and preserve Landlord's interest under this Lease or in the Property, the Existing Personalty and the Personalty, and in connection therewith, TENANT HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE, AND DURING THE CONTINUANCE, OF AN EVENT OF DEFAULT; and/or

(l) to seek any equitable relief available to Landlord, including, without limitation, the right of specific performance.

Additionally, in the event of any default by Tenant, Landlord shall take commercially reasonable efforts to mitigate its damages, which obligation shall include listing the Property for lease at a commercially reasonable rental.

Any action taken by Landlord under this Section 13.02 shall not operate as a waiver of any right which Landlord would otherwise have against Tenant for rental hereby or otherwise, and Tenant shall remain responsible to Landlord for any loss and/or damage suffered by Landlord by reason of Tenant's default or breach. The words "reenter" and "reentry" as used in this Lease are not restricted to their technical legal meaning.

Nothing set forth in this Section affects the right of Landlord to indemnification for liability arising prior to the termination of this Lease for personal injuries or property damage as may be provided elsewhere in this Lease. In all events, Landlord shall have the right upon at least ten (10) days' notice to Tenant (or without notice in the event of a bona fide emergency effecting material damage to property or endangering life or health) to cure any breach by Tenant at Tenant's sole cost and expense, and Tenant shall reimburse Landlord for such expense immediately upon demand plus Default Interest, commencing on the date due through the date of payment.

**Section 13.03 Cumulative Remedies**. (a) All powers and remedies given by Section 13.02 to Landlord, subject to applicable Law, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Landlord under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Tenant contained in this Lease, and no delay or omission of Landlord to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given by this Section or by Law to Landlord may be exercised from time to time, and as often as may be deemed expedient, by Landlord, subject at all times to Landlord's right in its sole judgment to discontinue any work commenced by Landlord or change any course of action undertaken by Landlord.

**Section 13.04 Landlord Default**. If Landlord is ever in default under the terms of this Lease, or if Landlord commits a breach of any one or more of the covenants, terms and conditions herein set forth, then Tenant shall deliver Landlord a written notice that states the alleged default or breach (the "**Landlord Default Notice**"). If Landlord does not cure the alleged default or breach within thirty (30) days after it receives the Landlord Default Notice (provided however, that if the breach or failure to perform cannot be reasonably cured within the 30-day period, then a Landlord default shall only be deemed to occur if Landlord does not in good faith commence the cure within the 30-day period and thereafter fails to diligently pursue the cure to completion within ninety (90) days after receiving the Landlord Default Notice), then, Tenant may cure such default or breach, and Landlord shall reimburse Tenant for all costs expended by Tenant in connection therewith within thirty (30) days after receiving an invoice from Tenant therefor, and if Landlord fails to reimburse Tenant within the 30-day period, then Tenant may deduct the amount of such costs from the next installment of Monthly Base Rent due hereunder until such costs have been repaid in full. Tenant agrees not to exercise any remedies available by virtue of a Landlord's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be reasonably necessary to cure such default) unless Tenant has also given such parties a reasonable opportunity to cure such default (including but not limited to foreclosure proceedings if necessary to effect such cure).

## ARTICLE XIV

## MORTGAGE, SUBORDINATION AND ATTORNMENT

**Section 14.01 No Liens**. Landlord's interest in this Lease and/or the Property shall not be subordinate to any liens or encumbrances placed upon the Property by or resulting from any act of Tenant, and nothing herein contained shall be construed to require such subordination by Landlord. NOTICE IS HEREBY GIVEN THAT TENANT IS NOT AUTHORIZED TO PLACE OR ALLOW TO BE PLACED ANY LIEN, MORTGAGE, DEED OF TRUST, DEED TO SECURE DEBT, SECURITY INTEREST OR ENCUMBRANCE OF ANY KIND UPON ALL OR ANY PART OF THE PROPERTY OR TENANT'S LEASEHOLD INTEREST THEREIN, AND ANY SUCH PURPORTED TRANSACTION SHALL BE VOID. Landlord shall have no interest in any personal property owned by Tenant and Tenant's lenders shall have the right to place security interests on such personal property. Landlord waives any right, title, or interest that Landlord may have in Tenant's personal property, anything in this Lease to the contrary notwithstanding and

Landlord shall execute such documents or interest as shall be reasonably necessary to give effect to such waiver.

**Section 14.02 Subordination**. This Lease at all times shall automatically be subordinate to the lien of any and all Mortgages now or hereafter placed upon the Property by Landlord, and Tenant covenants and agrees to execute and deliver, upon demand, such further instruments subordinating this Lease to the lien of any or all such Mortgages as shall be desired by Landlord, or any present or proposed mortgagees under trust deeds, upon the condition that Tenant shall have the right to remain in possession of the Property under the terms of this Lease, notwithstanding any default in any or all such Mortgages, or after the foreclosure of any such Mortgages, so long as no Event of Default shall have occurred and be continuing. If requested by Landlord, Tenant shall execute an SNDA with a Lender holding a Mortgage, and Tenant agrees to promptly execute and return such SNDA to Landlord.

**Section 14.03 Election To Declare Lease Superior**. If any mortgagee, receiver or other secured party elects to have this Lease and the interest of Tenant hereunder, be superior to any Mortgage and evidences such election by notice given to Tenant, then this Lease and the interest of Tenant hereunder shall be deemed superior to any such Mortgage, whether this Lease was executed before or after such Mortgage and in that event such mortgagee, receiver or other secured party shall have the same rights with respect to this Lease as if it had been executed and delivered prior to the execution and delivery of such Mortgage and had been assigned to such mortgagee, receiver or other secured party.

**Section 14.04 Attornment**. In the event any purchaser or assignee of any Lender at a foreclosure sale acquires title to the Property, or in the event that any Lender or any purchaser or assignee otherwise succeeds to the rights of Landlord as landlord under this Lease, Tenant shall attorn to Lender or such purchaser or assignee, as the case may be (a "Successor Landlord"), and recognize the Successor Landlord as lessor under this Lease, and, subject to the provisions of this Article XIV, this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant, provided that the Successor Landlord shall only be liable for any obligations of Landlord under this Lease which accrue after the date that such Successor Landlord acquires title. The term "Landlord", as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of title to the Property, and in the event of any transfer or transfers of title to the Property or any part thereof, Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease to be performed after the effective date of such transfer. In the event of any transfer or transfers of Landlord's interest in the Property, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, and Tenant agrees to attorn to such transferee. The foregoing provision shall be self-operative and effective without the execution of any further instruments.

**Section 14.05 Execution of Additional Documents**. Although the provisions in this Article XIV shall be self-operative and no future instrument of subordination shall be required, upon request

by Landlord Tenant shall execute and deliver whatever instruments may be reasonably required for such purposes.

**Section 14.06 Notice to Lender**. Tenant shall give written notice to any Lender having a recorded lien upon the Property or any part thereof of which Tenant has been notified of any breach or default by Landlord of any of its obligations under this Lease and give such Lender at least thirty (30) days beyond any notice period to which Landlord might be entitled to cure such default before Tenant may exercise any remedy with respect thereto.

## ARTICLE XV

## ASSIGNMENT

**Section 15.01 Assignment by Landlord**. As a material inducement to Landlord's willingness to enter into the transactions contemplated by this Lease (the "Transaction") and the other Transaction Documents, Tenant hereby agrees that Landlord may, from time to time and at any time and without the consent of Tenant, engage in the sale, assignment, grant, conveyance, transfer, financing, re-financing, purchase or re-acquisition of all, less than all or any portion of the Property, this Lease or any other Transaction Document, Landlord's right, title and interest in this Lease or any other Transaction Document, the servicing rights with respect to any of the foregoing, or participations in any of the foregoing, or enter into agreements in connection with any of the following or in accordance with requirements that may be imposed by applicable securities, tax or other Laws. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee (so long as Landlord and such purchaser or assignee notify Tenant in writing of such transfer and such purchaser or assignee expressly assumes in writing the obligations of Landlord hereunder from and after the date of such assignment). At the request of Landlord, Tenant will execute such documents confirming the sale, assignment or other transfer and such other agreements as Landlord may reasonably request, provided that the same do not increase the liabilities and obligations of Tenant hereunder. Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**Section 15.02 No Assignment by Tenant**. Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Property in entering into this Lease. Any assignment, sublease, transfer, conveyance, pledge or mortgage by Tenant, whether voluntary or involuntary, whether by operation of Law (for example, by merger) or otherwise, of any part or all of this Lease, or of any part or all of the leasehold estate created by this this Lease, or any interest herein is defined in this Agreement as a "Transfer". No Transfer shall occur without the prior written consent of Landlord, which consent shall not unreasonably be withheld. Notwithstanding the foregoing, Landlord's consent will not be required for a mortgage or pledge by Tenant of its assets so long as Tenant maintains the Minimum Net Worth requirement after such mortgage or pledge, after taking into account any distributions by Tenant of the proceeds from a financing secured by such mortgage or pledge. In no event, however, shall Tenant mortgage or pledge its leasehold interest hereunder without Landlord's prior written consent, which consent shall not unreasonably be withheld by Landlord. At the time of any assignment of this Lease which is approved in writing

by Landlord, the assignee shall assume all of the obligations of Tenant under this Lease pursuant to a written assumption agreement in form and substance reasonably acceptable to Landlord. Such assignment of this Lease shall not relieve Tenant of its obligations respecting this Lease unless otherwise agreed to by Landlord. Any transfer, mortgage, assignment or pledge of this Lease by Tenant shall be voidable at the sole option of Landlord. Any consent to any Transfer shall not be deemed to be a consent to any subsequent Transfer.

In determining whether to grant consent to the Transfer, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in this Lease; whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, satisfactory to Landlord; use of the Property by the proposed assignee, sublessee, or transferee must be identical to the use permitted by this Lease; use of the Property by the proposed assignee, sublessee, or transferee will not violate or create any potential violation of any laws; a tangible net worth which is at least equal to the greater of Tenant's Tangible Net Worth at the Effective Date. For purposes of this Lease, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with GAAP, excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, and copyrights, franchises. If, pursuant to any provision of this Section 15.02, this Lease is assigned or transferred, or if all or any part of the Property is sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, transferee, subtenant or occupant, and apply the net amount collected to the Rent and Additional Rent reserved in this Lease, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any covenant or condition of this Lease or a release of Tenant from the performance or further performance by Tenant of its obligations under this Lease.

Notwithstanding the foregoing, Tenant may without the consent of Landlord and provided that Tenant remains liable for the performance of the terms of this Lease, assign this Lease in its entirety, or sublet the Property, with respect to all of the Property: (i) to an entity resulting from a merger or consolidation with Tenant; or (ii) to any parent, affiliate or direct or indirect subsidiary of Tenant; (iii) to an entity which controls, is controlled by or is under common control with Tenant; (iv) in connection with the listing by Tenant or its parent or affiliates of its stock on a stock exchange; (v) or the sale by Tenant of any of its membership interests to a private equity firm or other buyer. In the event of any assignment or sublet pursuant to this paragraph, Tenant shall give Landlord a courtesy written notice at lease thirty (30) days in advance of the assignment or sublease, along with such other customary information as Landlord may reasonably request regarding the identity of the assignee or subtenant, together with updated insurance certifications.

**Section 15.03 Subletting**.

(a) Tenant shall not sublet the Property without the prior written consent of Landlord, which may be not be unreasonably withheld by Landlord, and any such purported subletting without Landlord's consent shall be void. Any Sublease shall be included in the definition of a "Transfer." Notwithstanding the foregoing, no Landlord consent shall be required with respect to entering into (or amending) a Sublease that is a Permitted Sublease (or with respect to an assignment by the Subtenant thereunder) so long as the Permitted Sublease also satisfies (or after the amendment or

assignment continues to satisfy) all of the other requirements set forth in this Section 15.04 for a Sublease. Landlord agrees that Tenant's patients occupying rooms are not Subtenants.

(b) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now or hereafter in effect (the "Subleases") entered into for any part or all of the Property and any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom. Nothing in this Section 15.04 shall constitute an agreement by Landlord to permit Tenant to enter into Subleases without Landlord's written consent.

(c) Any Sublease of the Property shall be subject and subordinate to the provisions of this Lease (and all future amendments to this Lease). No assignment or Sublease shall affect or reduce any of the obligations of Tenant hereunder, including rental payments, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or Sublease had been made, notwithstanding the fact that a Subtenant, and not Tenant, may be in occupancy of the Property (it being understood that all of the representations, warranties, covenants and obligations of Tenant shall at all times remain in full force and effect with respect to the Property, even if Tenant may not at all times be in occupancy of the Property). No assignment or Sublease shall impose any additional obligations on Landlord under this Lease. Any Sublease shall require the Subtenant thereunder to maintain general liability insurance and statutory workers' compensation insurance in form and amounts set forth in this Lease.

(d) Tenant shall, within five (5) days after the execution and delivery of any assignment or Sublease (or amendment thereto) consented to by Landlord, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment, shall be in recordable form.

(e) Landlord shall have no obligation to recognize any or to agree to not disturb any Subtenant upon any Event of Default, unless Landlord shall agree to do so in writing by separate instrument, but Landlord shall have no obligation to do so. In the event of Tenant's surrender of this Lease or the termination of this Lease for any reason or by any circumstance, Landlord may, at its option, either terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder (except to the extent that Landlord has entered into a nondisturbance agreement with a Subtenant).

(f) Tenant shall comply with all of the terms and conditions of this Lease relating to the Property, even though the Property may be subject to the terms of a Sublease, and the fact that Tenant may not have actual possession of the Property shall not relieve Tenant of any obligation to perform any covenant or satisfy any condition required to be performed or satisfied by Tenant under this Lease with respect to the Property.

(g) Tenant shall be responsible, at its sole cost and expense (with the right to obtain payment from or require payment by Subtenants subject to the License set forth in Section 15.04(h) below), for performing all covenants and satisfying all conditions required to be performed or satisfied by Tenant pursuant to any Sublease.

(h) Intentionally omitted.

(i) Subject to the License, Tenant shall be responsible for collecting from the Subtenants, and remitting to the appropriate Governmental Authorities, any sales, use or similar tax payable on rents received by Tenant pursuant to the Subleases.

(j) Tenant shall not accept any prepayment of rent from or on behalf of a Subtenant for more than thirty (30) days in advance of the accrual thereof. If there is any permitted prepayment of rent made pursuant to a Sublease, such prepayment shall be delivered to Landlord and applied by Landlord to the Rent obligations of Tenant next due and owing under this Lease.

(k) As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all Subleases, and to any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom, subject to the License.

(l) If Tenant fails to timely perform its obligations, or exercise its rights and remedies, as the "landlord" under any Sublease, then Landlord may, but shall not be obligated to, enter upon the Property (or applicable portion thereof) and perform any such obligations or exercise any such rights and remedies, as the "landlord" under the applicable Sublease, without being deemed guilty in any manner of trespass or becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action. Tenant hereby agrees to reimburse Landlord on demand for any expense that Landlord incurs while exercising its rights under this Section 15.04(l), together with interest at the Default Rate, which interest shall accrue from the date of Landlord's payment of such expense until the date of reimbursement by Tenant. Furthermore, Tenant hereby agrees to defend, indemnify and hold harmless the Indemnified Parties from and against any and all Losses caused by, incurred or resulting from the exercise of Landlord's rights under this Section 15.04(l).

(m) No Sublease shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable to the same extent as though no Sublease had been made unless otherwise agreed to by Landlord.

**Section 15.04 Intentionally Omitted.**

## ARTICLE XVI

## NOTICES

**Section 16.01 Notices**. All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Lease (collectively, "Notices") shall be in writing and given by any one of the following: (a) hand delivery; (b) express overnight delivery service; (c) certified or registered mail, return receipt requested; or (d) facsimile or E-Mail transmission, and shall be deemed to have been delivered upon (i) receipt, if hand delivered; (ii) the next Business Day, if delivered by a reputable express overnight delivery service; (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested; or (iv) transmission, if delivered by facsimile or E-Mail transmission. Notices shall be provided to the parties and addresses (or electronic mail addresses) specified below:

| | |
|---|---|
| If to Tenant: | Zinnia Health LLC<br>520 Newport Center, Suite 550<br>Newport Beach, CA 92660<br>Adam Bhaijee<br>Email: adam.bhaijee@zinniahealth.com |
| With a copy to | Paganelli Law Group<br>10401 N. Meridian Street, Suite 450<br>Indianapolis, IN 46290<br>Attn: Tony Paganelli |
| If to Landlord: | FUD Neary LLC<br>1133 W. Van Buren St.<br>Chicago, IL 60607<br>Attn: Shai Wolkowicki<br>Email: shai@shaitownrealty.com |
| With a copy to: | Northstone Law LLC<br>1133 W. Van Buren St.<br>Chicago, IL 60607<br>Attn: Animesh K. Ravani, Esq.<br>Email: ani@northstone.law |

or to such other address or such other person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. If any mortgagee of Landlord shall notify Tenant that it is the holder of a mortgage affecting the Property, Tenant shall provide a copy of such Notice to such mortgagee, but failure to provide such a copy shall not affect the validity of such Mortgage.

## ARTICLE XVII

## MISCELLANEOUS

**Section 17.01 Force Majeure**. If either party shall, without fault of such party, be delayed or prevented from the performance of any act required hereunder (other than the payment of money) by reason of acts of God, strikes, lockouts, labor troubles, war, terrorism, pandemic or epidemic, or inability to procure materials and such party gives the other party written notice of such event within ten (10) days after such event (a "Force Majeure Event"), the financial inability of the party excepted, performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended by a period equal to the period of such delay; *provided, however*, that nothing in this Section shall excuse Tenant from the prompt payment of any Rent or any other Monetary Obligations due hereunder. In the event of a Force Majeure Event in any event such party shall proceed with all diligence to complete the performance of the act upon the cessation of the Force Majeure Event.

**Section 17.02 No Merger**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Property by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly,

(a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and

(b) the fee estate or ownership of the Property or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Property or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

**Section 17.03 Interpretation**. Landlord and Tenant acknowledge and warrant to each other that each has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant. Whenever Landlord or an Indemnified Party is entitled to indemnification, such indemnification shall include (but shall not be limited to) the obligation of the indemnifying party to pay the reasonable legal fees and expenses of counsel selected by Landlord or such Indemnified Party.

**Section 17.04 Characterization**. The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Landlord entering into this Lease:

(a) Landlord and Tenant intend that: (i) this Lease is a "true lease," this Lease is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease; and (ii) the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between Landlord and Tenant, the Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, nor to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

(b) Landlord and Tenant covenant and agree that: (i) each will treat this Lease as an operating lease pursuant to Accounting Standards Codification (ASC) 840, as amended, and as a true lease for state law reporting purposes and for federal income tax purposes; (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to Governmental Authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties


Page 253 of 276

expressed in this Section 18.04; (iii) the Lease Term (including any Extension Term) is less than eighty percent (80%) of the estimated remaining economic life of the Property; and (iv) the Base Annual Rental is the fair market value for the use of the Property and was agreed to by Landlord and Tenant on that basis, and the execution and delivery of, and the performance by Tenant of its obligations pursuant to, this Lease do not constitute a transfer of all or any part of the Property.

(c) Tenant stipulates and agrees not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 18.04.

(d) Tenant acknowledges that fee simple title (both legal and equitable) is in Landlord and that Tenant has only the leasehold right of possession and use of the Property as provided herein.

**Section 17.05 Intentionally Omitted**.

**Section 17.06 Bankruptcy**. As a material inducement to Landlord executing this Lease, Tenant acknowledges and agrees that Landlord is relying upon

(a) the financial condition and specific operating experience of Tenant and Tenant's obligation to use the Property as a Permitted Facility.

(b) Tenant's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Tenant; and

(c) all defaults under this Lease being cured promptly and this Lease being assumed as required in any order for relief entered under the Bankruptcy Code for Tenant, or this Lease being rejected within such deadline as may be established by the United States Bankruptcy Court and the Property surrendered to Landlord.

**Section 17.07 Attorneys' Fees.** In the event of any judicial or other adversarial proceeding concerning this Lease, to the extent permitted by Law, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other Costs in addition to any other relief to which it may be entitled. Each party shall also be entitled to recover its reasonable attorneys' fees and other Costs incurred in any bankruptcy action filed by or against the other party, including, without limitation, those incurred in seeking relief from the automatic stay, in dealing with the assumption or rejection of this Lease, in any adversary proceeding, and in the preparation and filing of any proof of claim. The parties hereby expressly intend that such award of reasonable attorneys' fees and costs shall be mandatory and not discretionary.

**Section 17.08 Memoranda of Lease**. Upon the Commencement Date, Landlord and Tenant shall execute Landlord's standard form memorandum of lease in recordable form, indicating the names and addresses of Landlord and Tenant, a description of the Property, the Lease Term, but omitting Rentals and such other terms of this Lease as Landlord may not desire to disclose to the public. Further, upon Landlord's request, Tenant agrees to execute and acknowledge a termination of lease and/or quitclaim deed in recordable form to be held by Landlord until the expiration or sooner termination of the Lease Term, which termination may be assigned by Landlord to any successor concurrently with this Lease; *provided, however*, if Tenant shall fail or refuse to sign such a document in accordance with the provisions of this Section within ten (10) days following a request

by Landlord, Tenant irrevocably constitutes and appoints Landlord as its attorney-in-fact to execute and record such document, it being stipulated that such power of attorney is coupled with an interest and is irrevocable and binding. Tenant shall be responsible for payment of all taxes and recording fees in connection with the recording of the memoranda of lease contemplated by this Section 18.08. Landlord may, in its discretion, direct that neither this Lease nor a memorandum thereof be recorded.

**Section 17.09 No Brokerage**. Landlord and Tenant represent and warrant to each other that they have had no conversation or negotiations with any broker concerning the leasing of the Property. Each of Landlord and Tenant agrees to protect, indemnify, save and keep harmless the other, against and from all liabilities, claims, losses, Costs, damages and expenses, including attorneys' fees, arising out of, resulting from or in connection with their breach of the foregoing warranty and representation.

**Section 17.10 Waiver of Jury Trial and Certain Damages**. LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM LANDLORD AND ANY OF THE AFFILIATES, OFFICERS, DIRECTORS, MEMBERS, MANAGERS OR EMPLOYEES OF LANDLORD OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY TENANT OF ANY RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 17.11 Intentionally Omitted**.

**Section 17.12 State-Specific Provisions**. The provisions and/or remedies which are set forth on the attached Exhibit C shall be deemed a part of and included within the terms and conditions of this Lease.

**Section 17.13 Time Is of the Essence**. Time is of the essence with respect to each and every provision of this Lease. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included. If the time period by which any notices, acts or payments required hereunder must be

delivered, performed or paid expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next business day. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. prevailing local time.

**Section 17.14 Waiver and Amendment**. No provision of this Lease shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion. No acceptance by Landlord of an amount less than the Rental and other Monetary Obligations stipulated to be due under this Lease shall be deemed to be other than a payment on account of the earliest such Rental or other Monetary Obligations then due or in arrears nor shall any endorsement or statement on any check or letter accompanying any such payment be deemed a waiver of Landlord's right to collect any unpaid amounts or an accord and satisfaction.

**Section 17.15 Successors Bound**. Except as otherwise specifically provided herein, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of the respective heirs, successors, executors, administrators and assigns of each of the parties hereto.

**Section 17.16 Captions**. Captions are used throughout this Lease for convenience of reference only and shall not be considered in any manner in the construction or interpretation hereof.

**Section 17.17 Other Documents**. Each of the parties agrees to sign such other and further documents as may be necessary or appropriate to carry out the intentions expressed in this Lease.

**Section 17.18 Entire Agreement**. This Lease and any other instruments or agreements referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements except as herein provided. All prior or contemporaneous agreements, letters of intent, representations, and understandings of the parties are superseded by, and merged into, this Lease. No supplement, modification, or amendment of this Lease shall be binding unless executed in writing by Landlord and Tenant.

**Section 17.19 Forum Selection; Jurisdiction; Venue; Choice of Law**. For purposes of any action or proceeding arising out of this Lease, the parties hereto expressly submit to the exclusive jurisdiction of all federal and state courts located in the state where the Property is located. Tenant consents that it may be served with any process or paper by registered mail or by personal service within or without the state where the Property is located in accordance with applicable Law. Furthermore, Tenant waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this Section shall limit or restrict the right of Landlord to commence any proceeding in the federal or state courts located in the states where the Property is located to the extent Landlord deems such proceeding necessary or advisable to exercise remedies available under this Lease. This Lease shall be governed by, and construed with, the laws of the state where the Property is located, without giving effect to any state's conflict of laws principles.

**Section 17.20 Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be deemed an original. This Lease may be accepted and signed in electronic form (e.g.,

by an electronic or digital signature or other means of demonstrating assent) and each party's electronic acceptance and signature will be deemed binding between the parties. Each party acknowledges and agrees it will not contest the validity or enforceability of this Lease, including under any applicable statute of frauds, because it was accepted and/or signed in electronic form. Electronic records of a party when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records. Notwithstanding the same, original signatures may be exchanged by the parties for record keeping purposes.

**Section 17.21 Landlord's Acquisition of the Property**. This Lease is contingent upon Landlord's acquisition of the Property. If the Landlord does not acquire the Property, any funds deposited by Tenant with Landlord under this Lease shall be returned and the parties shall have no further obligations hereunder except those which expressly survive the termination of this Lease. In no event shall Landlord be deemed in default of this Lease for not acquiring the Property.

**Section 17.22 Severability**. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, to any extent, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the maximum extent permitted by law.

**Section 17.23 Due Authorization**. Each person executing this Lease on behalf of Landlord and Tenant, respectively, warrants and represents that the Party for whom he or she is acting has been duly formed, is in good standing, and has duly authorized the transactions contemplated herein and the execution of this Lease by him or her and that, when so executed, this Lease shall constitute a valid and binding obligation of the Party on whose behalf it is so executed.

**Section 17.24 Confidentiality**. All statements delivered to Landlord by Tenant and all information obtained by Landlord about Tenant, including, without limitation, financial information, in the exercise of Landlord's rights hereunder shall be held in strict confidence and shall not be disclosed to any party other than Landlord's personnel having the explicit need to know such information, for which Landlord agrees to get such personnel to similarly keep all such information confidential. Each party acknowledges that the terms and conditions of this Lease are to remain confidential for each parties' benefit, and may not be disclosed by either party to anyone except its professional advisors, prospective buyers, lenders, franchisor, or as required by order of the court, by any manner or means, directly or indirectly, without the other party's prior written consent which shall not be unreasonably withheld or delayed. The consent by either party to any disclosures shall not be deemed to be a waiver on the part of that party of any prohibition against any future disclosure.

**Section 17.25 No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

*Remainder of page intentionally left blank; signature page(s) to follow*


Page 257 of 276

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease as of the date first above written.

**LANDLORD**:

**FUD Neary LLC,**
a Delaware limited liability company

By: *Shai Wolkowicki*
Name: Shai Wolkowicki
Its: Manager

**[Signatures continued on next page]**

**TENANT**:

**Zinnia Health LLC**

By: ___________________________

Name: Take-Geun Kwon

Its: CEO

**EXHIBIT A**

**LEGAL DESCRIPTION/STREET ADDRESS OF THE PROPERTY**

102 Stewart Street, Anchorage, Alaska 99508

# EXHIBIT B

## FORM OF AUTHORIZATION AGREEMENT – PRE-ARRANGED PAYMENTS

AUTHORIZATION AGREEMENT
PRE-ARRANGED PAYMENTS

Reference Number __________

I (We) (Tenant) authorize ____________________________ to initiate entries identified below as required. Tenant further authorizes the bank below to post such entries to the identified checking account beginning with the payment draft date of ____/___/_____. A minimum of thirty (30) days advance notice is required to process first payment by ACH.

Bank Name____________________________Branch____________________________

City_________________________________State__________________Zip__________

— — — — — — — — —     — — — — — — — — — — — — — — —
***Transit - ABA     Account Number Information

ACCOUNT TYPE*** Please specify checking or savings account (C/S) ________

PLEASE FILL IN BANK INFORMATION CAREFULLY
ATTACH VOIDED CHECK FOR ACCOUNT VERIFICATION

Automatic debits will be made on the payment due date established by the relevant lease documents, or the next subsequent business day if such date is not a business day. This authority may be terminated upon thirty days prior written notification from the tenant to the servicer. Tenant has the right to stop payment of any entry by notification to the bank prior to the scheduled debit date. If an erroneous entry is initiated by the servicer to the tenant's account, tenant shall have the right to have the amount of such entry reversed by the bank. To initiate a reversal, the tenant must notify the bank in writing that an error has occurred and request a reversal. Such notice must be within 15 calendar days after the tenant receives the statement of account or other written notice from the bank identifying the error. Tenant hereby authorizes the servicer to impose a $60.00 returned item processing fee, subject to change, via ACH debit against the above-referenced account of the tenant if a non -sufficient funds or stop payment item is charged against the servicer's account.

Tenant Name(s) ____________________________________ Tax Identification Number
Date____________________
Print Authorized Name
Authorized Signature
Print Authorized Name
Authorized Signature
Contact Phone Number ___________________ Fax Number
Email Address:

Return Original to: ________________________
________________________
________________________

**EXHIBIT C**

**STATE-SPECIFIC PROVISIONS**

NONE.

**EXHIBIT D**

INTENTIONALLY OMITTED

**EXHIBIT E**

NONE

# <u>EXHIBIT G</u>

## EXISTING SUBLEASES

NONE.

# EXHIBIT E

Notice of Default dated May 15, 2026, with Exhibit A

Timm & Garfinkel, LLC to Zinnia Health LLC and ZH Operations LLC

Delinquent Base Monthly Rental, taxes, penalties and interest — five Leases

770 LAKE COOK ROAD
SUITE 150
DEERFIELD, IL 60015
(P) 847.236.1666
WWW.LTGLEGAL.COM

TZURIEL AMSTER
TAMSTER@LTGLEGAL.COM

# TIMM & GARFINKEL, LLC

May 15, 2026

**Via Email:**

Zinnia Health LLC
ZH Operations LLC
520 Newport Center, Suite 550
Newport Beach, CA 92660
Attn: Adam Bhaijee; Yossie Neiman;
Dan Levy; Steve Levin; Harrison Katzen
Email: Adam.Bhaijee@lunahealthgroup.com;
YNeiman@980investments.com;
dlevy@eaglecap.health;
Slevin@eaglecap.health; hckatzen@gmail.com

Paganelli Law Group
10401 N. Meridian Street, Suite 450
Indianapolis, IN 46290
Attention: Tony Paganelli
Email: tony@paganelligroup.com

Mike Lang
mike@mikelanglegal.com

RE: **(i)** Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC (ZH Operations LLC), as Tenant, relating to that certain premises known as 101 Bunnell Street, Anchorage, AK 99508, **(ii)** Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC (ZH Operatons LLC), as Tenant, relating to that certain premises known as 4950 Taku Drive, Anchorage, AK 99508, **(iii)** Lease Agreement dated June 6, 2024 between 5000 Taku Investors LLC, as Landlord, and Zinnia Health LLC (ZH Operations LLC), as Tenant relating to that certain premises known as 5000 Taku Drive, Anchorage, AK 99508, **(iv)** Lease Agreement dated April 1, 2025, between FUD Neary LLC, as Landlord, and Zinnia Health LLC (ZH Operations LLC), as Tenant, relating to that certain premises known as 102 Stewart Street, Anchorage, AK 99508, and **(v)** Lease Agreement dated May 30, 2024, between 2162 Lawrence Investors LLC, as Landlord, and Zinnia Health LLC (ZH Operations LLC), as Tenant, relating to that certain premises known as 2162 Lawrence Street, Denver, CO 80205 (each of (i)-(v) a "**Lease**" and collectively the "**Leases**"; each Tenant under the Leases are collectively referred to as the "**Tenant**"; and each landlord therein, a "**Landlord**", and collectively the "**Landlords**").

Gentlemen:

My firm represents the Landlords in connection with the above-referenced Leases. This letter shall serve as notice to Tenant of Tenant's Events of Default, as defined in Article 13.01(b) of the Leases, as a result of Tenant's failure to timely pay Landlord Base Monthly Rental (as defined in Article 1 and 2.05 of each Lease). A complete list of each of Tenant's defaults for failure to pay Rent is attached hereto and incorporated herein as **Exhibit A**. Landlord hereby demands from Tenant the immediate and full payment of **$1,442,571.56** which amount is the total outstanding balance of Base Monthly Rental, plus all late charges, fees, and interest accrued thereon, in accordance with Section 5.06 of the Lease, as of **May 13, 2026**.

Furthermore, each Tenant, respectively, has violated Section 15.02 of the Lease by failing to properly document the assignment of the Lease subsequent to the acquisition of the assets of Zinnia Health. This letter shall serve as notice to Tenant that Tenant is in default under Section 13.01(k) of the Lease for failure to properly document their assignment and submit the

assignment documents to Landlord for Landlord's consent as required under the Lease pursuant to Article 15.02. Please sign and return the Assignment and Assumption of Lease and Consent to Assignment and Assumption of Lease that was previously circulated by Landlord.

Tenant's failure to promptly rectify the aforementioned Events of Default, shall result in Landlord's pursuit of all available remedies under the Lease, at law or in equity. Please conduct yourself accordingly and comply with your contractual obligations.

Please contact me if you have any questions or if I can be of any further assistance.

TIMM & GARFINKEL, LLC

By: Tzuriel Amster
Tzuriel Amster

cc: Shai Wolkowicki
Casey Goldberg
Ben Sullivan
Jacob Scher
Glenn Garfinkel
(all via email)

**EXHIBIT A**

Delinquent Base Monthly Rental Amounts

[see attached]


Page 269 of 276

| Address | Rent due | Taxes due | Penalties/interest d | Total due |
|---|---|---|---|---|
| 5000 Taku | $ 247,200.00 | $ 43,997.13 | $ 17,155.00 | **$ 308,352.13** |
| 4950 Taku | $ 85,510.00 | $ 2,106.20 | $ 10,613.22 | **$ 98,229.42** |
| 101 Bunnell | $ 553,300.00 | $ 16,817.51 | $ 68,673.78 | **$ 638,791.29** |
| 102 Stewart | $ 216,290.00 | $ 9,524.18 | $ 26,845.21 | **$ 252,659.39** |
| 2162 Lawrence | $ 123,600.00 | $ 13,296.44 | $ 7,642.88 | **$ 144,539.32** |
| | **$ 1,225,900.00** | **$ 85,741.46** | **$ 130,930.10** | **$ 1,442,571.56** |

**RENT:**

| Month | $ | Penalties/interest | Total due | Address | Entity |
|---|---|---|---|---|---|
| 3/1/2026 | $ 82,400.00 | $ 6,964.49 | $ 89,364.49 | 5000 Taku | 5000 Taku Inves |
| 4/1/2026 | $ 82,400.00 | $ 5,704.79 | $ 88,104.79 | 5000 Taku | 5000 Taku Inves |
| 5/1/2026 | $ 82,400.00 | $ 4,485.72 | $ 86,885.72 | 5000 Taku | 5000 Taku Inves |
| 4/1/2026 | $ 61,800.00 | $ 4,278.59 | $ 66,078.59 | 2162 Lawrence | 2162 Lawrence I |
| 5/1/2026 | $ 61,800.00 | $ 3,364.29 | $ 65,164.29 | 2162 Lawrence | 2162 Lawrence I |
| 6/1/2025 | $ 4,250.00 | $ 931.39 | $ 5,181.39 | 4950 Taku | Bunnell Taku Inv |
| 7/1/2025 | $ 4,250.00 | $ 868.51 | $ 5,118.51 | 4950 Taku | Bunnell Taku Inv |
| 8/1/2025 | $ 4,250.00 | $ 803.54 | $ 5,053.54 | 4950 Taku | Bunnell Taku Inv |
| 9/1/2025 | $ 4,250.00 | $ 738.57 | $ 4,988.57 | 4950 Taku | Bunnell Taku Inv |
| 10/1/2025 | $ 8,500.00 | $ 1,351.38 | $ 9,851.38 | 4950 Taku | Bunnell Taku Inv |
| 11/1/2025 | $ 8,500.00 | $ 1,221.44 | $ 9,721.44 | 4950 Taku | Bunnell Taku Inv |
| 12/1/2025 | $ 8,500.00 | $ 1,095.68 | $ 9,595.68 | 4950 Taku | Bunnell Taku Inv |
| 1/1/2026 | $ 8,500.00 | $ 965.74 | $ 9,465.74 | 4950 Taku | Bunnell Taku Inv |
| 2/1/2026 | $ 8,500.00 | $ 835.79 | $ 9,335.79 | 4950 Taku | Bunnell Taku Inv |
| 3/1/2026 | $ 8,500.00 | $ 718.42 | $ 9,218.42 | 4950 Taku | Bunnell Taku Inv |
| 4/1/2026 | $ 8,755.00 | $ 606.13 | $ 9,361.13 | 4950 Taku | Bunnell Taku Inv |
| 5/1/2026 | $ 8,755.00 | $ 476.61 | $ 9,231.61 | 4950 Taku | Bunnell Taku Inv |
| 6/1/2025 | $ 27,500.00 | $ 6,026.64 | $ 33,526.64 | 101 Bunnell | 4950 Taku Can D |
| 7/1/2025 | $ 27,500.00 | $ 5,619.79 | $ 33,119.79 | 101 Bunnell | 4950 Taku Can D |
| 8/1/2025 | $ 27,500.00 | $ 5,199.38 | $ 32,699.38 | 101 Bunnell | 4950 Taku Can D |
| 9/1/2025 | $ 27,500.00 | $ 4,778.97 | $ 32,278.97 | 101 Bunnell | 4950 Taku Can D |
| 10/1/2025 | $ 55,000.00 | $ 8,744.25 | $ 63,744.25 | 101 Bunnell | 4950 Taku Can D |
| 11/1/2025 | $ 55,000.00 | $ 7,903.42 | $ 62,903.42 | 101 Bunnell | 4950 Taku Can D |
| 12/1/2025 | $ 55,000.00 | $ 7,089.73 | $ 62,089.73 | 101 Bunnell | 4950 Taku Can D |
| 1/1/2026 | $ 55,000.00 | $ 6,248.90 | $ 61,248.90 | 101 Bunnell | 4950 Taku Can D |
| 2/1/2026 | $ 55,000.00 | $ 5,408.08 | $ 60,408.08 | 101 Bunnell | 4950 Taku Can D |
| 3/1/2026 | $ 55,000.00 | $ 4,648.63 | $ 59,648.63 | 101 Bunnell | 4950 Taku Can D |
| 4/1/2026 | $ 56,650.00 | $ 3,922.04 | $ 60,572.04 | 101 Bunnell | 4950 Taku Can D |
| 5/1/2026 | $ 56,650.00 | $ 3,083.93 | $ 59,733.93 | 101 Bunnell | 4950 Taku Can D |
| 6/1/2025 | $ 10,750.00 | $ 2,355.87 | $ 13,105.87 | 102 Stewart | FUD Neary LLC |
| 7/1/2025 | $ 10,750.00 | $ 2,196.83 | $ 12,946.83 | 102 Stewart | FUD Neary LLC |
| 8/1/2025 | $ 10,750.00 | $ 2,032.49 | $ 12,782.49 | 102 Stewart | FUD Neary LLC |
| 9/1/2025 | $ 10,750.00 | $ 1,868.14 | $ 12,618.14 | 102 Stewart | FUD Neary LLC |
| 10/1/2025 | $ 21,500.00 | $ 3,418.21 | $ 24,918.21 | 102 Stewart | FUD Neary LLC |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/1/2025 | $ 21,500.00 | $ | 3,089.52 | $ | 24,589.52 | 102 Stewart | FUD Neary LLC |
| 12/1/2025 | $ 21,500.00 | $ | 2,771.44 | $ | 24,271.44 | 102 Stewart | FUD Neary LLC |
| 1/1/2026 | $ 21,500.00 | $ | 2,442.75 | $ | 23,942.75 | 102 Stewart | FUD Neary LLC |
| 2/1/2026 | $ 21,500.00 | $ | 2,114.07 | $ | 23,614.07 | 102 Stewart | FUD Neary LLC |
| 3/1/2026 | $ 21,500.00 | $ | 1,817.19 | $ | 23,317.19 | 102 Stewart | FUD Neary LLC |
| 4/1/2026 | $ 22,145.00 | $ | 1,533.16 | $ | 23,678.16 | 102 Stewart | FUD Neary LLC |
| 5/1/2026 | $ 22,145.00 | $ | 1,205.54 | $ | 23,350.54 | 102 Stewart | FUD Neary LLC |
| | **$ 1,225,900.00** | **$** | **130,930.10** | **$** | **1,356,830.10** | | |

**TAXES:**

| Address | Entity | PIN | Period | Due date | Current balance |
|---|---|---|---|---|---|
| 5000 Taku | 5000 Taku Investors | 006-293-17-000 | 2025-1 | 6/30/2025 | $ 12,774.48 |
| 5000 Taku | 5000 Taku Investors | 006-293-17-000 | 2025-2 | 8/31/2025 | $ 12,559.61 |
| 5000 Taku | 5000 Taku Investors | 006-293-18-000 | 2025-1 | 6/30/2025 | $ 8,411.67 |
| 5000 Taku | 5000 Taku Investors | 006-293-18-000 | 2025-2 | 8/31/2025 | $ 8,255.03 |
| 5000 Taku | 5000 Taku Investors | 006-293-19-000 | 2025-1 | 6/30/2025 | $ 1,027.22 |
| 5000 Taku | 5000 Taku Investors | 006-293-19-000 | 2025-2 | 8/31/2025 | $ 969.12 |
| 102 Stewart | FUD Neary LLC | 006-292-19-000 | 2025-1 | 6/30/2025 | $ 4,812.70 |
| 102 Stewart | FUD Neary LLC | 006-292-19-000 | 2025-2 | 8/31/2025 | $ 4,711.48 |
| 4950 Taku | Bunnell Taku Invest | 006-292-20-000 | 2025-1 | 6/30/2025 | $ 1,082.52 |
| 4950 Taku | Bunnell Taku Invest | 006-292-20-000 | 2025-2 | 8/31/2025 | $ 1,023.68 |
| 101 Bunnell | 4950 Taku Can Do L | 006-292-39-000 | 2025-1 | 6/30/2025 | $ 8,487.58 |
| 101 Bunnell | 4950 Taku Can Do L | 006-292-39-000 | 2025-2 | 8/31/2025 | $ 8,329.93 |
| 2162 Lawrence | 2162 Lawrence Inve | 02342-34-025-000 | 2025-1 | 2/28/2026 | $ 6,980.36 |
| 2162 Lawrence | 2162 Lawrence Inve | 02342-34-025-000 | 2025-2 | 6/15/2026 | $ 6,316.08 |
| | | | | | **$ 85,741.46** |

# EXHIBIT F

Notice of Default dated September 10, 2025, with Exhibit A

Timm & Garfinkel, LLC to Zinnia Health LLC

Delinquent Base Monthly Rental — five Leases

770 LAKE COOK ROAD
SUITE 150
DEERFIELD, IL 60015
(P) 847.236.1666
WWW.LTGLEGAL.COM

TZURIEL AMSTER
TAMSTER@LTGLEGAL.COM

# TIMM & GARFINKEL, LLC

September 10, 2025

**Via Email:**
Zinnia Health LLC
520 Newport Center, Suite 550
Newport Beach, CA 92660
Adam Bhaijee
Email: adam.bhaijee@zinniahealth.com

Paganelli Law Group
10401 N. Meridian Street, Suite 450
Indianapolis, IN 46290
Attention: Tony Paganelli
Email: tony@paganelligroup.com

RE: **(i)** Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, relating to that certain premises known as 101 Bunnell Street, Anchorage, AK 99508, **(ii)** Lease Agreement dated December 1, 2024, between Bunnell Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, relating to that certain premises known as 4950 Taku Drive, Anchorage, AK 99508, **(iii)** Lease Agreement dated June 6, 2024 between 5000 Taku Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant relating to that certain premises known as 5000 Taku Drive, Anchorage, AK 99508, **(iv)** Lease Agreement dated April 1, 2025, between FUD Neary LLC, as Landlord, and Zinnia Health LLC, as Tenant, relating to that certain premises known as 102 Stewart Street, Anchorage, AK 99508, and **(v)** Lease Agreement dated May 30, 2024, between 2162 Lawrence Investors LLC, as Landlord, and Zinnia Health LLC, as Tenant, relating to that certain premises known as 2162 Lawrence Street, Denver, CO 80205 (each of (i)-(v) a "**Lease**" and collectively the "**Leases**"; each Tenant under the Leases are collectively referred to as the "**Tenant**"; and each landlord therein, a "**Landlord**", and collectively the "**Landlords**").

Adam and Tony:

My firm represents the Landlords in connection with the above-referenced Leases. This letter shall serve as notice to Tenant of Tenant's Event of Default, as defined in Article 13.01(b) of the Leases, as a result of Tenant's failure to timely pay Landlord Base Monthly Rental (as defined in Article 1 and 2.05 of each Lease) under the Leases. A complete list of each of Tenant's defaults for failure to pay rent is attached hereto and incorporated herein as **Exhibit A**. Landlord hereby demands from Tenant the immediate and full payment of **$846,700.00 plus all late charges, fees, and interest accrued thereon in accordance with Section 5.06 of the Lease**, for the outstanding balance of Base Monthly Rental.

Tenant's failure to promptly rectify the aforementioned Events of Default, shall result in Landlord's pursuit of all available remedies under the Lease, at law or in equity. Please conduct yourself accordingly and comply with your contractual obligations.

Please contact me if you have any questions or if I can be of any further assistance.

TIMM & GARFINKEL, LLC

By: Tzuriel Amster
Tzuriel Amster

cc: Shai Wolkowicki
Casey Goldberg
Jacob Scher
Glenn Garfinkel
(all via email)

**EXHIBIT A**

Delinquent Base Monthly Rental Amounts

[see attached]

**Past Due Rent**

| Tenant | Address | Rent | Rent Commencement Date | December Rent Past Due | January Rent Past Due | February Rent Past Due | March Rent Past Due | April Rent Past Due | May Rent Past Due | June Rent Past Due | July Rent Past Due | August Rent Past Due | September Rent Past Due | TOTAL Rent Past Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZINNIA HEALTH LLC | 2162 Lawrence St., Denver, CO | $ 988,800 | 6/6/2024 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (82,400) | **$ (82,400)** |
| ZINNIA HEALTH LLC | 5000 Taku Dr., Anchorage, AK | $ 741,600 | 6/6/2024 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (61,800) | **$ (61,800)** |
| ZINNIA HEALTH LLC | 101 Bunnell St., Anchorage, AL | $ 660,000 | 12/1/2024 | $ (27,500) | $ (27,500) | $ (27,500) | $ (27,500) | $ (27,500) | $ (27,500) | $ (55,000) | $ (55,000) | $ (55,000) | $ (55,000) | **$ (385,000)** |
| ZINNIA HEALTH LLC | 4950 Taku Dr., Anchorage, AK | $ 102,000 | 12/1/2024 | $ (4,250) | $ (4,250) | $ (4,250) | $ (4,250) | $ (4,250) | $ (4,250) | $ (8,500) | $ (8,500) | $ (8,500) | $ (8,500) | **$ (59,500)** |
| ZINNIA HEALTH LLC | 102 Stewart St., Anchorage, AK | $ 258,000 | 4/1/2025 | $ - | $ - | $ - | $ - | $ (43,000) | $ (43,000) | $ (43,000) | $ (43,000) | $ (43,000) | $ (43,000) | **$ (258,000)** |
| **Total** | | **$ 1,020,000** | | **$ (31,750)** | **$ (31,750)** | **$ (31,750)** | **$ (31,750)** | **$ (74,750)** | **$ (74,750)** | **$ (106,500)** | **$ (106,500)** | **$ (106,500)** | **$ (250,700)** | **$ (846,700)** |